108

FILED

AUG 10 2026

CLERK'S OFFICE
DETROIT

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SYBRENA EVANS,                              Case No. 5:24-cv-13435-JEL-EAS

Plaintiff/Counter-Defendant,

                                            Hon. Judith E. Levy

v.                                          Mag. Judge Elizabeth A. Stafford


DANIELLE ROBERTSON, et al.,

Defendants.

---

**DEFENDANT'S ANSWER TO REMAINING CLAIM, AFFIRMATIVE DEFENSES,**

**COUNTERCLAIMS, AND REQUEST FOR PROSPECTIVE INJUNCTIVE RELIEF**

Defendant/Counter-Plaintiff, sued under the disputed designation **"Danielle Robertson,"**

appearing pro se, answers the sole remaining claim and states her affirmative defenses and

counterclaims against Plaintiff/Counter-Defendant Sybrena Evans as follows.

**I. PRELIMINARY STATEMENT, SCOPE OF CASE, AND PRESERVATION OF**

**OBJECTIONS**

1. Defendant understands the present merits scope of this action from the Court's prior rulings.

2. ECF No. 138 stated: "The sole remaining claim would be Evans's defamation claim based on

   Robertson's and Williams's alleged LARA complaints." ECF No. 138, PageID.3082.

3. District Judge Levy subsequently adopted ECF No. 138 in ECF No. 173. ECF No. 173,

   PageID.3932–3934.

4. Defendant therefore answers the remaining claim concerning her alleged report to the

   Michigan Department of Licensing and Regulatory Affairs ("LARA").

5. Defendant understands that ECF Nos. 175 and 176 subsequently addressed sanctions,

   discovery, and identity-related matters.

6. To the extent those later orders are construed as restoring substantive causes of action previously dismissed, Defendant preserves her objection and respectfully relies upon the disposition stated in ECF Nos. 138 and 173 unless and until the District Court expressly modifies that disposition.

7. Defendant's participation in this action under court order and threat or recommendation of default is not intended as a voluntary waiver of objections previously or timely preserved concerning personal jurisdiction, process, service of process, compelled identity disclosure, anonymous expression, the First Amendment, or identity-related discovery.

8. Defendant specifically preserves, to the extent previously and timely asserted, defenses under Fed. R. Civ. P. 12(b)(2), (4), and (5).

9. Defendant also preserves her First Amendment objections concerning compelled disclosure of her legal identity and anonymous expression.

10. Defendant is willing to comply with lawful orders concerning service and discovery while preserving those objections.

11. Defendant further distinguishes between lawful discovery expressly authorized by the Court and Plaintiff's earlier extra-judicial or premature identity-seeking activities.

12. Defendant alleges that the Court did not expressly authorize third-party identity discovery through subpoenas until August 6, 2026.

13. Defendant does not base her stalking counterclaim upon subpoenas or other identity discovery conducted within the lawful scope of the Court's August 6, 2026 authorization.

14. Defendant alleges that years of identity investigation preceding August 6, 2026 were not retroactively transformed into court-authorized discovery by that later order.

15. Except as expressly admitted, Defendant denies all allegations against her and demands strict proof.

## II. ANSWER TO PLAINTIFF'S REMAINING LARA-BASED DEFAMATION CLAIM

16. Defendant admits that she submitted information concerning Plaintiff to the Michigan Department of Licensing and Regulatory Affairs ("LARA").

17. Defendant alleges that her own complaint was created and attested on or about June 7, 2024.

18. Defendant denies filing a medical-malpractice complaint.

19. Defendant denies accusing Plaintiff of negligently treating Defendant or any patient.

20. Defendant's complaint answered "No" to the patient-treatment inquiry.

21. Defendant sought regulatory review of conduct by a licensed physician assistant that Defendant believed warranted review by the professional licensing authority.

22. Defendant did not purport to determine that Plaintiff had violated the Michigan Public Health Code; Defendant supplied information and requested that LARA make its own regulatory determination.

23. Michigan's Public Health Code addresses professional matters broader than patient-treatment malpractice, and Article 15 authorizes investigation of alleged grounds for discipline. See MCL 333.16221; MCL 333.16231.

24. Defendant does not allege that every objectionable online act automatically constitutes professional misconduct. Defendant alleges that she believed the conduct she documented warranted review by the agency charged with making that determination.

25. Before Defendant's June 7, 2024 complaint, Plaintiff had publicly invoked her medical education and professional licensure during Defendant-focused broadcasts.

26. Defendant alleges that this professional context informed her decision to seek review by the licensing authority; Defendant does not contend that every statement Plaintiff made online was itself a statutory disciplinary violation.

27. Defendant denies knowingly submitting false information, fabricated evidence, or materially false accusations to LARA.

28. Defendant denies acting in bad faith or with constitutional actual malice.

29. Defendant possessed contemporaneous materials documenting the conduct that concerned her.

30. Plaintiff's remaining claim also refers to an alleged LARA communication by non-party Keva Williams.

31. Williams is a separate person. Plaintiff appears to rely on a separate regulatory communication made by Williams earlier in 2024, which Defendant understands occurred in or about April 2024; Defendant reserves the exact publication date for confirmation from the agency record.

32. Defendant did not file, author, direct, control, approve, adopt, or submit Williams's separate regulatory communication and denies that Williams acted as Defendant's agent, representative, employee, proxy, or instrumentality.

33. Williams has already declared under penalty of perjury that, to the extent she took any action concerning Plaintiff, she acted independently based on her own reasons, experiences, and concerns, and that "[a]ll actions" she took concerning Plaintiff were her own actions based on her own grievances, complaints, concerns, experiences, and reasons. See ECF No. 163, PageID.3818, Williams Decl. ¶¶ 23–25.

34. Williams also declared that Defendant did not direct or control her reasons, evidence, statements, or decisions and that Williams did not act as Defendant's agent or proxy. See ECF No. 163, PageID.3817, Williams Decl. ¶¶ 16–20.

35. Plaintiff therefore must establish Defendant's liability, if any, from Defendant's own alleged publication rather than automatically attributing Williams's separate communication to Defendant.

36. Defendant further denies that Williams's earlier alleged publication and Defendant's June 7, 2024 alleged publication constitute one joint publication or necessarily share one accrual date.

37. Each alleged LARA publication must be analyzed according to its own speaker, content, date, defenses, causation, and damages.

38. During LARA's ensuing investigation, a Bureau of Professional Licensing investigator contacted Defendant regarding "Sybrena Evans, PA."

39. On February 24, 2025, Defendant responded to that investigative request and transmitted supporting materials concerning the online conduct underlying her regulatory concerns, including material concerning alleged stalking and harassment, the "Dirty 40" association campaign, the DForDanielle identity campaign, and the continuing association of Defendant with Danielle Elizabeth Allen and Allen-related criminal material. See Ex. A, February 24–25, 2025 LARA Investigative Correspondence and Supporting Evidence Submission, LARA Allegation No. 56-24-003982.

40. LARA acknowledged receipt of Defendant's submission on February 25, 2025. See Ex. A.

41. Defendant thereafter supplied the investigator additional information identifying the DForDanielle channel. See Ex. A.

42. Exhibit A reflects evidence supplied during LARA's investigation; Defendant does not represent that Exhibit A reproduces every word or attachment contained in the original June 7, 2024 complaint.

43. Defendant admits that LARA ultimately closed the matter because a disciplinary-code violation could not be substantiated.

44. Defendant denies that closure constitutes a finding that Defendant fabricated the reported conduct, knowingly lied, acted in bad faith, or acted with reckless disregard for truth.

45. Defendant denies that a regulatory decision not to impose discipline establishes falsity of every factual matter supplied to the agency.

46. Defendant denies publishing her LARA report to the general public as part of the communication on which Plaintiff's surviving claim is based.

47. Defendant denies responsibility for independent complaints or communications made by Williams or any other person.

48. Defendant denies Plaintiff sustained recoverable damages proximately caused by an actionable false statement in Defendant's own LARA communication.

49. To the extent any allegation concerning the remaining claim is not expressly admitted above, Defendant denies it and demands strict proof.

## III. AFFIRMATIVE DEFENSES

### First Defense — MCL 333.16244 Good-Faith Reporting Immunity

50. Plaintiff's surviving claim is barred or limited by MCL 333.16244 to the extent Defendant acted in good faith in making or assisting with a qualifying report under Article 15.

51. MCL 333.16244 provides civil and criminal immunity for a person acting in good faith who makes or assists with a qualifying report or assists the department in carrying out duties under Article 15, and it presumes qualifying reporters and assistants acted in good faith.

52. Defendant alleges that her LARA complaint and qualifying cooperation with the investigation were undertaken in good faith.

53. Defendant asserts that immunity only as to conduct falling within the statute and does not contend that it immunizes unrelated public speech.

**Second Defense — Qualified Privilege**

54. Defendant's communication to the state licensing authority was made to an agency possessing regulatory responsibility over Plaintiff's professional license.

