### E. October 24, 2025 — Dani Keyword Association

421. On October 24, 2025, Counter-Defendant published a NightTalk video using `#DForDanielle`.

422. Preserved backend keywords included multiple combinations of Counter-Plaintiff's names and identifiers with Counter-Defendant's branding and unrelated public topics.

423. Counter-Plaintiff alleges that this is further evidence of deliberate searchable association.

## XIV. DECEMBER 23, 2025 — COPYRIGHT-OFFICE IMPERSONATION IMPLICATION

424. On December 23, 2025, Counter-Defendant published RunTellThatToo | DForDenied…ButWait UNWINEWITHTEDDY | AnalyzeThisMess.

425. Counter-Defendant constructed a timeline concerning Counter-Plaintiff's communication with the United States Copyright Office.

426. Counter-Defendant represented that an event occurred at approximately 10:19.

427. Counter-Defendant reenacted or described a caller saying: "Hello, I'm Sybrena," or substantially equivalent language identifying the caller as Counter-Defendant herself.

428. Counter-Defendant then stated: "I did not pick up a telephone at 10:19."

429. Counter-Plaintiff admits communicating with the Copyright Office.

430. Counter-Plaintiff denies identifying herself as Sybrena Evans during that communication.

431. Counter-Plaintiff denies impersonating Sybrena Evans.

432. Counter-Plaintiff alleges that the publication materially implied that Counter-Plaintiff impersonated Counter-Defendant in communicating with a federal agency.

433. Counter-Plaintiff alleges that implication was false and reputationally damaging.

## XV. JANUARY 23, 2026 — "BACKDOOR ACCESS" AND ILLEGAL-ACCESS IMPLICATIONS

434. On January 23, 2026, Counter-Defendant published UNWINEWITHTEDDY | NightTalk on RunTellThatToo, using `#DForDanielle`.

435. Counter-Defendant accused Counter-Plaintiff of trying to "sabotage this case."

436. Counter-Defendant characterized Counter-Plaintiff's communication with the Copyright Office as interference with Counter-Defendant's copyright application.

437. Counter-Defendant stated that Counter-Plaintiff obtained "backdoor access to files and documents."

438. Counter-Defendant further stated that Counter-Plaintiff could "access records," go "behind files," get into "court documents," and "bulldoze[] in back door."

439. Counter-Defendant suggested Counter-Plaintiff had hidden assistance because of the amount of activity attributed to her.

440. Counter-Defendant linked the supposed conduct to Counter-Plaintiff's anonymity.

441. Counter-Defendant stated that Counter-Plaintiff needed to be "unmasked" and later "exposed."

442. Counter-Plaintiff denies using illegal "backdoor" access to court or government records.

443. Counter-Plaintiff denies hacking databases or obtaining records through illicit technological methods.

444. Counter-Plaintiff alleges that, taken as a whole, the publication materially implied criminal, deceptive, or illicit information-access activity.

445. Counter-Plaintiff further alleges that lawful court-record research, lawful governmental communication, lawful filings, or legitimate investigation do not become unlawful merely because Counter-Defendant calls them "backdoor" access or sabotage.

## XVI. JANUARY 31, 2026 — VIRUS, HACKING, TRACKING, AND DOXXING IMPLICATION

446. On January 31, 2026, Counter-Defendant published UNWINEWITHTEDDY | NightTalk on RunTellThatToo.

447. The publication used `#DForDanielle`.

448. Counter-Defendant warned persons supporting her case or channel to be cautious if they received communications from Counter-Plaintiff.

449. Counter-Defendant stated that the person being discussed was "quite skilled at obtaining information on individuals."

450. Counter-Defendant suggested recipients might find their information publicly exposed.

451. Counter-Defendant discussed burner phones, multiple email addresses, aliases, VPNs, and a possible "decoy."

452. Counter-Defendant then discussed electronic communications and the possibility that "that little virus can spread on your computer or whatever."

453. Counter-Defendant later stated that people can "track others."

454. Counter-Defendant claimed that Counter-Plaintiff or persons associated with her could dox people rapidly, even "within hours" or overnight.

455. Counter-Defendant speculated that Counter-Plaintiff had some special "pathway" or access route to other persons' information.

456. Counter-Plaintiff denies sending computer viruses or malware.

Page 53

457. Counter-Plaintiff denies hacking Counter-Defendant or supporters.

458. Counter-Plaintiff denies unlawfully accessing governmental or private databases.

459. Counter-Plaintiff denies using illegal technological means to obtain or expose private information.

460. Counter-Plaintiff alleges that, considered as a whole, Counter-Defendant's presentation materially implied that communicating with Counter-Plaintiff posed a cyber-security risk and that Counter-Plaintiff employed unlawful malware, hacking, tracking, or clandestine information-gathering techniques.

461. Counter-Plaintiff alleges that repeated qualifiers such as "could," "might," or "I don't know" did not remove the implication created by the publication as a whole.

462. During the same broadcast Counter-Defendant expressly promoted "D for Danielle on Stationhead."

463. Counter-Plaintiff alleges this further establishes Counter-Defendant's ownership or operation of the recurring DForDanielle cross-platform identifier.

## XVII. FEBRUARY 3, 2026 — CONTINUED IDENTITY INVESTIGATION

464. On February 3, 2026, Counter-Defendant published UNWINEWITHTEDDY | NightTalk on RunTellThatToo using `#DForDanielle`.

465. Counter-Defendant stated that she had been reviewing Counter-Plaintiff's videos and obtaining transcripts.

466. Counter-Defendant searched those transcripts for words, phrases, and identity clues.

467. Counter-Defendant expressly asked: "So, how do we find out who she is?"

468. Counter-Defendant discussed historical or deleted accounts, communications between Counter-Plaintiff and third persons, and relationships among accounts.

469. Counter-Defendant discussed publishing Counter-Plaintiff's voice so that others could attempt to recognize it.

470. Counter-Defendant suggested that identifying Counter-Plaintiff might require only "one individual, the right individual."

471. Counter-Defendant discussed potential recognition through real-world settings such as school, work, stores, or other ordinary activity.

472. Counter-Defendant returned to Danielle Elizabeth Allen and stated that Allen remained "not ruled out."

473. Counter-Defendant stated, "I didn't say she was, but I didn't rule it out either."

474. Counter-Plaintiff does not allege that reviewing public records or lawful public videos alone constitutes stalking.

475. Counter-Plaintiff alleges this publication as evidence of a continuing, deliberate, audience-assisted identity investigation immediately preceding the February 6 and February 9 Allen publications.

## XVIII. FEBRUARY 6, 2026 — ALLEN INTERROGATION, ARREST, AND CRIMINAL-IDENTITY IMPLICATION

476. On February 6, 2026, Counter-Defendant published UNWINEWITHTEDDY | MessyMocha on RunTellThatToo.

477. The publication used `#DForDanielle`.

478. Counter-Defendant announced that she would replay part of the interrogation of Danielle Elizabeth Allen.

479. Counter-Defendant directed viewers to the full interrogation on her DForDanielle channel.

480. The interrogation informed viewers that Allen was being placed under arrest for accessory after the fact in connection with an attempted second-degree-murder investigation.

481. Counter-Defendant discussed the death of an infant.

482. Counter-Defendant discussed the related criminal investigation.

483. Counter-Defendant discussed Allen's alleged concealment of Larry Champ's whereabouts.

484. Counter-Defendant discussed Allen's arrest and related criminal circumstances.

485. Counter-Plaintiff is not Danielle Elizabeth Allen.

486. Counter-Plaintiff was not the woman in the interrogation.

487. Counter-Plaintiff was not arrested in that matter.

488. Counter-Plaintiff was not an accessory after the fact in that matter.

489. Counter-Plaintiff had no involvement in the infant's death or the criminal investigation presented by Counter-Defendant.

490. Counter-Defendant expressly acknowledged that when the Allen material initially appeared, Counter-Plaintiff repeatedly responded: "It's not me. It's not me. It's not me. It's not me."

491. Counter-Defendant nevertheless used Counter-Plaintiff's reaction, postings, payments, and subsequent conduct as purported reasons to suspect a connection.

492. Counter-Defendant stated that those actions made her think "maybe there's something more to this."

493. Counter-Defendant stated: "I have never said once that Dani Robertson is Danielle Elizabeth Allen. What I have said is rule it in, rule it out. Listen to the voice and tell me what you think."

