100

FILED
AUG 17 2026
CLERK'S OFFICE
DETROIT

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**SYBRENA EVANS,**

Plaintiff/Counter-Defendant,

v.

**DANIELLE ROBERTSON, et al.,**

Defendants.

Case No. 5:24-cv-13435-JEL-EAS

Hon. Judith E. Levy

Mag. Judge Elizabeth A. Stafford

---

**DEFENDANT'S FIRST AMENDED ANSWER TO REMAINING CLAIM, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND REQUEST FOR PROSPECTIVE INJUNCTIVE RELIEF**

Defendant/Counter-Plaintiff, sued under the disputed designation **"Danielle Robertson,"** appearing pro se, answers the sole remaining claim and states her affirmative defenses and counterclaims against Plaintiff/Counter-Defendant Sybrena Evans as follows.

## I. PRELIMINARY STATEMENT, SCOPE OF CASE, AND PRESERVATION OF OBJECTIONS

1. Defendant understands the present merits scope of this action from the Court's prior rulings.
2. ECF No. 138 stated: "The sole remaining claim would be Evans's defamation claim based on Robertson's and Williams's alleged LARA complaints." ECF No. 138, PageID.3082.
3. District Judge Levy subsequently adopted ECF No. 138 in ECF No. 173. ECF No. 173, PageID.3932–3934.
4. Defendant therefore answers the remaining claim concerning her alleged report to the Michigan Department of Licensing and Regulatory Affairs ("LARA").

5. Defendant understands that ECF Nos. 175 and 176 subsequently addressed sanctions, discovery, and identity-related matters.

6. To the extent those later orders are construed as restoring substantive causes of action previously dismissed, Defendant preserves her objection and respectfully relies upon the disposition stated in ECF Nos. 138 and 173 unless and until the District Court expressly modifies that disposition.

7. Defendant's participation in this action under court order and threat or recommendation of default is not intended as a voluntary waiver of objections previously or timely preserved concerning personal jurisdiction, process, service of process, compelled identity disclosure, anonymous expression, the First Amendment, or identity-related discovery.

8. Defendant specifically preserves, to the extent previously and timely asserted, defenses under Fed. R. Civ. P. 12(b)(2), (4), and (5).

9. Defendant also preserves her First Amendment objections concerning compelled disclosure of her legal identity and anonymous expression.

10. Defendant is willing to comply with lawful orders concerning service and discovery while preserving those objections.

11. Defendant further distinguishes between lawful discovery expressly authorized by the Court and Plaintiff's earlier extra-judicial or premature identity-seeking activities.

12. Defendant alleges that the Court did not expressly authorize third-party identity discovery through subpoenas until August 6, 2026.

13. Defendant does not base her stalking counterclaim upon subpoenas or other identity discovery conducted within the lawful scope of the Court's August 6, 2026 authorization.

14. Defendant alleges that years of identity investigation preceding August 6, 2026 were not retroactively transformed into court-authorized discovery by that later order.
15. Except as expressly admitted, Defendant denies all allegations against her and demands strict proof.

## II. ANSWER TO PLAINTIFF'S REMAINING LARA-BASED DEFAMATION CLAIM

16. Defendant admits that she submitted information concerning Plaintiff to the Michigan Department of Licensing and Regulatory Affairs ("LARA").
17. Defendant alleges that her own complaint was created and attested on or about June 7, 2024.
18. Defendant denies filing a medical-malpractice complaint.
19. Defendant denies accusing Plaintiff of negligently treating Defendant or any patient.
20. Defendant's complaint answered "No" to the patient-treatment inquiry.
21. Defendant sought regulatory review of conduct by a licensed physician assistant that Defendant believed warranted review by the professional licensing authority.
22. Defendant did not purport to determine that Plaintiff had violated the Michigan Public Health Code; Defendant supplied information and requested that LARA make its own regulatory determination.
23. Michigan's Public Health Code addresses professional matters broader than patient-treatment malpractice, and Article 15 authorizes investigation of alleged grounds for discipline. See MCL 333.16221; MCL 333.16231.
24. Defendant does not allege that every objectionable online act automatically constitutes professional misconduct. Defendant alleges that she believed the conduct she documented warranted review by the agency charged with making that determination.

25. Before Defendant's June 7, 2024 complaint, Plaintiff had publicly invoked her medical education and professional licensure during Defendant-focused broadcasts.

26. Defendant alleges that this professional context informed her decision to seek review by the licensing authority; Defendant does not contend that every statement Plaintiff made online was itself a statutory disciplinary violation.

27. Defendant further alleges that the pre-report professional context included Plaintiff's specific May 2024 public statements concerning her medical license and professional status, as pleaded below.

28. Before Defendant submitted her June 7, 2024 regulatory report, Plaintiff had repeatedly and publicly invoked her medical education, active professional licensure, clinical experience, and asserted professional judgment while conducting Defendant-focused identity analysis. During the March 2023 Danielle Elizabeth Allen comparison, Plaintiff stated that she was licensed to practice medicine, represented that her professional license was current, stated that she had examined "thousands of people," referred to having "been in surgery," and characterized at least part of her anatomical comparison as her "professional opinion."

29. Plaintiff again publicly invoked her professional status in May 2024, including stating that she was "a licensed physician assistant here in Michigan." Defendant alleges that Plaintiff's repeated invocation of her medical education, active license, clinical experience, and asserted professional judgment materially informed Defendant's good-faith decision to submit the documented conduct to the state agency charged with regulating Plaintiff's professional license.

30. Defendant does not allege that Plaintiff's possession of a professional license or invocation of that license was itself unlawful. Defendant alleges that Plaintiff voluntarily invoked her

professional status as authority while conducting public anatomical and identity analysis concerning Defendant, and Defendant therefore reasonably sought review by the licensing authority rather than purporting to determine for herself whether Plaintiff's conduct constituted professional misconduct.

31. Counter-Plaintiff further alleges that before the June 7, 2024 regulatory report, Counter-Defendant publicly presented mental-health information in a manner invoking professional qualification, including stating during an August 16, 2023 bipolar-disorder program, "I'm qualified." A viewer publicly referred to Counter-Defendant as a "GREAT DOCTOR," and Counter-Defendant's channel account hearted the comment.

32. Defendant does not allege that the August 16, 2023 mental-health program was about Defendant, constituted malpractice, or independently violated professional licensing law. Defendant alleges it only as additional context showing the medically authoritative public role Counter-Defendant presented to viewers before Defendant later sought review from the professional licensing authority.

33. Defendant denies knowingly submitting false information, fabricated evidence, or materially false accusations to LARA.

34. Defendant denies acting in bad faith or with constitutional actual malice.

35. Defendant possessed contemporaneous materials documenting the conduct that concerned her.

36. Plaintiff's remaining claim also refers to an alleged LARA communication by non-party Keva Williams.

37. Williams is a separate person. Plaintiff appears to rely on a separate regulatory communication made by Williams earlier in 2024, which Defendant understands occurred

in or about April 2024; Defendant reserves the exact publication date for confirmation from the agency record.

38. Defendant did not file, author, direct, control, approve, adopt, or submit Williams's separate regulatory communication and denies that Williams acted as Defendant's agent, representative, employee, proxy, or instrumentality.

39. Williams has already declared under penalty of perjury that, to the extent she took any action concerning Plaintiff, she acted independently based on her own reasons, experiences, and concerns, and that "[a]ll actions" she took concerning Plaintiff were her own actions based on her own grievances, complaints, concerns, experiences, and reasons. See ECF No. 163, PageID.3818, Williams Decl. ¶¶ 23–25.

40. Williams also declared that Defendant did not direct or control her reasons, evidence, statements, or decisions and that Williams did not act as Defendant's agent or proxy. See ECF No. 163, PageID.3817, Williams Decl. ¶¶ 16–20.

41. Plaintiff therefore must establish Defendant's liability, if any, from Defendant's own alleged publication rather than automatically attributing Williams's separate communication to Defendant.

42. Defendant further denies that Williams's earlier alleged publication and Defendant's June 7, 2024 alleged publication constitute one joint publication or necessarily share one accrual date.

43. Each alleged LARA publication must be analyzed according to its own speaker, content, date, defenses, causation, and damages.

44. During LARA's ensuing investigation, a Bureau of Professional Licensing investigator contacted Defendant regarding "Sybrena Evans, PA."

45. On February 24, 2025, Defendant responded to that investigative request and transmitted supporting materials concerning the online conduct underlying her regulatory concerns, including material concerning alleged stalking and harassment, the "Dirty 40" association campaign, the DForDanielle identity campaign, and the continuing association of Defendant with Danielle Elizabeth Allen and Allen-related criminal material. See Ex. A, February 24–25, 2025 LARA Investigative Correspondence and Supporting Evidence Submission, LARA Allegation No. 56-24-003982.

46. LARA acknowledged receipt of Defendant's submission on February 25, 2025. See Ex. A.

47. Defendant thereafter supplied the investigator additional information identifying the DForDanielle channel. See Ex. A.

48. Exhibit A reflects evidence supplied during LARA's investigation; Defendant does not represent that Exhibit A reproduces every word or attachment contained in the original June 7, 2024 complaint.

49. Defendant admits that LARA ultimately closed the matter because a disciplinary-code violation could not be substantiated.

50. Defendant denies that closure constitutes a finding that Defendant fabricated the reported conduct, knowingly lied, acted in bad faith, or acted with reckless disregard for truth.

51. Defendant denies that a regulatory decision not to impose discipline establishes falsity of every factual matter supplied to the agency.

52. Defendant denies publishing her LARA report to the general public as part of the communication on which Plaintiff's surviving claim is based.

53. Defendant denies responsibility for independent complaints or communications made by Williams or any other person.

54. Defendant denies Plaintiff sustained recoverable damages proximately caused by an actionable false statement in Defendant's own LARA communication.

55. To the extent any allegation concerning the remaining claim is not expressly admitted above, Defendant denies it and demands strict proof.

## III. AFFIRMATIVE DEFENSES

### First Defense — MCL 333.16244 Good-Faith Reporting Immunity

56. Plaintiff's surviving claim is barred or limited by MCL 333.16244 to the extent Defendant acted in good faith in making or assisting with a qualifying report under Article 15.

57. MCL 333.16244 provides civil and criminal immunity for a person acting in good faith who makes or assists with a qualifying report or assists the department in carrying out duties under Article 15, and it presumes qualifying reporters and assistants acted in good faith.

58. Defendant alleges that her LARA complaint and qualifying cooperation with the investigation were undertaken in good faith.

59. Defendant asserts that immunity only as to conduct falling within the statute and does not contend that it immunizes unrelated public speech.

### Second Defense — Qualified Privilege

60. Defendant's communication to the state licensing authority was made to an agency possessing regulatory responsibility over Plaintiff's professional license.

61. Defendant asserts the common-law qualified privilege because her LARA communication was made in good faith to the state agency having regulatory responsibility over Plaintiff's professional license.

62. Defendant denies actual malice sufficient to defeat that privilege.

**Third Defense — Truth and Substantial Truth**

63. Plaintiff cannot recover for statements that were true or substantially true.

64. Defendant denies knowingly communicating any materially false actionable fact.

**Fourth Defense — Failure to Identify Actionable False Statement**

65. Plaintiff must establish an actionable statement concerning her, publication, falsity, legally sufficient fault, and cognizable harm.

66. Agency closure alone does not satisfy those elements.

**Fifth Defense — No False Patient-Malpractice Accusation**

67. Defendant did not accuse Plaintiff of malpractice in treating Defendant or any patient.

68. To the extent Plaintiff's theory depends upon such a characterization, Defendant denies it.

**Sixth Defense — No Actual Malice**

69. Defendant possessed contemporaneous material supporting the concerns she submitted.

70. Defendant denies subjective knowledge of falsity.

71. Defendant denies reckless disregard for truth.

**Seventh Defense — Conditional Limited-Purpose-Public-Figure Defense**

72. To the extent applicable, Plaintiff voluntarily injected herself and her asserted professional status into a public online controversy concerning Defendant, identity allegations, alleged misconduct, and Plaintiff's own conduct.

73. Plaintiff repeatedly broadcast publicly concerning those subjects.

74. Plaintiff solicited audience participation and engagement.

75. Plaintiff publicly invoked her medical education and then-current professional licensure while making anatomical and identity-related assessments concerning Defendant.

76. To the extent Plaintiff thereby assumed special prominence in a relevant public controversy, Defendant conditionally asserts the limited-purpose-public-figure doctrine.

77. Defendant therefore conditionally invokes the constitutional actual-malice standard and MCL 600.2911(6) to the extent applicable.

78. Defendant does not contend that merely maintaining a YouTube channel automatically creates public-figure status.

**Eighth Defense — No Agency or Joint Publication**

79. Defendant denies directing another person to submit a false complaint.

80. Defendant denies an agreement to commit defamation against Plaintiff.

81. Defendant cannot be held responsible for independent reports absent legally sufficient agency or concerted conduct.

**Ninth Defense — Causation and Damages**

82. LARA independently determined whether and how to investigate the report.

83. LARA independently determined whether professional discipline was warranted.

84. Defendant denies that actionable damages were proximately caused by a false unprivileged statement made by Defendant.

85. Counter-Defendant later publicly acknowledged that professional-board complaints were private. On February 10, 2026, while discussing the LARA dispute, her profession, professional reputation, the value of her license, and the inability to legally practice medicine without the required license, Counter-Defendant stated: "When someone files a complaint to the board, it is private." On February 13, 2026, Counter-Defendant again stated in substance that complaints filed to the medical board were private.

86. On February 18, 2026, Counter-Defendant publicly read or displayed court language stating: "The exact substance of the LARA complaints is unknown as Evans lacks access to the communications"; "The pleadings do not show that the LARA complaint became a matter of public controversy"; and "There is no sign that the complaints garnered public interest or press coverage." Counter-Defendant also read or discussed qualified-privilege language concerning reports to a state regulatory agency.

87. Defendant alleges that the private or inaccessible nature of the underlying regulatory communications and the absence of demonstrated public controversy arising from the complaints themselves materially bear on causation, scope of publication, mitigation, and proof of reputational injury. Defendant does not contend that privacy categorically eliminates all legally cognizable damages.

88. Plaintiff's own subsequent public statements materially bear on any claim that Defendant's private regulatory communication itself caused widespread public reputational dissemination. Plaintiff expressly acknowledged that complaints submitted to the professional board were private, and Plaintiff later publicly read or displayed language recognizing that she did not possess the exact substance of the LARA communications, that the pleadings did not establish that the LARA complaint became a matter of public controversy, and that there was no indication that the complaint itself generated press coverage or public interest.

89. Defendant alleges those admissions as relevant to publication, causation, mitigation, scope of dissemination, and proof of damages. Defendant does not contend that the private nature of a regulatory report categorically forecloses every form of legally cognizable injury.

90. Plaintiff nevertheless repeatedly chose to place the existence of the LARA dispute, her professional license, the practice of medicine, the medical board, and the professional or reputational harm she claimed resulted before her own public audience. Defendant alleges that Plaintiff's voluntary public amplification of a regulatory controversy she simultaneously acknowledged was private or inaccessible to her is relevant to causation, mitigation, self-publication, and allocation of any claimed reputational injury.

91. — May 2, 2025 Public Invocation of Professional Credentials and Claimed Professional Harm. During a May 2, 2025 Defendant-focused publication, Counter-Defendant publicly invoked her professional credentials and stated: "I'm a professional. I'm a licensed professional whose credibility is on the line." In the same discussion, Counter-Defendant publicly addressed the professional-board controversy, her profession, her claimed reputational injury, and the litigation involving Counter-Plaintiff. Defendant alleges Counter-Defendant's voluntary public invocation of her professional credentials and public discussion of claimed professional harm as relevant to publication, causation, mitigation, self-publication, scope of dissemination, and allocation of any claimed reputational injury arising from the otherwise private regulatory process.

**Tenth Defense — Failure to Mitigate and Independent Causes**

92. Recovery is barred or reduced to the extent Plaintiff failed reasonably to mitigate.

93. Plaintiff's own publication and amplification of the dispute is relevant to causation and mitigation.

94. Defendant further alleges that Plaintiff independently chose to broadcast to her YouTube audience the existence of the LARA dispute, its alleged substance or implications, her professional status, and the professional or reputational harm she claimed resulted,

notwithstanding her own public acknowledgments that the underlying board complaints were private or inaccessible to her.

95. On February 27, 2026, Plaintiff again publicly invoked "LARA," "the medical board," "the practice of medicine," and "licensing," while claiming professional harm. Defendant alleges that subsequent self-publication as relevant to causation, scope of dissemination, mitigation, and proof of reputational injury, not as a categorical bar to recovery.

96. Independent third-party publications are likewise relevant to causation.

**Eleventh Defense — Statute of Limitations and Republication Rules**

97. Defendant invokes all applicable statutes of limitation.

98. Michigan imposes a one-year limitations period on actions charging libel or slander. MCL 600.5805(11).

**Twelfth Defense — MCL 600.2911**

99. Defendant invokes all defenses and damage limitations supplied by MCL 600.2911.

**Thirteenth Defense — MCL 600.5823 Setoff/Counterclaim**

100. Defendant invokes MCL 600.5823 on a publication-by-publication basis.

101. To the extent MCL 600.5823 applies, Counter-Plaintiff asserts qualifying counterclaims defensively as a setoff against any recovery on Plaintiff's claim. Counter-Plaintiff does not rely on § 600.5823 for affirmative recovery beyond the amount of Plaintiff's established claim.

102. Plaintiff appears to rely upon at least two allegedly defamatory regulatory communications: an earlier communication independently made by Williams and a separate June 7, 2024 communication made by Defendant.

103. As to Plaintiff's claim based upon Defendant's alleged June 7, 2024 LARA publication, Defendant invokes MCL 600.5823 as to qualifying counterclaims that were not already barred when that Plaintiff claim accrued, even if the ordinary limitations period later expired before Defendant filed the counterclaims. Any recovery available solely through § 600.5823 is asserted only as defensive setoff against the amount established as Plaintiff's claim.

104. As to any claim Plaintiff asserts from Williams's earlier communication, the statutory analysis must use the accrual date of that separate alleged publication rather than automatically importing Defendant's June 7, 2024 date.

105. Defendant does not concede liability for Williams's report by asserting this defense in the alternative and does not contend that MCL 600.5823 revives a counterclaim that was already barred when the relevant Plaintiff claim accrued.

**Fourteenth Defense — Law of the Case / Scope**

106. Defendant relies upon ECF Nos. 138 and 173 concerning the remaining merits claim.

**Fifteenth Defense — First Amendment**

107. Defendant asserts all applicable First Amendment protections.

108. Defendant does not claim that petitioning the government supplies absolute constitutional immunity from otherwise actionable defamation.