55. Defendant asserts Michigan's common-law qualified privilege applicable to good-faith reports made to an appropriate authority, including Nuyen v. Slater, 372 Mich. 654, 659; 127 N.W\.2d 369 (1964), and Prysak v. R.L. Polk Co., 193 Mich. App. 1, 15; 483 N.W\.2d 629 (1992).

56. Defendant denies actual malice sufficient to defeat that privilege.

**Third Defense — Truth and Substantial Truth**

57. Plaintiff cannot recover for statements that were true or substantially true.

58. Defendant denies knowingly communicating any materially false actionable fact.

**Fourth Defense — Failure to Identify Actionable False Statement**

59. Plaintiff must establish an actionable statement concerning her, publication, falsity, legally sufficient fault, and cognizable harm.

60. Agency closure alone does not satisfy those elements.

**Fifth Defense — No False Patient-Malpractice Accusation**

61. Defendant did not accuse Plaintiff of malpractice in treating Defendant or any patient.

62. To the extent Plaintiff's theory depends upon such a characterization, Defendant denies it.

**Sixth Defense — No Actual Malice**

63. Defendant possessed contemporaneous material supporting the concerns she submitted.

64. Defendant denies subjective knowledge of falsity.

65. Defendant denies reckless disregard for truth.

**Seventh Defense — Conditional Limited-Purpose-Public-Figure Defense**

66. To the extent applicable, Plaintiff voluntarily injected herself and her asserted professional status into a public online controversy concerning Defendant, identity allegations, alleged misconduct, and Plaintiff's own conduct.

67. Plaintiff repeatedly broadcast publicly concerning those subjects.

68. Plaintiff solicited audience participation and engagement.

69. Plaintiff publicly invoked her medical education and then-current professional licensure while making anatomical and identity-related assessments concerning Defendant.

70. To the extent Plaintiff thereby assumed special prominence in a relevant public controversy, Defendant conditionally asserts the limited-purpose-public-figure doctrine.

71. Defendant therefore conditionally invokes the constitutional actual-malice standard and MCL 600.2911(6) to the extent applicable.

72. Defendant does not contend that merely maintaining a YouTube channel automatically creates public-figure status.

**Eighth Defense — No Agency or Joint Publication**

73. Defendant denies directing another person to submit a false complaint.

74. Defendant denies an agreement to commit defamation against Plaintiff.

75. Defendant cannot be held responsible for independent reports absent legally sufficient agency or concerted conduct.

**Ninth Defense — Causation and Damages**

76. LARA independently determined whether and how to investigate the report.

77. LARA independently determined whether professional discipline was warranted.

78. Defendant denies that actionable damages were proximately caused by a false unprivileged statement made by Defendant.

**Tenth Defense — Failure to Mitigate and Independent Causes**

79. Recovery is barred or reduced to the extent Plaintiff failed reasonably to mitigate.

80. Plaintiff's own publication and amplification of the dispute is relevant to causation and mitigation.

81. Independent third-party publications are likewise relevant to causation.

**Eleventh Defense — Statute of Limitations and Republication Rules**

82. Defendant invokes all applicable statutes of limitation.

83. Michigan imposes a one-year limitations period on actions charging libel or slander. MCL 600.5805(11).

**Twelfth Defense — MCL 600.2911**

84. Defendant invokes all defenses and damage limitations supplied by MCL 600.2911.

**Thirteenth Defense — MCL 600.5823 Setoff/Counterclaim**

85. Defendant invokes MCL 600.5823 on a publication-by-publication basis.

86. Section 600.5823 provides that, to the extent of the amount established as Plaintiff's claim, a limitations period does not bar a counterclaim unless that counterclaim was already barred when Plaintiff's claim accrued.

87. Plaintiff appears to rely upon at least two allegedly defamatory regulatory communications: an earlier communication independently made by Williams and a separate June 7, 2024 communication made by Defendant.

88. As to Plaintiff's claim based upon Defendant's June 7, 2024 communication, Defendant invokes MCL 600.5823 as to qualifying counterclaims that were not barred when that claim accrued.

89. As to any claim Plaintiff asserts from Williams's earlier communication, the statutory analysis must use the accrual date of that separate alleged publication rather than automatically importing Defendant's June 7, 2024 date.

90. Defendant does not concede liability for Williams's report by asserting this defense in the alternative and does not contend that MCL 600.5823 revives a counterclaim that was already barred when the relevant Plaintiff claim accrued.

**Fourteenth Defense — Law of the Case / Scope**

91. Defendant relies upon ECF Nos. 138 and 173 concerning the remaining merits claim.

**Fifteenth Defense — First Amendment**

92. Defendant asserts all applicable First Amendment protections.

93. Defendant does not claim that petitioning the government supplies absolute constitutional immunity from otherwise actionable defamation.

**Sixteenth Defense — Personal Jurisdiction, Process, and Service**

94. Defendant preserves previously and timely asserted Rule 12(b)(2), (4), and (5) objections.

**Seventeenth Defense — Equitable Defenses**

95. To the extent Plaintiff seeks equitable relief, Defendant asserts applicable principles of unclean hands, estoppel, laches, lack of irreparable injury, and lack of narrow tailoring.

**Eighteenth Defense — Regulatory Closure Is Not a Finding of Falsity**

96. LARA's inability to substantiate discipline does not establish that Defendant's underlying factual report was fabricated or malicious.

**Nineteenth Defense — Additional Defenses**

97. Defendant reserves the right to amend these defenses as permitted by Fed. R. Civ. P. 15.

## COUNTERCLAIM COMPLAINT

## IV. PARTIES AND JURISDICTION

98. Counter-Plaintiff is the Defendant sued under the disputed designation "Danielle Robertson."

99. "Danielle Robertson" is not Counter-Plaintiff's legal name.

100. Counter-Plaintiff has used public online identifiers including Dani Robertson, TruthTellerDani, DaniMontanaTV, and other Dani-related branding.

101. Counter-Defendant Sybrena Evans is Plaintiff in this action.

102. . This Court has original federal-question jurisdiction over Count IV under 28 U.S.C. § 1331 and 17 U.S.C. § 512(f), and supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law counterclaims forming part of the same case or controversy.

103. Count IV additionally arises under federal copyright law, 17 U.S.C. § 512(f).

104. Counter-Plaintiff asserts these counterclaims without waiving her preserved jurisdictional, service, anonymity, or First Amendment objections to Plaintiff's original action.

105. Counter-Plaintiff principally seeks cessation and narrowly tailored prospective injunctive relief, together with damages for reputation, emotional harm, and proved economic losses.

106. Counter-Plaintiff does not presently demand a jury.

## V. THE MULTI-YEAR COURSE OF CONDUCT

107. The course alleged in these counterclaims did not originate with this federal lawsuit, formal discovery, or any need to identify a defendant for judicial process.

108. On or about October 5, 2021, Counter-Defendant first directly contacted Counter-Plaintiff in connection with use of Counter-Plaintiff's online persona, AI or character voice, or related identity material for Halloween-oriented online content.

109. Counter-Plaintiff does not allege that the October 5, 2021 outreach itself constituted stalking, defamation, or other unlawful conduct.

110. Counter-Plaintiff alleges the October 5, 2021 outreach as the beginning of the direct-contact and content chronology that later developed into recurring Defendant-focused programming.

111. By 2022, Counter-Plaintiff had withdrawn consent for continuing direct contact and began using blocks and written cease demands.

112. From 2022 through August 2026, Counter-Defendant maintained recurring Defendant-focused content across multiple channels and platforms.

113. Counter-Plaintiff does not allege that every video about her was unlawful.

114. Counter-Plaintiff does not allege that criticism, commentary, lawful discussion of litigation, lawful public-record review, or discussion of common public topics constitutes stalking.

115. Counter-Plaintiff alleges that the larger course included repeated direct tagging after notice to stop; repeated demands that Counter-Plaintiff respond or engage; continued presence in Defendant-controlled membership spaces after requests to leave; cross-platform monitoring; alleged circumvention of access restrictions; repeated identity investigations;

attempts to obtain or expose Counter-Plaintiff's legal identity; false criminal and cyber-misconduct associations; associate-directed activity; and repeated use of Defendant-associated identifiers.

116. Counter-Plaintiff repeatedly informed Counter-Defendant that Defendant-directed contact and identity association were unwanted.

117. Counter-Plaintiff sent written cease-and-desist demands beginning by September 2022 and additional demands thereafter.

118. Counter-Plaintiff used available platform blocking or exclusion controls.

119. Counter-Plaintiff later sought a nondomestic stalking PPO and, separately, regulatory review through LARA.

120. Counter-Plaintiff alleges those acts were efforts to obtain cessation, protection, documentation, or review rather than invitations for continued contact.

121. Counter-Plaintiff denies that requesting cessation, submitting complaints to appropriate authorities or platforms, preserving evidence, obtaining source material, or making good-faith use of legal procedures transformed Counter-Plaintiff into a stalker or harasser.