494. Counter-Defendant nevertheless also stated that Allen's voice "was never ruled out in my opinion. Period."

495. Counter-Defendant read or discussed audience comments stating the voices "matched to perfection."

496. Counter-Defendant continued inviting the audience to determine whether Counter-Plaintiff was Allen.

497. Counter-Plaintiff alleges that the "rule it in, rule it out" disclaimer did not negate the implication of the full publication.

498. In the same broadcast, Counter-Defendant was presenting Allen's criminal interrogation and arrest while asking the audience whether Counter-Plaintiff was Allen.

499. Counter-Plaintiff alleges the materially defamatory implication was therefore not merely that two women had similar voices.

500. Counter-Plaintiff alleges the publication invited the audience to conclude that Counter-Plaintiff was the same person whose arrest, accessory-after-the-fact allegation, interrogation, and homicide-related investigation Counter-Defendant was simultaneously presenting.

501. Counter-Plaintiff alleges that the disclaimer was additionally contradicted by earlier affirmative Allen publications, including the October 13, 2023 "VOICE CONFIRMED" publication.

502. Counter-Plaintiff acknowledges seeking and paying to obtain source interrogation material for the purpose of reviewing and rebutting the false-identification narrative.

503. Counter-Plaintiff denies that obtaining evidence being used against her was evidence that she was the person depicted in that evidence.

504. Counter-Plaintiff alleges that Counter-Defendant repeatedly transformed Counter-Plaintiff's efforts to deny or disprove the accusation into purported additional proof of the accusation.

## XIX. FEBRUARY 9, 2026 — CONTINUED DEA / LAKE CHARLES IDENTITY THEORY

505. On February 9, 2026, Counter-Defendant again discussed Danielle Elizabeth Allen.

506. Counter-Defendant discussed "DEA," Lake Charles, Louisiana, voice comparisons, features, aliases, social-media connections, and purported identity clues.

507. By then Counter-Defendant's audience had already been repeatedly exposed to Allen's mugshot, interrogation, arrest, DUI, accessory-after-the-fact allegation, and homicide-related material.

508. Counter-Plaintiff alleges that "DEA" and Lake Charles therefore did not function as neutral identifiers in context.

509. Counter-Plaintiff alleges that renewed Allen comparisons carried forward the implication that Counter-Plaintiff was the real-world person Counter-Defendant had repeatedly associated with criminal history.

510. Counter-Plaintiff had repeatedly denied that identification.

511. Counter-Plaintiff had repeatedly demanded cessation.

512. Counter-Plaintiff alleges the continued publication in February 2026 supports an inference of knowing or reckless persistence rather than an isolated identification error.

## XX. FEBRUARY 11, 2026 — STATIONHEAD MONITORING AFTER DIRECTION TO LEAVE

513. Counter-Plaintiff operated or participated in a Stationhead space.

514. Counter-Plaintiff had blocked Counter-Defendant from commenting or interacting through available platform controls.

515. Counter-Plaintiff alleges the platform did not allow her to prevent a user from merely listening to an otherwise accessible room.

516. Counter-Defendant entered Counter-Plaintiff's Stationhead broadcast.

517. Counter-Defendant listened to Counter-Plaintiff's activities and statements.

518. Counter-Plaintiff learned that Counter-Defendant was present and expressly told her to leave.

519. Counter-Defendant did not immediately leave.

520. Counter-Defendant later publicly recounted that she had entered and listened to the Stationhead broadcast.

521. Counter-Defendant also stated that she nearly returned to Stationhead again.

522. Counter-Plaintiff does not allege that listening to a public livestream once, standing alone, constitutes stalking.

523. Counter-Plaintiff alleges the incident as one component of repeated cross-platform monitoring and post-notice persistence.

## XXI. MAY 5, MAY 8, AND MAY 20, 2026 — FORMAL RETRACTION NOTICE, THIRD-PARTY SURVEILLANCE NARRATIVE, AND COMPLETE-CATALOG MONITORING

524. On May 5, 2026, before asserting this defamation counterclaim, Counter-Plaintiff sent Counter-Defendant a written Formal Retraction and Correction Demand Under Michigan Defamation Law expressly invoking MCL 600.2911. See Ex. B.

525. The May 5 demand specifically identified as false, among other matters, accusations or implications that Counter-Plaintiff committed or was associated with a DUI; was an accessory after the fact, obstructed justice, helped cover up a crime, or was connected to an

accessory-after-the-fact allegation; was involved in or associated with child homicide or the death of a child; was involved in criminal activity through the "Dirty 40"; and was truthfully identified with those accusations through #DForDanielle or similar identifiers. See Ex. B.

526. The May 5 demand expressly stated that Counter-Plaintiff had repeatedly denied the accusations, demanded retraction and correction in substantially the same manner and visibility as the challenged publications, demanded preservation of evidence, and reserved claims for exemplary damages. See Ex. B.

527. More than three months elapsed between the May 5 retraction demand and this August 7, 2026 counterclaim. Counter-Plaintiff alleges that Counter-Defendant had a reasonable opportunity to retract and correct the publications encompassed by that demand before institution of this counterclaim.

**A. May 8, 2026**

528. On or about May 8, 2026, Counter-Defendant broadcast discussion involving Kimberly Smith and allegations concerning persons being watched, followed, or appearing at residences.

529. Counter-Defendant characterized portions of the account as "plausible" and stated in substance that she had no reason to doubt it.

530. The discussion connected those allegations to Counter-Plaintiff.

531. Counter-Plaintiff denies hiring, directing, sending, or authorizing anyone to watch, follow, surveil, intimidate, or appear at Counter-Defendant's residence.

532. Counter-Plaintiff alleges the publication continued the false third-party-surveillance narrative previously presented in October 2025.

533. Counter-Plaintiff does not allege that Counter-Defendant used the word "gun" in this publication.

**B. May 20, 2026**

534. On May 20, 2026, during UNWINEWITHTEDDY | NightTalk, Counter-Defendant stated that she possessed "Danielle's videos all of them her complete catalog."

535. Counter-Defendant discussed "clues" contained throughout Counter-Plaintiff's content.

536. Counter-Defendant stated: "it's all there you just have to put it together."

537. Counter-Plaintiff alleges this as direct evidence of sustained archival monitoring of Counter-Plaintiff's complete content catalog.

538. Counter-Plaintiff alleges that this monitoring continued years after Counter-Plaintiff began demanding cessation.

539. Counter-Plaintiff does not allege that possession of publicly available videos, standing alone, constitutes stalking.

540. Counter-Plaintiff alleges the admission as evidence of continuity, fixation, intent, identity investigation, and the cumulative nature of the broader conduct.

**XXII. JULY 2, 2026 — SAME-NAME COURT-RECORD / CRIMINAL IMPLICATION**

541. On July 2, 2026, Counter-Defendant published UNWINEWITHTEDDY | RunTellThatToo "Who Told You That?"

542. By July 2026, Counter-Defendant knew that "Dani Robertson" or "Danielle Robertson" was an online/stage identifier and not Counter-Plaintiff's legal name.

543. Counter-Defendant nevertheless searched for and discussed real persons bearing the same or similar Robertson name.

544. Counter-Defendant discussed an unrelated court or arrest matter.

545. Counter-Defendant attempted to connect Counter-Plaintiff's previously disclosed staged jail prank to the unrelated real-world court matter.

546. Counter-Defendant characterized the prank as sounding like an "alibi" or "confession."

547. Counter-Plaintiff denies that the unrelated arrest or court proceeding concerned her.

548. Counter-Plaintiff alleges that using unrelated Robertson records despite knowing the identifier was not her legal name materially implied that she had concealed a real arrest, criminal matter, or missed court obligation.

549. Counter-Plaintiff alleges that implication was false.

## XXIII. AUGUST 6–7, 2026 — LAWFUL DISCOVERY DISTINGUISHED; CONTINUED ASSOCIATE TAGGING

550. On August 6, 2026, the Court authorized third-party identity discovery.

551. Counter-Plaintiff does not base Count II upon lawful subpoenas issued within that authorization.

552. The authorization did not retroactively authorize Counter-Defendant's prior self-directed identity investigations or previously premature third-party subpoenas.

553. On August 7, 2026, Counter-Defendant published Defendant-focused litigation videos concerning the recommendation of default judgment.

554. The videos used `#DForDanielle` and `#DaniRobertson`.

555. The video descriptions directly mentioned Down the Rabbit Hole News.

556. Counter-Plaintiff alleges Down the Rabbit Hole News previously requested that Counter-Defendant stop directed tagging.

557. Counter-Plaintiff alleges the directed account mentions nevertheless continued.

558. Counter-Plaintiff does not seek to prohibit Counter-Defendant from publicly discussing this litigation.

559. Counter-Plaintiff alleges only that continued literal account-directed tagging after requests to stop is relevant to the continuing course and requested narrow prospective relief.