**Sixteenth Defense — Personal Jurisdiction, Process, and Service**

109. Defendant preserves previously and timely asserted Rule 12(b)(2), (4), and (5) objections.

**Seventeenth Defense — Equitable Defenses**

110. To the extent Plaintiff seeks equitable relief, Defendant asserts applicable principles of unclean hands, estoppel, laches, lack of irreparable injury, and lack of narrow tailoring.

**Eighteenth Defense — Regulatory Closure Is Not a Finding of Falsity**

111. LARA's inability to substantiate discipline does not establish that Defendant's underlying factual report was fabricated or malicious.

**Nineteenth Defense — Additional Defenses**

112. Defendant reserves the right to amend these defenses as permitted by Fed. R. Civ. P. 15.

## COUNTERCLAIM COMPLAINT

## IV. PARTIES AND JURISDICTION

113. Counter-Plaintiff is the Defendant sued under the disputed designation "Danielle Robertson."

114. "Danielle Robertson" is not Counter-Plaintiff's legal name.

115. Counter-Plaintiff has used public online identifiers including Dani Robertson, TruthTellerDani, DaniMontanaTV, and other Dani-related branding.

116. Counter-Defendant Sybrena Evans is Plaintiff in this action.

117. This Court has original federal-question jurisdiction over Count IV under 28 U.S.C. § 1331 and 17 U.S.C. § 512(f), and supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law counterclaims forming part of the same case or controversy.

118. Count IV additionally arises under federal copyright law, 17 U.S.C. § 512(f).

119. Counter-Plaintiff asserts these counterclaims without waiving her preserved jurisdictional, service, anonymity, or First Amendment objections to Plaintiff's original action.

120. Counter-Plaintiff principally seeks cessation and narrowly tailored prospective injunctive relief, together with damages for reputation, emotional harm, and proved economic losses.

121. Counter-Plaintiff does not presently demand a jury.

## V. THE MULTI-YEAR COURSE OF CONDUCT

122. The course alleged in these counterclaims did not originate with this federal lawsuit, formal discovery, or any need to identify a defendant for judicial process. On or about October 5, 2021, Counter-Defendant first directly contacted Counter-Plaintiff in connection with use of Counter-Plaintiff's online persona, AI or character voice, or related identity material for Halloween-oriented online content. Counter-Plaintiff does not allege that the October 5, 2021 outreach itself constituted stalking, defamation, or other unlawful conduct. Counter-Plaintiff alleges the October 5, 2021 outreach as the beginning of the direct-contact and content chronology that later developed into recurring Defendant-focused programming.

123. In January 2022, Counter-Defendant directly praised Counter-Plaintiff's online presentation, stating in substance that Counter-Plaintiff's "creative approach and delivery" was captivating and that what Counter-Plaintiff had done for YouTube would not be the same. On January 18, 2022, Counter-Defendant stated: "P.S. I sense a sequel to this movie." Counter-Defendant then stated: "Rise Of The Avengers! I have an idea for your twin." Counter-Defendant subsequently stated: "I'll have to create your twin and a story."

124. Counter-Defendant expressly referenced recognizable aspects of Counter-Plaintiff's existing online presentation, stating: "I love the music you play in your intro. I know it well," and discussed her ability to use the same underlying track. Counter-Defendant also proposed using Counter-Plaintiff's voice or persona on Counter-Defendant's own channel, asking: "How about if I release your message in Dani's voice on my channel?" Counter-Defendant stated that she had been "working on a name for the twin." Counter-Defendant proposed possible names including "Natasha" and immediately described the Natasha concept as a "Russian double agent."

125. The preserved AiNatashaTheMachine YouTube account reflects a join date of approximately January 30, 2022. Counter-Plaintiff alleges that Counter-Defendant's express January 18 proposal of a "twin," the "Rise Of The Avengers" concept, her work on a name for the twin, her proposal of "Natasha," and the subsequent creation of AiNatashaTheMachine are circumstantial evidence that the later identity arose from the twin concept Counter-Defendant had been discussing with Counter-Plaintiff.

126. — Counter-Defendant's Later Admission Concerning Associated Channels. Counter-Defendant later publicly stated, "I have other YouTube channels," and in the same explanation identified AiNatashaTheMachine and DForDanielle among those channels. Counter-Plaintiff alleges that statement as direct evidence of Counter-Defendant's ownership, operation, control, or participation in those recurring channel identities.

127. — Counter-Defendant's Retrospective Statement Concerning AiNatashaTheMachine. During a January 19, 2025 publication, Counter-Defendant revisited the early-2022 period and stated in substance that she had already "put that name out there" as "Ai Natasha, the Machine" and had discussed that name with only one person.

128. Counter-Plaintiff alleges that statement together with Counter-Defendant's January 2022 proposal to create Counter-Plaintiff's "twin," her statement that she was working on a name for the twin, her proposal of "Natasha," the subsequent appearance of AiNatashaTheMachine, and Counter-Defendant's later public statement identifying AiNatashaTheMachine and DForDanielle among her other YouTube channels. Counter-Plaintiff alleges those facts as evidence of Counter-Defendant's creation, operation, control, or participation in the AiNatashaTheMachine identity and as attribution evidence for later Allen/DForDanielle-related publications made through that associated channel.

129. Counter-Plaintiff does not rely upon the January 19, 2025 publication to allege ownership, control, agency, or wrongdoing concerning any unrelated third-party account discussed during that broadcast. The publication is alleged only to corroborate Counter-Defendant's own connection to AiNatashaTheMachine and the recurring channel structure through which later Defendant-focused and Allen-related material was published.

130. During later direct communications concerning the proposal, Counter-Defendant acknowledged: "As for a twin, I mentioned it to you while you were here as well," and "I know what I said about a twin." Counter-Plaintiff had objected that Counter-Defendant wanted to "replace me with a twin of me." Counter-Defendant denied that she wanted Counter-Plaintiff gone. Counter-Plaintiff therefore does not allege that Counter-Defendant admitted wanting Counter-Plaintiff removed from YouTube. Counter-Plaintiff alleges instead the narrower conduct established by the communications themselves: Counter-Defendant expressly proposed creating Counter-Plaintiff's twin, developed an Avengers-themed continuation, discussed Counter-Plaintiff's intro and voice, worked on a name for the twin, proposed Natasha, and thereafter created or participated in the AiNatashaTheMachine identity.

131. By May 1, 2022, Counter-Plaintiff expressly rejected continued imitation, writing: "Nope. I don't want anyone to twin or clone me, there's only one me." Counter-Plaintiff alleges that the May 1 communication supplied unequivocal written notice that Counter-Plaintiff did not consent to continued imitation, cloning, or presentation of another online persona as Counter-Plaintiff's twin. Counter-Plaintiff does not claim ownership of Marvel, the Avengers, Black Widow, Natasha Romanoff, or other third-party intellectual property. Counter-Plaintiff alleges the communications as evidence of Counter-Defendant's

knowledge of Counter-Plaintiff's online persona, intentional identity mirroring, motive, lack of consent, and context for the later Defendant-focused course.

132. — Pre-Escalation Baseline. Counter-Plaintiff alleges the surviving pre-May 2022 communications and publications as relationship and motive context. The surviving material reviewed to date reflects voluntary interaction, discussion of Counter-Plaintiff's online persona and creative presentation, monitoring or commentary, and comparatively neutral or favorable references before Counter-Plaintiff expressly rejected continued imitation or cloning in May 2022.

133. Counter-Plaintiff does not allege that every pre-May 2022 interaction was favorable or that the surviving archive proves Counter-Defendant held no negative view at that time. Counter-Plaintiff alleges more narrowly that the surviving pre-May 2022 record does not reflect the later recurring portrayal of Counter-Plaintiff as a terrorist or dangerous person, mentally disordered person, fraudster, sex worker, or Danielle Elizabeth Allen/Lake Charles criminal identity.

134. Counter-Plaintiff alleges the earlier record as a baseline against which the later escalation in tone, accusations, and false-persona construction may be evaluated for motive, common-law malice, fault, course, and credibility.

135. By 2022, Counter-Plaintiff had withdrawn consent for continuing direct contact and began using blocks and written cease demands. From 2022 through August 2026, Counter-Defendant maintained recurring Defendant-focused content across multiple channels and platforms.

136. — Verified Frequency and Volume of Dani-Associated Publications. Counter-Plaintiff's presently scoped preserved publication catalog identifies at least 291 unique video or livestream records containing one or more Dani-associated account, hashtag, or search-

metadata identifiers. That scoped tally does not purport to represent every Defendant-related publication in Counter-Plaintiff's larger preserved archive or every cross-platform publication.

137. Within those 291 unique video/livestream records, at least 145 publications contain one or more literal account mentions of Counter-Plaintiff-associated accounts, and at least 158 contain one or more Dani-associated hashtag or search-metadata identifiers. Twelve publications fall within both categories, yielding 291 unique publications within the scoped tally. The same scoped audit separately identifies 402 distinct Dani-associated identifier occurrences when each distinct target identifier is counted once per publication. See Ex. C.

138. Counter-Plaintiff alleges the volume, duration, and recurrence of those publications as evidence of continuity, identification, persistence, dissemination, audience association, and the sustained scope of Counter-Defendant's Defendant-focused programming. Counter-Plaintiff does not allege that every video, livestream, hashtag, metadata identifier, or other public commentary publication independently constituted stalking or another actionable tort. The specifically pleaded publications are representative or particularly probative examples drawn from the larger preserved record.

139. Counter-Plaintiff does not allege that every video about her was unlawful. Counter-Plaintiff does not allege that criticism, commentary, lawful discussion of litigation, lawful public-record review, or discussion of common public topics constitutes stalking. Counter-Plaintiff alleges that the larger course included repeated direct tagging after notice to stop; repeated demands that Counter-Plaintiff respond or engage; continued presence in Defendant-controlled membership spaces after requests to leave; cross-platform monitoring; alleged circumvention of access restrictions; repeated identity investigations; attempts to obtain or

expose Counter-Plaintiff's legal identity; false criminal and cyber-misconduct associations; associate-directed activity; and repeated use of Defendant-associated identifiers.

140. Counter-Plaintiff repeatedly informed Counter-Defendant that Defendant-directed contact and identity association were unwanted. Counter-Plaintiff sent written cease-and-desist demands beginning by September 2022 and additional demands thereafter. Counter-Plaintiff used available platform blocking or exclusion controls. Counter-Plaintiff later sought a nondomestic stalking PPO and, separately, regulatory review through LARA. Counter-Plaintiff alleges those acts were efforts to obtain cessation, protection, documentation, or review rather than invitations for continued contact.

141. Counter-Plaintiff's written cease demands included notices dated on or about September 3, 2022; October 5, 2022; January 31, 2023; April 24, 2024; September 11, 2024; and June 21, 2025, followed by a May 5, 2026 retraction demand.

142. Of particular relevance to the 2023 identity campaign, Counter-Plaintiff's January 31, 2023 written notice preceded the March 2023 Mystery Clue and Danielle Elizabeth Allen publications.

143. Counter-Plaintiff therefore alleges that subsequent direct account mentions, identity comparisons, audience polls, engagement demands, and related account-directed conduct occurred after Counter-Defendant had already received written notice that continued Defendant-directed contact and targeting were unwanted.

144. Counter-Plaintiff does not allege that every later public criticism constituted stalking merely because a cease demand had been sent. Counter-Plaintiff alleges the notices as evidence of knowledge when evaluating the later direct electronic contacts and larger course of conduct.

145. — Counter-Defendant's Own Acknowledgments of Unwanted Contact and Cessation Demands. Counter-Plaintiff does not rely solely upon proof that written cease-and-desist demands were transmitted. Counter-Defendant repeatedly demonstrated in her own broadcasts that she was aware Counter-Plaintiff objected to continued tagging, direct engagement, Defendant-focused contact, and continued presence in Counter-Plaintiff-controlled online spaces.

146. During the October 3, 2022 Cracking the Code, Part 2 publication, Counter-Defendant replayed or read Counter-Plaintiff's objection that Counter-Defendant continued tagging her while Counter-Defendant continued supplying a call-in mechanism and demanding that Counter-Plaintiff respond. Counter-Plaintiff alleges the publication as direct evidence that Counter-Defendant knew by October 2022 that continuing account-directed tagging and engagement demands were unwanted.

147. During the September 9, 2023 publication, Counter-Defendant replayed Counter-Plaintiff's complaints concerning excessive Defendant-focused videos, unnecessary attempts at contact, and Counter-Defendant's presence in spaces where Counter-Plaintiff had stated she was not welcome, including a membership area. Counter-Defendant responded in substance, "I guess that's why you want me gone too." Counter-Plaintiff alleges that exchange as further evidence that Counter-Defendant actually understood that Counter-Plaintiff wanted the Defendant-directed contact and presence discontinued.

148. Counter-Defendant later made an additional express acknowledgment on January 27, 2025 by referring to "your request for me to remove myself from membership" and by replaying Counter-Plaintiff's instruction, "Exit all my memberships." Counter-Plaintiff alleges these statements together with the written cease demands as evidence of actual notice and

knowledge of withdrawn consent. Counter-Plaintiff does not allege from these particular broadcasts alone that Counter-Defendant expressly admitted receipt of every individual written cease-and-desist notice.

149. Counter-Plaintiff denies that requesting cessation, submitting complaints to appropriate authorities or platforms, preserving evidence, obtaining source material, or making good-faith use of legal procedures transformed Counter-Plaintiff into a stalker or harasser. Counter-Plaintiff has preserved complete copies of source materials underlying the publications quoted or described in this pleading, including full videos, screenshots, and corresponding transcripts or transcript records.

150. Counter-Plaintiff does not attribute independent third-party statements to Counter-Defendant merely because they appeared in Counter-Defendant's chat, panel, livestream, or audience. Counter-Plaintiff relies upon third-party statements against Counter-Defendant only where independently relevant to audience meaning, dissemination, notice, causation, or damages, or where Counter-Defendant herself solicited repetition, supplied the framing, adopted, confirmed, endorsed, directed, or incorporated the statement into her own presentation.

151. — Preservation of Source Materials and Later-Unavailable Publications. Counter-Plaintiff has preserved the source materials underlying the factual allegations in this pleading, including full videos and livestreams, platform screenshots, titles, descriptions, publication dates, visible metadata, literal account mentions, community posts, social-media posts, relevant comment or chat captures, and corresponding transcripts or transcript records.

152. Counter-Plaintiff has also preserved copies of publications and associated platform records that were publicly available when captured but that Counter-Defendant later deleted,

removed, made private or unlisted, or otherwise rendered unavailable at the location where Counter-Plaintiff originally observed them. Counter-Plaintiff alleges subsequent public unavailability only to the extent established by comparison with the preserved record and does not infer from public unavailability alone that underlying electronic data was destroyed.

153. Counter-Plaintiff's preservation includes materials captured before their later removal or unavailability. Accordingly, later disappearance of a publication from Counter-Defendant's public-facing channels or accounts does not eliminate Counter-Plaintiff's preserved evidence of the publication, its displayed title or metadata, its spoken content, or its associated account and publication context.

154. Where a preserved recording or transcript and a platform capture concern the same publication, Counter-Plaintiff relies upon the recording or transcript for the substance of what was spoken and upon the contemporaneous platform capture for matters including the displayed title, publication date, account name, hashtags, literal @ mentions, view count, description, and other visible metadata. Counter-Plaintiff has retained the underlying source materials so that the complete context may be reviewed rather than relying upon isolated excerpts.

155. Counter-Plaintiff alleges preservation of later-unavailable publications because those records remain relevant to publication, notice, course of conduct, audience meaning, dissemination, fault, credibility, damages, and proof of the historical record, including where a later factual denial or materially inconsistent characterization may be compared against the preserved source evidence.

156. Counter-Plaintiff does not deny that she began her online activities anonymously or that she deliberately employed lawful privacy-protective arrangements intended to prevent her personal identifying, contact, business, and related information from being readily exposed to the public.

157. Counter-Plaintiff does not deny that lawful privacy, business, account, contact, or organizational arrangements may involve information appearing through different names, accounts, persons, or structures.

158. Counter-Plaintiff denies that her anonymity, privacy measures, separate accounts, or lawful arrangements constituted or evidenced fraud, identity theft, a troll farm, the "Dirty 40," a crime ring, a criminal conspiracy, a fraudulent enterprise, or any organized criminal activity.

159. Counter-Plaintiff alleges that Counter-Defendant repeatedly took otherwise lawful facts concerning anonymity and privacy and added materially false criminal, fraudulent, deceptive, or clandestine meaning to them through publications concerning hidden coordination, "layers," "satellites," fraud, criminal behavior, troll activity, the "Dirty 40," and related wrongdoing.

160. — Direct Conduct and Third-Party Escalation. Counter-Plaintiff alleges a recurring pattern in which Counter-Defendant alternated between direct investigative conduct and solicitation, amplification, or re-engagement of third parties.

161. Counter-Defendant herself contacted or attempted to contact persons associated with the Allen family, pursued access to Counter-Plaintiff's restricted website after learning that access from known routes had been blocked, repeatedly published Allen-family and

criminal-identification material, and continued directing literal account mentions and other communications toward Counter-Plaintiff after demands that contact cease.

162. At other times, Counter-Defendant publicly tagged, solicited, welcomed, or re-engaged persons whose publicly described methods included "boots on the ground," location verification, telephone contact, family outreach, local-source recruitment, contemplated travel, and physical "pull up" activity.

163. — Community-Wall Audience-Assisted Identity and Location Inquiry. Counter-Defendant also used her YouTube Community wall to solicit audience participation in identifying and connecting real-world persons, physical characteristics, family-related information, and locations to the continuing Defendant-focused identity inquiry. In preserved Community posts, Counter-Defendant repeatedly addressed her audience as "MOB" and published visual clues accompanied by questions inviting viewers to identify persons or make identity-related connections.

164. Representative preserved posts included: "Hey MOB! Could it be 'MYSTERY?'" in connection with an image referencing "MS. DAVIS," an alias associated with Counter-Plaintiff; "Who Dis Woman?" accompanied by an image depicting a woman and vehicle in what appears to be a residential carport or driveway setting; "Who Dis Man?" accompanied by an image of a man in what appears to be a law-enforcement uniform; "Who Else Wears A PonyTail?" accompanied by an image focusing on a woman's appearance or hairstyle; and "Who Eats Here?" accompanied by an image of a specific restaurant. Counter-Plaintiff alleges that these posts occurred within the larger Allen/DEA identity investigation in which Counter-Defendant was publicly examining alleged family relationships, physical characteristics, voices, vehicles, geographic clues, and real-world locations.