122. Counter-Plaintiff has preserved complete copies of source materials underlying the publications quoted or described in this pleading, including full videos, screenshots, and corresponding transcripts or transcript records.

## VI. 2022 — EARLY DIRECT CONTACT, ASSOCIATE LABELING, AND NOTICE

### A. May 1, 2022 — Early "Goons" and Associate Narrative

123. On May 1, 2022, Counter-Defendant publicly addressed Counter-Plaintiff and stated, "Don't call your goons on me either."

124. Counter-Defendant explained that she was calling them "goons" because "that's what they will be if they come after me," and warned Counter-Plaintiff not to "call the goons on me to blast YouTube."

125. Counter-Plaintiff alleges this publication principally as historical evidence showing the early development of Counter-Defendant's recurring practice of characterizing persons perceived as supporting or acting with Counter-Plaintiff as a coordinated group acting against her.

126. Counter-Plaintiff does not seek independent defamation damages based solely upon the May 1, 2022 "goons" terminology; the publication is alleged as chronology, motive, common-law-malice context, and background to the later "Dirty 40," associate-monitoring, and conspiracy narratives.

**B. October 2, 2022 — Cracking the Code, Part 1**

127. On October 2, 2022, Counter-Defendant conducted a livestream discussing Counter-Plaintiff.

128. Counter-Defendant accused Counter-Plaintiff of hacking YouTube or engaging in comparable technical manipulation.

129. Counter-Defendant repeatedly demanded or urged Counter-Plaintiff to call while Counter-Defendant was live.

130. Counter-Plaintiff did not solicit that interaction.

131. Counter-Plaintiff communicated that continued Defendant-directed contact was unwanted.

132. Counter-Plaintiff alleges the publication as historical notice, course-of-conduct, identity, and cyber-misconduct context.

**C. October 3, 2022 — Cracking the Code, Part 2**

133. Counter-Defendant continued the subject the following day.

134. Counter-Defendant expressly sought "answers" from Counter-Plaintiff.

135. Counter-Defendant discussed alleged manipulation of source code, metadata, search results, "nofollow" references, channels, and other technical matters.

136. Counter-Defendant suggested Counter-Plaintiff might "scrub" information.

137. Counter-Defendant questioned whether Counter-Plaintiff was tracking Counter-Defendant or interfering with search visibility or traffic.

138. Counter-Defendant repeatedly supplied a call-in mechanism and demanded a response.

139. During the broadcast, Counter-Defendant replayed or read Counter-Plaintiff's objection that Counter-Defendant continued tagging her.

140. Counter-Defendant thereby possessed actual notice that continued account-directed tagging and engagement demands were unwanted.

141. These 2022 matters are alleged principally as historical notice and course-of-conduct evidence, not as independently timely affirmative defamation claims.

## VII. 2023 — DEVELOPMENT OF THE DANIELLE ELIZABETH ALLEN CRIMINAL-IDENTITY NARRATIVE

142. Beginning by 2023, Counter-Defendant developed a recurring public theory that Counter-Plaintiff was or might be Danielle Elizabeth Allen.

143. Counter-Plaintiff is not Danielle Elizabeth Allen.

144. Counter-Plaintiff is not the person depicted in Allen's mugshot or police interrogation.

145. Counter-Plaintiff did not commit Allen's DUI.

146. Counter-Plaintiff was not an accessory after the fact in the criminal matter associated with Allen.

147. Counter-Plaintiff had no involvement in the death of the four-month-old infant or the homicide-related investigation associated with Allen.

148. Counter-Plaintiff alleges that the defamatory sting arose from the recurring combination of Counter-Plaintiff's recognizable names, handles, voice, branding, hashtags, friends, and identity clues with Allen's mugshot, interrogation, arrest history, DUI, accessory-after-the-fact allegation, and child-death-related criminal material.

149. Counter-Plaintiff alleges the resulting implication was not merely that two people shared a first name; it was that Counter-Plaintiff was or probably was the same real-world person associated with the criminal material.

**A. March 4, 2023 — HearHerTV Direct Inbox Identification and Child-Killer Accusation**

150. Counter-Plaintiff alleges that on March 4, 2023, third-party creator HearHerTV entered Counter-Plaintiff's direct-message inbox and addressed Counter-Plaintiff as Danielle Elizabeth Allen.

151. Counter-Plaintiff alleges that, in the same direct-contact sequence, HearHerTV used "Mommy Killer," "Baby Killer," or materially equivalent child-killing language toward Counter-Plaintiff while treating Counter-Plaintiff as the Allen person being discussed.

152. Counter-Plaintiff is not Danielle Elizabeth Allen, did not kill a child, and was not responsible for the death of the four-month-old infant associated with the unrelated Louisiana matter.

153. Counter-Plaintiff alleges these communications as early evidence that the Allen/infant-death association was being understood and repeated by a third-party audience. Counter-Plaintiff does

not attribute HearHerTV's independent words to Counter-Defendant as though Counter-Defendant personally uttered them and does not allege agency solely from these publications.

154. Counter-Plaintiff previously documented HearHerTV's adoption of the "Baby Killer" accusation as downstream harm associated with Counter-Defendant's Allen publications. See ECF No. 84, PageID.1292.

**B. March 5, 2023 — Surviving Dani Robertson Part 3 / Mystery Clue 8**

155. On March 5, 2023, Counter-Defendant published Surviving Dani Robertson Part 3: Mystery Clue 8.

156. Counter-Defendant stated that she was getting closer to identifying Counter-Plaintiff and compared physical imagery and voice material.

157. Counter-Defendant invoked her medical education during anatomical comparison and stated that her professional license was current. Counter-Plaintiff further alleges that Counter-Defendant is a physician assistant, the same professional designation later reflected in LARA investigative correspondence identifying her as "Sybrena Evans, PA."

158. Counter-Defendant displayed or discussed mugshot and orange-jumpsuit imagery.

159. Counter-Defendant acknowledged Counter-Plaintiff's denial, stating in substance, "She says it's not her. Okay."

160. Counter-Defendant nevertheless continued soliciting audience comparison and identity conclusions.

161. Counter-Plaintiff alleges this publication as historical evidence of the development of the Allen theory, audience recruitment, knowledge of denial, motive, and professional-status invocation.

162. Counter-Plaintiff does not seek independent affirmative defamation damages for the March 5, 2023 publication.

**C. March 6, 2023 — HearHerTV "Baby Killer" Livestream Directed at Counter-Plaintiff**

163. Counter-Plaintiff alleges that on or about March 6, 2023, HearHerTV published a livestream whose title used "Baby Killer" or materially equivalent child-killing language while referring to Counter-Plaintiff in connection with the Danielle Elizabeth Allen and infant-death narrative.

164. Counter-Plaintiff denies the accusation and alleges the publication as additional evidence of actual downstream audience meaning, dissemination, and reputational harm during the initial rollout of the Allen theory.

165. Counter-Plaintiff again does not attribute HearHerTV's independent words to Counter-Defendant as direct speech and does not seek to impose liability on Counter-Defendant merely because another creator spoke.

**D. April 4, 2023 — Members-Only Allen Criminal-History and Identity Presentation**

166. On April 4, 2023, Counter-Defendant conducted what she expressly described as her "first members only" Allen-related livestream.

167. During the paid members-only publication, Counter-Defendant presented records and purported "receipts" concerning Danielle Elizabeth Allen, including marriage-license information, relationship history, protective-order records involving Larry Champ, criminal-history information, arrest-related material, bail information, and Allen's mugshot.

168. Counter-Defendant expressly framed the information as part of an identity "rule in / rule out" inquiry and asked what information might be another piece of the "puzzle."

169. Counter-Defendant displayed Allen's mugshot, discussed later criminal trouble and bail, and stated that additional records and information remained for future members-only broadcasts.

170. Paid audience interaction occurred during the publication, including paid Super Chat activity.

171. Counter-Plaintiff alleges this publication as historical evidence establishing the detailed personal and criminal referent Counter-Defendant supplied to her audience before later continuing to associate Counter-Plaintiff with Allen.

172. Counter-Plaintiff does not seek independent affirmative defamation damages for the April 4, 2023 publication.

**E. By April 7, 2023 — HearHerTV Public Criminal Accusations and Sharing of Counter-Defendant's Lake Charles Video**

173. Counter-Plaintiff has preserved screenshots captured on April 7, 2023 showing HearHerTV publicly addressing @DaniRobertson as "Danielle Elizabeth Allen," directing Counter-Plaintiff to stay out of HearHerTV's inbox, and stating, in substance, that Counter-Plaintiff had been arrested in 2016 as an accessory in connection with the death of an innocent four-month-old child. The screenshots establish that these posts existed by April 7, 2023; Counter-Plaintiff preserves the precise original posting date for proof rather than relying solely on the screenshot capture date.