## XXIV. PREMATURE GOOGLE SUBPOENA AND PRE-AUGUST-6 IDENTITY EXTRACTION

560. Counter-Defendant filed this action on December 23, 2024.

561. Shortly thereafter, Counter-Defendant attempted to obtain identifying information concerning Counter-Plaintiff through a subpoena directed to Google and through other third-party process.

562. At that time ordinary third-party identity discovery had not been authorized.

563. Counter-Plaintiff learned of the action through notice associated with the attempted subpoena and appeared to protect her anonymity and challenge the subpoena.

564. Counter-Plaintiff alleges that the Google subpoena contained attorney-identifying information suggesting involvement of counsel even though Counter-Defendant was proceeding pro se.

565. Counter-Plaintiff does not presently characterize the subpoena as "forged" absent adjudication of that issue.

566. Counter-Plaintiff alleges the document materially suggested attorney involvement or issuance authority that Counter-Plaintiff disputed.

567. The Court later held that the early subpoenas were premature under Rule 26 and quashed them.

568. Counter-Plaintiff alleges this chronology as evidence that the litigation immediately continued the identity-extraction objective already pursued outside judicial discovery for years.

569. Counter-Plaintiff does not allege that filing a lawsuit itself constitutes stalking.

570. Counter-Plaintiff does not allege that subpoenas later expressly authorized beginning August 6, 2026 constitute stalking.

## XXV. MONETIZATION, ENGAGEMENT, AND ECONOMIC INCENTIVE

571. Counter-Defendant regularly solicited likes, shares, subscriptions, channel memberships, donations, Cash App payments, Super Chats, and audience participation while producing Defendant-focused content.

572. Defendant-focused broadcasts generated views and engagement.

573. Some broadcasts generated direct financial contributions.

574. Counter-Defendant promoted additional channels and cross-platform programming during Defendant-focused content.

575. Counter-Plaintiff does not allege that monetizing lawful commentary is wrongful.

576. Counter-Plaintiff alleges that Defendant-focused controversy supplied Counter-Defendant with audience engagement and economic incentive to continue producing Defendant-centered accusations, identity theories, and broadcasts rather than allowing the controversy to end.

577. Counter-Plaintiff alleges that the sustained combination of monetization and continued Defendant-focused publication is relevant to motive and persistence.

## XXVI. BRAND AND REPUTATIONAL HARM

578. Counter-Plaintiff developed online identities, channels, names, and branding through which audiences recognized her.

579. Counter-Defendant repeatedly attached those identifiers to criminal identities, hacking accusations, cyber-security insinuations, surveillance allegations, dishonesty allegations, financial accusations, and identity controversies.

580. Counter-Defendant repeatedly used Counter-Plaintiff's visible hashtags and backend metadata identifiers.

581. Counter-Plaintiff alleges that this persistent association impaired the reputation attached to her names, channels, and online brand.

582. Counter-Plaintiff has received reports from viewers that Counter-Defendant's Defendant-focused content appeared in their feeds or otherwise reached them through online recommendations or associations.

583. Counter-Plaintiff does not presently allege that a particular metadata tag technologically caused a particular recommendation.

584. Counter-Plaintiff alleges the reports as evidence of actual dissemination and audience exposure.

585. Counter-Plaintiff alleges reputational injury, humiliation, emotional distress, and diversion of substantial time and resources to rebutting accusations and preserving evidence.

586. Counter-Plaintiff alleges reasonable out-of-pocket evidence-preservation, storage, transcription, records, and mitigation expenses to the extent proved.

587. Counter-Plaintiff alleges diversion of productive or revenue-generating time to the extent proved.

588. Counter-Plaintiff does not plead "brand interference" as a separate tort.

## COUNT I

**DEFAMATION, DEFAMATION PER SE, AND DEFAMATION BY IMPLICATION**

589. Counter-Plaintiff incorporates the preceding allegations to the extent applicable to this count.

590. Under Michigan law, defamation requires a false and defamatory communication concerning the plaintiff, publication to a third person, legally sufficient fault, and either actionability independent of special harm or legally cognizable damages. See, e.g., Hawkins v. Mercy Health Servs., Inc., 230 Mich. App. 315, 325; 583 N.W.2d 725 (1998).

591. Michigan recognizes defamation by implication where the overall publication juxtaposes facts or statements in a manner that communicates a materially false defamatory implication. See Hawkins, 230 Mich. App. at 330; Reighard v. ESPN, Inc., 341 Mich. App. 526, 536–40; 991 N.W.2d 803 (2022).

592. Michigan law also treats words imputing commission of a criminal offense as actionable in themselves to the extent provided by MCL 600.2911(1). See Cetera v. Mileto, 342 Mich. App. 441, 450–51; 995 N.W.2d 838 (2022).

593. Counter-Defendant published the challenged statements and presentations to third-party audiences.

594. Counter-Defendant identified Counter-Plaintiff by name, handle, title, hashtag, direct account mention, metadata, voice, DForDanielle identifier, or surrounding context.

595. The publications were therefore "of and concerning" Counter-Plaintiff.

596. Counter-Plaintiff's Danielle Elizabeth Allen theory is not based merely on Counter-Defendant discussing an unrelated person with a similar first name.

597. Counter-Plaintiff alleges a recurring false criminal-identification narrative in which Counter-Defendant associated Counter-Plaintiff's recognizable Dani Robertson identity, account identifiers, voice, friends, hashtags, and branding with Danielle Elizabeth Allen while simultaneously presenting Allen's mugshot, interrogation, arrest, DUI, accessory-after-the-fact allegation, child-death-related investigation, and other criminal material.

598. Counter-Plaintiff alleges that those publications, considered as a whole, communicated the materially false implication that Counter-Plaintiff was the same real-world person associated with those criminal matters.

599. Counter-Plaintiff is not Danielle Elizabeth Allen and did not commit or participate in the crimes or criminal events attributed to Allen.

600. The criminal implication produced actual downstream audience understanding. On June 20, 2023, Donat Ricketts expressly stated that the Dani/Allen identification had been "proven by Unwind with Teddy," directed viewers to Counter-Defendant's content, and then repeatedly accused Dani Robertson of killing a four-month-old child.

601. That downstream audience understanding appeared before the June 20 Ricketts broadcast. In March 2023 and in posts preserved by April 7, 2023, HearHerTV directly treated Counter-Plaintiff as Danielle Elizabeth Allen, used "Mommy Killer," "Baby Killer," or materially equivalent child-killing language, and publicly accused @DaniRobertson of having been arrested as an accessory in the four-month-old child-death matter.

602. The second screenshot captured on April 7 also shows HearHerTV sharing Counter-Defendant's "Love Triangle MURDER IN LAKE CHARLES" video while using child-murder language. Counter-Plaintiff alleges this sequence as evidence that the criminal implication was

actually understood and transmitted by third parties, not merely subjectively inferred by Counter-Plaintiff.

603. Counter-Plaintiff does not seek to hold Counter-Defendant automatically liable for HearHerTV's independent wording; the HearHerTV publications are alleged for meaning, dissemination, causation, reputation, notice of the nature of the controversy, and damages.

604. Counter-Plaintiff does not attribute Ricketts's independent words to Counter-Defendant as though Counter-Defendant personally uttered them; Counter-Plaintiff alleges them as evidence of meaning, dissemination, causation, and reputational injury.

605. The August 15, 2023 Stationhead publication further demonstrates deliberate dissemination after denial: Counter-Defendant stated that Counter-Plaintiff "has not debunked anything," falsely asserted that "Danielle Robertson impersonated Danielle Elizabeth Allen," stated "I need to say that often," and explained that the repetition was intended so an Allen-family member who might be listening would hear it.

606. The March 19, 2024 Jaguar Wright panel further demonstrates Counter-Defendant's affirmative adoption of the disputed identification. Counter-Defendant stated that her own "assessment and the evidence" pointed toward Danielle Elizabeth Allen and asked Wright what clue had convinced her "that it was her." See ECF No. 84-1, PageID.1304–1305.

607. Counter-Plaintiff alleges that these publications materially strengthen the fault analysis because they show both deliberate repetition to third parties and an affirmative evidence-based identification claim after Counter-Plaintiff had repeatedly denied being Allen.

608. The Allen identification remained materially uncertain even in Counter-Defendant's own publications. Counter-Defendant stated in 2023, among other things, "I don't know 100%,"

"Though it's not scientific as a fact right now, the evidence points toward her being that," and "she may not be Danielle Elizabeth Allen."