165. Counter-Defendant also used direct audience polling as part of that identification process. A contemporaneous screenshot personally captured by Counter-Plaintiff on March 5, 2023, while Counter-Defendant's live programming was occurring, shows the UNWINEWITHTEDDY account asking: "Do you think the voice you heard Voice A sounds that of Voice B?" At the time of capture, the poll reflected 177 votes, with approximately 66% answering "Yes" and 34% answering "No." Counter-Plaintiff alleges the contemporaneous poll as direct evidence that Counter-Defendant submitted the disputed voice-identification inquiry to audience participation.

166. Counter-Plaintiff does not allege from these images alone who captured any particular photograph, that any photograph was unlawfully obtained, that Counter-Defendant personally followed or surveilled a depicted person, that any depicted person actually frequented a displayed location, or that an individual Community post standing alone constituted stalking. Counter-Plaintiff alleges the sequence as evidence of audience solicitation, audience-assisted identity investigation, real-world-person and location inquiry, continuity, purpose, escalation, and expansion of the Defendant-focused course beyond Counter-Defendant's own individual observations.

167. Counter-Plaintiff alleges this combination as evidence of a continuing extrajudicial identity-and-location campaign rather than isolated commentary. Counter-Plaintiff does not allege that every independent act of a third party is attributable to Counter-Defendant absent evidence of direction, adoption, agency, or other legally sufficient connection.

## VI. 2022 — EARLY DIRECT CONTACT, ASSOCIATE LABELING, AND NOTICE

### A. May 1, 2022 — Early "Goons" and Associate Narrative

168. On May 1, 2022, Counter-Defendant publicly addressed Counter-Plaintiff and stated, "Don't call your goons on me either." Counter-Defendant explained that she was calling them "goons" because "that's what they will be if they come after me," and warned Counter-Plaintiff not to "call the goons on me to blast YouTube."

169. Counter-Plaintiff alleges this publication principally as historical evidence showing the early development of Counter-Defendant's recurring practice of characterizing persons perceived as supporting or acting with Counter-Plaintiff as a coordinated group acting against her. Counter-Plaintiff does not seek independent defamation damages based solely upon the May 1, 2022 "goons" terminology; the publication is alleged as chronology, motive, common-law-malice context, and background to the later "Dirty 40," associate-monitoring, and conspiracy narratives.

### B. October 2, 2022 — Cracking the Code, Part 1

170. On October 2, 2022, Counter-Defendant conducted a livestream discussing Counter-Plaintiff. Counter-Defendant accused Counter-Plaintiff of hacking YouTube or engaging in comparable technical manipulation. Counter-Defendant repeatedly demanded or urged Counter-Plaintiff to call while Counter-Defendant was live.

171. Counter-Plaintiff did not solicit that interaction. Counter-Plaintiff communicated that continued Defendant-directed contact was unwanted. Counter-Plaintiff alleges the publication as historical notice, course-of-conduct, identity, and cyber-misconduct context.

**C. October 3, 2022 — Cracking the Code, Part 2**

172. Counter-Defendant continued the subject the following day. Counter-Defendant expressly sought "answers" from Counter-Plaintiff. Counter-Defendant discussed alleged manipulation of source code, metadata, search results, "nofollow" references, channels, and other technical matters. Counter-Defendant suggested Counter-Plaintiff might "scrub" information. Counter-Defendant questioned whether Counter-Plaintiff was tracking Counter-Defendant or interfering with search visibility or traffic.

173. Counter-Defendant repeatedly supplied a call-in mechanism and demanded a response. During the broadcast, Counter-Defendant replayed or read Counter-Plaintiff's objection that Counter-Defendant continued tagging her. Counter-Defendant thereby possessed actual notice that continued account-directed tagging and engagement demands were unwanted. These 2022 matters are alleged principally as historical notice and course-of-conduct evidence, not as independently timely affirmative defamation claims.

**VII. 2023 — DEVELOPMENT OF THE DANIELLE ELIZABETH ALLEN CRIMINAL-IDENTITY NARRATIVE**

174. Beginning by 2023, Counter-Defendant developed a recurring public theory that Counter-Plaintiff was or might be Danielle Elizabeth Allen. Counter-Plaintiff is not Danielle Elizabeth Allen. Counter-Plaintiff is not the person depicted in Allen's mugshot or police interrogation. Counter-Plaintiff did not commit Allen's DUI. Counter-Plaintiff was not an accessory after the fact in the criminal matter associated with Allen. Counter-Plaintiff had no involvement in the death of the four-month-old infant or the homicide-related investigation associated with Allen.

175. Counter-Plaintiff alleges that the defamatory sting arose from the recurring combination of Counter-Plaintiff's recognizable names, handles, voice, branding, hashtags, friends, and identity clues with Allen's mugshot, interrogation, arrest history, DUI, accessory-after-the-fact allegation, and child-death-related criminal material. Counter-Plaintiff alleges the resulting implication was not merely that two people shared a first name; it was that Counter-Plaintiff was or probably was the same real-world person associated with the criminal material.

**A. March 4, 2023 — HearHerTV Direct Inbox Identification and Child-Killer Accusation**

176. Counter-Plaintiff alleges that on March 4, 2023, third-party creator HearHerTV entered Counter-Plaintiff's direct-message inbox and addressed Counter-Plaintiff as Danielle Elizabeth Allen. Counter-Plaintiff alleges that, in the same direct-contact sequence, HearHerTV used "Mommy Killer," "Baby Killer," or materially equivalent child-killing language toward Counter-Plaintiff while treating Counter-Plaintiff as the Allen person being discussed.

177. Counter-Plaintiff is not Danielle Elizabeth Allen, did not kill a child, and was not responsible for the death of the four-month-old infant associated with the unrelated Louisiana matter. Counter-Plaintiff alleges these communications as early evidence that the Allen/infant-death association was being understood and repeated by a third-party audience. Counter-Plaintiff does not attribute HearHerTV's independent words to Counter-Defendant as though Counter-Defendant personally uttered them and does not allege agency solely from these publications. Counter-Plaintiff previously documented HearHerTV's adoption of the "Baby Killer" accusation as downstream harm associated with Counter-Defendant's Allen publications. See ECF No. 84, PageID.1292.

**B. March 5, 2023 — Surviving Dani Robertson Part 3 / Mystery Clue 8**

178. On March 5, 2023, Counter-Defendant published Surviving Dani Robertson Part 3: Mystery Clue 8. Counter-Defendant stated that she was getting closer to identifying Counter-Plaintiff and compared physical imagery and voice material. Counter-Defendant invoked her medical education during anatomical comparison and stated that her professional license was current. Counter-Plaintiff further alleges that Counter-Defendant is a physician assistant, the same professional designation later reflected in LARA investigative correspondence identifying her as "Sybrena Evans, PA."

179. During the March 5, 2023 anatomical and identity comparison, Counter-Defendant did more than generally reference a medical background.

180. Counter-Defendant stated that she was licensed to practice medicine and represented that her professional license was current. Counter-Defendant stated that she had examined "thousands of people." Counter-Defendant referred to having "been in surgery." While making anatomical observations in an effort to determine whether Counter-Plaintiff was Danielle Elizabeth Allen, Counter-Defendant characterized at least part of her analysis as her "professional opinion."

181. Counter-Plaintiff alleges these statements to show that Counter-Defendant voluntarily invoked her medical training, active professional licensure, clinical experience, and asserted professional judgment as authority for a public identity analysis concerning Counter-Plaintiff. Counter-Plaintiff alleges that those statements materially informed her later good-faith decision to ask LARA, rather than Counter-Plaintiff herself, to determine whether the documented conduct warranted review by Counter-Defendant's professional licensing

regulator. Counter-Plaintiff does not allege that invocation of a professional license by itself establishes a disciplinary violation.

182. Counter-Plaintiff further alleges that Counter-Defendant's invocation of active professional licensure, examination of "thousands of people," surgical experience, and "professional opinion" was capable of lending enhanced credibility and apparent professional authority to Counter-Defendant's public anatomical comparison of Counter-Plaintiff with Danielle Elizabeth Allen. Counter-Plaintiff alleges those representations both as part of the Allen-publication context and as evidence explaining why Counter-Plaintiff later sought review by Counter-Defendant's professional licensing regulator rather than purporting to make a licensing determination herself.

183. Counter-Defendant displayed or discussed mugshot and orange-jumpsuit imagery. Counter-Defendant acknowledged Counter-Plaintiff's denial, stating in substance, "She says it's not her. Okay." Counter-Defendant nevertheless continued soliciting audience comparison and identity conclusions.

184. During the same publication, Counter-Defendant stated in substance that "we're getting close," that the "pieces are coming together," and that she had asked another person to "find" Counter-Plaintiff. Counter-Plaintiff alleges those statements as evidence that the publication was part of an affirmative continuing effort to identify and expose Counter-Plaintiff rather than an isolated discussion.

185. Counter-Defendant further conditioned portions of the presentation on audience size, participation, likes, or engagement before proceeding with additional identity material. Counter-Plaintiff alleges those statements as audience-recruitment and commercial-engagement context.

186. Although Counter-Defendant expressly acknowledged Counter-Plaintiff's denial by stating, "She says it's not her," Counter-Defendant nevertheless continued the identification exercise, characterized additional material as a "big clue," and asked whether the Allen identification should be "ruled in" or "ruled out."

187. Counter-Plaintiff alleges that the continued comparison after an express denial is relevant to Counter-Defendant's knowledge, persistence, fault, false-light state of mind, course of conduct, and the later escalation from uncertainty to statements that the identification had been "confirmed."

188. Counter-Plaintiff alleges this publication as historical evidence of the development of the Allen theory, audience recruitment, knowledge of denial, motive, and professional-status invocation. Counter-Plaintiff does not seek independent affirmative defamation damages for the March 5, 2023 publication.

**C-1. March 6, 2023 — Mystery Clue No. 7 / Voice A–Voice B Audience Poll**

189. On March 6, 2023, Counter-Defendant expressly dated another publication in the continuing Mystery Clue series and again compared Counter-Plaintiff's voice with Danielle Elizabeth Allen's police-interrogation voice.

190. Counter-Defendant presented Counter-Plaintiff's voice as "Voice A" and Allen's voice as "Voice B," asked viewers whether "Voice A" was the same as or sounded like "Voice B," and conducted an audience poll concerning the identification.

191. Counter-Defendant reported that approximately seventy-three percent of responding viewers answered affirmatively and approximately twenty-seven percent answered negatively.

192. Counter-Plaintiff alleges that Counter-Defendant thereby converted a disputed real-world criminal identification into a public audience-participation exercise in which viewers were asked to determine whether Counter-Plaintiff was the woman heard in the Allen police interrogation.

193. Counter-Plaintiff alleges the publication as historical evidence of audience mobilization, knowledge, dissemination, identity targeting, false-light meaning, and the development of the Allen criminal-identification narrative.

**C. March 6, 2023 — HearHerTV "Baby Killer" Livestream Directed at Counter-Plaintiff**

194. Counter-Plaintiff alleges that on or about March 6, 2023, HearHerTV published a livestream whose title used "Baby Killer" or materially equivalent child-killing language while referring to Counter-Plaintiff in connection with the Danielle Elizabeth Allen and infant-death narrative. Counter-Plaintiff denies the accusation and alleges the publication as additional evidence of actual downstream audience meaning, dissemination, and reputational harm during the initial rollout of the Allen theory. Counter-Plaintiff again does not attribute HearHerTV's independent words to Counter-Defendant as direct speech and does not seek to impose liability on Counter-Defendant merely because another creator spoke.

**C-2. March 8, 2023 — "No Deadlines, No Ultimatums — It's Called Rule In, Rule Out"**

195. On March 8, 2023, Counter-Defendant continued the public identity investigation and expressly stated: "We didn't say you were that individual, but we did say that we want your identity known. And it's important to us. It's very important to us."

196. During the same publication, Counter-Defendant continued comparing Counter-Plaintiff with Danielle Elizabeth Allen through voice material, criminal-arrest imagery, and "rule in / rule out" audience participation.

197. Counter-Defendant discussed Allen in connection with an allegation that Allen had been charged as an accessory after the fact to the second-degree murder of a four-month-old infant.

198. Counter-Defendant nevertheless continued inviting viewers to determine whether Counter-Plaintiff should be "ruled in" as Allen and represented that the then-existing audience polling favored "rule it in."

199. Counter-Defendant further suggested that Counter-Plaintiff could cause the identification to be ruled out by producing or appearing live with the real Danielle Elizabeth Allen. Counter-Plaintiff alleges that Counter-Defendant thereby placed the burden on Counter-Plaintiff to disprove a criminally stigmatizing identification that Counter-Plaintiff had already denied.

200. Counter-Plaintiff alleges the publication as evidence that Counter-Defendant's objective was not merely to comment upon public records concerning Allen, but to publicly identify Counter-Plaintiff and recruit the audience into deciding whether Counter-Plaintiff was the real-world woman associated with the criminal material.

201. On March 9, 2023, Counter-Defendant expressly identified the continuing "Girl, Bye. Surviving Dani Robertson" programming, referred to having already presented or recapped "mystery clues one through nine," and stated that additional clues, including at least "clue ten," would follow.

202. Counter-Plaintiff alleges the March 9 publication principally as evidence that the identity investigation was structured as a continuing serialized series rather than a single isolated publication.

**C-3. March 2023 — Mystery Clue No. 10, "The Apple Doesn't Fall Too Far From the Tree"**

203. During another March 2023 Mystery Clue publication, Counter-Defendant expanded the Allen identification theory beyond Counter-Plaintiff herself and presented purported voice similarities between Counter-Plaintiff and Danielle Elizabeth Allen's mother.

204. Counter-Defendant compared pronunciation, speech, pacing, intonation, and repeated words, solicited audience reactions concerning whether the speakers sounded related, and displayed a viewer response stating in substance that the voices sounded like "mother and daughter."

205. Counter-Defendant placed the purported family resemblance into the same criminal context by discussing Danielle Elizabeth Allen's mugshot, orange-jumpsuit imagery, police interrogation, and the allegation that Allen had been charged as an accessory after the fact in a matter involving the second-degree murder and death of a four-month-old infant.

206. Counter-Defendant further stated that it was "absolute 1000% correct" that Counter-Plaintiff had a history of making false police reports and impersonating people and treated Counter-Plaintiff's use of the name "Elizabeth" as another purported clue connecting Counter-Plaintiff to Danielle Elizabeth Allen.

207. Counter-Plaintiff denies those criminal, impersonation, and false-report accusations and alleges the publication as part of the continuing false criminal persona created through the Mystery Clue series.

**C-4. March 2023 — "Girl, Bye — Surviving Dani Robertson — It Begins Here" / Mystery Clue No. 6**

208. During a separate March 2023 publication identified as part of "Girl, Bye — Surviving Dani Robertson," Counter-Defendant displayed Counter-Plaintiff's avatar beside Danielle Elizabeth Allen-related imagery, compared Counter-Plaintiff's voice with Allen's interrogation voice, and again asked viewers to "rule it in" or "rule it out."

209. Counter-Defendant created a live audience poll concerning whether the voices belonged to the same person and reported approximately eighty-seven to eighty-eight percent affirmative responses. Counter-Defendant also stated that other content creators would be able to share the information.

210. During the same Dani-focused publication, Counter-Defendant promoted subscriptions, promoted her second channel, addressed members, encouraged likes and audience participation, and acknowledged a twenty-dollar Super Chat. Counter-Plaintiff alleges those facts as evidence that the Allen-identification series was conducted within monetized audience-facing programming.

211. Counter-Defendant replayed and acknowledged Counter-Plaintiff's express denial that she was Danielle Elizabeth Allen, including Counter-Plaintiff's statement that "This is not me," yet continued presenting Allen as a "rule in" possibility. Counter-Defendant suggested that Counter-Plaintiff could produce Allen live and alternatively speculated that Counter-Plaintiff could have a twin or family relationship to Allen.

212. Counter-Plaintiff alleges that the identification theory therefore persisted and expanded after an express denial and that Counter-Defendant simultaneously used the disputed identification as recurring audience-engagement and monetized content.

213. — Audience Mobilization Around Criminal Identification. Counter-Plaintiff alleges that Counter-Defendant did not merely express an isolated private suspicion concerning Danielle Elizabeth Allen. Counter-Defendant converted that suspicion into recurring public participatory programming by presenting numbered "Mystery Clues," conducting voice and image comparisons, displaying criminal records and imagery, soliciting viewer opinions, creating audience polls, and repeatedly asking viewers to "rule in" or "rule out" Counter-Plaintiff as Allen.

214. The person whom viewers were being asked to "rule in" was simultaneously being presented through police-interrogation audio, mugshot and orange-jumpsuit imagery, arrest history, an accessory-after-the-fact allegation, second-degree-murder material, homicide-related reporting, and the death of a four-month-old infant.

215. Counter-Plaintiff alleges that the combined presentation foreseeably communicated far more than a neutral comparison between two women who shared a first name. It invited viewers to determine whether Counter-Plaintiff was the real-world woman associated with the Lake Charles criminal material.

216. — Commercially Amplified Brand-Targeted Identity Campaign. Counter-Plaintiff alleges that Counter-Defendant's "Mystery Clue" series was not conducted as formal litigation activity or through judicial process. Instead, Counter-Defendant published the series as public social-media programming using Dani-related names, identifiers, voice material, branding, titles, thumbnails, and audience-facing presentations.

217. Counter-Defendant solicited audience participation in the continuing identity investigation while also promoting subscriptions, memberships, likes, viewer contributions, channel growth, and other monetized engagement.

218. Counter-Plaintiff alleges that the series was structured to generate attention, audience growth, engagement, and monetizable traffic while simultaneously associating Counter-Plaintiff's recognizable Dani identity and brands with the Allen criminal-identification narrative.

219. — Express Identity-Pursuit and Anticipated Audience Value. During another Dani-focused publication, Counter-Defendant expressly stated: "The purpose of this is to find you, your identification."

220. Counter-Defendant further stated that she would willingly sacrifice approximately 10,000 existing views because "we'll make them back on one video when we do find you."

221. Counter-Defendant later stated that she hoped the matter would become "bigger and bigger until we find you" because "people need to know who you are."

222. Counter-Plaintiff alleges these statements as direct evidence that Counter-Defendant viewed the continuing effort to identify and reveal Counter-Plaintiff as recurring audience-facing content with anticipated view and engagement value.

223. — Continuing Audience Verdict After Denial. During another Dani-focused publication, Counter-Defendant continued treating Danielle Elizabeth Allen as a "rule in" and a "lead" that should be followed through despite Counter-Plaintiff's repeated denials.