174. The same preserved post described Counter-Plaintiff as a "dangerous woman," accused her of harassment and bullying, directly tagged @DaniRobertson and multiple third parties, and linked an article concerning the unrelated Louisiana criminal matter.

Page 19

175. A second screenshot captured on April 7, 2023 shows HearHerTV using the text "MURD*R of A 4 month Old Baby" while sharing Counter-Defendant's "Love Triangle MURDER IN LAKE CHARLES 'Analyze This'" video. Counter-Plaintiff alleges the shared video and accompanying text as evidence that the criminal meaning of Counter-Defendant's Allen presentation was being adopted and disseminated by another creator.

176. Counter-Plaintiff alleges the preserved HearHerTV posts as concrete evidence that another creator understood the Allen/Lake Charles presentation as identifying Dani Robertson with the person associated with the infant-death criminal matter and then repeated that criminal meaning while distributing Counter-Defendant's video.

177. Counter-Plaintiff does not attribute HearHerTV's independent accusations to Counter-Defendant as direct speech, does not plead agency from these facts alone, and alleges the publications principally as evidence of audience meaning, dissemination, causation, reputational injury, and the foreseeable sting of the Allen identification.

**F. June 8 and June 19, 2023 — Continued Mystery-Clue Identity Investigation After Denials**

178. On June 8, 2023, Counter-Defendant continued the identity-focused series in a publication identified in Counter-Plaintiff's preserved record as "Mystery Clue #16 — Analyze This — It's Personal."

179. Counter-Plaintiff alleges that the June 8 publication continued the preexisting effort to identify Counter-Plaintiff through purported clues after Counter-Plaintiff had already denied being Danielle Elizabeth Allen.

180. On June 19, 2023, Counter-Defendant again discussed the identity investigation and Allen-related material after Counter-Plaintiff's denials. Counter-Plaintiff has preserved the corresponding broadcast record and transcript.

181. Counter-Plaintiff alleges the June 8 and June 19 publications as historical evidence of continuity, repeated identity targeting, knowledge of denial, audience recruitment, and the development of the criminal-identification narrative. Counter-Plaintiff does not seek independent affirmative defamation damages based solely on these older publications.

## G. June 20, 2023 — Downstream Publication Showing Audience Meaning and Reputational Harm

182. On June 20, 2023, content creator Donat Ricketts published a separate broadcast concerning Counter-Plaintiff and the Allen narrative.

183. Ricketts expressly attributed the Dani/Allen identification to Counter-Defendant, stating that it had been "proven by Unwind with Teddy," and directed his viewers to Unwind with Teddy to compare the voices and supposedly "prove" the identification.

184. Ricketts then repeatedly accused Dani Robertson of killing a four-month-old child, called Dani a "child killer," invoked "a life for a life," referenced the death penalty, and stated that he would continue reminding people on YouTube of the accusation.

185. Ricketts further stated that he would share Unwind with Teddy content so that viewers could conduct additional research.

186. Counter-Plaintiff denies killing a child, giving a child alcohol, participating in the infant's death, or being charged in that matter.

187. Counter-Plaintiff does not attribute every independent statement made by Ricketts to Counter-Defendant as though Counter-Defendant personally uttered it.

188. Counter-Plaintiff alleges the Ricketts publication as evidence of actual downstream audience understanding, dissemination, causation, and reputational injury because Ricketts expressly identified Unwind with Teddy as the source that had "proven" the identification and then broadcast the conclusion that Dani was responsible for the child's death.

189. Counter-Plaintiff alleges that this downstream publication demonstrates that the criminal implication was not merely theoretical or dependent on Counter-Plaintiff's subjective interpretation.

**H. June 26–July 21, 2023 — Direct Tags, Geographic Clues, and Voice-Comparison Publications**

190. Counter-Plaintiff's preserved publication catalog reflects additional June and July 2023 identity-focused publications directly identifying or tagging Counter-Plaintiff.

191. By June 26, 2023, Counter-Defendant was using direct @DaniRobertson references in identity-search programming that included a "Rule In / Rule Out" presentation identified as "Mystery Clue 19."

192. On July 1, 2023, Counter-Defendant published a video titled substantially "@DaniRobertson and Danielle E. Allen BOTH HAVE TIES TO INDIANA Clue or Coincidence?" thereby directly pairing Counter-Plaintiff's account with Allen through a geographic clue.

193. On July 21, 2023, Counter-Defendant published "Danielle Elizabeth IT'S YOUUU SIS? Mystery Clue #22," again directly referencing @DaniRobertson in the preserved publication record.

194. The related preserved voice-comparison presentation labeled one sample "Dani Robertson Voice A" and another "Danielle Elizabeth Voice B," used "Rule In Rule Out" language, and invited audience comparison concerning whether the voices belonged to the same person.

195. Counter-Plaintiff alleges these publications as historical evidence that the Allen identification was repeatedly developed through direct account references, voice comparisons, geographic clues, and audience participation before the September 2023 publications in which Counter-Defendant expressly acknowledged material uncertainty.

**I. August 15, 2023 — Stationhead Allen-Family Outreach, Voice Physiology, and Deliberate Repetition**

196. On August 15, 2023, Counter-Defendant conducted a Stationhead-connected broadcast titled in substance "No One Answers — What's Up With That?" while continuing identity and voice-comparison programming.

197. Counter-Defendant discussed how forensic or expert voice comparison examines distinguishing features and stated that voices may vary with environment, biology, physiology, and changes involving the vocal cords.

198. Counter-Plaintiff alleges this discussion in context with Counter-Defendant's earlier March 5, 2023 invocation of her medical education and then-current professional license while making anatomical identity comparisons. Counter-Defendant is a physician assistant.

199. During the August 15 broadcast, Counter-Defendant stated that she had decided to "reach out to a few people," acknowledged that she had not received a response from persons in the Tolbert family, and stated that she would not identify exactly whom she had contacted.

200. Counter-Defendant discussed researching telephone numbers and addresses associated with multiple family members, including the same telephone number appearing for multiple sisters at

different addresses, and described disconnected numbers while continuing to consider additional family outreach.

201. Counter-Defendant stated that "Danielle on this platform has not proven anything" and "has not debunked anything," despite Counter-Plaintiff's prior denials that she was Allen.

202. Counter-Defendant then expressly stated, "Danielle Robertson impersonated Danielle Elizabeth Allen," followed by, "I need to say that often," and explained that she wanted a family member who might be listening to hear the accusation.

203. Counter-Plaintiff denies impersonating Danielle Elizabeth Allen and alleges that the August 15 statement is important evidence of deliberate repetition of a false identity accusation for dissemination to third parties after Counter-Plaintiff had disputed the Allen identification.

204. Counter-Defendant further discussed attempting to obtain the opinion of a man she identified as Allen's father concerning "someone impersonating his daughter," stated that he could help "rule out the voices," and stated that he would know how to contact his daughter, Danielle.

205. Counter-Plaintiff alleges that the August 15 broadcast demonstrates that the Allen investigation had moved beyond passive YouTube commentary into affirmative third-party family outreach, record and telephone research, voice-comparison analysis, and an expressed intention to repeat the impersonation accusation so Allen-family members would hear it.

206. Counter-Plaintiff does not allege that contacting a third party, standing alone, automatically constitutes stalking. The August 15 conduct is alleged as identity-investigation scope, purpose, notice, fault, malice, third-party dissemination, course-of-conduct, and pre-litigation context.

**J. September 9, 2023 — Express Unmasking Objective, Associates, Allen Criminal Association, and Admitted Uncertainty**

207. On September 9, 2023, Counter-Defendant continued serialized Dani-focused programming in "@DaniRobertson CAUSE UNWINEWITHTEDDY GONNA FIND OUT Pt. 2 | @AiNatasha007."

208. Counter-Defendant expressly made identification of Counter-Plaintiff a stated objective and later stated, "I want one person, your identity."

209. Counter-Defendant further stated that the presentation was "purposeful," repeatedly predicted that other persons would hear the material and help "find out," and solicited broader audience dissemination.

210. Counter-Defendant discussed persons she associated with Counter-Plaintiff, stated that viewers would see persons she called the "Dirty 40," and announced that she would "call out every name" she wanted.

211. During the same publication, Counter-Defendant replayed Counter-Plaintiff's objection that Counter-Defendant was making excessive unnecessary videos, attempting unnecessary contact, and entering spaces where she was not welcome, including a membership area. Counter-Defendant responded in substance, "I guess that's why you want me gone too."

212. Counter-Defendant thereby demonstrated actual awareness by September 2023 that Counter-Plaintiff objected to continued Defendant-directed contact and membership presence.

213. Counter-Defendant also expressly recognized that Counter-Plaintiff challenged her publications as defamatory, stating in substance, "If you think I'm slandering you and

defaming you, meet me in court. Simple. Unmask yourself and we'll just bring the evidence with us."