609. Counter-Plaintiff repeatedly denied the identification, including before Counter-Defendant continued the narrative into 2026.

610. On June 6, 2024, after repeated denials, Counter-Defendant again combined the Allen criminal narrative with statements that she wanted Dani's identity known, jail or orange-jumpsuit imagery, and the statement that Counter-Plaintiff was "not even in custody yet."

611. On February 6, 2026, Counter-Defendant replayed Allen's criminal interrogation and arrest material while again inviting viewers to decide whether Counter-Plaintiff was Allen.

612. On February 9, 2026, Counter-Defendant continued the Allen/DEA/Lake Charles identity theory.

613. Counter-Plaintiff alleges defamation per se to the extent the publications directly or by materially false factual implication imputed criminal conduct to Counter-Plaintiff.

614. Counter-Plaintiff also alleges defamation by implication because the recurring juxtaposition of Counter-Plaintiff's identity with Allen's criminal history was capable of causing viewers to understand that Counter-Plaintiff was Allen or responsible for Allen's criminal conduct.

615. Counter-Plaintiff separately alleges a false "Dirty 40" conspiracy implication to the extent Counter-Defendant identified Counter-Plaintiff as a member, participant, organizer, or co-conspirator in the group after expressly defining that designation as a coordinated and secretive group involved in malicious, nefarious, illegal, harmful, or wrongful activity, including knowing participation, aiding and abetting, conspiracy, criminal charges, and legal responsibility.

616. Counter-Plaintiff denies participating in a criminal conspiracy or organized criminal enterprise with persons Counter-Defendant placed within the "Dirty 40." Counter-Plaintiff alleges crime-based defamation per se only to the extent a particular publication, considered in full context, imputed criminal conduct to Counter-Plaintiff.

617. Counter-Plaintiff alleges the November 28, 2023 "Dirty 40" publication principally as evidence of defamatory meaning, notice, fault, context, and defensive setoff under MCL 600.5823 to the extent the statute applies.

618. Counter-Plaintiff's impersonation-based defamation theories are limited to the following two subjects:

    a. the materially false implication that Counter-Plaintiff impersonated **Sybrena Evans** when communicating with the United States Copyright Office; and

    b. the materially false implication that Counter-Plaintiff submitted copyright takedowns while falsely posing as or using the identity of **Tasha K**.

619. Counter-Plaintiff admits that she communicated with the Copyright Office but denies identifying herself as Sybrena Evans.

620. Counter-Plaintiff does not deny that she and Nicole separately submitted legitimate copyright takedowns concerning HearHerTV material; Counter-Plaintiff denies that she identified herself to YouTube as Tasha K or submitted those complaints while falsely representing that she was Tasha K.

621. Counter-Plaintiff further alleges independently timely publications or implications, to the extent proved, including:

    a. the August 26, 2025 publication falsely portraying Counter-Plaintiff as wrongfully retaining or controlling Joy Ferguson's money;

    b. the October 1, 2025 publication materially implying Counter-Plaintiff caused, arranged, or was connected to suspicious calls, a driveway vehicle, stalking, or surveillance;

    c. the December 23, 2025 Sybrena Evans impersonation implication;

    d. the January 23, 2026 implication of unlawful "backdoor" access to court or government records;

    e. the January 31, 2026 implication that Counter-Plaintiff posed a cyber-security risk or used malware, viruses, tracking, doxxing, or illicit information-gathering techniques;

    f. the February 6 and February 9, 2026 Allen criminal-identification publications;

    g. the May 8, 2026 continuation of a third-party surveillance implication; and

    h. the July 2, 2026 implication that Counter-Plaintiff was connected to an unrelated Robertson arrest or court matter.

622. Counter-Plaintiff alleges each foregoing statement or implication was materially false in the manner specifically pleaded above.

623. Counter-Plaintiff denies hacking, malware distribution, illegal database access, unlawful backdoor access, covert technological intrusion, sending persons to stalk or surveil Counter-Defendant, wrongfully retaining Joy Ferguson's money, or being the unrelated Robertson associated with the July 2026 court-record narrative.

624. Counter-Defendant knew of repeated contrary denials and nevertheless continued renewing substantially similar accusations and implications.

**A. Fault, Constitutional Actual Malice, Common-Law Malice, and Retraction Notice**

625. Counter-Plaintiff alleges at least negligence as to each actionable publication and, to the extent a higher constitutional standard applies, alleges knowledge of falsity or reckless disregard for truth or falsity.

626. Counter-Plaintiff alleges constitutional actual malice from a cumulative knowledge trail rather than from hostility alone. In 2023, Counter-Defendant herself admitted that she did not know "100%" whether Counter-Plaintiff was Allen, stated that the identification was "not scientific as a fact," and later acknowledged that Counter-Plaintiff "may not be Danielle Elizabeth Allen."

627. Counter-Plaintiff repeatedly denied being Allen and repeatedly disputed the criminal associations. Counter-Defendant nevertheless continued publishing the Allen narrative, including titles and presentations that increased rather than reduced the degree of asserted certainty.

628. On August 15, 2023, Counter-Defendant did not merely repeat the Allen premise inadvertently; she stated that she "need[ed] to say" the alleged Allen impersonation "often" so that a family member who might be listening would hear it. Counter-Plaintiff alleges this as evidence of deliberate publication and third-party dissemination after dispute and denial.

629. By March 19, 2024, Counter-Defendant expressly told Jaguar Wright that her own "assessment and the evidence" pointed toward Danielle Elizabeth Allen. Counter-Plaintiff alleges that the shift from acknowledged uncertainty to an affirmative evidence-based representation, despite intervening denials, supports an inference of knowing or reckless persistence rather than innocent mistake.

630. Counter-Plaintiff sent at least six written cease-and-desist notices over the course of the dispute, including notices dated September 3, 2022; October 5, 2022; January 31, 2023; April 24, 2024; September 11, 2024; and June 21, 2025.

631. The April 24, 2024 written notice was particularly specific: it expressly informed Counter-Defendant that Counter-Plaintiff was not Danielle Elizabeth Allen, denied the DUI and

accessory-to-homicide or child-death associations, objected to continuing DForDanielle publications and direct tagging, and demanded cessation.

632. Counter-Defendant thereafter continued Allen-related identity and criminal imagery, including the June 6, 2024 publication immediately preceding Counter-Plaintiff's LARA complaint and later 2026 Allen publications.

633. On May 5, 2026, Counter-Plaintiff escalated the notice from cease-and-desist demands to a formal, publication-focused retraction and correction demand under MCL 600.2911, specifically identifying the DUI, accessory-after-the-fact, child-homicide, Dirty 40 criminal-group, criminal-misidentification, and #DForDanielle associations as false. See Ex. B.

634. Counter-Plaintiff alleges that the combination of Counter-Defendant's own admitted uncertainty, repeated direct denials, specific written correction notices, the April 24, 2024 Allen-specific notice, the May 5, 2026 statutory retraction demand, contrary evidence, and continued materially equivalent publication supports an inference of knowing falsity or reckless disregard as to actionable later publications.

635. Counter-Plaintiff does not equate hostility, audience engagement, or financial motive alone with constitutional actual malice. Those matters are alleged only as circumstantial context together with evidence bearing on Counter-Defendant's subjective doubts, knowledge, persistence, and refusal to correct.

636. Separately, Counter-Plaintiff alleges common-law malice in the sense of bad faith or ill will for purposes of exemplary damages. Counter-Plaintiff relies upon the multi-year persistence after repeated notice; the stated desire to expose Counter-Plaintiff's identity; the September 9, 2023 statement that the presentation was "purposeful"; the statement "I want one person,

your identity"; audience recruitment; associate expansion; the June 6, 2024 statement "Yes, I want her identity known"; and continuation after formal demands to cease, retract, and correct.

637. Counter-Plaintiff alleges compliance with the pre-suit retraction-notice condition of MCL 600.2911(2)(b) as to libel publications encompassed by the May 5, 2026 demand. The demand was sent before this counterclaim, expressly invoked MCL 600.2911, requested retraction and correction in substantially the same manner as the challenged publications, and afforded Counter-Defendant more than three months before this counterclaim was filed. See Ex. B.

638. Michigan treats exemplary damages for libel as compensatory rather than punishment damages and requires common-law malice, meaning bad faith or ill will. Peisner v. Detroit Free Press, Inc., 421 Mich. 125, 136–42; 364 N.W.2d 600 (1984).