224. Counter-Defendant asked whether she should continue pursuing the lead and ultimately conducted an audience poll asking whether Dani "walks like a duck, quacks like a duck, [and] is the duck we seek." Counter-Defendant reported approximately ninety-six percent affirmative responses and four percent negative responses.

225. During the same publication, Counter-Defendant repeatedly solicited likes and engagement before continuing portions of her presentation and acknowledged paid viewer support through a Super Chat.

226. Counter-Plaintiff alleges the publication as further evidence of audience-assisted identification, persistence after denial, and monetized engagement surrounding the Dani/Allen campaign.

**D. April 4, 2023 — Members-Only Allen Criminal-History and Identity Presentation**

227. On April 4, 2023, Counter-Defendant conducted what she expressly described as her "first members only" Allen-related livestream. During the paid members-only publication, Counter-Defendant presented records and purported "receipts" concerning Danielle Elizabeth Allen, including marriage-license information, relationship history, protective-order records involving Larry Champ, criminal-history information, arrest-related material, bail information, and Allen's mugshot. Counter-Defendant expressly framed the information as part of an identity "rule in / rule out" inquiry and asked what information might be another piece of the "puzzle."

228. Counter-Defendant displayed Allen's mugshot, discussed later criminal trouble and bail, and stated that additional records and information remained for future members-only broadcasts. Paid audience interaction occurred during the publication, including paid Super Chat activity.

229. Counter-Plaintiff alleges this publication as historical evidence establishing the detailed personal and criminal referent Counter-Defendant supplied to her audience before later continuing to associate Counter-Plaintiff with Allen. Counter-Plaintiff does not seek independent affirmative defamation damages for the April 4, 2023 publication.

**E. By April 7, 2023 — HearHerTV Public Criminal Accusations and Sharing of Counter-Defendant's Lake Charles Video**

230. Counter-Plaintiff has preserved screenshots captured on April 7, 2023 showing HearHerTV publicly addressing @DaniRobertson as "Danielle Elizabeth Allen," directing Counter-Plaintiff to stay out of HearHerTV's inbox, and stating, in substance, that Counter-Plaintiff had been arrested in 2016 as an accessory in connection with the death of an innocent four-month-old child. The screenshots establish that these posts existed by April 7, 2023; Counter-Plaintiff preserves the precise original posting date for proof rather than relying solely on the screenshot capture date. The same preserved post described Counter-Plaintiff as a "dangerous woman," accused her of harassment and bullying, directly tagged @DaniRobertson and multiple third parties, and linked an article concerning the unrelated Louisiana criminal matter. A second screenshot captured on April 7, 2023 shows HearHerTV using the text "MURD*R of A 4 month Old Baby" while sharing Counter-Defendant's "Love Triangle MURDER IN LAKE CHARLES 'Analyze This'" video. Counter-Plaintiff alleges the shared video and accompanying text as evidence that the criminal meaning of Counter-Defendant's Allen presentation was being adopted and disseminated by another creator.

231. Counter-Plaintiff alleges the preserved HearHerTV posts as concrete evidence that another creator understood the Allen/Lake Charles presentation as identifying Dani Robertson with the person associated with the infant-death criminal matter and then repeated that criminal meaning while distributing Counter-Defendant's video. Counter-Plaintiff does not attribute HearHerTV's independent accusations to Counter-Defendant as direct speech, does not plead agency from these facts alone, and alleges the publications principally as evidence of audience meaning,

dissemination, causation, reputational injury, and the foreseeable sting of the Allen identification.

232. — Actual Downstream Adoption of Counter-Defendant's Identification Material. During a March 2023 HearHerTV publication, the third-party creator expressly encouraged viewers to subscribe to Counter-Defendant's Unwind with Teddy channel and described Counter-Defendant as providing the detailed or "slow cooked" breakdown of the ongoing Dani identity investigation.

233. HearHerTV then replayed or discussed the same voice-comparison and interrogation material, repeatedly asked whether the identification should be "ruled in" or "ruled out," and announced with members of the audience that "We're ruling it in."

234. HearHerTV thereafter treated Counter-Plaintiff as Danielle Elizabeth Allen, referred to her as "Deadly Dani," tied the identification to Allen's interrogation, and made explicit independent accusations that Counter-Plaintiff was a murderer or accomplice in the death of a four-month-old infant.

235. Counter-Plaintiff does not attribute HearHerTV's independent words to Counter-Defendant as though Counter-Defendant personally uttered them and does not allege agency from those statements alone. Counter-Plaintiff alleges the publication as evidence of actual audience understanding, downstream dissemination, causation, reputational injury, and the foreseeable meaning of Counter-Defendant's recurring Allen-identification programming.

236. — April 7, 2023 — Downstream Audience Adoption of DUI, Child-Death, Flight, and Law-Enforcement-Family Associations. Counter-Plaintiff preserved comments from an account displayed as "Jennifer Luv Spewitt" that were directed to "Danielle" and reflected adoption of multiple elements of the ongoing Allen/DEA identity narrative. In the

preserved comments, the commenter stated that she herself had received a DUI years earlier and then told "Danielle," "You obviously didn't learn yours."

237. The same commenter further contrasted her own DUI with "a baby's death" and "any other person's death," stated to "Danielle," "But you ran from the police...vroom vroom," and in a separate preserved comment referred to "your daddy" as a deputy. Counter-Plaintiff alleges those comments as evidence that a third-party audience member understood and adopted multiple criminal and family-law-enforcement associations being circulated in the Dani/Allen identity controversy.

238. Counter-Plaintiff denies having committed Danielle Elizabeth Allen's DUI, denies having run from police in connection with Allen's criminal matter, denies involvement in the infant's death, and denies that the commenter's law-enforcement-family characterization established Counter-Plaintiff's identity or family relationship to Allen.

239. Counter-Plaintiff does not attribute Jennifer Luv Spewitt's independent words to Counter-Defendant as though Counter-Defendant personally uttered them. Counter-Plaintiff alleges the comments as actual downstream audience understanding, dissemination, reputational harm, and evidence that the recurring Dani/Allen presentation was capable of causing viewers to associate Counter-Plaintiff with Allen's DUI, child-death criminal matter, alleged flight-related conduct, and family-law-enforcement details.

**May 16, 2023 — Fake-Name / Fraud / Wire-Fraud Persona**

240. On May 16, 2023, Counter-Defendant stated or materially conveyed that Counter-Plaintiff created fake names and fake email accounts, used rubber stamps, and sent "false Emails all the time. Fake, fraudulent." Counter-Defendant further analogized the alleged conduct to using the internet or wire to commit fraud.

241. Counter-Plaintiff denies committing fraud or wire fraud and denies that lawful pseudonyms, privacy measures, email accounts, or other lawful identity-protective arrangements constituted criminal fraud. Counter-Plaintiff alleges this older publication as historical false-light, fault, malice, and recurring-fraud-persona context, including context for the later criminalized-anonymity allegations pleaded at ¶¶156–159, rather than as an unrestricted timely defamation-damages claim.

**May 21–22, 2023 — Downstream Adoption of the Dani/Allen Identification**

242. On May 21, 2023, third-party creator HearHerTV published a separate video titled substantially "MONIQUE TOLBERT aka DE@DLY DANI'S MOMMA' GOING BACK DOWN MEMORY LANE." Counter-Plaintiff alleges the title as evidence that a downstream creator was publicly treating the Allen-family relationship as established rather than merely asking a neutral question.

243. On May 22, 2023, HearHerTV published a separate video titled substantially "DE@DLY DANI YOU HAVE BEEN EXPOSED, HUNTY!!" and used Dani-related identifying metadata.

244. Counter-Plaintiff alleges the May 21 and May 22 publications as evidence that the Dani/Allen narrative propagated beyond Counter-Defendant's original Mystery Clue presentations and was adopted by another creator as an asserted real-world identification.

245. Counter-Plaintiff again does not attribute HearHerTV's independent wording to Counter-Defendant as direct speech and alleges these publications only for downstream audience meaning, dissemination, causation, reputation, notice, and damages.

246. — March–May 2023 Allen-Family and Workplace Escalation. Counter-Defendant's Danielle Elizabeth Allen investigation extended beyond discussion of Allen herself.

Counter-Defendant publicly displayed or circulated Allen-family information, including identifying material concerning Allen's parents, and posted Allen's father to her community wall as part of the continuing effort to connect Counter-Plaintiff with the Allen family.

247. The resulting identity campaign extended offline. A subscriber associated with Counter-Defendant's audience, known as "Crazy Lucian," contacted Allen's father's workplace, and preserved materials dated March 8 and May 18, 2023 reflect employment-related outreach concerning the misidentified family.

248. Counter-Plaintiff does not automatically attribute an independent third party's telephone call or other conduct to Counter-Defendant merely because the person watched or participated in Counter-Defendant's programming. Counter-Plaintiff alleges these events as evidence of actual downstream consequences, dissemination, audience mobilization, foreseeability, reputational harm, and the expansion of the false Allen identification into real-world family and workplace activity.

249. — May 3, 2023 — Mystery Clue #15 / Claimed Courtney Morris Family Voice Identification. On May 3, 2023, Counter-Defendant promoted and published Defendant-focused programming identified substantially as *Messy Mocha | DANIELLE THAT'S YOU SIS? Mystery Clue #15 "Analyze This" Interview*. The accompanying publication stated that a family member of Courtney Morris had said that the voice heard on tape was that of @DaniRobertson and invited viewers to listen to the interview and decide what they thought.

250. The corresponding Mystery Clue #15 presentation used the "Rule In Rule Out" framework and the title or cover language "Danielle Danielle That's You Sis?" while continuing the effort to identify Counter-Plaintiff through voice comparison.

251. Counter-Plaintiff alleges the May 3 publication as historical evidence of direct account identification, third-party corroboration framing, audience recruitment, dissemination, and the progression toward Counter-Defendant's later October 13, 2023 publication stating that @DaniRobertson's voice had been "CONFIRMED" as Danielle Elizabeth Allen by Courtney Morris's family members. Counter-Plaintiff denies being Danielle Elizabeth Allen.

**F. June 8 and June 19, 2023 — Continued Mystery-Clue Identity Investigation After Denials**

252. On June 8, 2023, Counter-Defendant continued the identity-focused series in a publication identified in Counter-Plaintiff's preserved record as "Mystery Clue #16 — Analyze This — It's Personal." Counter-Plaintiff alleges that the June 8 publication continued the preexisting effort to identify Counter-Plaintiff through purported clues after Counter-Plaintiff had already denied being Danielle Elizabeth Allen.

253. On June 19, 2023, Counter-Defendant again discussed the identity investigation and Allen-related material after Counter-Plaintiff's denials. Counter-Plaintiff has preserved the corresponding broadcast record and transcript. Counter-Plaintiff alleges the June 8 and June 19 publications as historical evidence of continuity, repeated identity targeting, knowledge of denial, audience recruitment, and the development of the criminal-identification narrative. Counter-Plaintiff does not seek independent affirmative defamation damages based solely on these older publications.

**G. June 20, 2023 — Downstream Publication Showing Audience Meaning and Reputational Harm**

254. On June 20, 2023, content creator Donat Ricketts published a separate broadcast concerning Counter-Plaintiff and the Allen narrative. Ricketts expressly attributed the Dani/Allen identification to Counter-Defendant, stating that it had been "proven by Unwind with Teddy," and directed his viewers to Unwind with Teddy to compare the voices and supposedly "prove" the identification. Ricketts then repeatedly accused Dani Robertson of killing a four-month-old child, called Dani a "child killer," invoked "a life for a life," referenced the death penalty, and stated that he would continue reminding people on YouTube of the accusation. Ricketts further stated that he would share Unwind with Teddy content so that viewers could conduct additional research.

255. Counter-Plaintiff denies killing a child, giving a child alcohol, participating in the infant's death, or being charged in that matter. Counter-Plaintiff does not attribute every independent statement made by Ricketts to Counter-Defendant as though Counter-Defendant personally uttered it. Counter-Plaintiff alleges the Ricketts publication as evidence of actual downstream audience understanding, dissemination, causation, and reputational injury because Ricketts expressly identified Unwind with Teddy as the source that had "proven" the identification and then broadcast the conclusion that Dani was responsible for the child's death. Counter-Plaintiff alleges that this downstream publication demonstrates that the criminal implication was not merely theoretical or dependent on Counter-Plaintiff's subjective interpretation.

256. Counter-Plaintiff alleges that the Ricketts publication is especially probative of audience meaning because Ricketts did not merely repeat the Allen story independently. He

expressly identified Counter-Defendant's Unwind with Teddy programming as the source that had "proven" the Dani/Allen identification and directed his viewers back to Counter-Defendant's content to compare the voices.

257. Counter-Plaintiff alleges that Ricketts's subsequent independent use of "child killer," infant-death accusations, "a life for a life," and death-penalty rhetoric demonstrates that Counter-Defendant's Allen presentation was objectively capable of being understood as identifying Counter-Plaintiff with the child-death criminal matter.

258. Counter-Plaintiff does not attribute Ricketts's independent wording, threats, or rhetoric to Counter-Defendant as though Counter-Defendant personally uttered them. Counter-Plaintiff alleges the publication as actual downstream understanding, dissemination, causation, reputational injury, and damages.

**June 23, 2023 — Mystery Clue #17 / Express Family-Member Motive Theory**

259. On June 23, 2023, Counter-Defendant promoted and published Defendant-focused programming identified substantially as "DANI 'SOMEBODY BOTHERED' One Of Your Family Members?" and "Mystery Clue #17," using the literal account reference @DaniRobertson and the recurring "Rule It In / Rule It Out" framework.

260. During the publication, Counter-Defendant replayed or presented a statement that Dani had "come over here and handle[d] her business because somebody bothered one of her family members," and Counter-Defendant expressly treated that statement as supporting the ongoing identity inquiry rather than as an unrelated third-party remark.

261. Counter-Defendant stated in substance that "everyone knew what Dani meant," explained that her purpose in replaying the material was to support what she and her audience had already been thinking, and characterized the family-member statement as a "clue."

262. Counter-Defendant connected the family-member inference to the continuing Monique Tolbert / Danielle Elizabeth Allen inquiry by asking whether the person Counter-Plaintiff was supposedly protecting or reacting for could be a member of that family and by continuing to treat family relationships as evidence relevant to Counter-Plaintiff's identity.

263. Counter-Defendant further treated the disputed family connection as something Counter-Plaintiff could disprove, stating in substance that if the theory were not true Counter-Plaintiff could "debunk it" and asking why she had not done so.

264. Counter-Defendant submitted the family inference to audience participation under the "Rule It In / Rule It Out" framework and reported an audience result favoring "rule it in." Counter-Plaintiff denies being Danielle Elizabeth Allen or a member of the Allen/Tolbert family and denies that any reaction to third-party conduct established a family relationship.

265. Counter-Plaintiff does not attribute an independent third party's words to Counter-Defendant merely because Counter-Defendant replayed them. Counter-Plaintiff alleges this publication based upon Counter-Defendant's own selection, framing, adoption of the family inference, connection of that inference to the continuing Allen/Tolbert identity inquiry, audience solicitation, and statements placing the burden on Counter-Plaintiff to disprove the theory.

**H. June 26–July 21, 2023 — Direct Tags, Geographic Clues, and Voice-Comparison Publications**

266. Counter-Plaintiff's preserved publication catalog reflects additional June and July 2023 identity-focused publications directly identifying or tagging Counter-Plaintiff.

267. By June 26, 2023, Counter-Defendant was using direct @DaniRobertson references in identity-search programming that included a "Rule In / Rule Out" presentation identified as "Mystery Clue 19."

268. On July 1, 2023, Counter-Defendant published a video titled substantially "@DaniRobertson and Danielle E. Allen BOTH HAVE TIES TO INDIANA Clue or Coincidence?" thereby directly pairing Counter-Plaintiff's account with Allen through a geographic clue.

269. On July 21, 2023, Counter-Defendant published "Danielle Elizabeth IT'S YOUUU SIS? Mystery Clue #22," again directly referencing @DaniRobertson in the preserved publication record.

270. The related preserved voice-comparison presentation labeled one sample "Dani Robertson Voice A" and another "Danielle Elizabeth Voice B," used "Rule In Rule Out" language, and invited audience comparison concerning whether the voices belonged to the same person. Counter-Plaintiff alleges these publications as historical evidence that the Allen identification was repeatedly developed through direct account references, voice comparisons, geographic clues, and audience participation before the September 2023 publications in which Counter-Defendant expressly acknowledged material uncertainty.

**I. August 15, 2023 — Stationhead Allen-Family Outreach, Voice Physiology, and Deliberate Repetition**

271. On August 15, 2023, Counter-Defendant conducted a Stationhead-connected broadcast titled in substance "No One Answers — What's Up With That?" while continuing identity and voice-comparison programming. Counter-Defendant discussed how forensic or expert voice comparison examines distinguishing features and stated that voices may vary with environment, biology, physiology, and changes involving the vocal cords. Counter-Plaintiff alleges this discussion in context with Counter-Defendant's earlier March 5, 2023 invocation of her medical

education and then-current professional license while making anatomical identity comparisons. Counter-Defendant is a physician assistant.

272. During the August 15 broadcast, Counter-Defendant stated that she had decided to "reach out to a few people," acknowledged that she had not received a response from persons in the Tolbert family, and stated that she would not identify exactly whom she had contacted. Counter-Defendant discussed researching telephone numbers and addresses associated with multiple family members, including the same telephone number appearing for multiple sisters at different addresses, and described disconnected numbers while continuing to consider additional family outreach.

273. Counter-Defendant stated that "Danielle on this platform has not proven anything" and "has not debunked anything," despite Counter-Plaintiff's prior denials that she was Allen. Counter-Defendant then expressly stated, "Danielle Robertson impersonated Danielle Elizabeth Allen," followed by, "I need to say that often," and explained that she wanted a family member who might be listening to hear the accusation. Counter-Plaintiff denies impersonating Danielle Elizabeth Allen and alleges that the August 15 statement is important evidence of deliberate repetition of a false identity accusation for dissemination to third parties after Counter-Plaintiff had disputed the Allen identification.

274. Counter-Defendant further discussed attempting to obtain the opinion of a man she identified as Allen's father concerning "someone impersonating his daughter," stated that he could help "rule out the voices," and stated that he would know how to contact his daughter, Danielle. Counter-Plaintiff alleges that the August 15 broadcast demonstrates that the Allen investigation had moved beyond passive YouTube commentary into affirmative third-party family outreach, record and telephone research, voice-comparison analysis, and an expressed

intention to repeat the impersonation accusation so Allen-family members would hear it. Counter-Plaintiff does not allege that contacting a third party, standing alone, automatically constitutes stalking. The August 15 conduct is alleged as identity-investigation scope, purpose, notice, fault, malice, third-party dissemination, course-of-conduct, and pre-litigation context.