214. Later in the broadcast, after an audience reference to an "accomplice after the fact," Counter-Defendant immediately identified "DEA ... Danielle Elizabeth Allen," stated that the evidence she had reviewed supposedly "points to" Counter-Plaintiff being Allen and that Allen was "not ruled out," but admitted: "If it's not her, fine" and "I don't know 100%."

215. Counter-Plaintiff alleges these statements as direct evidence that Counter-Defendant herself recognized that the Allen identification was materially uncertain while continuing to publish the criminal-identification theory.

216. Counter-Plaintiff alleges the publication as evidence that the identity objective, associate scrutiny, notice of unwanted contact, and Allen criminal-identification theory were already operating together before this lawsuit.

**K. September 15–17, 2023 — "True Identity" Search and Express Uncertainty**

217. During a September 15–16, 2023 publication, Counter-Defendant stated, "I just want to get to the true identity of one anonymous person."

218. Counter-Defendant discussed a "long list," friends or associates, the "Dirty 40," and the preservation or cataloguing of digital activity, including statements in substance that "every little step" would remain and that "dots can be connected."

219. Counter-Defendant stated that Counter-Plaintiff did not like Counter-Defendant "calling other folks names" or "talking about your friends."

220. In a September 17, 2023 publication, Counter-Defendant asked how anyone could state as a fact that Dani Robertson was not Danielle Elizabeth Allen.

221. Counter-Defendant then admitted: "Though it's not scientific as a fact right now, the evidence points toward her being that," and stated that there were "so many coincidences" pointing toward the women being the same person.

222. Counter-Defendant treated Counter-Plaintiff's efforts to obtain the underlying interrogation material for review and rebuttal as purported evidence supporting the identification.

223. Counter-Plaintiff alleges these statements as evidence of Counter-Defendant's subjective awareness that the identification remained materially uncertain while she continued publishing it.

**L. September 20–22, 2023 — Notice of Criminal Meaning and Continuing Doubt**

224. On or about September 20, 2023, Counter-Defendant described the underlying Allen material as a true-crime or murder-related Lake Charles story.

225. Counter-Defendant acknowledged that another creator had accused her of using the Danielle Elizabeth Allen story to "lay at the foot of Danielle Robertson a guilty charge."

226. Counter-Defendant denied that she had literally used the "M word."

227. Counter-Plaintiff alleges this exchange not as an admission that the accusation was true, but as evidence that Counter-Defendant knew by September 2023 the precise criminal implication viewers and other creators were drawing from the Allen publications.

228. On or about September 22, 2023, Counter-Defendant again addressed the identity theory and stated, "No, she may not be Danielle Elizabeth Allen," while continuing to suggest that persons defending Counter-Plaintiff might be protecting her or preventing the truth from being found.

229. Counter-Plaintiff alleges the progression from "I don't know 100%," to "not scientific as a fact," to "she may not be" as evidence of material uncertainty existing inside Counter-Defendant's own publications.

**M. September 29 and October 13, 2023 — "Dirty Forty" and "VOICE CONFIRMED"**

230. On September 29, 2023, Counter-Defendant published a video substantially titled "@DaniRobertson The Dirty Forty CAUSE UNWINEWITHTEDDY GONNA FIND OUT."

231. Counter-Defendant expressly identified Counter-Plaintiff, discussed "Danielle and the Dirty 40," and portrayed persons associated with Counter-Plaintiff as supposedly acting behind the scenes.

232. Counter-Plaintiff denies organizing or participating in a criminal or unlawful conspiracy.

233. On or about October 13, 2023, Counter-Defendant published content titled substantially "@DaniRobertson VOICE CONFIRMED AS Danielle Elizabeth Allen By Courtney Morris's Family Members."

234. Counter-Plaintiff alleges that the title affirmatively represented that the disputed identification had been confirmed.

235. Counter-Plaintiff denies being Allen.

236. Counter-Plaintiff alleges these older publications for context, notice, audience meaning, fault, course of conduct, and setoff to the extent permitted by MCL 600.5823.

**N. October 15–20, 2023 — Lake Charles Interrogation Series and Continued Dani Association**

237. Immediately after the October 13, 2023 "VOICE CONFIRMED" publication, Counter-Defendant continued publishing Lake Charles criminal and interrogation material while using Counter-Plaintiff-associated identifiers in the publications or searchable metadata.

238. On October 15, 2023, Counter-Defendant published "Love Triangle MURDER IN LAKE CHARLES 'Analyze This' Police Report Pt. 5," with preserved metadata using #DaniRobertson.

239. On October 16, 2023, Counter-Defendant published the interrogation of Danielle E. Allen under the "Love Triangle" / "Murder In Lake Charles" framing with #DaniRobertson, and separately published Larry D. Champ interrogation material with the same Dani-associated metadata.

240. On October 17, 2023, Counter-Defendant published Courtney Morris interrogation material using both #DaniRobertson and #TruthTellerDani, followed on October 18 by a related interrogation Short using #DaniRobertson.

241. On October 20, 2023, Counter-Defendant published "Jaguar Wright Interview | I KNOW YOU'RE WATCHING DANI 'Analyze This'," whose preserved description directly referenced @DaniRobertson.

242. Counter-Plaintiff alleges that this sequence is significant because Counter-Defendant did not separate the Lake Charles criminal material from the Dani identity campaign after announcing that the voice identification had been "confirmed"; instead, she continued associating Counter-Plaintiff's identifiers with the interrogation and homicide-related series.

243. Counter-Plaintiff alleges these publications as historical identification, defamatory-meaning, dissemination, malice, audience-understanding, course-of-conduct, and MCL 600.5823

setoff evidence to the extent legally available, not as unrestricted affirmative recovery for otherwise untimely publications.

**O. November 28, 2023 — Counter-Defendant Defines the "Dirty 40" as a Coordinated Conspiratorial Group**

244. On November 28, 2023, Counter-Defendant published "D For Danielle — Defining The Meaning Of The Dirty Forty | CAUSE @UNWINEWITHTEDDY GONNA FIND OUT."

245. Counter-Defendant expressly told her audience what she meant by the recurring "Dirty 40" designation. She described a group of approximately forty persons allegedly "working behind the scenes" to cause "havoc or trouble" in another person's life.

246. Counter-Defendant stated that the "receipts" she claimed to possess showed a "coordinated effort" to create problems or disruption and to engage in "nefarious activities," and she described the alleged group as a "potentially malicious or secretive group of people."

247. Counter-Defendant then deliberately transitioned from the "Dirty 40" to the concept of a "co-conspirator." Through the AI material she selected and broadcast, a co-conspirator was defined as a person knowingly participating in or supporting a conspiracy involving illegal, harmful, or wrongful activity, including through planning, execution, facilitation, aiding, or abetting, with potential criminal prosecution and legal responsibility.

248. Counter-Defendant did not leave that definition as an unrelated abstract discussion. She immediately returned to the evidence she claimed to possess, stated that intent mattered, referred to "the receipts that I've been showing," referenced alleged activity spanning 2021 through 2023, and discussed "involvement in the conspiracy."

249. Counter-Defendant further stated that, moving forward, when discussing the "Dirty 40," she would show "names and receipts and times and places and collaborations," including persons allegedly possessing knowledge of or participating in the activity.

250. Counter-Plaintiff alleges this publication because Counter-Defendant herself supplied the meaning of the recurring "Dirty 40" designation to her audience and tied that designation to covert coordination, malicious or nefarious conduct, conspiracy, knowing participation, aiding and abetting, illegality, criminal prosecution, and legal liability.

251. To the extent Counter-Defendant identified Counter-Plaintiff as a member, participant, organizer, or co-conspirator within the "Dirty 40," Counter-Plaintiff denies participating in any criminal conspiracy or organized criminal enterprise with persons Counter-Defendant placed within that designation.

252. Counter-Plaintiff alleges this November 28 publication as particularly relevant to the meaning of later "Dirty 40" publications and to the circumstances that caused Counter-Plaintiff to seek regulatory assistance in June 2024.

**P. December 21, 2023 — Allen-Specific Birthday Association**

253. On December 21, 2023, Counter-Defendant published a YouTube Short titled substantially "Danielle Happy Birthday Mr. Grinch @UNWINEWITHTEDDY #Shorts."

254. December 21 is not Counter-Plaintiff's birthday. Counter-Plaintiff alleges that December 21 corresponds to Danielle Elizabeth Allen's birthday.

255. Counter-Plaintiff alleges that, in the context of the continuing Allen identity campaign, publishing a "Happy Birthday" message directed to "Danielle" on Allen's birthday further reinforced the implication that Counter-Plaintiff and Allen were the same person.

256. Counter-Plaintiff alleges the Short as identity-association, fault, and malice evidence and will produce the preserved Short and supporting birth-date record at the appropriate evidentiary stage.