639. Counter-Plaintiff therefore seeks exemplary damages under MCL 600.2911(2)(b), as legally available, for the incremental injury to feelings attributable to Counter-Defendant's common-law malice, and only as to publications for which the statutory retraction prerequisite and all other elements are established.

**B. Full Context, Audience Meaning, Damages, and Timeliness**

640. Counter-Plaintiff alleges that Counter-Defendant frequently used questions, qualifiers, hypotheticals, audience comments, "maybe," "could," "rule it in, rule it out," and similar formulations while conveying defamatory factual implications.

641. Counter-Plaintiff therefore pleads the defamatory meaning from each publication's full context rather than converting qualified wording into direct quotations never used.

642. Contemporaneous audience reactions are alleged as evidence of actual audience understanding, not as automatic republications attributable to Counter-Defendant.

643. Counter-Plaintiff's online reputation is particularly dependent upon credibility because her public-facing work includes commentary concerning true crime, homicide cases, public controversies, alleged injustice, activism, and accountability.

644. Counter-Plaintiff alleges that falsely associating her recognizable online identity with an unrelated woman's mugshot, DUI history, interrogation, arrest, accessory-after-the-fact allegation, and child-death-related criminal investigation directly injured the credibility and reputation upon which her public-facing work depends.

645. Counter-Plaintiff alleges reputational injury, humiliation, emotional harm, damage to the reputation associated with her public names and online branding, mitigation expenses, and other proved economic loss.

646. Counter-Plaintiff seeks affirmative damages only for publications for which recovery is timely and legally available.

647. The July 24, 2024 "fake activist that commits fraud" publication is additionally alleged as direct evidence of the criminal and misconduct-oriented reputational framing used against Counter-Plaintiff after the LARA report. Counter-Plaintiff does not seek standalone affirmative defamation damages for that otherwise untimely publication and does not rely upon it as conduct that caused the earlier June 7, 2024 regulatory report.

648. Older publications are pleaded as context, notice, audience meaning, intent, fault, course-of-conduct evidence, and, where MCL 600.5823 permits, defensive setoff up to the amount of Plaintiff's established claim.

## C. Damages Allocation — Independently Timely Affirmative Recovery Versus MCL 600.5823 Setoff

649. Counter-Plaintiff expressly segregates affirmative damages from defensive setoff so that older publications are not pleaded as though MCL 600.5823 created an unrestricted affirmative recovery.

650. As to Count I only, Counter-Plaintiff seeks affirmative defamation damages for independently timely publications or republications occurring within the applicable one-year period. Because this counterclaim is dated August 7, 2026 and Michigan provides a one-year limitations period for libel and slander, MCL 600.5805(11), the principal affirmative Count I period is August 7, 2025 through August 7, 2026, subject to otherwise applicable accrual, republication, tolling, and preservation rules.

651. The independently timely Count I publications presently identified include the August 26, 2025 publication and the later 2025 and 2026 publications specifically pleaded above. Counter-Plaintiff does not seek a standalone affirmative damages judgment based solely on an older defamation publication that is otherwise time-barred.

652. Earlier defamation publications, including 2022-2024 publications and any pre-August 7, 2025 publication that is not independently timely, are pleaded for context, identification, audience meaning, notice, intent, fault, actual-malice evidence, common-law-malice evidence, causation, and reputational history and, where the statutory conditions are satisfied, solely as defensive setoff under MCL 600.5823.

653. Any amount allowed solely through MCL 600.5823 is requested only as a defensive offset or recoupment against the amount established as Plaintiff's claim and not as an affirmative

money judgment exceeding Plaintiff's established claim based solely on otherwise untimely defamation publications.

654. Counts II, III, and IV remain governed by the limitations, accrual, causation, and damages rules applicable to those distinct causes of action; this Count I allocation is not intended to impose the one-year defamation cutoff on non-defamation causes of action.

655. Counter-Plaintiff requests that damages be allocated by count and by actionable publication or conduct as necessary to prevent duplication or double recovery.

656. Counter-Plaintiff seeks prospective relief against particular statements or materially equivalent implications only after they are adjudicated false and actionable.

## COUNT II

## CIVIL ACTION FOR DAMAGES RESULTING FROM STALKING

## MCL 600.2954; MCL 750.411h AND 750.411i

657. Counter-Plaintiff incorporates the preceding allegations to the extent applicable to this count.

658. This is Counter-Plaintiff's principal course-of-conduct counterclaim.

659. MCL 600.2954 permits a victim to maintain a civil action against an individual who engages in conduct prohibited by MCL 750.411h or 750.411i.

660. Civil stalking tracks the statutory stalking elements.

661. Stalking concerns a willful course of conduct involving repeated or continuing harassment.

662. Harassment includes repeated or continuing unconsented contact directed toward a victim that would cause a reasonable person emotional distress and that actually causes the victim emotional distress.

663. "Unconsented contact" includes contact initiated or continued without consent or in disregard of an expressed desire that the contact be avoided or discontinued.

664. Conduct serving a legitimate purpose and constitutionally protected activity cannot be converted into stalking merely because it is unwelcome.

665. Counter-Plaintiff therefore does not allege that every video, criticism, public-record search, hashtag, lawsuit filing, or discussion of a common public topic constitutes stalking.

## A. Actual Notice

666. Counter-Plaintiff expressly withdrew consent for continuing Defendant-directed contact.

667. Counter-Plaintiff sent multiple cease-and-desist demands beginning in 2022.

668. Counter-Plaintiff used available platform blocking tools.

669. Counter-Plaintiff demanded cessation of direct account tagging.

670. Counter-Plaintiff demanded that Counter-Defendant leave Defendant-controlled membership spaces.

671. On January 27, 2025, Counter-Defendant herself acknowledged "your request for me to remove myself from membership."

672. Counter-Defendant replayed the direct instruction "Exit all my memberships."

673. Those admissions establish actual knowledge of withdrawn consent.

## B. Repeated or Continuing Conduct

674. Counter-Plaintiff alleges that despite actual notice, Counter-Defendant continued qualifying conduct including:

a. repeated direct electronic account tagging;

675. The volume of preserved literal @ mentions and account-directed tagging is addressed in Section VIII above. Counter-Plaintiff has preserved the underlying publication catalog and will

Page 78

further particularize the dates, identifiers, and post-notice frequency in an amended pleading or other filing permitted by the Court.

    b. repeated demands that Counter-Plaintiff call, respond, answer, enter broadcasts, or engage;

    c. continued membership/access after express requests to leave;

    d. alleged circumvention of Defendant-controlled website restrictions;

    e. cross-platform entry and monitoring after attempts to exclude Counter-Defendant;

    f. remaining in Counter-Plaintiff's Stationhead space after an express direction to leave;

    g. repeated associate-directed account tagging after requests to cease;

    h. repeated efforts to enlist third persons in identifying or scrutinizing Counter-Plaintiff;

    i. audience-assisted identity searches;

    j. repeated direct association of Counter-Plaintiff with false criminal, hacking, surveillance, and dangerous-conduct narratives; and

    k. additional qualifying contact established through discovery.

676. Counter-Plaintiff alleges that Counter-Defendant's conduct was repeated, noncontinuous, and reflected continuity of purpose.

677. The alleged course did not end after the initial 2022 cessation demands.

678. It continued through 2023.

679. It continued through 2024.

680. It continued through 2025.

681. It continued through 2026.

**C. Monitoring and Identity Campaign as Context**

682. Counter-Plaintiff alleges the pre-August 6, 2026 identity-investigation activity as context showing continuity and purpose.

683. Counter-Defendant repeatedly analyzed Counter-Plaintiff's voice.

684. Counter-Defendant repeatedly analyzed alleged physical characteristics.

685. Counter-Defendant searched for unrelated persons bearing similar names.

686. Counter-Defendant analyzed Counter-Plaintiff's account relationships and associates.

687. Counter-Defendant solicited audience assistance in identification.

688. Counter-Defendant stated "I want to find your identity."

689. On February 3, 2026, Counter-Defendant asked "So, how do we find out who she is?"

690. On May 20, 2026, Counter-Defendant admitted possessing Counter-Plaintiff's "complete catalog" and searching it for clues.

691. Counter-Plaintiff does not allege that those speech or research acts independently establish stalking.

692. Counter-Plaintiff alleges them as evidence of the purpose and continuity surrounding separately pleaded unconsented conduct.

**D. Associates**

693. Counter-Plaintiff alleges that the course expanded to persons associated with her.

694. Those persons included moderators, supporters, Down the Rabbit Hole News, Lenora, Jenny Penny, and others.

695. Counter-Plaintiff alleges Down the Rabbit Hole News expressly requested that directed tagging stop.

696. Counter-Defendant nevertheless continued direct account mentions in Defendant-focused publications, including August 7, 2026.