**I-1. August 16, 2023 — Mental-Health Professional-Authority Context**

275. On August 16, 2023, Counter-Defendant published a members-only program titled substantially Night Talk with Teddy | BIPOLAR DISORDER What Is It? "Analyze This" Relax Music. The program was not directed at Counter-Plaintiff. During the program, Counter-Defendant presented detailed information concerning bipolar disorder, mania, hypomania, psychosis, psychiatric treatment, medication, psychotherapy, emergency intervention, and related mental-health symptoms and stated, "I'm qualified."

276. A viewer publicly characterized Counter-Defendant as a "GREAT DOCTOR," and Counter-Defendant's channel account visibly hearted the comment. Counter-Plaintiff does not allege from the heart reaction alone that Counter-Defendant legally represented herself to be a physician, and Counter-Plaintiff does not allege that the general bipolar-disorder program was directed at her or independently wrongful.

277. Counter-Plaintiff alleges the publication as professional-authority and audience-perception context relevant to the weight reasonable viewers familiar with Counter-Defendant's medically authoritative presentations could later attach to Counter-Defendant's psychiatric and mental-instability characterizations of Counter-Plaintiff.

**J. September 9, 2023 — Express Unmasking Objective, Associates, Allen Criminal Association, and Admitted Uncertainty**

278. On September 9, 2023, Counter-Defendant continued serialized Dani-focused programming in "@DaniRobertson CAUSE UNWINEWITHTEDDY GONNA FIND OUT Pt. 2 | @AiNatasha007." Counter-Defendant expressly made identification of Counter-Plaintiff a stated objective and later stated, "I want one person, your identity." Counter-Defendant further stated that the presentation was "purposeful," repeatedly predicted that other persons would hear the material and help "find out," and solicited broader audience dissemination.

279. Counter-Defendant discussed persons she associated with Counter-Plaintiff, stated that viewers would see persons she called the "Dirty 40," and announced that she would "call out every name" she wanted. During the same publication, Counter-Defendant replayed Counter-Plaintiff's objection that Counter-Defendant was making excessive unnecessary videos, attempting unnecessary contact, and entering spaces where she was not welcome, including a membership area. Counter-Defendant responded in substance, "I guess that's why you want me gone too." Counter-Defendant thereby demonstrated actual awareness by September 2023 that Counter-Plaintiff objected to continued Defendant-directed contact and membership presence.

280. Counter-Defendant also expressly recognized that Counter-Plaintiff challenged her publications as defamatory, stating in substance, "If you think I'm slandering you and defaming you, meet me in court. Simple. Unmask yourself and we'll just bring the evidence with us." Later in the broadcast, after an audience reference to an "accomplice after the fact," Counter-Defendant immediately identified "DEA ... Danielle Elizabeth Allen," stated that the evidence she had reviewed supposedly "points to" Counter-Plaintiff being Allen

and that Allen was "not ruled out," but admitted: "If it's not her, fine" and "I don't know 100%." Counter-Plaintiff alleges these statements as direct evidence that Counter-Defendant herself recognized that the Allen identification was materially uncertain while continuing to publish the criminal-identification theory. Counter-Plaintiff alleges the publication as evidence that the identity objective, associate scrutiny, notice of unwanted contact, and Allen criminal-identification theory were already operating together before this lawsuit.

**K. September 15–17, 2023 — "True Identity" Search and Express Uncertainty**

281. During a September 15–16, 2023 publication, Counter-Defendant stated, "I just want to get to the true identity of one anonymous person." Counter-Defendant discussed a "long list," friends or associates, the "Dirty 40," and the preservation or cataloguing of digital activity, including statements in substance that "every little step" would remain and that "dots can be connected." Counter-Defendant stated that Counter-Plaintiff did not like Counter-Defendant "calling other folks names" or "talking about your friends."

282. In a September 17, 2023 publication, Counter-Defendant asked how anyone could state as a fact that Dani Robertson was not Danielle Elizabeth Allen. Counter-Defendant then admitted: "Though it's not scientific as a fact right now, the evidence points toward her being that," and stated that there were "so many coincidences" pointing toward the women being the same person. Counter-Defendant treated Counter-Plaintiff's efforts to obtain the underlying interrogation material for review and rebuttal as purported evidence supporting the identification. Counter-Plaintiff alleges these statements as evidence of Counter-Defendant's subjective awareness that the identification remained materially uncertain while she continued publishing it.

**September 16–17, 2023 — Identity Objective, Associates, and Dirty 40**

283. Counter-Defendant expressly stated in substance that the objective was to determine Counter-Plaintiff's "true identity." Counter-Defendant discussed persons she associated with Counter-Plaintiff, including friends and persons Counter-Defendant placed within the "Dirty 40" framework. Counter-Defendant stated in substance: "I want one person, your identity." Counter-Defendant described retaining or organizing information concerning Counter-Plaintiff and persons associated with her so that purported connections or "dots" could be assembled.

284. Counter-Defendant acknowledged material uncertainty concerning the Allen identification, including stating that she did not know the identification "100%" and that it was "not scientific as a fact right now." Counter-Plaintiff alleges those acknowledgments as evidence of Counter-Defendant's subjective uncertainty concerning the criminal-identification theory before materially equivalent later publications.

**September 18, 2023**

285. Counter-Defendant continued the serialized identity campaign in a publication titled substantially: "@DaniRobertson It's Youuu CAUSE UNWINEWITHTEDDY Gonna Find Out." Counter-Plaintiff alleges the title and corresponding publication as additional direct-account, identity-investigation, continuity, and notice evidence. Counter-Plaintiff relies upon transcript-specific statements from this publication only to the extent established by the preserved corresponding recording and transcript.

**L. September 20–22, 2023 — Notice of Criminal Meaning and Continuing Doubt**

286. On or about September 20, 2023, Counter-Defendant described the underlying Allen material as a true-crime or murder-related Lake Charles story. Counter-Defendant

acknowledged that another creator had accused her of using the Danielle Elizabeth Allen story to "lay at the foot of Danielle Robertson a guilty charge." Counter-Defendant denied that she had literally used the "M word." Counter-Plaintiff alleges this exchange not as an admission that the accusation was true, but as evidence that Counter-Defendant knew by September 2023 the precise criminal implication viewers and other creators were drawing from the Allen publications.

287. On or about September 22, 2023, Counter-Defendant again addressed the identity theory and stated, "No, she may not be Danielle Elizabeth Allen," while continuing to suggest that persons defending Counter-Plaintiff might be protecting her or preventing the truth from being found. Counter-Plaintiff alleges the progression from "I don't know 100%," to "not scientific as a fact," to "she may not be" as evidence of material uncertainty existing inside Counter-Defendant's own publications.

**M. September 29 and October 13, 2023 — "Dirty Forty" and "VOICE CONFIRMED"**

288. On September 29, 2023, Counter-Defendant published a video substantially titled "@DaniRobertson The Dirty Forty CAUSE UNWINEWITHTEDDY GONNA FIND OUT." Counter-Defendant expressly identified Counter-Plaintiff, discussed "Danielle and the Dirty 40," and portrayed persons associated with Counter-Plaintiff as supposedly acting behind the scenes. Counter-Plaintiff denies organizing or participating in a criminal or unlawful conspiracy.

289. — October 6, 2023 — Mystery Clue #21. By October 6, 2023, Counter-Defendant continued publishing the serialized Dani-focused identity investigation in a publication identified as "Mystery Clue #21" under the "Analyze This" format.

290. Counter-Plaintiff alleges the October 6 publication as a duration marker demonstrating that the audience-assisted identity campaign continued for months after the initial March 2023 Allen comparisons and Counter-Plaintiff's repeated denials.

291. Counter-Plaintiff preserves each source publication according to its own displayed title and numbering and does not infer chronology merely from the numbering of individual "Mystery Clue" publications.

292. On or about October 13, 2023, Counter-Defendant published content titled substantially "@DaniRobertson VOICE CONFIRMED AS Danielle Elizabeth Allen By Courtney Morris's Family Members." Counter-Plaintiff alleges that the title affirmatively represented that the disputed identification had been confirmed. The title did not merely ask viewers whether the voices sounded similar; it affirmatively used the words "VOICE CONFIRMED" while directly identifying @DaniRobertson with Danielle Elizabeth Allen. Counter-Plaintiff denies being Allen. Counter-Plaintiff alleges the title as evidence of escalation from Counter-Defendant's earlier express uncertainty to materially more definitive identity language. Counter-Plaintiff further alleges that the October 13 representation followed the earlier May 3, 2023 Mystery Clue #15 publication in which Counter-Defendant had already represented that a Courtney Morris family member said the voice heard on tape was @DaniRobertson.

293. Counter-Plaintiff alleges these older publications for context, notice, audience meaning, fault, course of conduct, and setoff to the extent permitted by MCL 600.5823.

**N. October 15–20, 2023 — Lake Charles Interrogation Series and Continued Dani Association**

294. Immediately after the October 13, 2023 "VOICE CONFIRMED" publication, Counter-Defendant continued publishing Lake Charles criminal and interrogation material while using Counter-Plaintiff-associated identifiers in the publications or searchable metadata.

295. On October 15, 2023, Counter-Defendant published "Love Triangle MURDER IN LAKE CHARLES 'Analyze This' Police Report Pt. 5," with preserved metadata using #DaniRobertson. Counter-Plaintiff alleges the October 15, 2023 publication separately as part of the criminal referent supplied to viewers for the ongoing Danielle Elizabeth Allen identity comparison. Counter-Plaintiff expressly denies any involvement in the murder, homicide, infant death, accessory conduct, or related Louisiana criminal matter.

296. On October 16, 2023, Counter-Defendant published the interrogation of Danielle E. Allen under the "Love Triangle" / "Murder In Lake Charles" framing with #DaniRobertson, and separately published Larry D. Champ interrogation material with the same Dani-associated metadata.

297. Counter-Plaintiff alleges the Danielle Elizabeth Allen interrogation as a separate October 16, 2023 publication under the continuing "Murder in Lake Charles" presentation. That publication further supplied Allen's criminal interrogation and criminal history as identity-comparison material for viewers evaluating whether Counter-Plaintiff was Allen.

298. Counter-Plaintiff separately alleges the Larry Champ interrogation material as its own October 16, 2023 publication rather than merging it with the Allen interrogation merely because both were published on the same date. Counter-Plaintiff alleges the Larry Champ publication

separately because it supplied additional criminal-case context to the same audience-facing identification narrative.

299. On October 17, 2023, Counter-Defendant published Courtney Morris interrogation material using both #DaniRobertson and #TruthTellerDani, followed on October 18 by a related interrogation Short using #DaniRobertson.

300. Counter-Plaintiff alleges the Courtney Morris interrogation material as a separate October 17, 2023 publication using #DaniRobertson and #TruthTellerDani. Counter-Plaintiff alleges that the combination of her identifiers with another participant's interrogation in the same Lake Charles criminal narrative reinforced the false public association between Counter-Plaintiff and that criminal matter.

301. Counter-Plaintiff separately alleges the October 18, 2023 Lake Charles interrogation Short using #DaniRobertson as its own publication. Counter-Plaintiff alleges the Short as a separate publication reinforcing the same false criminal-identity association.

302. On October 20, 2023, Counter-Defendant published "Jaguar Wright Interview | I KNOW YOU'RE WATCHING DANI 'Analyze This'," whose preserved description directly referenced @DaniRobertson. During the Allen/Lake Charles discussion, Counter-Defendant discussed Danielle Elizabeth Allen's criminal history, including the DUI story and the accusation that Allen had been an accessory in connection with the murder of a four-month-old infant, while continuing to invite comparison with Counter-Plaintiff. Counter-Plaintiff denies being Danielle Elizabeth Allen and denies any involvement in the murder, infant death, accessory allegation, DUI, or any other Allen-related crime. Counter-Plaintiff further alleges that Counter-Defendant stated that charges were eventually dropped while still describing Allen as an accessory

connected to the four-month-old infant's murder; Counter-Plaintiff pleads that qualification together with the accusation as part of the publication's full context.

303. Counter-Plaintiff alleges that this sequence is significant because Counter-Defendant did not separate the Lake Charles criminal material from the Dani identity campaign after announcing that the voice identification had been "confirmed"; instead, she continued associating Counter-Plaintiff's identifiers with the interrogation and homicide-related series. Counter-Plaintiff alleges these publications as historical identification, defamatory-meaning, dissemination, malice, audience-understanding, course-of-conduct, and MCL 600.5823 setoff evidence to the extent legally available, not as unrestricted affirmative recovery for otherwise untimely publications.

**O. November 28, 2023 — Counter-Defendant Defines the "Dirty 40" as a Coordinated Conspiratorial Group**

304. On November 28, 2023, Counter-Defendant published "D For Danielle — Defining The Meaning Of The Dirty Forty | CAUSE @UNWINEWITHTEDDY GONNA FIND OUT." Counter-Defendant expressly told her audience what she meant by the recurring "Dirty 40" designation. She described a group of approximately forty persons allegedly "working behind the scenes" to cause "havoc or trouble" in another person's life. Counter-Defendant stated that the "receipts" she claimed to possess showed a "coordinated effort" to create problems or disruption and to engage in "nefarious activities," and she described the alleged group as a "potentially malicious or secretive group of people."

305. Counter-Defendant then deliberately transitioned from the "Dirty 40" to the concept of a "co-conspirator." Through the AI material she selected and broadcast, a co-conspirator was defined as a person knowingly participating in or supporting a conspiracy involving illegal,

harmful, or wrongful activity, including through planning, execution, facilitation, aiding, or abetting, with potential criminal prosecution and legal responsibility. Counter-Defendant did not leave that definition as an unrelated abstract discussion. She immediately returned to the evidence she claimed to possess, stated that intent mattered, referred to "the receipts that I've been showing," referenced alleged activity spanning 2021 through 2023, and discussed "involvement in the conspiracy." Counter-Defendant further stated that, moving forward, when discussing the "Dirty 40," she would show "names and receipts and times and places and collaborations," including persons allegedly possessing knowledge of or participating in the activity. Counter-Plaintiff alleges this publication because Counter-Defendant herself supplied the meaning of the recurring "Dirty 40" designation to her audience and tied that designation to covert coordination, malicious or nefarious conduct, conspiracy, knowing participation, aiding and abetting, illegality, criminal prosecution, and legal liability.

306. To the extent Counter-Defendant identified Counter-Plaintiff as a member, participant, organizer, or co-conspirator within the "Dirty 40," Counter-Plaintiff denies participating in any criminal conspiracy or organized criminal enterprise with persons Counter-Defendant placed within that designation. Counter-Plaintiff alleges this November 28 publication as particularly relevant to the meaning of later "Dirty 40" publications and to the circumstances that caused Counter-Plaintiff to seek regulatory assistance in June 2024.

307. Counter-Defendant expressly placed Down the Rabbit Hole News, also known as Black Rabbit, within the Dirty 40 framework. Counter-Defendant stated in substance: "Why was Black Rabbit … part of … the dirty 40? I said it," followed by "Black Rabbit was involved." Counter-Defendant described persons within the framework as "sharing

information" and "planning and plotting our demise." Counter-Defendant publicly asked Black Rabbit: "Were you a co-conspirator?" Counter-Defendant thereafter discussed multiple participants, "other co-conspirator[s]," the Dirty 40, and an intention to identify persons and provide a purported "receipt" and "connection" for each.

308. Counter-Plaintiff does not allege that Black Rabbit actually participated in a conspiracy. Counter-Plaintiff alleges the statements to show Counter-Defendant's expansion of the Defendant-focused investigation to persons Counter-Defendant believed were connected to Counter-Plaintiff. Counter-Defendant also followed associate-related material across platforms, including reviewing Lenora's Instagram activity and devoting broadcast time to parsing Lenora's comments, online associations, and website-related statements as part of continuing Dani-focused content. Counter-Plaintiff further alleges that Counter-Defendant retained information concerning other persons associated with Counter-Plaintiff, including Lemon-related material that Counter-Defendant described as having been saved "for a rainy day."

309. Counter-Plaintiff acknowledges ordinary YouTube collaboration with Down the Rabbit Hole News, also known as Black Rabbit. Counter-Plaintiff does not allege that ordinary collaboration, association, shared online commentary, or participation in one another's public programming was itself unlawful.

310. Counter-Plaintiff denies that her collaboration with Black Rabbit involved criminal activity, fraud, stalking, covert surveillance, unlawful information gathering, troll-farm operations, a concealed enterprise, or any organized wrongful activity.

311. Counter-Plaintiff alleges wrongdoing only where Counter-Defendant transformed ordinary online association into a materially false implication of criminal, fraudulent, stalking, covert-investigative, troll-farm, or other seriously wrongful coordination.

312. — Audience Understanding of "Troll Farm" Through the Existing Dirty 40 Framework. Counter-Defendant later used the term "troll farm" in a manner consistent with the coordinated-group framework she had previously supplied to her recurring audience through the "Dirty 40" series.

313. In discussing a purported troll farm, Counter-Defendant stated in substance that "that's what the troll farm does, they move around," questioned how multiple persons "coordinate[d]" their conduct, described "all these different moving parts," stated that there was sufficient information for her to believe "there really is a troll farm," and asked, "who is the head of the troll farm?"

314. Counter-Defendant's own usage therefore presented a "troll farm" as an organized network involving multiple persons, coordinated conduct, moving participants, shared objectives, and possible centralized leadership rather than merely unrelated online critics.

315. Counter-Defendant thereafter incorporated the same terminology into Dani-focused programming and stated to or about Counter-Plaintiff that she was "not exposing the troll farm" and was "maybe running one of [her] own."

316. Counter-Plaintiff alleges that Counter-Defendant's recurring audience had already been supplied with a Dani-centered meaning connecting hidden coordination, the "Dirty 40," co-conspirators, groups, coordinated activity, and possible centralized leadership before Counter-Defendant publicly suggested that Counter-Plaintiff operated her own "troll farm."

317. Counter-Plaintiff denies operating, directing, funding, organizing, participating in, or serving as the head of any troll farm, Dirty 40, coordinated harassment network, fraudulent network, conspiracy, crime ring, or organized criminal enterprise.

**P. December 21, 2023 — Allen-Specific Birthday Association**

318. On December 21, 2023, Counter-Defendant published a YouTube Short titled substantially "Danielle Happy Birthday Mr. Grinch @UNWINEWITHTEDDY #Shorts." December 21 is not Counter-Plaintiff's birthday. Counter-Plaintiff alleges that December 21 corresponds to Danielle Elizabeth Allen's birthday. Counter-Plaintiff alleges that, in the context of the continuing Allen identity campaign, publishing a "Happy Birthday" message directed to "Danielle" on Allen's birthday further reinforced the implication that Counter-Plaintiff and Allen were the same person. Counter-Plaintiff alleges the Short as identity-association, fault, and malice evidence and will produce the preserved Short and supporting birth-date record at the appropriate evidentiary stage.