**Q. Tasha K Impersonation-by-Implication Theory**

257. During a RunTellThatToo publication titled "DANIELLE & NICOLE ALLEGEDLY CONSPIRE TO TAKE @HEARHERTV DOWN," Counter-Defendant discussed copyright takedowns submitted against HearHerTV.

258. Counter-Plaintiff does not deny that she and Nicole separately submitted copyright takedowns concerning material they believed infringed protected content, and Counter-Plaintiff does not base this defamation theory upon Counter-Defendant merely reporting that takedowns occurred.

259. The actionable issue is the separate implication that Counter-Plaintiff submitted copyright complaints while falsely posing as or using the identity of Tasha K.

260. During the broadcast, an audience participant asserted that Dani had appeared as a "fake Tasha K" in connection with strikes against other channels. Counter-Plaintiff alleges that viewer statement as audience context and does not attribute the original statement to Counter-Defendant.

261. Counter-Defendant later reinforced the premise by questioning why a submission had not been recognized as "a fake," immediately discussing Tasha K's multiple email addresses, and then characterizing the alleged striking activity as one of Dani Robertson's methods of operation.

262. Counter-Plaintiff alleges that, in context, the sequence materially implied that Dani submitted copyright complaints by using a false Tasha K identity rather than submitting legitimate complaints in her own or an authorized capacity.

263. Counter-Plaintiff denies identifying herself to YouTube as Tasha K and denies submitting the relevant copyright complaints while falsely representing that she was Tasha K.

264. Counter-Plaintiff alleges the Tasha K theory only to the extent independently timely or available as defensive setoff under MCL 600.5823.

265. For clarity, Counter-Plaintiff's impersonation-based defamation theories in this pleading are limited to Tasha K and Sybrena Evans. Counter-Plaintiff does not assert an Allen impersonation theory; the Allen allegations concern false criminal identification and defamation by implication.

## VIII. METADATA, SEARCH ASSOCIATION, AND DEFENDANT-IDENTIFIER TARGETING

266. Counter-Plaintiff preserved contemporaneous screenshots showing that Counter-Defendant did not limit Defendant association to spoken commentary.

267. Counter-Defendant repeatedly used combinations of Counter-Plaintiff's public identifiers in titles, descriptions, hashtags, account mentions, and searchable video metadata.

268. Preserved metadata included variations of Dani Robertson, DaniMontanaTV, TruthTellerDani, and related Dani-associated terms.

269. Counter-Defendant also repeatedly coupled Counter-Plaintiff's identifiers with Counter-Defendant's own channel names, series labels, creators, and public subjects.

270. In some preserved examples, the visible subject of a video was principally another public figure or topic, yet Counter-Plaintiff's names or identifiers remained embedded in the video's keyword metadata.

271. Counter-Plaintiff alleges this as evidence that the association was deliberate rather than incidental.

272. Counter-Plaintiff does not claim ownership of ordinary hashtags.

273. Counter-Plaintiff does not allege that use of a hashtag alone is stalking.

274. Counter-Plaintiff alleges that repeated use of `#DaniRobertson`, `#TruthTellerDani`, `#DaniMontanaTV`, `#DForDanielle`, and similar identifiers intentionally associated Counter-Defendant's videos with Counter-Plaintiff's online identity.

275. Counter-Plaintiff has preserved search-result evidence in which Counter-Defendant's Defendant-referencing content appeared together with Counter-Plaintiff's own content in searches associated with Counter-Plaintiff or subjects she addressed.

276. Counter-Plaintiff does not allege that any individual tag necessarily caused a particular recommendation ranking.

277. Counter-Plaintiff alleges the metadata, visible hashtags, titles, descriptions, and search results as evidence of intent, "of and concerning" identification, dissemination, continuity, brand association, monitoring, and motive.

278. Where the underlying publication itself contained defamatory statements or implications, use of Counter-Plaintiff's names and identifiers further tied the defamatory publication to Counter-Plaintiff's recognizable online identity.

279. Counter-Plaintiff has preserved a substantial volume of additional YouTube publications containing literal direct @ mentions and tagging of Counter-Plaintiff's accounts, repeated use of

Counter-Plaintiff's channel identifiers, and related account-directed communications. The present pleading does not attempt to reproduce the entire preserved catalog. Counter-Plaintiff will further particularize the number, dates, account identifiers, platforms, and post-notice frequency of those direct mentions and tags in an amended pleading or other filing permitted by the Court. The underlying videos, screenshots, metadata, and catalog are preserved.

## IX. DFOR DANIELLE, MESSYDANI, AND CONTINUING BRAND ASSOCIATION

280. Counter-Defendant created and repeatedly used the identifier DForDanielle in connection with Counter-Plaintiff.

281. Counter-Defendant promoted DForDanielle across platforms.

282. Counter-Defendant maintained or promoted a DForDanielle YouTube presence.

283. Counter-Defendant also publicly promoted "D for Danielle on Stationhead."

284. Counter-Plaintiff alleges that Counter-Defendant's moderators regularly promoted Counter-Defendant's channels and cross-platform DForDanielle presence.

285. Counter-Plaintiff alleges that Counter-Defendant also adopted or used MessyDani, a name associated with Counter-Plaintiff's preexisting website/domain, in connection with monetized activity.

286. Counter-Plaintiff does not assert a separate appropriation count in this pleading.

287. Counter-Plaintiff alleges these facts as evidence of persistent brand association, motive, continuity, and reputational harm.

## X. 2024 — CONTINUED TAGGING, ALLEN ASSOCIATIONS, BOUNDARY CIRCUMVENTION, AND LARA HELP-SEEKING

### A. February 9, 2024 — Full Allen Interrogation Paired With DForDanielle and #DaniRobertson

288. On February 9, 2024, Counter-Defendant published "TrueCrime | FULL INTERROGATION 'DForDanielle' | @DForDanielle NEW!"

289. The preserved publication used both #DForDanielle and #DaniRobertson while presenting the police interrogation and criminal circumstances of Danielle Elizabeth Allen.

290. The publication invited viewers to consider a "real-life Danielle" and an "anonymous Danielle" while discussing a person who had been charged as an accessory after the fact in connection with the death of a four-month-old infant.

291. Counter-Plaintiff acknowledges that the publication also used qualifying language indicating that the person had been suspected of a crime but found innocent or that the charges did not result in a conviction. Counter-Plaintiff does not omit that qualification.

292. Counter-Plaintiff alleges that the qualification did not eliminate the materially false identification implication created by pairing the Allen interrogation and homicide-related circumstances with #DForDanielle, #DaniRobertson, the recurring "Rule In / Rule Out" identity framework, and the prior voice-comparison campaign.

293. Counter-Plaintiff is not Allen, was not the person interrogated, was not arrested in that matter, did not commit Allen's DUI, and was not an accessory after the fact or participant in the infant-death investigation.

**B. March 19, 2024 — Jaguar Wright Panel and Counter-Defendant's Express Adoption of the Allen Identification**

294. On March 19, 2024, Counter-Defendant published or participated in "MochaMeltdown | Jaguar Wright 'LET ME HIT THE LINK' AnalyzeThis | @UNWINEWITHTEDDY."

295. During the panel, Counter-Defendant addressed Jaguar Wright while invoking Danielle Elizabeth Allen and the recurring Superman/Clark Kent comparison used to suggest that two identities could not appear together because they were the same person. See ECF No. 84-1, PageID.1304.

296. At approximately 1:24:04, Counter-Defendant stated in substance, "my assessment and the evidence points toward" Danielle Elizabeth Allen and asked Wright what clue had convinced her "that it was her." See ECF No. 84-1, PageID.1305.

297. Counter-Plaintiff alleges that this was not neutral reporting of an internet rumor. Counter-Defendant expressly characterized the Allen identification as her own assessment supported by evidence and solicited agreement from another public speaker before that speaker's audience.

298. Counter-Defendant's Allen narrative included voice comparisons, Indiana or geographic clues, interrogation and criminal material, and the prior identification series. Counter-Defendant also acknowledged that the Allen-related charges had been dropped while continuing to describe the accessory-after-the-fact and four-month-old child-death context.

299. Counter-Plaintiff alleges that the March 19 publication is especially probative of fault and malice because Counter-Defendant had already received repeated denials from Counter-Plaintiff yet affirmatively told Wright that her own assessment and evidence pointed toward the Allen identification.

300. Counter-Plaintiff alleges the Jaguar Wright panel as pre-LARA defamation-by-implication, criminal-identification, third-party amplification, audience-expansion, actual-malice, common-law-malice, reputational-harm, and MCL 600.5823 evidence to the extent legally available.

## C. April 24, 2024 — Specific Allen Denial and Direct-Tag Cessation Notice

301. During 2024, Counter-Plaintiff continued demanding cessation.

302. By April 2024, Counter-Plaintiff had sent multiple cease-and-desist notices.

303. Counter-Plaintiff's April 24, 2024 written demand expressly denied being Danielle Elizabeth Allen and denied the DUI and homicide-related associations.