697. Counter-Plaintiff alleges the associate-directed activity as part of the cumulative course and as a reason narrowly tailored prospective relief must include attempts to reach or pressure Counter-Plaintiff through persons associated with her.

### E. Objective and Actual Emotional Distress

698. Counter-Plaintiff alleges that the repeated conduct after years of cessation demands would cause a reasonable person in her circumstances to feel harassed, intimidated, frightened, threatened, or emotionally distressed.

699. Counter-Plaintiff alleges that she actually experienced substantial emotional distress from the continuing conduct.

700. Counter-Plaintiff experienced persistent distress associated with repeated identity exposure attempts, criminal associations, direct unwanted contact, and the extension of the controversy to associates.

701. Counter-Plaintiff experienced fear concerning involuntary unmasking and offline targeting.

702. Counter-Plaintiff experienced humiliation and reputational distress.

703. Counter-Plaintiff was required repeatedly to monitor, preserve, document, and respond to conduct she had already requested be stopped.

704. The duration and persistence compounded the distress.

### F. Legitimate-Purpose / First Amendment Limitation

705. Counter-Plaintiff expressly excludes from Count II lawful subpoenas and discovery authorized beginning August 6, 2026.

706. Counter-Plaintiff expressly excludes ordinary public discussion of this litigation.

707. Counter-Plaintiff expressly excludes criticism, opinion, and lawful reporting.

708. Counter-Plaintiff expressly excludes lawful fair use or ordinary discussion of public topics.

709. Counter-Plaintiff does not seek ownership of public hashtags.

710. Public posts, metadata, monetization, and identity commentary are alleged only as context unless the particular conduct independently satisfies Michigan law.

## G. Damages

711. Counter-Plaintiff alleges damages resulting from the prohibited course.

712. Those damages include emotional distress and reputational consequences.

713. Counter-Plaintiff alleges reasonable out-of-pocket preservation and mitigation costs to the extent legally recoverable.

714. Counter-Plaintiff alleges diversion of time and other economic losses to the extent proved.

715. Counter-Plaintiff seeks actual damages, exemplary damages, costs, and other relief authorized by MCL 600.2954. Counter-Plaintiff is self-represented and does not presently seek attorney fees.

## H. Earlier Conduct / Setoff

716. Conduct outside the ordinary limitations period is alleged as background, notice, intent, and course-of-conduct evidence.

717. To the extent any older counterclaim was not barred when Plaintiff's claim accrued, Counter-Plaintiff invokes MCL 600.5823 defensively.

## COUNT III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

718. Counter-Plaintiff incorporates the preceding allegations to the extent applicable to this count.

719. To establish a prima facie claim of intentional infliction of emotional distress, a plaintiff must establish extreme and outrageous conduct, intent or recklessness, causation, and severe emotional distress. *Dalley v. Dykema Gossett, PLLC*, 287 Mich. App. 296, 321; 788 N.W.2d 679 (2010).

720. Counter-Plaintiff does not base this claim merely upon insults, criticism, ordinary disagreement, or constitutionally protected speech.

**A. Non-Speech, Access-Boundary, and Direct-Contact Conduct**

721. Count III does not rely on speech standing alone. Counter-Plaintiff specifically relies upon alleged non-speech, access, and contact conduct as part of the cumulative outrageousness analysis.

722. In May 2024, after Counter-Plaintiff attempted to block Counter-Defendant from a Defendant-controlled website or online space, Counter-Defendant allegedly described accessing the site from a different physical location or computer, including a public library. Counter-Plaintiff alleges that conduct as deliberate circumvention of an expressed access boundary.

723. Counter-Plaintiff also expressly directed Counter-Defendant to "Exit all my memberships," and Counter-Defendant later acknowledged "your request for me to remove myself from membership." Counter-Plaintiff alleges continued membership or access after withdrawal of consent as conduct distinct from ordinary criticism.

724. Counter-Plaintiff further relies upon repeated literal account-directed tagging after written cease demands, repeated cross-platform entry or monitoring after blocks or exclusion efforts, and the February 11, 2026 Stationhead incident in which Counter-Defendant did not immediately leave after being directly told to leave.

725. Counter-Plaintiff further relies on alleged efforts to connect her pseudonymous online identity to real-world identity and location information, including physical-address, residence, IP/location, and surveillance implications, together with attempts to obtain identifying account data outside then-existing court authorization. Counter-Plaintiff alleges these acts as part of the cumulative fear of offline targeting, while not seeking IIED liability merely for protected discussion of public records or public locations.

726. Counter-Plaintiff specifically limits this theory to preauthorization identity-data efforts and other conduct outside then-existing court authorization. Counter-Plaintiff does not base Count III on discovery later expressly authorized by the Court.

727. The foregoing access-boundary, contact, and identity-location conduct is alleged together with the publication history to show a sustained course, not to transform any isolated public webpage view, tag, or lawful investigation into IIED by itself.

728. Counter-Plaintiff alleges the cumulative multi-year course rather than any one isolated video.

729. Over approximately four years, Counter-Defendant allegedly:

a. repeatedly associated Counter-Plaintiff with unrelated criminal identities;

b. continued the Danielle Elizabeth Allen association after repeated express denials;

c. replayed Allen's interrogation and arrest materials while continuing to suggest Counter-Plaintiff might be Allen;

d. accused or implied that Counter-Plaintiff hacked, tracked, sent viruses, used illicit "backdoor" access, secretly obtained records, or, in the two specifically pleaded instances, falsely impersonated Tasha K or Sybrena Evans;

Page 84

e. accused or implied that Counter-Plaintiff caused persons to stalk or surveil Counter-Defendant;

f. repeatedly demanded Defendant's direct engagement after requests to cease;

g. allegedly circumvented Defendant-controlled access boundaries;

h. continued maintaining access or membership after demands to leave;

i. monitored Counter-Plaintiff across platforms;

j. maintained and searched Counter-Plaintiff's "complete catalog" for identifying clues;

k. extended Defendant-focused conduct to persons associated with Counter-Plaintiff;

l. repeatedly used Counter-Plaintiff-associated identifiers and metadata to attach Defendant-focused content to Counter-Plaintiff's online identity; and

m. continued substantial parts of that course through 2026.

730. Counter-Defendant had repeated notice that Counter-Plaintiff wanted the conduct to stop.

731. Counter-Defendant had repeated notice of Counter-Plaintiff's denial of the principal identity accusations.

732. Counter-Plaintiff alleges that the persistence after years of notice distinguishes this case from an ordinary online disagreement.

733. Counter-Plaintiff alleges that the duration, repetition, escalation, identity focus, criminal associations, boundary circumvention, and continued post-notice conduct were extreme and outrageous when considered cumulatively.

734. Counter-Plaintiff alleges Counter-Defendant intended the continuing campaign or acted recklessly regarding the likelihood that it would cause severe distress.

735. Counter-Plaintiff alleges the conduct actually caused severe emotional distress.

736. The distress includes continuing fear concerning identity exposure and offline targeting, humiliation, reputational distress, anxiety associated with the continuing campaign, and disruption caused by the need continually to protect, document, and defend herself.

737. Counter-Plaintiff alleges causation between the sustained conduct and that distress.

738. Counter-Plaintiff seeks all damages legally recoverable.

739. Counter-Plaintiff expressly preserves First Amendment limitations and does not seek IIED liability for protected speech standing alone.

## COUNT IV

**KNOWING MATERIAL COPYRIGHT MISREPRESENTATION**

**17 U.S.C. § 512(f)**

740. Counter-Plaintiff incorporates the preceding allegations only to the extent consistent with this federal claim.

741. Counter-Plaintiff created a composite meme using multiple source components.

742. Those components included an image of Counter-Defendant derived from Michigan court footage.

743. The background or bookshelf portion came from separately sourced stock material.

744. The red hockey-style clothing/body component came from a separately sourced image.

745. Counter-Plaintiff selected and arranged the various components into a composite meme.

746. Counter-Defendant did not record the court footage.

747. Counter-Defendant did not create Counter-Plaintiff's composite arrangement.

748. Counter-Defendant nevertheless asserted copyright rights concerning the image.

749. In the original case materials, Counter-Defendant described the challenged image as her likeness from a PPO proceeding and alleged that Counter-Plaintiff removed the background and used the image.