## VIII. METADATA, SEARCH ASSOCIATION, AND DEFENDANT-IDENTIFIER TARGETING

319. Counter-Plaintiff preserved contemporaneous screenshots showing that Counter-Defendant did not limit Defendant association to spoken commentary. Counter-Defendant repeatedly used combinations of Counter-Plaintiff's public identifiers in titles, descriptions, hashtags, account mentions, and searchable video metadata. Preserved metadata included variations of Dani Robertson, DaniMontanaTV, TruthTellerDani, and related Dani-associated terms. Counter-Defendant also repeatedly coupled Counter-Plaintiff's identifiers with Counter-Defendant's own channel names, series labels, creators, and public subjects. In some preserved examples, the visible subject of a video was principally another public figure or

topic, yet Counter-Plaintiff's names or identifiers remained embedded in the video's keyword metadata. Counter-Plaintiff alleges this as evidence that the association was deliberate rather than incidental.

320. Counter-Plaintiff does not claim ownership of ordinary hashtags. Counter-Plaintiff does not allege that use of a hashtag alone is stalking. Counter-Plaintiff alleges that repeated use of `#DaniRobertson`, `#TruthTellerDani`, `#DaniMontanaTV`, `#DForDanielle`, and similar identifiers intentionally associated Counter-Defendant's videos with Counter-Plaintiff's online identity.

321. Counter-Plaintiff has preserved search-result evidence in which Counter-Defendant's Defendant-referencing content appeared together with Counter-Plaintiff's own content in searches associated with Counter-Plaintiff or subjects she addressed. Counter-Plaintiff does not allege that any individual tag necessarily caused a particular recommendation ranking. Counter-Plaintiff alleges the metadata, visible hashtags, titles, descriptions, and search results as evidence of intent, "of and concerning" identification, dissemination, continuity, brand association, monitoring, and motive. Where the underlying publication itself contained defamatory statements or implications, use of Counter-Plaintiff's names and identifiers further tied the defamatory publication to Counter-Plaintiff's recognizable online identity.

322. Counter-Plaintiff has preserved a substantial volume of additional YouTube publications containing literal direct @ mentions and tagging of Counter-Plaintiff's accounts, repeated use of Counter-Plaintiff's channel identifiers, and related account-directed communications. The present pleading does not attempt to reproduce the entire preserved catalog. Counter-Plaintiff will further particularize the number, dates, account identifiers, platforms, and post-notice

frequency of preserved direct mentions and contacts through discovery, an evidentiary submission, or another filing permitted by the Court. The underlying videos, screenshots, metadata, and catalog are preserved. Counter-Plaintiff distinguishes literal account mentions using @ from ordinary hashtags using #. Counter-Plaintiff alleges that literal account mentions were directed to Counter-Plaintiff's established accounts and were capable of generating account notifications. Counter-Plaintiff does not allege that every literal mention actually generated or delivered a notification absent platform records establishing such delivery. The preserved catalog identifies at least eighteen specifically dated YouTube publications between October 2022 and January 2024 containing a literal @DaniRobertson or @TruthTellerDani account mention in the title or description.

323. Representative publications include:

a. October 11, 2022 — "D For Danielle aka @DaniRobertson 'THE POLICE CALL and BOGUS WELFARE CHECK'";

b. December 20, 2022 — "Night Talk with Teddy | MS. DAVIS 'Starting Beef With Dani' DIRTY DELETE Pt. 1 … | @TRUTHTELLERDANI";

c. September 8, 2023 — "@DaniRobertson 'CAUSE UNWINEWITHTEDDY GONNA FIND OUT Pt. 1";

d. September 26, 2023 — "@DaniRobertson The French Connection CAUSE UNWINEWITHTEDDY GONNA FIND OUT";

e. September 29, 2023 — "@DaniRobertson The Dirty Forty CAUSE UNWINEWITHTEDDY GONNA FIND OUT";

f. October 7, 2023 — "D For Danielle aka @DaniRobertson Admits ANON Take A Look At This Receipt Inside";

g. October 20, 2023 — "Jaguar Wright Interview | I KNOW YOU'RE WATCHING DANI," with @DaniRobertson in the description;

h. October 25, 2023 — "@DaniRobertson 'THE TEA IS GOING TO GET HOTTER'";

i. October 27, 2023 — "Email Exchange @DaniRobertson aka DAVID JOHNSON and @TalesFromTheCult";

j. December 2, 2023 — "@DaniRobertson IMPERSONATES & FILES FALSE COPYRIGHT CLAIMS AGAIN";

k. December 7, 2023 — "@DaniRobertson 'I WON'T BE FOUND TRUST ON THAT'";

l. December 24, 2023 — "@DaniRobertson BREAKING DOWN THE MESS OF 2021";

m. January 2, 2024 — "@SeanDavieWayShow 'I KNOW FOR A FACT @DANIROBERTSON ISN'T UGLY' You Know Her?";

n. January 3, 2024 — "@DaniRobertson REACTS TO DANIELLE ELIZABETH PHONE INQUIRY";

o. January 7, 2024 — "@DaniRobertson 'HOW TO CANCEL @JOHNYATES' A Step by Step Guide"; and

p. January 23, 2024 — "D For Danielle 'HIDING SPOT REVEALED? SOMEBODY PEEL BACK THE LAYERS'," with @DaniRobertson in the description.

324. Counter-Plaintiff has preserved additional Instagram and X/Twitter literal-account mentions after the April 24, 2024 fourth cease-and-desist notice. Counter-Plaintiff's April 24 notice contemporaneously stated that Counter-Defendant had tagged Counter-Plaintiff in more than 200 DForDanielle-related videos and expressly demanded cessation of unwanted contact and false tagging. Counter-Plaintiff alleges

the contemporaneous figure as the documented count asserted at the time and will rely upon the preserved publication archive for proof.

325. A summary of representative written cease dates and subsequent account-identifier use is attached as Exhibit C, Cease-and-Desist / Direct Account-Mention and Channel-Identifier Timeline. Exhibit C separately identifies literal "@" account mentions and ordinary hashtags and does not characterize hashtag use alone as direct electronic contact.

326. Exhibit C is offered as a chronological roadmap to the preserved notice and publication records. The underlying videos, posts, screenshots, metadata, and written notices are preserved, and Counter-Plaintiff relies upon those underlying source records to establish any disputed publication, date, identifier, contact, or platform event. That preserved archive also includes relevant community posts and publications captured before later deletion, removal, privatization, unlisting, or other public unavailability.

327. January 3, 2024 — Directly Tagged Danielle Elizabeth Inquiry Publication. Counter-Defendant published "@DaniRobertson REACTS TO DANIELLE ELIZABETH PHONE INQUIRY 'AnalyzeThis,'" directly tagging Counter-Plaintiff's account while continuing the Danielle Elizabeth identity investigation.

## IX. DFOR DANIELLE, MESSYDANI, AND CONTINUING BRAND ASSOCIATION

328. Counter-Defendant created and repeatedly used the identifier DForDanielle in connection with Counter-Plaintiff. Counter-Defendant promoted DForDanielle across platforms. Counter-Defendant maintained or promoted a DForDanielle YouTube presence. Counter-Defendant also publicly promoted "D for Danielle on Stationhead." Counter-Plaintiff

alleges that Counter-Defendant's moderators regularly promoted Counter-Defendant's channels and cross-platform DForDanielle presence.

329. Counter-Plaintiff alleges that Counter-Defendant also adopted or used MessyDani, a name associated with Counter-Plaintiff's preexisting website/domain, in connection with monetized activity. Counter-Plaintiff asserts below a separate Michigan appropriation-of-identity claim based principally upon Counter-Defendant's alleged later adoption and beneficial use of Counter-Plaintiff's preexisting MessyDani identity. Counter-Plaintiff alleges these facts as evidence of persistent brand association, motive, continuity, and reputational harm.

330. Counter-Plaintiff distinguishes DForDanielle from MessyDani. Counter-Plaintiff does not allege that she created DForDanielle. Counter-Plaintiff alleges Counter-Defendant created or adopted DForDanielle as Counter-Defendant's recurring designation for Counter-Plaintiff and subjects pertaining to Counter-Plaintiff. Counter-Defendant used DForDanielle to organize, title, identify, promote, distribute, and monetize Dani-focused content, including Allen/unmasking material and other publications concerning Counter-Plaintiff.

331. — Verified DForDanielle Volume. Counter-Plaintiff's separate audit presently identifies at least 50 preserved videos using the exact #DForDanielle hashtag. That figure is a conservative minimum and does not include title-only use of DForDanielle, community-post use, DForDanielle channel or account use, or the numerous DFor___ derivative titles used throughout Counter-Defendant's serialized programming. See Ex. C.

332. Counter-Plaintiff alleges the recurring DForDanielle designation as particularly probative because Counter-Defendant created or adopted DForDanielle as her own recurring

designation for Counter-Plaintiff and Counter-Plaintiff-related subjects. The volume of that designation, together with the broader Dani-associated identifier record, is alleged as evidence that the association was systematic and recurring rather than incidental and as evidence of identification, continuity, audience association, promotion, dissemination, motive, and sustained Defendant-focused programming. Counter-Plaintiff does not allege that every individual use of DForDanielle or #DForDanielle, standing alone, constituted direct electronic contact or an independent tort.

333. MessyDani is different. Counter-Plaintiff alleges that MessyDani was Counter-Plaintiff's preexisting website name and online identifier. Counter-Plaintiff registered or caused the registration of MessyDani.com on September 2, 2021, before the later DForDanielle account and before Counter-Defendant's challenged use of MessyDani. Counter-Plaintiff used MessyDani.com and MessyDani in connection with her own online identity and activities before Counter-Defendant adopted the designation. Counter-Defendant knew MessyDani was associated with Counter-Plaintiff through her prior familiarity with and investigation of Counter-Plaintiff's website and online identity.

334. A preserved DForDanielle profile directly linked:

a. Cash App — $MessyDani;

b. Instagram — messydani; and

c. Stationhead — dfordanielle.

335. The same DForDanielle profile displayed the Counter-Defendant-associated contact email unwinewithteddy@gmail.com and linked the DForDanielle YouTube account. The DForDanielle YouTube account reflected a join date of approximately September

19, 2023, more than two years after the September 2, 2021 registration of MessyDani.com.

336. A preserved August 16, 2024 AiNatashaTheMachine community post further promoted content by directing viewers to "D For Danielle @MessyDani?" and describing the promoted content as "The Full Interrogation uninterrupted." Counter-Plaintiff alleges the post as additional documentary evidence that Counter-Defendant-associated programming connected the DForDanielle project with the MessyDani identifier while promoting Dani-focused interrogation content. See Ex. D. Counter-Plaintiff further alleges Counter-Defendant's own statements concerning AiNatashaTheMachine as attribution evidence linking that associated channel to the broader DForDanielle/Allen identity-publication structure.

337. Counter-Plaintiff alleges that Counter-Defendant used $MessyDani in connection with a payment account through which money was solicited, transmitted, or received. Counter-Plaintiff alleges that Counter-Defendant used messydani in connection with Instagram and used MessyDani in additional social-media activity established by preserved account records.

338. Counter-Plaintiff did not authorize Counter-Defendant to adopt MessyDani as Counter-Defendant's own payment, social-media, promotional, or source-identifying designation. Counter-Plaintiff alleges that Counter-Defendant obtained financial, promotional, audience, engagement, and identity-association benefits from the challenged use.

## X. 2024 — CONTINUED TAGGING, ALLEN ASSOCIATIONS, BOUNDARY CIRCUMVENTION, AND LARA HELP-SEEKING

### A. February 9, 2024 — Full Allen Interrogation Paired With DForDanielle and #DaniRobertson

339. On February 9, 2024, Counter-Defendant published "TrueCrime | FULL INTERROGATION 'DForDanielle' | @DForDanielle NEW!" The preserved publication used both #DForDanielle and #DaniRobertson while presenting the police interrogation and criminal circumstances of Danielle Elizabeth Allen. The publication invited viewers to consider a "real-life Danielle" and an "anonymous Danielle" while discussing a person who had been charged as an accessory after the fact in connection with the death of a four-month-old infant. Counter-Plaintiff acknowledges that the publication also used qualifying language indicating that the person had been suspected of a crime but found innocent or that the charges did not result in a conviction. Counter-Plaintiff does not omit that qualification.

340. Counter-Plaintiff alleges that the qualification did not eliminate the materially false identification implication created by pairing the Allen interrogation and homicide-related circumstances with #DForDanielle, #DaniRobertson, the recurring "Rule In / Rule Out" identity framework, and the prior voice-comparison campaign. Counter-Plaintiff is not Allen, was not the person interrogated, was not arrested in that matter, did not commit Allen's DUI, and was not an accessory after the fact or participant in the infant-death investigation.

### B. March 19, 2024 — Jaguar Wright Panel and Counter-Defendant's Express Adoption of the Allen Identification

341. On March 19, 2024, Counter-Defendant published or participated in "MochaMeltdown | Jaguar Wright 'LET ME HIT THE LINK' AnalyzeThis | @UNWINEWITHTEDDY." During

the panel, Counter-Defendant addressed Jaguar Wright while invoking Danielle Elizabeth Allen and the recurring Superman/Clark Kent comparison used to suggest that two identities could not appear together because they were the same person. See ECF No. 84-1, PageID.1304. At approximately 1:24:04, Counter-Defendant stated in substance, "my assessment and the evidence points toward" Danielle Elizabeth Allen and asked Wright what clue had convinced her "that it was her." See ECF No. 84-1, PageID.1305. Counter-Plaintiff alleges that this was not neutral reporting of an internet rumor. Counter-Defendant expressly characterized the Allen identification as her own assessment supported by evidence and solicited agreement from another public speaker before that speaker's audience.

342. Counter-Defendant's Allen narrative included voice comparisons, Indiana or geographic clues, interrogation and criminal material, and the prior identification series. Counter-Defendant also acknowledged that the Allen-related charges had been dropped while continuing to describe the accessory-after-the-fact and four-month-old child-death context. Counter-Plaintiff alleges that the March 19 publication is especially probative of fault and malice because Counter-Defendant had already received repeated denials from Counter-Plaintiff yet affirmatively told Wright that her own assessment and evidence pointed toward the Allen identification. Counter-Plaintiff alleges the Jaguar Wright panel as pre-LARA defamation-by-implication, criminal-identification, third-party amplification, audience-expansion, actual-malice, common-law-malice, reputational-harm, and MCL 600.5823 evidence to the extent legally available.

**B-1. March 19, 2024 — Separate "Troll Farm" Publication and Directed Adoption**

343. In a separate March 19, 2024 publication titled HearHerTv "JAGUAR WRIGHT & THE TROLL FARM" AnalyzeThis, Counter-Defendant expressly framed the program around an alleged "troll farm" and included #danirobertson among the publication's identifying hashtags.

344. Counter-Defendant did not merely remain silent while independent guests spoke. Counter-Defendant directed selected assertions to be repeated, including stating "repeat that," instructed viewers to "read between the lines," characterized portions of the material as "eye opening," and affirmatively participated in developing the alleged troll-farm theory.

345. Counter-Defendant further explained that she had selected or replayed material while examining whether persons under discussion were connected with a "troll Farm" or whether their movement and relationships supported such a theory, and stated in substance that the developing theory "makes sense."

346. Counter-Defendant also returned the discussion to prior statements concerning who "Dani" was and relationships among persons being placed within the alleged network. Counter-Plaintiff alleges that the title, #danirobertson identifier, Counter-Defendant's selected presentation, repeated prompts, interpretive instruction, and confirming statements reinforced the implication that Counter-Plaintiff was connected to a concealed or coordinated troll-farm operation.

347. Counter-Plaintiff does not seek to hold Counter-Defendant responsible merely because independent guests expressed their own opinions. Counter-Plaintiff relies upon those portions in which Counter-Defendant herself supplied the framing, solicited repetition, directed the discussion, selected or replayed material, adopted or confirmed asserted connections, or otherwise incorporated third-party assertions into her own recurring coordinated-network narrative.

348. Counter-Plaintiff alleges this older publication as false-light, implication, audience-meaning, fault, course-of-conduct, and MCL 600.5823 evidence to the extent legally available rather than as an unrestricted independently timely affirmative defamation-damages publication.

**March 23, 2024 — DForDanielle "YOOUUU ARE NON-COMPLIANT" Publication**

349. Counter-Defendant published Defendant-focused material titled substantially: "D For Danielle 'YOOUUU ARE NON-COMPLIANT' AnalyzeThis RealCommentary." Counter-Plaintiff alleges the publication as additional evidence of the recurring DForDanielle identity framework and continuation of Defendant-focused programming after prior objections and denials. Counter-Plaintiff relies upon additional transcript-specific statements from that publication only where established by the preserved corresponding recording and transcript.

**C. April 24, 2024 — Specific Allen Denial and Direct-Tag Cessation Notice**

350. During 2024, Counter-Plaintiff continued demanding cessation. By April 2024, Counter-Plaintiff had sent multiple cease-and-desist notices. Counter-Plaintiff's April 24, 2024 written demand expressly denied being Danielle Elizabeth Allen and denied the DUI and homicide-related associations. The same demand objected to continuing direct account tagging.

351. Counter-Defendant therefore had actual notice of Counter-Plaintiff's denial and objection to the ongoing association. Counter-Plaintiff alleges that Counter-Defendant nevertheless continued the association and directed tagging.

352. — May 16, 2024 — Continued Downstream Adoption of DUI Association. A preserved audience comment from an account displayed as "Zenobia Alkebu" referred to Counter-Plaintiff as "dui dani" while discussing Counter-Plaintiff and other persons in the surrounding controversy.

353. Counter-Plaintiff alleges the comment not as speech automatically attributable to Counter-Defendant, but as additional evidence that the DUI association used in the recurring

Dani/Allen identity narrative was actually understood and adopted by an audience member more than a year after the initial 2023 Allen publications.

354. Counter-Plaintiff denies having committed Danielle Elizabeth Allen's DUI and alleges the May 16, 2024 comment as audience-meaning, dissemination, reputational-harm, and continuity evidence.

**D. May 2024 — Website Access Circumvention**

355. Counter-Plaintiff had attempted to block Counter-Defendant's access to a Defendant-controlled website or online space. Counter-Plaintiff alleges that Counter-Defendant thereafter publicly described accessing the site from a different physical location or computer, including a public library, after the prior access point had been blocked. Counter-Plaintiff alleges the conduct as evidence of deliberate circumvention of an expressed access boundary. Counter-Plaintiff does not allege that lawful viewing of an ordinary public webpage, standing alone, constitutes stalking.