304. The same demand objected to continuing direct account tagging.

305. Counter-Defendant therefore had actual notice of Counter-Plaintiff's denial and objection to the ongoing association.

306. Counter-Plaintiff alleges that Counter-Defendant nevertheless continued the association and directed tagging.

## D. May 2024 — Website Access Circumvention

307. Counter-Plaintiff had attempted to block Counter-Defendant's access to a Defendant-controlled website or online space.

308. Counter-Plaintiff alleges that Counter-Defendant thereafter publicly described accessing the site from a different physical location or computer, including a public library, after the prior access point had been blocked.

309. Counter-Plaintiff alleges the conduct as evidence of deliberate circumvention of an expressed access boundary.

310. Counter-Plaintiff does not allege that lawful viewing of an ordinary public webpage, standing alone, constitutes stalking.

**E. May 21, 2024 — "SHE KNOWS I'M ON TO HER" Targeted Identification**

311. On May 21, 2024, before Counter-Plaintiff's June 7 LARA complaint, Counter-Defendant published an Instagram item titled substantially "D For Danielle — SHE KNOWS I'M ON TO HER."

312. Counter-Plaintiff alleges the May 21 publication as additional pre-LARA targeted-identification and continuity evidence. Counter-Plaintiff does not allege that the title alone independently establishes stalking or defamation.

**F. June 6, 2024 — Continued Allen Criminal Association and Express Unmasking Objective**

313. On June 6, 2024, one day before Counter-Plaintiff's own LARA complaint, Counter-Defendant again publicly connected Dani Robertson with Danielle Elizabeth Allen and criminal or incarceration imagery.

314. Counter-Defendant stated, "Yes, I want her identity known," and further stated in substance that when Dani's identity became known, "everybody else is going to know it too."

315. Counter-Defendant repeatedly invoked jail or an "orange jumpsuit" while discussing Counter-Plaintiff and persons who remained friendly with her.

316. Counter-Defendant returned to Danielle Elizabeth Allen, Allen's accessory-after-the-fact history, Larry Champ, the criminal interrogation, and the underlying child-death investigation.

317. Counter-Defendant contrasted that criminal material with the fact that "Dani Robertson says she's not Danielle Elizabeth Allen."

318. Counter-Defendant then suggested the possibility that Counter-Plaintiff had been lying and stated in substance that Counter-Plaintiff was "not even in custody yet," emphasizing "yet."

319. Counter-Plaintiff denies being Allen, denies involvement in Allen's criminal matter, and denies any basis for the incarceration implication.

320. Counter-Plaintiff alleges the June 6 publication as particularly significant notice, fault, criminal-implication, identity-campaign, and help-seeking context because it immediately preceded Counter-Plaintiff's June 7 regulatory complaint.

**G. June 7, 2024 — Defendant's Separate LARA Complaint**

321. On or about June 7, 2024, Counter-Plaintiff submitted her own separate complaint to LARA.

322. Counter-Plaintiff alleges that substantial conduct occurring during the year immediately preceding that report, including the Allen criminal-identification narrative, Dirty 40 or associate-focused conduct, direct tagging, identity investigation, and other documented online conduct, formed part of the circumstances that caused her to seek regulatory review.

323. Counter-Plaintiff does not allege that every underlying video independently constituted a licensing violation.

324. Counter-Plaintiff alleges that she sought an independent determination from LARA concerning conduct by a licensed professional.

325. Plaintiff now seeks damages based upon that regulatory help-seeking communication.

326. During LARA's later investigation, Counter-Plaintiff supplied supporting evidence, and the investigator acknowledged receipt. See Ex. A.

**H. June 9, 2024 — Immediate Post-LARA Continuation With Jaguar Wright / TruthTellerDani Association**

327. On June 9, 2024, two days after Counter-Plaintiff's LARA complaint, Counter-Defendant published "Dani Robertson Side and Jaguar Wright Side — Continued From Morning Live."

Page 40

328. The preserved publication displayed or promoted the $TruthTellerDani identifier while continuing Dani/Jaguar-related programming.

329. Counter-Plaintiff does not allege that the June 9 publication caused her June 7 report. She alleges it as immediate post-report continuation corroborating that the identity-focused and Dani-associated programming did not cease after the regulatory help-seeking communication.

**I. June 29, 2024 — Continued Identity Investigation and Mischaracterization of Family Outreach**

330. On June 29, 2024, Counter-Defendant continued discussing the effort to identify Counter-Plaintiff.

331. Counter-Defendant stated, "I want to find your identity," or words to that effect.

332. Counter-Defendant also stated or implied that Counter-Plaintiff had been "following" the daughter of Monique Allen Tolbert and represented that Counter-Defendant possessed "receipts."

333. Counter-Plaintiff acknowledges following the daughter's publicly accessible social-media account for the limited purpose of attempting to notify the Allen family about the ongoing harassment, false-identification campaign, and perceived risk of offline danger. Counter-Plaintiff denies physically following, stalking, surveilling, threatening, intimidating, or pursuing the daughter.

334. Counter-Plaintiff alleges that Counter-Defendant mischaracterized that protective online outreach as suspicious "following" or surveillance and alleges the incident as Allen-family identity-campaign context, not as a denial that Counter-Plaintiff followed the publicly accessible account.

**J. July 24, 2024 — "Fake Activist That Commits Fraud" / Shanquella-Related Publication**

335. On July 24, 2024, during "NightTalk | BlackTea 'LATE NIGHT CHIT CHAT' AnalyzeThis | @UNWINEWITHTEDDY," Counter-Defendant directly identified Counter-Plaintiff as "Danielle" and contrasted being an activist with being a "cyber bully harasser stalker."

336. Counter-Defendant then called Counter-Plaintiff "the fake activist that commits fraud," referenced Counter-Plaintiff's communications concerning Shanquella Robinson, invoked Shanquella Robinson's father, and questioned whether he knew about the accusations Counter-Defendant was making.

337. In the same sequence, Counter-Defendant accused or implied that Counter-Plaintiff abused women through photographs, was stalking or harassing Counter-Defendant, concealed her real identity, and should "say your name" and identify herself to Shanquella Robinson's father.

338. Counter-Plaintiff denies committing fraud, stalking, cyberbullying, or harassment and denies the materially false criminal or misconduct implications asserted in that publication.

339. Counter-Plaintiff alleges the publication as especially damaging to her public credibility because her online work included commentary and advocacy concerning the Shanquella Robinson matter and other true-crime or accountability subjects.

340. Because the July 24, 2024 publication post-dates Counter-Plaintiff's June 7 LARA complaint and is outside the ordinary one-year defamation period for this August 7, 2026 counterclaim, Counter-Plaintiff does not rely on it as the basis for her June 7 report or seek a standalone affirmative damages judgment based solely on that publication. It is pleaded as continuation, reputational-history, course-of-conduct, and later-fault or malice context to the extent legally relevant.

**K. September–October 2024 — Direct Account Mentions**

341. Counter-Defendant continued direct account mentions of Counter-Plaintiff after cessation demands.

342. On September 26, 2024, Counter-Defendant used `@TruthTellerDani` with law-enforcement-related hashtags and DForDanielle identifiers.

343. On October 3, 2024, Counter-Defendant directly used Dani-related account mentions while invoking the U.S. Marshals and FBI.

344. On October 10, 2024, Counter-Defendant directly tagged Counter-Plaintiff while asserting that Counter-Plaintiff "gets away with lying to police," or substantially equivalent language.

345. On October 17, 2024, Counter-Defendant directly identified Counter-Plaintiff as "Danielle Robertson," described her as "on the run," and discussed alleged failure to respond to federal process.

346. On October 21, 2024, Counter-Defendant directly addressed Counter-Plaintiff: "YOU NEED TO ANSWER YOUTUBE'S QUESTIONS."

347. Counter-Plaintiff alleges these older publications principally as course-of-conduct, notice, identity, and intent evidence and as statutory setoff where legally available.

**XI. JANUARY 27, 2025 — MEMBERSHIP AFTER EXPRESS DEMANDS TO LEAVE**

348. Counter-Plaintiff maintained paid members-only online spaces.

349. Counter-Plaintiff expressly demanded that Counter-Defendant terminate or leave Counter-Plaintiff's memberships.

350. On January 27, 2025, during NightTalk | DForDesperation "LET'S TALK ABOUT IT" AnalyzeThis | UNWINEWITHTEDDY, Counter-Defendant replayed or quoted Counter-

Plaintiff's complaint that Counter-Defendant remained "subscribed and a member" years later "despite my repeated demands for them to cancel and leave."

351. Counter-Defendant responded by referring to "your request for me to remove myself from membership."

352. During the same broadcast, Counter-Defendant replayed Counter-Plaintiff telling her: "Exit all my memberships."

353. Counter-Defendant further acknowledged Counter-Plaintiff's complaint that Counter-Defendant remained present in connection with member-appreciation events.