750. Counter-Defendant thereafter sought registration for a work identified as "Miss Evans."

751. Counter-Defendant's application materials acknowledged that the underlying image came from court-recorded video.

752. Counter-Plaintiff alleges that Counter-Defendant asserted authorship or copyright rights substantially because the image depicted Counter-Defendant's own likeness.

753. The Copyright Office later refused registration.

754. Counter-Plaintiff alleges the refusal explained, in substance, that Counter-Defendant's likeness did not itself constitute authorship in the court-recorded material and that Counter-Defendant had not established authorship/authority sufficient to register the underlying audiovisual work.

755. The copyright claim in this action was later dismissed with prejudice on the merits.

## A. DMCA Notices

756. On or about December 12, 2024, Google/YouTube notified Counter-Plaintiff concerning copyright complaints submitted by Counter-Defendant.

757. Any earlier reference to "December 12, 2004" was a typographical error; the intended date is December 12, 2024.

758. Counter-Defendant submitted copyright infringement notices affecting four Counter-Plaintiff videos.

759. In those notices Counter-Defendant represented that Counter-Plaintiff's identified material infringed copyright rights owned or controlled by Counter-Defendant.

760. Counter-Plaintiff alleges that those ownership and infringement representations were materially false.

761. Counter-Plaintiff alleges Counter-Defendant knew she had not authored the court recording.

762. Counter-Plaintiff alleges Counter-Defendant knew she had not authored Counter-Plaintiff's composite arrangement.

763. Counter-Plaintiff alleges Counter-Defendant therefore knew she lacked the exclusive copyright rights she represented as the basis for removal.

764. Section 512(f) imposes liability upon a person who knowingly materially misrepresents under § 512 that material or activity is infringing and causes reliance damages.

**B. Service-Provider Reliance**

765. YouTube acted upon Counter-Defendant's notices.

766. Four Counter-Plaintiff videos were removed or disabled.

767. Counter-Plaintiff received notice of channel consequences and a deadline requiring response to avoid additional adverse action or termination risk.

768. Counter-Plaintiff was required to submit counter-notifications or otherwise invoke the platform's challenge process.

769. Counter-Plaintiff alleges approximately ten days of lost or materially impaired ordinary YouTube activity as a result of the takedown process.

770. Counter-Plaintiff alleges corresponding lost revenue during that period.

771. Counter-Plaintiff also incurred time and reasonable costs responding to the takedowns and preserving evidence.

**C. Relationship to Filing of This Action**

772. Counter-Defendant sought copyright registration during the same December 2024 period.

773. Counter-Defendant filed this action on December 23, 2024.

774. Counter-Plaintiff alleges that the lawsuit was filed while the registration process remained incomplete.

775. Counter-Plaintiff alleges that the filing prevented or delayed ordinary restoration of the affected videos through the platform process.

776. Counter-Plaintiff alleges that the resulting losses were caused by the service provider's reliance upon the challenged copyright representations.

777. Counter-Plaintiff seeks all damages recoverable under 17 U.S.C. § 512(f).

778. Counter-Plaintiff does not assert a separate copyright-infringement counterclaim concerning Counter-Defendant's later Stationhead use of Counter-Plaintiff's content in this pleading.

## XXVII. REQUEST FOR NARROWLY TAILORED PROSPECTIVE INJUNCTIVE RELIEF

779. Counter-Plaintiff's principal objective throughout this dispute has been cessation.

780. Counter-Plaintiff first attempted voluntary cessation.

781. Counter-Plaintiff sent cease-and-desist notices.

782. Counter-Plaintiff used blocking and exclusion mechanisms.

783. Counter-Plaintiff demanded that Counter-Defendant leave membership spaces.

784. Counter-Plaintiff sought a PPO.

785. Counter-Plaintiff sought regulatory assistance.

786. Counter-Plaintiff alleges that the relevant course nevertheless continued into August 2026.

787. Counter-Plaintiff alleges there is therefore a real prospect of recurrence absent prospective relief.

788. Counter-Plaintiff does not seek an order prohibiting Counter-Defendant from mentioning her.

789. Counter-Plaintiff does not seek an order prohibiting criticism.

790. Counter-Plaintiff does not seek an order prohibiting lawful reporting of public court proceedings.

791. Counter-Plaintiff does not seek an order prohibiting lawful discovery authorized by this Court.

792. Counter-Plaintiff does not seek ownership of hashtags.

793. Counter-Plaintiff does not seek to prohibit constitutionally protected speech.

794. Counter-Plaintiff requests only relief narrowly tailored to conduct adjudicated unlawful.

795. To the extent authorized by applicable law and Fed. R. Civ. P. 65, Counter-Plaintiff requests prospective relief prohibiting Counter-Defendant from:

a. repeatedly directing electronic communications to Counter-Plaintiff, including literal account tagging or direct account mentions intended to create account-directed contact, after notice that such direct contact is unwanted;

b. repeatedly demanding that Counter-Plaintiff call, answer, respond, enter a broadcast, or otherwise directly engage after notice to cease;

c. circumventing Counter-Plaintiff-controlled website, membership, account, or platform access restrictions for the purpose of continuing conduct adjudicated unlawful;

d. remaining in Defendant-controlled interactive spaces after express exclusion where the continued presence constitutes qualifying unconsented contact;

e. directing, soliciting, encouraging, or coordinating third persons to locate, identify, contact, surveil, dox, or obtain nonpublic identifying information concerning Counter-Plaintiff outside lawful court-authorized discovery;

f. using persons associated with Counter-Plaintiff as a means to reach, pressure, locate, or perpetuate conduct adjudicated to constitute stalking of Counter-Plaintiff;

g. repeatedly directing unwanted electronic contact to known associates of Counter-Plaintiff for the purpose of facilitating conduct adjudicated to constitute stalking or unlawful harassment;

h. republishing particular statements or materially equivalent defamatory implications only after those statements or implications have been finally adjudicated false and actionable; and

i. engaging in other specific conduct finally adjudicated to violate MCL 750.411h, MCL 750.411i, or other applicable law.

796. Counter-Plaintiff requests that any injunction contain an express carveout preserving:

a. lawful court-authorized discovery;

b. ordinary litigation communications permitted by law;

c. criticism and opinion;

d. truthful reporting;

e. lawful fair use;

f. general public discussion of this litigation; and

g. other constitutionally protected expression.

797. Michigan courts require careful First Amendment scrutiny where stalking-based relief reaches speech. See TT v. KL, 334 Mich. App. 413, 442–50; 965 N.W.2d 101 (2020).

798. Counter-Plaintiff therefore requests conduct-specific relief rather than a general prohibition on speech.

## XXVIII. DAMAGES

799. Counter-Plaintiff alleges actual damages to the extent caused by actionable conduct and proved.

800. Those damages include injury to reputation and to the reputation associated with Counter-Plaintiff's online names, channels, and branding.

801. Counter-Plaintiff alleges humiliation, emotional distress, and, as to Count III, severe emotional distress to the extent established.

802. As to actionable libel encompassed by the May 5, 2026 pre-suit retraction demand, Counter-Plaintiff seeks exemplary damages under MCL 600.2911(2)(b) only upon proof of common-law malice and only to compensate incremental injury to feelings attributable to bad faith or ill will, consistent with Peisner v. Detroit Free Press, Inc., 421 Mich. 125; 364 N.W.2d 600 (1984).

803. Counter-Plaintiff alleges fear concerning involuntary identity exposure and offline targeting.

804. Counter-Plaintiff alleges disruption caused by the repeated need to monitor, preserve, rebut, and respond to the continuing accusations and conduct.

805. Counter-Plaintiff has incurred actual out-of-pocket expenses reasonably associated with preserving, documenting, responding to, and mitigating the alleged continuing conduct, including digital or cloud storage, evidence preservation, transcription, records, and amounts actually paid to non-attorney persons or services assisting with evidence collection, preservation, organization, or review.

806. Counter-Plaintiff seeks those out-of-pocket amounts only to the extent they were reasonably incurred as a result of actionable conduct, can be proved, and are legally recoverable.

807. Counter-Plaintiff alleges separately provable lost income, lost revenue, or diversion of revenue-producing time to the extent causally attributable and legally recoverable.

808. Counter-Plaintiff alleges specific lost YouTube revenue attributable to the challenged DMCA takedown period to the extent proved.

809. Counter-Plaintiff does not allege that ordinary litigation expenses automatically constitute tort damages.

810. Counter-Plaintiff does not seek compensation merely for her own pro se time.

811. Counter-Plaintiff is self-represented and does not presently seek attorney fees.

812. Counter-Plaintiff separately seeks allowable taxable or statutory costs to the extent authorized by applicable law, including MCL 600.2954, Fed. R. Civ. P. 54(d), and 28 U.S.C. § 1920.