**June 19, 2024 — Circumvention Admission**

356. Counter-Defendant publicly acknowledged: "She blocked me from accessing her website." Counter-Defendant thereafter described going to a public location and using another computer in order to obtain access. Counter-Defendant later summarized the access restrictions substantially as: "Phone blocked. Home computer blocked. account blocked, local libraries blocked."

357. Counter-Plaintiff alleges that Counter-Defendant knew Counter-Plaintiff had restricted or blocked access from routes previously associated with Counter-Defendant and nevertheless sought alternate means or locations from which to obtain access.

358. Counter-Plaintiff alleges this conduct as attempted circumvention of known access restrictions and as course-of-conduct evidence. Counter-Plaintiff does not characterize the conduct as "hacking" or as a criminal offense absent legally sufficient proof of such an offense.

359. Counter-Plaintiff alleges the statements as evidence that Counter-Defendant knew Counter-Plaintiff was attempting to deny her access and intentionally sought alternate means of obtaining access. Because the June 19, 2024 admission occurred after Counter-Plaintiff's June 7, 2024 LARA complaint, Counter-Plaintiff does not allege that this particular admission caused the earlier regulatory report. Counter-Plaintiff alleges it as subsequent evidence of continuation and confirmation of the access-boundary conduct forming part of the larger course.

**E. May 21, 2024 — "SHE KNOWS I'M ON TO HER" Targeted Identification**

360. On May 21, 2024, before Counter-Plaintiff's June 7 LARA complaint, Counter-Defendant published an Instagram item displaying the text substantially "D For Danielle — SHE KNOWS I'M ON TO HER." Counter-Plaintiff alleges the May 21 publication as additional pre-LARA targeted-identification and continuity evidence. Counter-Plaintiff does not allege that the displayed text alone independently establishes stalking or defamation.

361. During the May 21, 2024 pre-LARA publication, Counter-Defendant stated: "there's actually a filing against my medical license" and "she's obsessed with trying to get my medical license." Counter-Plaintiff alleges those statements not to adopt the "obsessed" characterization, but to show that Counter-Defendant herself was publicly discussing her medical license and regulatory-complaint activity before Counter-Plaintiff's June 7, 2024 LARA report.

**May 24, 2024 — Express Physician-Assistant Licensure Statement**

362. On May 24, 2024, approximately two weeks before Counter-Plaintiff's June 7 LARA complaint, Counter-Defendant publicly stated: "I am a licensed physician assistant here in Michigan." Counter-Plaintiff alleges the statement as additional pre-report professional-status context supporting why she regarded LARA as the appropriate regulator to review the documented conduct.

363. — May 24, 2024 Criminalized-Course Characterization. Counter-Defendant stated that Counter-Plaintiff had engaged in a "repeated pattern of behavior that has crossed legal lines and crossed state lines" and referred to impersonation, interference with medical and legal matters, and contact with family or persons in Counter-Defendant's home state. Counter-Plaintiff alleges the publication as historical criminalized-persona, fault, and course context and does not treat every component of the statement as a separately actionable timely publication.

**F. June 6, 2024 — Continued Allen Criminal Association and Express Unmasking Objective**

364. On June 6, 2024, one day before Counter-Plaintiff's own LARA complaint, Counter-Defendant again publicly connected Dani Robertson with Danielle Elizabeth Allen and criminal or incarceration imagery. Counter-Defendant stated, "Yes, I want her identity known," and further stated in substance that when Dani's identity became known, "everybody else is going to know it too." Counter-Defendant repeatedly invoked jail or an "orange jumpsuit" while discussing Counter-Plaintiff and persons who remained friendly with her. Counter-Defendant returned to Danielle Elizabeth Allen, Allen's accessory-after-

the-fact history, Larry Champ, the criminal interrogation, and the underlying child-death investigation.

365. Counter-Defendant contrasted that criminal material with the fact that "Dani Robertson says she's not Danielle Elizabeth Allen." Counter-Defendant then suggested the possibility that Counter-Plaintiff had been lying and stated in substance that Counter-Plaintiff was "not even in custody yet," emphasizing "yet." Counter-Plaintiff denies being Allen, denies involvement in Allen's criminal matter, and denies any basis for the incarceration implication. Counter-Plaintiff alleges the June 6 publication as particularly significant notice, fault, criminal-implication, identity-campaign, and help-seeking context because it immediately preceded Counter-Plaintiff's June 7 regulatory complaint.

**F-1. June 7, 2024 — Terrorism, Dangerous-Person, and Mental-Instability Publication**

366. On June 7, 2024, Counter-Defendant publicly characterized conduct she attributed to Counter-Plaintiff as "homegrown terrorism" and stated: "She is a homegrown terrorist. I really believe that."

367. Counter-Defendant thereafter questioned whether "terrorist" might be too strong a term and stated that she would call Counter-Plaintiff a "terrorizer" "to be more precise." Counter-Defendant further described Counter-Plaintiff as a "dangerous person" and stated that Counter-Plaintiff "can hurt somebody."

368. During the same publication, Counter-Defendant repeatedly used psychological or psychiatric terminology concerning Counter-Plaintiff, stating in substance, "I really believe it's a sickness," raising "multiple personality disorder," stating that Counter-Plaintiff "definitely needs to be evaluated," describing Counter-Plaintiff as a "pathological liar," and discussing "paranoia" in connection with the conduct attributed to Counter-Plaintiff.

369. Counter-Plaintiff denies engaging in terrorism, terroristic activity, unlawful violence, or conduct providing a factual basis to portray her as physically dangerous. Counter-Plaintiff further denies that Counter-Defendant possessed a factual basis to place Counter-Plaintiff before the public as psychiatrically disordered or mentally unstable.

370. Counter-Plaintiff does not allege that Counter-Defendant formally diagnosed her with a particular psychiatric disorder. Counter-Plaintiff alleges that the publication contributed to a recurring false public persona portraying her as mentally unstable, psychiatrically disordered, dangerous, threatening, and terroristic.

371. Because Counter-Plaintiff's own LARA complaint and this publication occurred on the same calendar date, Counter-Plaintiff does not allege without proof of the sequence of events that this particular publication caused the earlier regulatory report. Counter-Plaintiff alleges the publication for false-light, emotional-distress, fault, reputational, and course-of-conduct purposes.

**G. June 7, 2024 — Defendant's Separate LARA Complaint**

372. On or about June 7, 2024, Counter-Plaintiff submitted her own separate complaint to LARA. Counter-Plaintiff alleges that substantial conduct occurring during the year immediately preceding that report, including the Allen criminal-identification narrative, Dirty 40 or associate-focused conduct, direct tagging, identity investigation, and other documented online conduct, formed part of the circumstances that caused her to seek regulatory review. Counter-Plaintiff does not allege that every underlying video independently constituted a licensing violation.

373. Counter-Plaintiff alleges that she sought an independent determination from LARA concerning conduct by a licensed professional. Plaintiff now seeks damages based upon

that regulatory help-seeking communication. During LARA's later investigation, Counter-Plaintiff supplied supporting evidence, and the investigator acknowledged receipt. See Ex. A.

**H. June 9, 2024 — Immediate Post-LARA Continuation With Jaguar Wright / TruthTellerDani Association**

374. On June 9, 2024, two days after Counter-Plaintiff's LARA complaint, Counter-Defendant published "Dani Robertson Side and Jaguar Wright Side — Continued From Morning Live." The preserved publication displayed or promoted the $TruthTellerDani identifier while continuing Dani/Jaguar-related programming. Counter-Plaintiff does not allege that the June 9 publication caused her June 7 report. She alleges it as immediate post-report continuation corroborating that the identity-focused and Dani-associated programming did not cease after the regulatory help-seeking communication.

**June 15, 2024 — Direct DEA-or-Family Identification Publication**

375. On June 15, 2024, Counter-Defendant published "D For Danielle How Did You Know DEA Traveled to Las Vegas? @UNWINEWITHTEDDY #Shorts." Counter-Defendant stated: "either you are DEA or you're a very close family member." Counter-Plaintiff alleges that statement as a direct binary identity implication that Counter-Plaintiff was Danielle Elizabeth Allen or was closely related to her.

376. Counter-Plaintiff is not Danielle Elizabeth Allen and denies that the publication supplied a truthful basis for the criminal-identity association. Counter-Plaintiff alleges the June 15 publication as Allen-identity, false-light, fault, and continuing-publication context, and as Count I support only to the extent legally preserved or otherwise actionable.

**June 19, 2024 — Allen-Family and Cyber-Tracking False Persona**

377. In the separate June 19, 2024 publication already alleged above for website-access circumvention, Counter-Defendant also continued the Allen identity theory by stating or materially conveying that Counter-Plaintiff had not proven she was not an Allen family member, that saying "It's not me" was insufficient, and that Counter-Plaintiff was either Allen or family. Counter-Plaintiff alleges that Counter-Defendant treated Counter-Plaintiff's denials and attempts to stop the accusations as additional reasons to continue the theory, including framing efforts to stop the accusations as efforts to "silence" Counter-Defendant.

378. During the same June 19 publication, Counter-Defendant stated: "It's because she's tracking me, people," and stated that Counter-Plaintiff could "track you" and "follow you," could supposedly go "inside the belly" of a system and identify someone where they were, and could "manipulate the system." Counter-Plaintiff denies unlawfully tracking, following, locating, hacking, or manipulating Counter-Defendant or others and alleges these statements as a separate false cyber-misconduct persona within the same publication, distinct from the separately pleaded access-circumvention conduct.

**I. June 29, 2024 — Continued Identity Investigation and Mischaracterization of Family Outreach**

379. On June 29, 2024, Counter-Defendant continued discussing the effort to identify Counter-Plaintiff. Counter-Defendant stated, "I want to find your identity," or words to that effect. Counter-Defendant also stated or implied that Counter-Plaintiff had been "following" the daughter of Monique Allen Tolbert and represented that Counter-Defendant possessed "receipts."

380. Counter-Plaintiff acknowledges following the daughter's publicly accessible social-media account for the limited purpose of attempting to notify the Allen family about the ongoing harassment, false-identification campaign, and perceived risk of offline danger. Counter-Plaintiff denies physically following, stalking, surveilling, threatening, intimidating, or pursuing the daughter. Counter-Plaintiff alleges that Counter-Defendant mischaracterized that protective online outreach as suspicious "following" or surveillance and alleges the incident as Allen-family identity-campaign context, not as a denial that Counter-Plaintiff followed the publicly accessible account.

**July 9, 2024 — NightTalk | BlackTea "OUCH!" AnalyzeThis | @UNWINEWITHTEDDY**

381. On July 9, 2024, Counter-Defendant published NightTalk | BlackTea "OUCH!" AnalyzeThis | @UNWINEWITHTEDDY and separately continued presenting Danielle Elizabeth Allen as a leading identity candidate or family connection for Counter-Plaintiff through photo, family, geographic, and identity comparison. Counter-Plaintiff denies being Allen and alleges the publication as continuing identity, fault, false-light, and persistence evidence after repeated denials.

**July 10, 2024 — NightTalk | BlackTea "CHILL AND CHAT" AnalyzeThis | @UNWINEWITHTEDDY**

382. On July 10, 2024, Counter-Defendant published NightTalk | BlackTea "CHILL AND CHAT" AnalyzeThis | @UNWINEWITHTEDDY and again stated or materially implied that Counter-Plaintiff was Danielle Elizabeth Allen or a close relative. Counter-Plaintiff denies that identity or family connection and alleges the publication as a separate continuation of the Allen/DEA theory.

383. Counter-Defendant's continued interaction with Marquisio Watson a/k/a KingWurld is particularly probative because Counter-Defendant publicly discussed Watson's "boots on the ground" approach, Lake Charles contacts, claimed telephone and location information, and anticipated reveal before later continuing to tag and solicit him concerning Counter-Plaintiff's identity and voice.

384. After Watson publicly described address verification, family contact, travel, telephone calls, local-source activity, and "pull up" or face-to-face conduct, Counter-Defendant nevertheless continued to re-engage him in Dani-focused identity and unmasking publications.

385. Counter-Plaintiff alleges that continued re-engagement as circumstantial evidence of knowledge and encouragement of the broader identity campaign while expressly not attributing every independent act, statement, threat, or method of Watson to Counter-Defendant absent proof of direction or adoption.

**July 17, 2024 — NightTalk | BlackTea "PEOPLE DEFINITELY ACTING STRANGE" AnalyzeThis | @UNWINEWITHTEDDY**

386. On July 17, 2024, Counter-Defendant published NightTalk | BlackTea "PEOPLE DEFINITELY ACTING STRANGE" AnalyzeThis | @UNWINEWITHTEDDY and separately returned to the Danielle Elizabeth Allen interrogation audio and recurring voice-comparison inquiry. Counter-Plaintiff alleges the publication as continuity and persistence evidence after repeated denials rather than as a major standalone defamation theory.

**July 19, 2024 — NightTalk | BlackTea "I NEED TO FACE THIS HEAD ON" AnalyzeThis | @UNWINEWITHTEDDY**

387. On July 19, 2024, Counter-Defendant published NightTalk | BlackTea "I NEED TO FACE THIS HEAD ON" AnalyzeThis | @UNWINEWITHTEDDY and separately republished or replayed the March 2023 ProtonMail identity inquiry together with Danielle Elizabeth Allen criminal material, including the accessory-after-the-fact and infant-death context. Counter-Plaintiff alleges the July 19 republication as a new publication event continuing the Allen criminal-identity association after repeated denials.

388. Counter-Plaintiff is not Danielle Elizabeth Allen and denies involvement in the accessory allegation, infant death, or other Allen-associated criminal conduct. Counter-Plaintiff alleges the July 19 publication as historical republication, false-light, fault, malice, and continuing-identity evidence and as Count I support only to the extent legally preserved or otherwise actionable.

389. — July 26, 2024 — "ASSIGNMENT UNDERSTOOD" / Directed-Assignment and Dirty-40 Network Accusation. Counter-Defendant published NightTalk | BlackTea "ASSIGNMENT UNDERSTOOD" AnalyzeThis | @UNWINEWITHTEDDY. During the publication, Counter-Defendant displayed what she characterized as a December 2021 "receipt" concerning communications involving @TruthTellerDani and a person who had written "assignment understood."

390. Counter-Defendant did not limit the presentation to displaying the communication. Counter-Defendant stated that she now knew "beyond a shadow of a doubt" that people had been "on assignments," stated that "there were multiple people involved," stated that they had "never done anything solo dolo," and repeatedly stated that people were assigned to

perform tasks or were "put on other people" and later reported or checked back concerning the assignment.

391. Counter-Defendant expressly connected the claimed assignment system to the "Dirty 40," stating in substance that "the Dirty 40 was busy" and that she could now confirm that people had assignments. Counter-Defendant further directly addressed "Truth teller" and stated: "You've given out assignment because the assignment came from you, truth teller," relying upon the words "assignment understood" as purported proof that Counter-Plaintiff had issued an assignment to another person.

392. Counter-Plaintiff denies assigning, directing, recruiting, dispatching, or coordinating persons to harass, troll, attack, infiltrate, surveil, intimidate, or otherwise wrongfully target Counter-Defendant or other persons. Counter-Plaintiff further denies directing a "Dirty 40," troll farm, coordinated harassment network, or other organized wrongful enterprise.

393. Counter-Plaintiff denies that the isolated phrase "assignment understood," without its complete underlying communication and context, established that Counter-Plaintiff ordered another person to engage in harassment, trolling, retaliation, infiltration, criminal activity, or other wrongful conduct. Counter-Plaintiff alleges that Counter-Defendant supplied that broader meaning through her own repeated interpretation and presentation of the communication.

394. Counter-Plaintiff does not attribute to Counter-Defendant independent audience comments using terms such as "organized crime" or "RICO" merely because those comments appeared in the live chat, and Counter-Plaintiff does not plead this publication as proof that Counter-Defendant expressly accused her of money laundering. Counter-Plaintiff alleges Counter-Defendant's own assignment, Dirty-40, coordination, and direction statements as

historical false-light, defamatory-meaning, fault, audience-conditioning, and coordinated-network context.

**K. September–October 2024 — Direct Account Mentions**

395. Counter-Defendant continued direct account mentions of Counter-Plaintiff after cessation demands.

396. — September 20, 2024 — Continuing Literal Account Mention. Counter-Defendant published DEFLECTION PROJECTION WON'T STOP U.S. MARSHAL SERVICE, whose preserved description used the literal account mention @DaniRobertson after prior written demands that Defendant-directed contact cease.

397. — September 24, 2024 — Continuing Literal Account Mentions. Counter-Defendant published LOOK WHO'S COMPLAINING?, whose preserved description used the literal account mentions @DaniRobertson and @TruthTellerDani.

398. Counter-Plaintiff alleges those literal account mentions as additional post-notice account-directed contacts. Counter-Plaintiff distinguishes the literal account mentions from ordinary hashtags and does not allege that the titles, law-enforcement references, or public commentary standing alone establish stalking or defamation.

399. On September 26, 2024, Counter-Defendant used `@TruthTellerDani` with law-enforcement-related hashtags and DForDanielle identifiers.

400. On October 3, 2024, Counter-Defendant directly used Dani-related account mentions while invoking the U.S. Marshals and FBI.

**October 2024 — RipRunningReceipts / @RipRunners Deliberately Transient Publication Method**

401. Counter-Defendant publicly described creating and using a separate RipRunningReceipts / @RipRunners channel after copyright strikes or takedown activity affecting her other channels.

402. Counter-Defendant explained that the separate channel would be used to display what she called "receipts," including material she wanted viewers to see or hear while reducing the time the material remained publicly available.

403. Counter-Defendant repeatedly described the method in expressly transient terms, including that a publication or "pop up" would be "quick," that viewers needed to be ready, and that she would "expose" material and then "rip it down."

404. Counter-Defendant further described the method as putting material up, allowing viewers to see or hear the "receipt," and then taking or "ripping" it down, while directing viewers to subscribe or enable notifications so they could reach the separate channel before the material was removed.

405. Counter-Defendant also stated in substance that the timing was intended to occur before another strike or removal process could be completed and discussed going live without advance notice and removing the material quickly.

406. Counter-Defendant later confirmed that some RipRunningReceipts material consisted of video footage or clips presented for a limited period and that viewers had only a short window to watch before the material was taken down.