354. Counter-Plaintiff alleges these admissions establish actual knowledge that consent for Counter-Defendant's continued membership/access had been withdrawn.

355. Counter-Plaintiff alleges that Counter-Defendant nevertheless continued maintaining membership or access thereafter.

356. Counter-Plaintiff alleges the membership evidence as a significant post-notice fact supporting the civil-stalking course of conduct.

357. Counter-Plaintiff does not presently allege a specific membership "upgrade" as an established fact unless corroborating platform records are produced.

## XII. MARCH–AUGUST 2025 — ASSOCIATE TARGETING, MONITORING, AND REPEATED ACCUSATIONS

### A. March 28, 2025 — Lenora Privacy Complaint

358. On March 28, 2025, Counter-Defendant published a post identifying Counter-Plaintiff as Dani Robertson and `#DForDanielle`.

359. Counter-Defendant accused Counter-Plaintiff of submitting another "bogus privacy complaint" and described it as a repeated takedown.

360. Counter-Plaintiff alleges the particular privacy complaint was submitted by Lenora, not Counter-Plaintiff.

361. Counter-Plaintiff alleges Counter-Defendant falsely attributed another person's platform complaint to her.

362. Because this publication falls outside the ordinary one-year defamation period if filed in August 2026, Counter-Plaintiff alleges it principally as context, notice, meaning, and course-of-conduct evidence.

## B. May 8, 2025 — Lenora

363. On May 8, 2025, Counter-Defendant discussed a takedown associated with Lenora.

364. Counter-Defendant discussed Lenora's image or likeness and the platform complaint.

365. Counter-Defendant stated: "Enough time on Lenora tonight. Okay. I think she got the message. Maybe. I don't know."

366. Counter-Plaintiff alleges this as associate-directed context, not as an independent timely defamation claim.

## C. June 29, 2025 — Discord Monitoring / Tracking Narrative

367. On June 29, 2025, in a broadcast identified as UNWINEWITHTEDDY | DForDisTooDeep "AnalyzeThisMess"…Because Somebody Has To Say It!, Counter-Defendant discussed Counter-Plaintiff's Discord and membership environment.

368. Counter-Defendant stated that she herself had been inside Counter-Plaintiff's Discord since approximately 2022.

369. Counter-Defendant represented that her membership or presence gave her access to information she otherwise would not know.

370. Counter-Defendant further told viewers that Counter-Plaintiff's Discord supposedly allowed Counter-Plaintiff to track persons, IP addresses, or locations.

371. Counter-Plaintiff denies possessing illicit tracking capabilities through ordinary Discord authentication.

372. Counter-Plaintiff alleges the Discord discussion as monitoring/access context and as part of the recurring portrayal that Counter-Plaintiff secretly tracks other people.

**D. July 29, 2025 — Monitoring Counter-Plaintiff's Research**

373. On July 29, 2025, Counter-Defendant published UNWINEWITHTEDDY | DForDanielleandDonat'sTimeline.

374. Counter-Defendant dissected how Counter-Plaintiff researched an unrelated person's arrest or court matter.

375. Counter-Defendant analyzed timestamps, court URLs, databases, and the time Counter-Plaintiff allegedly accessed information.

376. Counter-Defendant questioned whether the access was "coordinated."

377. Counter-Plaintiff alleges this as evidence of monitoring Counter-Plaintiff's research activity and repackaging lawful research as suspicious or clandestine conduct.

**E. August 24, 2025 — "Watch How People Move"**

378. On August 24, 2025, Counter-Defendant published DForDestruction II "THE BLACK TEA SECTOR."

379. Counter-Defendant monitored or discussed what Counter-Plaintiff and other creators were doing.

380. Counter-Defendant directed viewers: "Watch how people move."

381. Counter-Defendant further instructed viewers: "Listen carefully to anyone … taking up for Danielle."

382. Counter-Defendant encouraged the audience to "Stand up to this bully in numbers."

383. Counter-Plaintiff alleges those statements as evidence of audience mobilization, scrutiny of associates, continuity, and motive.

384. Counter-Plaintiff does not allege that ordinary audience criticism by itself constitutes stalking.

**F. August 26, 2025 — Joy Ferguson Money Accusation**

385. On August 26, 2025, Counter-Defendant published a livestream and/or community content concerning Joy Ferguson and Counter-Plaintiff.

386. Counter-Defendant stated that Joy had paid Counter-Plaintiff and that Counter-Plaintiff had refused a refund.

387. A contemporaneous written post stated: "She refused to refund her money for the lousy and disappointing Livestream she created."

388. Counter-Defendant also stated or implied that Counter-Plaintiff personally received or controlled the money and that a financial trail proved it.

389. Counter-Plaintiff denies wrongfully retaining or converting Joy Ferguson's money.

390. Counter-Plaintiff alleges that platform-controlled payment/refund procedures governed the relevant membership transaction rather than a personal decision by Counter-Plaintiff to wrongfully keep another person's funds.

391. Counter-Plaintiff alleges the publication falsely portrayed her as dishonest in handling another person's money.

## XIII. SEPTEMBER–OCTOBER 2025 — SEARCH ASSOCIATION AND SURVEILLANCE IMPLICATIONS

### A. September 18, 2025 — Topic/Metadata Association

392. On September 18, 2025, Counter-Defendant published a video visibly concerning Charlie Kirk and Candace Owens.

393. Preserved keyword metadata for the same video paired those subjects with Dani Robertson-related terms.

394. Counter-Plaintiff alleges the example as evidence that Counter-Defendant intentionally inserted Counter-Plaintiff's identity into searchable metadata even where the visible topic concerned other public figures.

395. Counter-Plaintiff does not allege that discussing those public figures constitutes stalking.

### B. October 1, 2025 — "Did Someone Lace Up?" Surveillance Implication

396. On October 1, 2025, Counter-Defendant published the members-only livestream Dani Robertson | DForDelete Did Someone Lace Up? | UNWINEWITHTEDDY AnalyzeThisMess.

397. The publication identified Counter-Plaintiff in the title.

398. It used multiple identifiers associated with Counter-Plaintiff, including `#DForDanielle`, `#DaniRobertson`, `#TruthTellerDani`, and `#DaniMontanaTV`.

399. Counter-Defendant stated that she had purportedly served "Danielle."

400. Counter-Defendant stated that she did not trust Counter-Plaintiff.

401. Counter-Defendant then described suspicious telephone calls from Michigan numbers.

402. Counter-Defendant described silent breathing during at least one call.

403. Counter-Defendant emphasized that multiple calls occurred "all since I have served Danielle."

404. Counter-Defendant next described a black sedan entering or stopping at her driveway or residence.

405. Counter-Defendant recalled other events involving persons or vehicles allegedly watching or following her.

406. Counter-Plaintiff alleges that the sequencing and repeated references to Counter-Plaintiff materially implied that Counter-Plaintiff caused, arranged, encouraged, knew about, or was connected to those calls or alleged surveillance.

407. Counter-Plaintiff denies sending, hiring, directing, recruiting, encouraging, coordinating, or causing anyone to call, watch, follow, surveil, intimidate, or appear at Counter-Defendant's residence.

408. Counter-Plaintiff alleges the implication falsely portrayed her as orchestrating stalking or surveillance.

**C. October 2, 2025 — Dropping the Tea Audience Understanding**

409. On October 2, 2025, a third-party channel, Dropping the Tea, published UNWINEWITHTEDDY SERVES Dani Robertson!

410. The commentator recounted Counter-Defendant's statements concerning silent telephone calls and the driveway vehicle.

411. The commentator then connected the discussion directly to "Dany."

412. The commentator referred to an "Avengers army Dany built."

413. The commentator concluded by asking whether the "calls and driveway visitors" were merely coincidences or "something more" and whether "Dany" was "finally facing the music."

414. Counter-Plaintiff does not attribute Dropping the Tea's independent statements to Counter-Defendant.

415. Counter-Plaintiff alleges them as contemporaneous evidence of how a secondary viewer actually understood the implication created by Counter-Defendant's October 1 presentation.

416. Counter-Plaintiff further alleges contemporaneous chat comments reflected similar audience understanding.

417. The audience evidence is alleged for identification, meaning, dissemination, reputational effect, and damages.

**D. October 6, 2025 — Jaguar Wright Tagging in Continuing DForDanielle Programming**

418. On October 6, 2025, Counter-Defendant published a community post directly tagging @RealJag77 while promoting a DForDanielle-related upcoming program and using #JaguarWright and #DForDanielle. See ECF No. 84-1, PageID.1306.

419. Counter-Plaintiff alleges the post as evidence that Counter-Defendant continued re-enlisting or alerting a person previously involved in the Allen-identification discussion while continuing DForDanielle identity programming.

420. Counter-Plaintiff does not allege that tagging Jaguar Wright, standing alone, is unlawful; the post is alleged as third-party audience recruitment, identity-campaign continuity, motive, and course-of-conduct evidence.