813. Counter-Plaintiff seeks only damages and costs legally recoverable under each applicable cause of action.

## XXIX. PRAYER FOR RELIEF

WHEREFORE, Defendant/Counter-Plaintiff respectfully requests that the Court:

A. enter judgment in Defendant's favor on Plaintiff's remaining LARA-based defamation claim;

B. hold that qualifying good-faith LARA reporting and cooperation are protected by MCL 333.16244 to the extent established;

C. determine Plaintiff's alleged Williams and Robertson regulatory publications separately according to their respective speakers, contents, dates, defenses, causation, and damages,

and decline to impute Williams's independent acts to Defendant absent legally sufficient proof of agency or concerted liability;

D. enter judgment for Counter-Plaintiff on Count I as to statements and implications proved false, defamatory, published, actionable, and made with the legally required fault;

E. award actual damages on Count I, including proved reputational, emotional, business, and economic damages legally recoverable under Michigan law;

F. award exemplary damages on Count I to the extent permitted by MCL 600.2911(2)(b), upon proof of the applicable pre-suit retraction requirement, common-law malice, and incremental injury to feelings attributable to bad faith or ill will;

G. enter judgment for Counter-Plaintiff on Count II for conduct proved prohibited by MCL 750.411h or MCL 750.411i and actionable under MCL 600.2954;

H. award the actual damages, exemplary damages, allowable costs, and other relief authorized by MCL 600.2954, while recognizing that Counter-Plaintiff does not presently seek attorney fees;

I. enter judgment for Counter-Plaintiff on Count III for intentional infliction of emotional distress;

J. enter judgment for Counter-Plaintiff on Count IV under 17 U.S.C. § 512(f);

K. award damages caused by the four challenged copyright takedowns, including proved lost revenue and other damages incurred as a result of service-provider reliance and legally recoverable under § 512(f);

L. apply MCL 600.5823 to qualifying older counterclaims on a publication-by-publication basis and only to the extent permitted by its terms;

M. enter narrowly tailored prospective injunctive relief substantially as requested above;

N. limit any speech-related injunction to specific conduct or particular statements or materially

  equivalent implications finally adjudicated unlawful, false, and actionable, with

  appropriate protection for lawful court-authorized discovery, truthful reporting, criticism,

  opinion, and other constitutionally protected expression;

O. award allowable taxable or statutory costs;

P. grant such declaratory or equitable relief as is lawful and necessary to prevent recurrence of

  conduct adjudicated unlawful; and

Q. grant such other and further relief as the Court deems just and proper.

## XXX. NO JURY DEMAND

814. Defendant/Counter-Plaintiff does not presently demand a jury trial.


Respectfully submitted,

   **Defendant/Counter-Plaintiff, Pro Se**

sued under the disputed designation "Danielle Robertson"

4539 N. 22nd Street

Phoenix, Arizona 85016-4639

DaniRobertson@proton.me

Dated: August 7, 2026

Signature: Danielle Robertson

Defendant/Counter-Plaintiff, Pro Se


## CERTIFICATE OF SERVICE

   I certify that on August 7, 2026, I served a true and correct copy of the foregoing

Defendant's Answer to Remaining Claim, Affirmative Defenses, Counterclaims, and Request for


Page 95

Prospective Injunctive Relief upon Plaintiff in the manner permitted by the Federal Rules of Civil Procedure, the Local Rules of this Court, and applicable orders.

Dated: August 7, 2026

Signature: Danielle Robertson

Defendant/Counter-Plaintiff, Pro Se

## CITATION-CHECK CERTIFICATION

Consistent with ECF No. 173, I certify that before signing and filing this pleading, I personally checked each legal citation appearing herein and confirmed that the citation is accurate and supports the proposition for which it is cited.

Dated: August 7, 2026

Signature: Danielle Robertson

Defendant/Counter-Plaintiff, Pro Se

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

SYBRENA EVANS, Plaintiff/Counter-Defendant

v.

DANIELLE ROBERTSON, et al., Defendants

Case No. 5:24-cv-13435-JEL-EAS

## INDEX OF EXHIBITS

**Exhibit A**   February 24-25, 2025 LARA Investigative Correspondence
and Supporting Evidence Submission, LARA Allegation No. 56-24-003982

**Exhibit B**   May 5, 2026 Formal Retraction and Correction Demand
Under Michigan Defamation Law (MCL 600.2911)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SYBRENA EVANS, Plaintiff/Counter-Defendant

v.

DANIELLE ROBERTSON, et al., Defendants

Case No. 5:24-cv-13435-JEL-EAS
Hon. Judith E. Levy
Mag. Judge Elizabeth A. Stafford

## EXHIBIT A

**February 24-25, 2025 LARA Investigative Correspondence and Supporting Evidence Submission**

LARA Allegation No. 56-24-003982

 Gmail

DANI R <danimontana2022@gmail.com>

## LARA Allegation #56-24-003982

4 messages

**Lehman, Meghan (LARA)** <LehmanM4@michigan.gov>                    Fri, Feb 21, 2025 at 9:53 AM
To: "Danimontana2022@gmail.com" <Danimontana2022@gmail.com>

Dani Robertson:

I am an investigator with the Michigan Department of Licensing and Regulatory Affairs (LARA).

I am contacting you regarding Sybrena Evans, PA.

Please call me at the phone number listed below at your earliest convenience.

Thank you.

Meghan Lehman, Regulation Agent

Public Health Code Investigations Section

Investigations & Inspections Division

Bureau of Professional Licensing

Direct Line: 248.404.0201

www.michigan.gov/bpl



PROTECT PEOPLE &
PROMOTE BUSINESS

**DANIELLE ROBERTSON** <danimontana2022@gmail.com>                    Mon, Feb 24, 2025 at 5:25 PM
To: "Lehman, Meghan (LARA)" <LehmanM4@michigan.gov>

# Sybrena Evans: Stalking, Harassment, and Associations

(AKA **UnwineWithTeddy**, **AinatashaTheMachine**, **RunTellThatToo** on YouTube)

## 1. Admitted Malicious Doxxing and Unauthorized Access (Timestamp: 0:00 – 0:23)

- **Evans openly admits** to doxxing people, meaning she **maliciously posts private information online to harm them**.
- She **confessed to traveling to different locations** to **bypass a website block** and regain access after being restricted.
- **Continues stalking** by refusing to leave my **private YouTube memberships** on **three different channels** (which I cannot block due to YouTube limitations).

## 2. Coordinated Harassment with Violent Individuals

### A. Donat Ricketts Connection (3:27 – 17:52)

- **Evans collaborates with Donat Ricketts**, a person with a **history of violent threats**, **domestic violence**, and **elder abuse charges**.
- Encouraged him to harass **Evangelist Valerie and her sister**, falsely claiming I might be related to them.
- Donat later distanced himself from Evans, stating he was gifting off of me for content, and he was done with her identification games, etc.
- **Donat Ricketts' direct threats (17:52):**
  - **Publicly threatened in a YouTube video** to **"beat up"** and **"off"** me.
  - Stated:
    - **"Bitch, I will knock on your door and beat your mother fawking ass."**
    - **"If you live close by or somewhere where I know, bitch, I will off you."**
  - Engaged in **sexual harassment** via a **public YouTube community post**, stating:
    - **"Let me Angry fuck you."**
    - **"Might show up at your house"** after **obtaining my address from YouTube**.

### B. Marquisio Watson Connection (26:31 – 56:12)

- In **July 2024, Evans linked up with Marquisio Watson**, another individual with a **violent history**
- Watson **echoed Evans' defamatory claims**, falsely accusing me of being **Danielle Allen** (a woman accused in a homicide but later cleared).
- **Evans and Watson falsely accused me of striking her channel**, using an email from **Tasha K's fan club**, when it was later proven that **Nicole Johnson (Tasha K's Fan Club President) was responsible**.
- **Watson later distanced himself from Evans**, stating that she was playing victim and likes to play the victim.
- **Threats from Watson after linking with Evans (56:12):**
  - Evans **praised** his "boots-on-the-ground" approach **while he directly threatened me**.

## 3. False Accusations of Hacking (1:08:00)

- Evans **falsely accused me of hacking her YouTube channel** and **manipulating source codes**, despite having no technical knowledge.
- **YouTube confirmed her claims were baseless** and advised me to **report her videos for harassment**.
- Evans made **multiple videos spreading these false claims** and later **hid them**, but she continues pushing the narrative.