407. Counter-Plaintiff alleges the RipRunningReceipts evidence only as proof of alternate-channel use, deliberate transient publication, dissemination method, purpose, and intent within the broader course. Counter-Plaintiff does not plead the RipRunningReceipts activity as a

separate copyright-infringement counterclaim and does not enlarge Count IV beyond the four specifically pleaded § 512(f) takedown notices.

408. On October 10, 2024, Counter-Defendant directly tagged Counter-Plaintiff while asserting that Counter-Plaintiff "gets away with lying to police," or substantially equivalent language.

409. October 14, 2024 — DForDanielle, What Defamation Looks Like. During a Defendant-focused publication, Counter-Defendant stated: "I have a medical background, okay? I'm licensed." Counter-Plaintiff alleges the statement only as additional evidence that Counter-Defendant repeatedly invoked her medical background and professional licensure while publicly addressing Counter-Plaintiff and defending the authority or credibility of her statements. Counter-Plaintiff does not allege that professional licensure itself constituted wrongdoing.

410. On October 17, 2024, Counter-Defendant directly identified Counter-Plaintiff as "Danielle Robertson," described her as "on the run," and discussed alleged failure to respond to federal process.

411. On October 21, 2024, Counter-Defendant directly addressed Counter-Plaintiff: "YOU NEED TO ANSWER YOUTUBE'S QUESTIONS."

412. Counter-Plaintiff alleges these older publications principally as course-of-conduct, notice, identity, and intent evidence and as statutory setoff where legally available.

**L. September–December 2024 — Additional Mental-Health, Terrorism, Sex-Work, and Allen-Family Publications**

413. — September 14–22, 2024 Psychological and Mental-Instability Characterizations. On September 14, 2024, Counter-Defendant repeatedly characterized Counter-Plaintiff as a

"malignant narcissist" and used extended psychological explanations concerning alleged lack of remorse, manipulation, control, superiority, and escalating conflict. Counter-Plaintiff does not allege that the phrase "malignant narcissist," standing alone, constitutes an actionable psychiatric diagnosis.

414. On September 16, 2024, Counter-Defendant stated concerning Counter-Plaintiff, "I definitely think she's got multiple personality," and stated that Counter-Plaintiff moved "in and out" of different "characters."

415. On September 22, 2024, Counter-Defendant undertook an extended psychological analysis of Counter-Plaintiff, repeatedly invoking "cognitive dissonance," internal "mental conflict," guilt, rationalization, desperation, and psychological mechanisms as explanations for Counter-Plaintiff's alleged conduct.

416. Counter-Plaintiff does not allege that every psychological opinion or rhetorical characterization independently constitutes defamation. Counter-Plaintiff alleges the sequence as false-light, audience-meaning, cumulative emotional-distress, and course evidence concerning Counter-Defendant's recurring construction of a mentally unstable or psychologically disordered public persona.

417. — September–November 2024 Terrorism / Fear / Dangerous-Person Continuity. On September 17, 2024, Counter-Defendant described Counter-Plaintiff as "the same Danielle Robertson who has been terrorizing a number of YouTubers."

418. On October 10, 2024, Counter-Defendant characterized conduct she attributed to Counter-Plaintiff and persons associated with her as "terrorism," stated "that's the way I feel it is," and further stated that Counter-Plaintiff "just terrorizes people."

419. — October 22, 2024 Sex-Work / Nosy Ho Live Publication. Counter-Defendant publicly developed a theory associating Counter-Plaintiff with Nosy Ho Live's commercial sex-work instruction. Counter-Defendant expressly referred to Nosy Ho Live's "sex work classes" and stated concerning Counter-Plaintiff, "I think that she also — she purchased the class," further suggesting that Counter-Plaintiff may have purchased the class "through one of her moderators."

420. Counter-Defendant continued the presentation by discussing women who had purchased Nosy Ho Live's classes and persons she believed may have been "part of a ring," and then returned to Counter-Plaintiff, suggested that Counter-Plaintiff was not "getting paid the kind of money" associated with Nosy Ho Live, stated "maybe she's into that kind of a business too," stated "I think she's linked to it," and stated that several of Counter-Plaintiff's followers were "linked to the industry in some way."

421. Counter-Plaintiff has not worked as a sex worker or prostitute and denies engaging in commercial sexual conduct, operating within a sex-work ring or industry, purchasing Nosy Ho Live's sex-work classes, or participating in such instruction. Counter-Plaintiff alleges that, viewed in full context, the publication materially conveyed the false implication that Counter-Plaintiff participated in Nosy Ho Live's sex-work instruction and was herself connected to commercial sex work or the sex-work industry.

422. On November 2, 2024, Counter-Defendant further stated that Counter-Plaintiff used conduct "to terrorize and to stoke fear in others."

423. Counter-Plaintiff alleges those publications as continuity evidence for the recurring false public portrayal later expressed more explicitly through "homegrown terrorism," "homegrown terrorist," "terrorizer," "dangerous person," and the statement that Counter-

Plaintiff "can hurt somebody." Counter-Plaintiff does not allege that every rhetorical use of "terrorize" independently constitutes actionable defamation.

424. — September 13–December 20, 2024 Allen/DEA Family-Identification Continuity. On September 13, 2024, Counter-Defendant stated that she had "the right family" and that "somewhere inside the Allen and Simeon family" she believed Counter-Plaintiff resided.

425. On September 28, 2024, Counter-Defendant stated in substance that if Counter-Plaintiff was not Danielle Elizabeth Allen, then Counter-Plaintiff was "someone extremely close to that family."

426. On November 2, 2024, Counter-Defendant stated that if Counter-Plaintiff was not Danielle Elizabeth Allen, then Counter-Plaintiff was "someone close to her," "someone close to Mo'Nique Tolbert," and that "somewhere inside of that family" Dani Robertson existed. Counter-Defendant stated that she had "not changed [her] position."

427. On November 24, 2024, Counter-Defendant stated, "I think she's related to that family," asserted that evidence linking Counter-Plaintiff to a person in the family would support that it was "the right family," and stated that "somewhere in that family" she believed the audience would "find Danielle."

428. On December 8, 2024, Counter-Defendant continued the voice-comparison inquiry and instructed listeners, if they came across Danielle Elizabeth Allen, to consider whether Allen's voice sounded like Dani Robertson's voice.

429. On December 19, 2024, Counter-Defendant stated in substance that there was "only one person" she had pursued in the identity theory, referred to that person as "DEA," identified the referent as Danielle Elizabeth, and again discussed perceived voice similarity.

430. On December 20, 2024, Counter-Defendant stated that she believed she had "the right family," stated that "somewhere in that family" Counter-Plaintiff would be found, and stated that although Counter-Plaintiff denied being Allen, Counter-Plaintiff "acts like it is" and that her "behavior speaks volumes."

431. Counter-Plaintiff denies being Danielle Elizabeth Allen, denies being a concealed member of the Allen/Tolbert/Simeon family, and denies the criminal identity and conduct associated with Allen. Counter-Plaintiff alleges this historical sequence as continuity, audience meaning, fault, false-light, and reputational-history evidence explaining the later DEA/Lake Charles publications.

**XI. JANUARY 27, 2025 — MEMBERSHIP AFTER EXPRESS DEMANDS TO LEAVE**

432. Counter-Plaintiff maintained paid members-only online spaces. Counter-Plaintiff expressly demanded that Counter-Defendant terminate or leave Counter-Plaintiff's memberships. On January 27, 2025, during NightTalk | DForDesperation "LET'S TALK ABOUT IT" AnalyzeThis | UNWINEWITHTEDDY, Counter-Defendant replayed or quoted Counter-Plaintiff's complaint that Counter-Defendant remained "subscribed and a member" years later "despite my repeated demands for them to cancel and leave." Counter-Defendant responded by referring to "your request for me to remove myself from membership."

433. During the same broadcast, Counter-Defendant replayed Counter-Plaintiff telling her: "Exit all my memberships." Counter-Defendant further acknowledged Counter-Plaintiff's complaint that Counter-Defendant remained present in connection with member-appreciation events. Counter-Plaintiff alleges these admissions establish actual knowledge that consent for Counter-Defendant's continued membership/access had been withdrawn.

434. Counter-Plaintiff alleges that Counter-Defendant nevertheless continued maintaining membership or access thereafter. Counter-Plaintiff alleges the membership evidence as a significant post-notice fact supporting the civil-stalking course of conduct. Counter-Plaintiff does not presently allege a specific membership "upgrade" as an established fact unless corroborating platform records are produced.

## XII. FEBRUARY–AUGUST 2025 — CONTINUED ALLEN REPUBLICATIONS, ASSOCIATE TARGETING, MONITORING, AND REPEATED ACCUSATIONS

435. — February 22, 2025 — Continued Allen Identification After Express Denial. Counter-Defendant separately published programming addressing Counter-Plaintiff's denial that she was Danielle Elizabeth Allen, including Counter-Plaintiff's reliance upon family circumstances inconsistent with the Allen identity.

436. Rather than treating Counter-Plaintiff's denial as ending the matter, Counter-Defendant continued publicly discussing the Allen identification.

437. Counter-Plaintiff alleges the publication as additional evidence that Counter-Defendant continued the Allen identity campaign after repeated express notice that the identification was false.

438. — February 27, 2025 — Allen/Lake Charles Interrogation Paired With Dani Identifiers. Counter-Defendant published NightTalk | DForDeadline "YOU'VE BEEN SERVED" AnalyzeThis | UNWINEWITHTEDDY using Dani-associated identifiers including #DaniRobertson, #DaniMontana, #DForDanielle, and #TruthTellerDani.

439. During the same publication, Counter-Defendant again presented and analyzed the 2016 Lake Charles police interrogation concerning Danielle Elizabeth Allen, including

circumstances involving Larry Champ, a silver Impala, the location described in the interrogation, and the underlying criminal investigation.

440. Counter-Plaintiff alleges that pairing her recognizable online identifiers with Allen's criminal-interrogation material renewed the false public association between Counter-Plaintiff and Allen.

441. Counter-Plaintiff is not Danielle Elizabeth Allen and was not the person interrogated in that matter.

442. — February 28, 2025 — Separate Republication of Allen Police Interrogation. Counter-Defendant separately published another program in which she played the July 28, 2016 police interrogation audio of Danielle Elizabeth Allen and again presented the Lake Charles criminal circumstances.

443. Counter-Defendant discussed Allen's statements concerning Larry Champ and related criminal-investigation evidence.

444. Counter-Defendant also acknowledged that the accessory-after-the-fact charge against Allen was ultimately dropped. Counter-Plaintiff does not omit that qualification.

445. Counter-Plaintiff alleges that the qualification did not eliminate the false-identification implication created by repeatedly presenting Allen's criminal interrogation to an audience previously instructed to compare Allen with Counter-Plaintiff.

446. — March 9, 2025 — Audience Understanding. Counter-Defendant revisited historical audience reactions to the Allen voice-comparison material, including a viewer comment stating in substance that the voices were "uncannily beyond similar" and "it's you." Counter-Plaintiff alleges the comment as evidence of actual audience understanding of the

Allen comparison and not as independent speech automatically attributable to Counter-Defendant.

**A. March 29, 2025 — Continued Allen-Family Mapping**

447. March 29, 2025 — Counter-Defendant continued the Allen-family identity theory and stated in substance that investigators had the "right family" and that "somewhere in that family, you're going to find her."

448. Counter-Defendant continued examining family and social connections as possible means of locating or identifying Counter-Plaintiff and treated family-associated information and reactions as additional evidence supporting the continuing identity theory.

449. Counter-Plaintiff alleges the publication as evidence that the family-centered identification campaign continued long after Counter-Plaintiff's repeated denials and was not confined to the initial 2023 Mystery Clue series.

450. During the March 29, 2025 IT'S RECEIPTS HUNTY RECEIPTS publications, Counter-Defendant reiterated that she had "the right family" and stated that she still believed that conclusion "without a doubt until it's proven otherwise."

451. Counter-Defendant stated: "somewhere in that family, you're going to find her, Danielle," continuing to place Counter-Plaintiff within the Allen/Tolbert family framework.

452. Counter-Defendant expressly asked, "Are you family?" and stated that Counter-Plaintiff was "acting like family," while treating Counter-Plaintiff's reactions and disputes as additional support for the asserted family connection.

453. Counter-Defendant further referred to copyright or privacy complaints and other efforts to remove or challenge publications as purported circumstantial reasons to question whether Counter-Plaintiff had a family relationship to persons in the Allen/Tolbert narrative.

454. Counter-Plaintiff denies that any copyright complaint, privacy complaint, takedown request, litigation position, or other effort to challenge or remove content proves a blood, familial, or other real-world family relationship to Danielle Elizabeth Allen, Monique Tolbert, or the Allen/Tolbert family. Counter-Plaintiff alleges the March 29 publication as continued family-identification, false-light, fault, and course evidence after repeated denials.

455. — May 1, 2025 Voice-Comparison Reinforcement. On May 1, 2025, during MessyMocha, Counter-Defendant again used voice similarity as an identity-association device and stated in substance, "I definitely think Daniel Elizabeth sounds similar to D for Danielle."

456. Counter-Plaintiff alleges the publication as historical continuity and false-light context showing that Counter-Defendant continued reinforcing the Allen/DForDanielle voice-association theory after the 2024 family-identification publications and before the later renewed DEA/Lake Charles publications. Counter-Plaintiff does not allege that the transcription rendering "Daniel Elizabeth" creates a separate identity; the statement is alleged according to the surrounding Allen/Dani identity context.

457. — May 15, 2025 Direct Account Mentions and Continuing Identity-Focused Publication. On May 15, 2025, Counter-Defendant published UNWINEWITHTEDDY | DForDiscover This "AnalyzeThisMess"… Because Somebody Has To Say It! The publication description expressly used the literal account mentions @DaniRobertson, @TruthTellerDani, and @DaniMontanaTV. Counter-Defendant also described the "cloak of anonymity" as "slipping," stated that "time is ticking," and stated that "somebody's about to get unmasked."

458. Counter-Plaintiff alleges the literal account mentions as additional post-notice account-directed electronic contact and the accompanying statements as evidence of continuity,

purpose, and the ongoing pre-August-6-2026 identity-focused course. Counter-Plaintiff distinguishes literal account mentions from ordinary hashtags and does not allege that public commentary concerning anonymity, standing alone, constitutes stalking.

**June 14, 2025 — AI-Authorship / Collusion / Deceptive-Court-Conduct Implication**

459. On June 14, 2025, Counter-Defendant stated or materially implied that Counter-Plaintiff wrote a letter using artificial intelligence, was "involved in its creation," knew the source, was in "contact or collusion with the sender," helped craft or edit the letter, or fabricated an AI explanation to conceal Counter-Plaintiff's own involvement or the involvement of someone close to her.

460. Counter-Plaintiff denies the materially false deceptive-court-conduct implication to the extent the publication attributed dishonest authorship, collusion, fabrication, or concealment to her. Counter-Plaintiff alleges this June 14, 2025 publication as false-light, fault, and recurring deceptive-persona evidence and as Count I support only to the extent preserved by MCL 600.5823, relation-back, or another applicable doctrine; Counter-Plaintiff does not allege beyond what the underlying publication establishes that she impersonated a particular person before a federal judge.

**June 23, 2025 — Restricted / Backdoor Court-Access Narrative**

461. Counter-Defendant published Defendant-focused material concerning the manner in which Counter-Plaintiff allegedly obtained court-related information. Counter-Defendant initially stated: "It's not hacking or anything." Counter-Plaintiff therefore does not mischaracterize the publication as an unqualified accusation of hacking. Counter-Defendant nevertheless thereafter presented possible explanations expressly including that Counter-Plaintiff "illegally accessed the system" or obtained material from a person with "privileged access."

462. Counter-Defendant described the material as having been obtained through "restricted means" and referred to "Back door." Counter-Defendant stated in substance: "I really believe that. But we will find out." Counter-Plaintiff alleges the publication as evidence of an illegal/restricted/privileged-access implication and as circumstantial evidence of Counter-Defendant's subjective uncertainty while developing the accusation. During the same general presentation, Counter-Defendant described looking closely at Counter-Plaintiff's videos for "breadcrumbs" and a "slip up," including examining minute visual details. Counter-Plaintiff alleges the monitoring statements as pre-August-6-2026 identity-investigation evidence, not as an allegation that close review of a public video by itself constitutes stalking.

**C. June 29, 2025 — Discord Monitoring / Tracking Narrative**

463. On June 29, 2025, in a broadcast identified as UNWINEWITHTEDDY | DForDisTooDeep "AnalyzeThisMess"…Because Somebody Has To Say It!, Counter-Defendant discussed Counter-Plaintiff's Discord and membership environment. Counter-Defendant stated that she herself had been inside Counter-Plaintiff's Discord since approximately 2022. Counter-Defendant represented that her membership or presence gave her access to information she otherwise would not know.

464. Counter-Defendant further told viewers that Counter-Plaintiff's Discord supposedly allowed Counter-Plaintiff to track persons, IP addresses, or locations. Counter-Plaintiff denies possessing illicit tracking capabilities through ordinary Discord authentication. Counter-Plaintiff alleges the Discord discussion as monitoring/access context and as part of the recurring portrayal that Counter-Plaintiff secretly tracks other people.

**D. July 29, 2025 — Monitoring Counter-Plaintiff's Research**

465. On July 29, 2025, Counter-Defendant published UNWINEWITHTEDDY | DForDanielleandDonat'sTimeline. Counter-Defendant dissected how Counter-Plaintiff researched an unrelated person's arrest or court matter. Counter-Defendant analyzed timestamps, court URLs, databases, and the time Counter-Plaintiff allegedly accessed information.

466. Counter-Defendant questioned whether the access was "coordinated." Counter-Plaintiff alleges this as evidence of monitoring Counter-Plaintiff's research activity and repackaging lawful research as suspicious or clandestine conduct.

467. — August 12, 2025 — KingWurld Re-Engagement Through Existing Voice-Identification Material. Counter-Defendant directly re-engaged Marquisio Watson a/k/a KingWurld in a Dani-focused identity publication using the prompt substantially: "@KING WURLD Does this sound like somebody you know?" In connection with that solicitation, Counter-Defendant directed Watson to previously published X/Twitter voice-identification material used in the continuing effort to identify Counter-Plaintiff by voice.

468. The previously published material included a September 24, 2024 X/Twitter post using #IdentifyTheVoice and asking listeners whether they recognized Counter-Plaintiff's "unedited voice" and "unique laughter." Counter-Plaintiff alleges that Counter-Defendant's August 12, 2025 solicitation therefore directed Watson to specific preexisting voice-identification material rather than merely inviting generic commentary.

469. Counter-Plaintiff does not allege from the tag alone that Watson acted as Counter-Defendant's agent and does not attribute Watson's independent conduct to Counter-Defendant absent legally sufficient proof.