470. — August 16, 2025 — AiNatashaTheMachine Direct Account Mentions and Cross-Channel Identity Solicitation. On August 16, 2025, the Counter-Defendant-associated AiNatashaTheMachine account, which Counter-Defendant later publicly identified among her other YouTube channels, published a community post stating in substance, "@DForDanielle Checked....Receipts Are In," and expressly included the literal account mentions @DaniRobertson, @DaniMontanatv, and @TruthTellerDani, together with @UNWINEWITHTEDDY, @RunTellThatToo, and @AiNatasha007. The publication also used identity- and pursuit-related hashtags including #IdentifyTheVoice, #DontRunNow, #USMarshals, and #FBI. See Ex. C.

471. Counter-Plaintiff alleges the literal @DaniRobertson, @DaniMontanatv, and @TruthTellerDani mentions as additional account-directed electronic contacts occurring after repeated written demands that Defendant-directed contact cease. Counter-Plaintiff alleges the simultaneous references to DForDanielle and Counter-Defendant-associated channels as evidence of cross-channel continuity in the identity-focused course.

472. Counter-Plaintiff distinguishes the literal account mentions from ordinary hashtags and does not allege that use of #IdentifyTheVoice, #DontRunNow, #USMarshals, or #FBI, standing alone, constitutes stalking or an independently actionable defamatory publication.

473. — August 16, 2025 — Separate DForDanielle Direct Account-Mention Publication. On the same date, the DForDanielle account separately published a community post stating in substance, "Hey MOB! Checked...Receipts Are In," and expressly included the literal account mentions @DaniRobertson, @DaniMontanatv, and @TruthTellerDani. The publication also used #UNWINEWITHTEDDY and #RunTellThatToo. See Ex. C.

474. Counter-Plaintiff alleges this as a separate same-day account-directed publication rather than as a duplicate of the AiNatashaTheMachine post. The DForDanielle publication independently used all three of Counter-Plaintiff's literal account handles after repeated written demands that Defendant-directed contact cease and further connected those account mentions with Counter-Defendant's recurring DForDanielle project.

475. Counter-Plaintiff distinguishes the literal @ account mentions from the hashtags appearing in the post and does not allege that #UNWINEWITHTEDDY or #RunTellThatToo, standing alone, constituted direct electronic contact.

**August 23, 2025 — DForDestruction "THE BLACK TEA SECTOR" AnalyzeThisMess**

476. On August 23, 2025, Counter-Defendant published DForDestruction "THE BLACK TEA SECTOR" AnalyzeThisMess and stated: "We've been tracking Danielle Robertson's patterns for a long time." Counter-Plaintiff alleges the statement as evidence of monitoring, persistence, and continuity of the Defendant-focused course of conduct.

**E. August 24, 2025 — "Watch How People Move"**

477. On August 24, 2025, Counter-Defendant published DForDestruction II "THE BLACK TEA SECTOR." Counter-Defendant monitored or discussed what Counter-Plaintiff and other creators were doing. Counter-Defendant directed viewers: "Watch how people move."

478. Counter-Defendant further instructed viewers: "Listen carefully to anyone … taking up for Danielle." Counter-Defendant encouraged the audience to "Stand up to this bully in numbers." Counter-Plaintiff alleges those statements as evidence of audience mobilization, scrutiny of associates, continuity, and motive. Counter-Plaintiff does not allege that ordinary audience criticism by itself constitutes stalking.

**F. August 26, 2025 — Joy Ferguson Money Accusation**

479. On August 26, 2025, Counter-Defendant published a YouTube Community Post and related programming concerning Joy Ferguson and Counter-Plaintiff. The Community Post stated: "She refused to refund her money for the lousy and disappointing Livestream she created." Counter-Defendant also stated or implied that Counter-Plaintiff personally received or controlled the money and that a financial trail proved it.

480. Counter-Plaintiff denies wrongfully retaining or converting Joy Ferguson's money. Counter-Plaintiff alleges that platform-controlled payment/refund procedures governed the relevant membership transaction rather than a personal decision by Counter-Plaintiff to wrongfully keep another person's funds. Counter-Plaintiff alleges the publication falsely portrayed her as dishonest in handling another person's money.

481. The August 26, 2025 publication and/or associated written post directly used or identified @DaniRobertson and @TruthTellerDani. Counter-Plaintiff alleges those literal account mentions as post-notice direct-account contact in addition to the separately alleged money accusation.

482. — September 12, 2025 Continuing Literal Account-Directed Community Posts. After repeated written notice that Counter-Plaintiff did not want Defendant-directed tagging and contact, Counter-Defendant published separate YouTube community posts expressly identifying @DaniRobertson and @TruthTellerDani, including posts concerning alleged PayPal activity and Joy Ferguson.

483. Counter-Plaintiff alleges the literal account mentions as additional post-notice electronic contacts. Counter-Plaintiff distinguishes those literal account mentions from ordinary

hashtags and does not allege that discussion of PayPal or Joy Ferguson, standing alone, constitutes stalking.

## XIII. SEPTEMBER–OCTOBER 2025 — SEARCH ASSOCIATION AND SURVEILLANCE IMPLICATIONS

### A. September 18, 2025 — Topic/Metadata Association

484. On September 18, 2025, Counter-Defendant published a video visibly concerning Charlie Kirk and Candace Owens. Preserved keyword metadata for the same video paired those subjects with Dani Robertson-related terms. Counter-Plaintiff alleges the example as evidence that Counter-Defendant intentionally inserted Counter-Plaintiff's identity into searchable metadata even where the visible topic concerned other public figures. Counter-Plaintiff does not allege that discussing those public figures constitutes stalking.

### September 26, 2025 — Systematic Archival Preservation

485. Counter-Defendant stated that Defendant-related material had been preserved "multiple places for backup." Counter-Defendant stated that deletion of DaniMontana videos did not matter because "I have them." Counter-Defendant stated that she possessed "every post that was about me." Counter-Defendant described her preservation practice: "If you see something, take a snapshot. Get it. Document it."

486. Counter-Plaintiff does not allege that preserving a public video independently constitutes stalking. Counter-Plaintiff alleges the statements as corroboration of systematic archival monitoring and preservation over time.

**September 28, 2025 — Wyoming Registered-Agent / Shell-Companies-and-Scams Implication**

487. On September 28, 2025, Counter-Defendant published *Dani Robertson | DForDecision: Wyoming Agent, Shell Cos & Secrecy | UNWINEWITHTEDDY AnalyzeThisMess*. During the publication, Counter-Defendant discussed the Wyoming registered-agent address used by Counter-Plaintiff and repeatedly connected that address with shell companies, scams, fraud, concealment, fake names, and other allegedly illegitimate business activity.

488. The Wyoming-agent association had previously been supplied to the Court by Counter-Defendant. In the September 25, 2025 Report and Recommendation, the Court stated, "As Evans points out," before discussing another registered agent operating from the address and citing Counter-Defendant's filing. The same Report and Recommendation separately stated that, "[f]or privacy purposes, Robertson may retain a registered agent and use that address." Counter-Plaintiff alleges that the Court did not find that Counter-Plaintiff owned, operated, controlled, or participated in the unrelated businesses or alleged misconduct associated with other users of the registered-agent address.

489. Counter-Defendant thereafter went beyond merely reporting that the Court had discussed the address. Counter-Defendant stated in substance, "If you hide behind shell companies and scammy agents, the court will cut through it," and presented the registered-agent address through a broader shell-company, scam, secrecy, concealment, and fraudulent-business narrative.

490. Counter-Plaintiff denies using the registered agent to operate a fraudulent shell company, participate in scams or fraudulent business activity, or conceal ownership of an illegitimate enterprise. Counter-Plaintiff alleges that, viewed in context, Counter-Defendant's added framing materially implied that Counter-Plaintiff's lawful use of a registered-agent address evidenced

Counter-Plaintiff's own participation in shell-company, scam-related, fraudulent, or comparable clandestine business conduct. Counter-Plaintiff does not base this allegation upon truthful reporting of what the Court actually stated or upon truthful reporting concerning unrelated entities using the same address.

**B. October 1, 2025 — "Did Someone Lace Up?" Surveillance Implication**

491. On October 1, 2025, Counter-Defendant published the members-only livestream Dani Robertson | DForDelete Did Someone Lace Up? | UNWINEWITHTEDDY AnalyzeThisMess. The publication identified Counter-Plaintiff in the title. It used multiple identifiers associated with Counter-Plaintiff, including `#DForDanielle`, `#DaniRobertson`, `#TruthTellerDani`, and `#DaniMontanaTV`. Counter-Defendant stated that she had purportedly served "Danielle."

492. Counter-Defendant stated that she did not trust Counter-Plaintiff. Counter-Defendant then described suspicious telephone calls from Michigan numbers. Counter-Defendant described silent breathing during at least one call. Counter-Defendant emphasized that multiple calls occurred "all since I have served Danielle." Counter-Defendant next described a black sedan entering or stopping at her driveway or residence.

493. Counter-Defendant recalled other events involving persons or vehicles allegedly watching or following her. Counter-Plaintiff alleges that the sequencing and repeated references to Counter-Plaintiff materially implied that Counter-Plaintiff caused, arranged, encouraged, knew about, or was connected to those calls or alleged surveillance. Counter-Plaintiff denies sending, hiring, directing, recruiting, encouraging, coordinating, or causing anyone to call, watch, follow, surveil, intimidate, or appear at Counter-Defendant's residence.

Counter-Plaintiff alleges the implication falsely portrayed her as orchestrating stalking or surveillance.

**C. October 2, 2025 — Dropping the Tea Audience Understanding**

494. On October 2, 2025, a third-party channel, Dropping the Tea, published UNWINEWITHTEDDY SERVES Dani Robertson! The commentator recounted Counter-Defendant's statements concerning silent telephone calls and the driveway vehicle. The commentator then connected the discussion directly to "Dany." The commentator referred to an "Avengers army Dany built." The commentator concluded by asking whether the "calls and driveway visitors" were merely coincidences or "something more" and whether "Dany" was "finally facing the music."

495. Counter-Plaintiff does not attribute Dropping the Tea's independent statements to Counter-Defendant. Counter-Plaintiff alleges them as contemporaneous evidence of how a secondary viewer actually understood the implication created by Counter-Defendant's October 1 presentation. Counter-Plaintiff further alleges contemporaneous chat comments reflected similar audience understanding. The audience evidence is alleged for identification, meaning, dissemination, reputational effect, and damages.

**D. October 6, 2025 — Jaguar Wright Tagging in Continuing DForDanielle Programming**

496. On October 6, 2025, Counter-Defendant published a community post directly tagging @RealJag77 while promoting a DForDanielle-related upcoming program and using #JaguarWright and #DForDanielle. See ECF No. 84-1, PageID.1306. Counter-Plaintiff alleges the post as evidence that Counter-Defendant continued re-enlisting or alerting a person previously involved in the Allen-identification discussion while continuing DForDanielle identity programming. Counter-Plaintiff does not allege that tagging Jaguar Wright, standing

alone, is unlawful; the post is alleged as third-party audience recruitment, identity-campaign continuity, motive, and course-of-conduct evidence.

497. — October 12, 2025 Continuing Literal Account Mention. Counter-Defendant again directly addressed @DaniRobertson in a YouTube community post after repeated demands that Defendant-directed tagging and contact cease.

498. Counter-Plaintiff alleges the October 12 literal account mention as additional evidence of continuation of the post-notice account-directed course and not merely as an ordinary hashtag or general public reference.

**E. October 24, 2025 — Dani Keyword Association**

499. On October 24, 2025, Counter-Defendant published a NightTalk video using `#DForDanielle`. Preserved backend keywords included multiple combinations of Counter-Plaintiff's names and identifiers with Counter-Defendant's branding and unrelated public topics. Counter-Plaintiff alleges that this is further evidence of deliberate searchable association.

**December 8, 2025 — DForDeep6 Part 1**

500. On December 8, 2025, Counter-Defendant separately renewed the Danielle Elizabeth Allen identity investigation in a publication titled substantially "UNWINEWITHTEDDY | 'DForDeep6' Part 1 AnalyzeThisMess," using #DaniRobertson and #TruthTellerDani. Counter-Defendant again presented Allen-related identity and criminal material in connection with Counter-Plaintiff after years of Counter-Plaintiff's denials and Counter-Defendant's own earlier admissions that she did not know the identification "100%." Counter-Plaintiff alleges this December 8 publication independently under Count I and

denies being Danielle Elizabeth Allen or the person associated with Allen's mugshot, interrogation, DUI, accessory allegation, infant death, homicide, or murder-related material.

**December 9, 2025 — DForDeep6 Part 2**

501. On December 9, 2025, Counter-Defendant separately published another Allen-focused program titled substantially "UNWINEWITHTEDDY | 'DForDeep6' Part 2 AnalyzeThisMess," using #DaniRobertson and #TruthTellerDani, and again placed the Danielle Elizabeth Allen identity theory before an audience. Counter-Plaintiff alleges December 9 as its own publication and separately denies every Allen identity and criminal association renewed in that program.

**December 10, 2025 — DForDeep6 Part 3**

502. On December 10, 2025, Counter-Defendant separately published a third program titled substantially "UNWINEWITHTEDDY | 'DForDeep6' Part 3 AnalyzeThisMess," using #DaniRobertson and #TruthTellerDani, renewing or continuing the Danielle Elizabeth Allen criminal-identity narrative. Counter-Plaintiff alleges the December 10 publication separately because it again exposed viewers to the Allen identity and criminal referent on a new publication date. Counter-Plaintiff denies being Danielle Elizabeth Allen and denies any connection to the murder, homicide, infant death, DUI, accessory offense, arrest, or other criminal conduct attributed to Allen.

503. — December 12, 2025 DForDeadline "Reveal Identity." Counter-Defendant separately published Defendant-focused programming concerning the anticipated disclosure of Counter-Plaintiff's legal identity and stated in substance that once Counter-Plaintiff's legal name was revealed the Danielle Elizabeth Allen/DEA theory could be "rule[d] in or rule[d] out."

504. Counter-Plaintiff alleges the publication as evidence that the anticipated identity disclosure remained expressly connected to the preexisting Allen/DEA identification theory after years of denials. Counter-Plaintiff alleges the publication for continuity, identity-campaign context, fault, false-light meaning, and course evidence and does not allege that lawful discussion of a court-ordered deadline itself constituted stalking.

## XIV. DECEMBER 23, 2025 — COPYRIGHT-OFFICE IMPERSONATION IMPLICATION

505. On December 23, 2025, Counter-Defendant published RunTellThatToo | DForDenied…ButWait UNWINEWITHTEDDY | AnalyzeThisMess. Counter-Defendant constructed a timeline concerning Counter-Plaintiff's communication with the United States Copyright Office. Counter-Defendant represented that an event occurred at approximately 10:19. Counter-Defendant reenacted or described a caller saying: "Hello, I'm Sybrena," or substantially equivalent language identifying the caller as Counter-Defendant herself. Counter-Defendant then stated: "I did not pick up a telephone at 10:19."

506. Counter-Plaintiff admits communicating with the Copyright Office. Counter-Plaintiff denies identifying herself as Sybrena Evans during that communication. Counter-Plaintiff denies impersonating Sybrena Evans. Counter-Plaintiff alleges that the publication materially implied that Counter-Plaintiff impersonated Counter-Defendant in communicating with a federal agency. Counter-Plaintiff alleges that implication was false and reputationally damaging.

**December 24, 2025–January 4, 2026 — Representative Commercial Use and Cross-Platform Promotion**

507. On December 24, 2025, Counter-Defendant used Dani-associated identifiers in Christmas or holiday programming.

508. On December 25, 2025, Counter-Defendant published "Christmas Night" using #dfordanielle, #danirobertson, and #truthtellerdani.

509. On December 26, 2025, Counter-Defendant published HearHerTV Rewind programming using Dani-associated metadata.

510. On December 27, 2025, Counter-Defendant discussed channel growth, Cash App, Super Chat, and subscriber migration in the continuing Dani-associated content sequence.

511. On December 29, 2025, Counter-Defendant directed viewers across platforms, stating: "I'm live on station head and on YouTube over here on D for Danielle," "the link is in the chat. It's station head. It's um D for Danielle," and "Please join me right now over on Station Head."

512. On December 31, 2025, Counter-Defendant published Rewind programming using Dani-associated metadata. Counter-Plaintiff further alleges that a separate December 31 New Year's Eve publication used general music or channel tags and did not use the Dani identifiers. Counter-Plaintiff alleges that comparison as evidence supporting an inference that Dani identifiers were selectively attached to particular publications rather than mechanically used on every publication.

513. On January 1, 2026, Counter-Defendant published DForDisInformation programming using Dani-associated identifiers and received a $10 Super Chat.

514. On January 2, 2026, Counter-Defendant published generic MessyMocha programming using Dani-associated identifiers and received $49.99 and $5 Super Chats.

515. In a separate January 2, 2026 Blaine/Monica publication, Counter-Defendant explained that a larger creator can "send subscribers your way" and "give you exposure."

516. On January 3, 2026, Counter-Defendant published AllAboutTheTea material using Dani-associated identifiers.

517. On January 4, 2026, Counter-Defendant presented Monique-related material using Dani-associated identifiers and Stationhead promotion.

**January 3, 2026 — "Layers" / Network Publication**

518. On January 3, 2026, Counter-Defendant stated that "people were already present on the platform," that "they already had a purpose," and: "She says she's solo dolo. I don't believe that." Counter-Defendant further stated that "layers have been put into place before your arrival so that you can remain anonymous," asked "Is this bigger?" and stated: "There's layers." Counter-Plaintiff does not deny lawful anonymity or lawful privacy-protective arrangements. Consistent with ¶¶156–159, Counter-Plaintiff denies the materially false criminal, fraudulent, deceptive, or clandestine meaning allegedly attached to those lawful facts.

**January 4, 2026 — Monique Tolbert/Allen Family-Link Publication**

519. Counter-Defendant published "Monique's Interview" using Dani-associated metadata and replayed an identity investigation concerning Monique Tolbert/Monique Allen. Monique Tolbert/Allen was presented within the larger identity investigation as Danielle Allen's mother or family connection, and the replay included discussion of the Allen surname or alias and related identity information. Counter-Plaintiff does not allege that discussion of

Monique by itself constituted defamation. Counter-Plaintiff alleges the publication as another separate public reinforcement of the family-link framework used to connect Counter-Plaintiff with Danielle Elizabeth Allen.

**January 4, 2026 — DForDeadlock Network Structure**

520. In DForDeadlock-related discussion, Counter-Defendant described persons as having "hid in the shadows," stated that "things were coordinated," referred to a "party line" and the "Dirty 40," and stated that "information was shared." Counter-Defendant further described pictures being "passed around," people "getting instructions," and "any satellites around that." Counter-Defendant also qualified the discussion by stating that it was not "some wild conspiracy or anything like that." Counter-Plaintiff therefore alleges the January 4 material as supporting network-structure and course-of-conduct context, not as a standalone direct accusation that Counter-Defendant expressly said Counter-Plaintiff committed a criminal conspiracy.

**January 6, 2026 — Criminalized Anonymity**

521. On January 6, 2026, Counter-Defendant used an anonymous-defendant analogy involving "claims of fraud" and "claims of criminal behavior." Counter-Defendant later stated that anonymity is not protected when used to enable "harassment, coordinated interference, fraud, abuse of copyright systems, [and] litigation misconduct." Counter-Defendant also described undisclosed help, advance planning, "moving shells around," changing voices, burner phones, and VPNs.

522. Counter-Plaintiff alleges the January 6 publication principally as defamation by implication and false-light context arising from the criminal or fraudulent meaning attached to lawful anonymity and privacy arrangements; Counter-Plaintiff does not falsely attribute to

Counter-Defendant a direct statement that "Dani committed identity theft." Counter-Plaintiff further preserves Counter-Defendant's qualification that a later credit-card or identity-theft example was "just speaking in general." Consistent with ¶¶156–159, Counter-Plaintiff does not deny lawful anonymity, privacy measures, separate accounts, or lawful arrangements.

**January 15, 2026 — Members-Only Dani-Identifier / Stationhead Programming**

523. On January 15, 2026, Counter-Defendant published members-only NightTalk programming using Dani-associated identifiers. Counter-Plaintiff alleges that the preserved surrounding evidence also reflects use of Counter-Plaintiff-associated material on Stationhead and audience activity directed or carried between YouTube and Stationhead.

524. Counter-Plaintiff alleges the January 15 publication as representative commercial and identity-use evidence involving a members-only environment, Dani-associated identifiers, Counter-Plaintiff-associated material as programming content, cross-platform audience movement, and continued use after objection. Counter-Plaintiff does not plead the incident as a new copyright-infringement cause of action.

## XV. JANUARY 23, 2026 — "BACKDOOR ACCESS" AND ILLEGAL-ACCESS IMPLICATIONS

525. On January 23, 2026, Counter-Defendant published UNWINEWITHTEDDY | NightTalk on RunTellThatToo, using `#DForDanielle`. Counter-Defendant accused Counter-Plaintiff of trying to "sabotage this case." Counter-Defendant characterized Counter-Plaintiff's communication with the Copyright Office as interference with Counter-Defendant's copyright application. Counter-Defendant stated that Counter-Plaintiff obtained "backdoor access to files and documents." Counter-Defendant further stated that Counter-Plaintiff

could "access records," go "behind files," get into "court documents," and "bulldoze[] in back door."

526. Counter-Defendant suggested Counter-Plaintiff had hidden assistance because of the amount of activity attributed to her. Counter-Defendant linked the supposed conduct to Counter-Plaintiff's anonymity. Counter-Defendant stated that Counter-Plaintiff needed to be "unmasked" and later "exposed." Counter-Plaintiff denies using illegal "backdoor" access to court or government records. Counter-Plaintiff denies hacking databases or obtaining records through illicit technological methods. Counter-Plaintiff alleges that, taken as a whole, the publication materially implied criminal, deceptive, or illicit information-access activity. Counter-Plaintiff further alleges that lawful court-record research, lawful governmental communication, lawful filings, or legitimate investigation do not become unlawful merely because Counter-Defendant calls them "backdoor" access or sabotage.

**January 30, 2026 — Two Separate Dani-Identifier Publications**

527. On January 30, 2026, Counter-Defendant separately published "MessyMocha Plus Breaking News!" using Dani-associated identifiers despite generic or unrelated subject matter. Counter-Plaintiff alleges that upload as a distinct publication and representative identity/metadata-use example.

528. In a separate January 30, 2026 publication, Counter-Defendant published NightTalk using Dani-associated identifiers despite generic or unrelated subject matter. Counter-Plaintiff alleges the NightTalk upload separately from "MessyMocha Plus Breaking News!" and does not aggregate the two merely because they occurred on the same date.

**XVI. JANUARY 31, 2026 — VIRUS, HACKING, TRACKING, AND CYBER-SECURITY IMPLICATION**

529. On January 31, 2026, Counter-Defendant published UNWINEWITHTEDDY | NightTalk on RunTellThatToo. The publication used `#DForDanielle`. Counter-Defendant warned persons supporting her case or channel to be cautious if they received communications from Counter-Plaintiff. Counter-Defendant stated that the person being discussed was "quite skilled at obtaining information on individuals." Counter-Defendant suggested recipients might find their information publicly exposed. Counter-Defendant discussed burner phones, multiple email addresses, aliases, VPNs, and a possible "decoy."

530. Counter-Defendant then discussed electronic communications and the possibility that "that little virus can spread on your computer or whatever." Counter-Defendant later stated that people can "track others." Counter-Defendant speculated that Counter-Plaintiff had some special "pathway" or access route to other persons' information.

531. Counter-Plaintiff denies sending computer viruses or malware. Counter-Plaintiff denies hacking Counter-Defendant or supporters. Counter-Plaintiff denies unlawfully accessing governmental or private databases. Counter-Plaintiff denies using illegal technological means to obtain or expose private information.

532. Counter-Plaintiff alleges that, considered as a whole, Counter-Defendant's presentation materially implied that communicating with Counter-Plaintiff posed a cyber-security risk and that Counter-Plaintiff employed unlawful malware, hacking, tracking, or clandestine information-gathering techniques. Counter-Plaintiff alleges that repeated qualifiers such as "could," "might," or "I don't know" did not remove the implication created by the publication as a whole. During the same broadcast Counter-Defendant expressly promoted

"D for Danielle on Stationhead." Counter-Plaintiff alleges this further establishes Counter-Defendant's ownership or operation of the recurring DForDanielle cross-platform identifier.

**February 1–2, 2026 — Additional Dani-Identifier / Stationhead Examples**

533. On February 1, 2026, Counter-Defendant published generic NightTalk programming using Dani-associated identifiers. Counter-Plaintiff alleges the publication only as cumulative identity/metadata-use evidence and does not attribute separate merits statements to other participants merely because they were present.

534. On February 2, 2026, Counter-Defendant again used Dani-associated identifiers on generic NightTalk programming and referred to material that might need to be played on Stationhead. Counter-Plaintiff alleges the publication as supporting searchable-association and cross-platform-programming evidence, not as a new copyright theory.

## XVII. FEBRUARY 3, 2026 — CONTINUED IDENTITY INVESTIGATION

535. On February 3, 2026, Counter-Defendant published UNWINEWITHTEDDY | NightTalk on RunTellThatToo using `#DForDanielle`. Counter-Defendant stated that she had been reviewing Counter-Plaintiff's videos and obtaining transcripts. Counter-Defendant searched those transcripts for words, phrases, and identity clues. Counter-Defendant expressly asked: "So, how do we find out who she is?" Counter-Defendant discussed historical or deleted accounts, communications between Counter-Plaintiff and third persons, and relationships among accounts.

536. Counter-Defendant discussed publishing Counter-Plaintiff's voice so that others could attempt to recognize it. Counter-Defendant suggested that identifying Counter-Plaintiff might require only "one individual, the right individual." Counter-Defendant discussed potential recognition through real-world settings such as school, work, stores, or other

ordinary activity. Counter-Defendant returned to Danielle Elizabeth Allen and stated that Allen remained "not ruled out." Counter-Defendant stated, "I didn't say she was, but I didn't rule it out either."

537. Counter-Plaintiff does not allege that reviewing public records or lawful public videos alone constitutes stalking. Counter-Plaintiff alleges this publication as evidence of a continuing, deliberate, audience-assisted identity investigation immediately preceding the February 6 and February 9 Allen publications.

## XVIII. FEBRUARY 6, 2026 — ALLEN INTERROGATION, ARREST, AND CRIMINAL-IDENTITY IMPLICATION

538. On February 6, 2026, Counter-Defendant published UNWINEWITHTEDDY | MessyMocha on RunTellThatToo. The publication used `#DForDanielle`. Counter-Defendant announced that she would replay part of the interrogation of Danielle Elizabeth Allen. Counter-Defendant directed viewers to the full interrogation on her DForDanielle channel.

539. The interrogation informed viewers that Allen was being placed under arrest for accessory after the fact in connection with an attempted second-degree-murder investigation. Counter-Defendant discussed the death of an infant. Counter-Defendant discussed the related criminal investigation. Counter-Defendant discussed Allen's alleged concealment of Larry Champ's whereabouts. Counter-Defendant discussed Allen's arrest and related criminal circumstances.

540. Counter-Plaintiff is not Danielle Elizabeth Allen. Counter-Plaintiff was not the woman in the interrogation. Counter-Plaintiff was not arrested in that matter. Counter-Plaintiff was

not an accessory after the fact in that matter. Counter-Plaintiff had no involvement in the infant's death or the criminal investigation presented by Counter-Defendant.

541. Counter-Defendant expressly acknowledged that when the Allen material initially appeared, Counter-Plaintiff repeatedly responded: "It's not me. It's not me. It's not me. It's not me." Counter-Defendant nevertheless used Counter-Plaintiff's reaction, postings, payments, and subsequent conduct as purported reasons to suspect a connection. Counter-Defendant stated that those actions made her think "maybe there's something more to this." Counter-Defendant stated: "I have never said once that Dani Robertson is Danielle Elizabeth Allen. What I have said is rule it in, rule it out. Listen to the voice and tell me what you think." Counter-Defendant nevertheless also stated that Allen's voice "was never ruled out in my opinion. Period." Counter-Defendant read or discussed audience comments stating the voices "matched to perfection." Counter-Defendant continued inviting the audience to determine whether Counter-Plaintiff was Allen.

542. Counter-Plaintiff alleges that the "rule it in, rule it out" disclaimer did not negate the implication of the full publication. In the same broadcast, Counter-Defendant was presenting Allen's criminal interrogation and arrest while asking the audience whether Counter-Plaintiff was Allen. Counter-Plaintiff alleges the materially defamatory implication was therefore not merely that two women had similar voices. Counter-Plaintiff alleges the publication invited the audience to conclude that Counter-Plaintiff was the same person whose arrest, accessory-after-the-fact allegation, interrogation, and homicide-related investigation Counter-Defendant was simultaneously presenting. Counter-Plaintiff alleges that the disclaimer was additionally contradicted by earlier affirmative Allen publications, including the October 13, 2023 "VOICE CONFIRMED" publication.

543. Counter-Plaintiff acknowledges seeking and paying to obtain source interrogation material for the purpose of reviewing and rebutting the false-identification narrative. Counter-Plaintiff denies that obtaining evidence being used against her was evidence that she was the person depicted in that evidence. Counter-Plaintiff alleges that Counter-Defendant repeatedly transformed Counter-Plaintiff's efforts to deny or disprove the accusation into purported additional proof of the accusation.

**February 7, 2026 — Periodic Monitoring and Dani-Identifier Use**

544. On February 7, 2026, Counter-Defendant stated: "you know, I'm going to be checking, right?" Counter-Defendant later stated: "they know that I will be checking periodically." Counter-Defendant described monitoring whether videos were removed, whether material was public, private, or unlisted, reuploads, playlists, URLs, upload dates, and view counts.

545. Counter-Plaintiff does not allege that reviewing publicly available material, standing alone, constitutes stalking. Counter-Plaintiff alleges the monitoring in combination with the direct @ contacts, notice, membership-space conduct, alleged website-access circumvention, Stationhead entry, and other conduct pleaded above and below. Counter-Plaintiff further alleges that generic NightTalk programming on February 7 largely addressed unrelated news and entertainment while still carrying Dani-associated identifiers, as additional identity-use and commercial-context evidence.

## XIX. FEBRUARY 9, 2026 — UNWINEWITHTEDDY | NIGHTTALK ON RUNTELLTHATTOO — CONTINUED DEA / LAKE CHARLES IDENTITY THEORY

546. On February 9, 2026, Counter-Defendant published UNWINEWITHTEDDY | NightTalk on RunTellThatToo and again discussed Danielle Elizabeth Allen. Counter-Defendant discussed "DEA," Lake Charles, Louisiana, voice comparisons, features, aliases, social-

media connections, and purported identity clues. By then Counter-Defendant's audience had already been repeatedly exposed to Allen's mugshot, interrogation, arrest, DUI, accessory-after-the-fact allegation, and homicide-related material. Counter-Plaintiff alleges that "DEA" and Lake Charles therefore did not function as neutral identifiers in context. Counter-Plaintiff alleges that renewed Allen comparisons carried forward the implication that Counter-Plaintiff was the real-world person Counter-Defendant had repeatedly associated with criminal history.

547. Counter-Plaintiff had repeatedly denied that identification. Counter-Plaintiff had repeatedly demanded cessation. Counter-Plaintiff alleges the continued publication in February 2026 supports an inference of knowing or reckless persistence rather than an isolated identification error. Counter-Plaintiff alleges that the later February 9 presentation reflected materially greater certainty than Counter-Defendant's earlier statements that she did not know "100%," that the identification was not established "as a fact," and that Counter-Plaintiff "may not be Danielle Elizabeth Allen." Counter-Plaintiff is not Danielle Elizabeth Allen and did not commit or participate in any murder, homicide, infant death, DUI, accessory offense, arrest-related offense, or other Allen-associated crime.

**February 10, 2026 — LARA Privacy Admission, Professional Harm, and Dani-Identifier Programming**

548. On February 10, 2026, Counter-Defendant publicly discussed the LARA dispute, her profession, professional reputation, the value of her license, and that without the required license she could not legally practice medicine. Counter-Defendant stated: "When someone files a complaint to the board, it is private." Counter-Plaintiff alleges the statement as a

significant admission concerning the limited publication and accessibility of the underlying regulatory communication.

549. The February 10 publication also used the DForDocketNews framing and Dani-associated identifiers. Counter-Plaintiff alleges that feature as additional identity-based-programming context. Counter-Plaintiff does not allege that the private nature of the regulatory complaint categorically eliminates all damages; she alleges it as material to causation, scope of publication, mitigation, and proof of reputational injury.

## XX. FEBRUARY 11, 2026 — STATIONHEAD MONITORING AFTER DIRECTION TO LEAVE

550. Counter-Plaintiff operated or participated in a Stationhead space. Counter-Plaintiff had blocked Counter-Defendant from commenting or interacting through available platform controls. Counter-Plaintiff alleges the platform did not allow her to prevent a user from merely listening to an otherwise accessible room.

551. Counter-Defendant entered Counter-Plaintiff's Stationhead broadcast. Counter-Defendant listened to Counter-Plaintiff's activities and statements. Counter-Plaintiff learned that Counter-Defendant was present and expressly told her to leave. Counter-Defendant did not immediately leave.

552. Counter-Defendant later publicly recounted that she had entered and listened to the Stationhead broadcast. Counter-Defendant also stated that she nearly returned to Stationhead again. Counter-Plaintiff does not allege that listening to a public livestream once, standing alone, constitutes stalking. Counter-Plaintiff alleges the incident as one component of repeated cross-platform monitoring and post-notice persistence.

**February 12–March 5, 2026 — LARA, Stationhead, Metadata, and Cross-Platform Programming**

553. On February 12, 2026, Counter-Defendant stated: "Follow me on all social media and D for Danielle and on station head," stated "there's something I want you guys to hear," and stated "it will be on Station Head." Counter-Plaintiff alleges those statements narrowly as evidence of deliberate audience redirection and cross-platform programming.

554. On February 13, 2026, Counter-Defendant again stated in substance that complaints filed to the medical board were private. Counter-Plaintiff alleges that repeated privacy acknowledgment as LARA causation and publication-scope evidence. Counter-Plaintiff further alleges any Stationhead reference in the same publication only as supporting cross-platform-funnel evidence, not as a separate primary appropriation event.

555. On February 14, 2026, Counter-Defendant continued Lake Charles visual or research material and discussed Stationhead audience movement. Counter-Defendant stated that approximately eight people had been listening on Stationhead, that "the eight that were listening heard something," and that "there will be more." Counter-Plaintiff alleges the publication as evidence of deliberate cross-platform programming, audience development, and continuing Lake Charles research context.

556. On February 18, 2026, Counter-Defendant publicly read or displayed language stating: "The exact substance of the LARA complaints is unknown as Evans lacks access to the communications"; "The pleadings do not show that the LARA complaint became a matter of public controversy"; and "There is no sign that the complaints garnered public interest or press coverage." Counter-Defendant also discussed qualified privilege for reports to a state regulatory agency. Counter-Plaintiff alleges the publication principally as LARA causation,

publication-scope, mitigation, and self-publication evidence; any Stationhead reference is alleged only as secondary cross-platform support.

557. February 18, 2026 — Lake Charles Visual and Continuing Allen/DEA Geographic Association. During the same February 18, 2026 publication, Counter-Defendant changed or displayed a background depicting roadway signage in Lake Charles, Louisiana, and expressly identified the location to viewers as "somewhere in Lake Charles, Louisiana." Counter-Defendant then stated that she had "come across" something and that her focus was on a specific historical period extending from late 2023 through 2024. Counter-Plaintiff alleges that the deliberate Lake Charles visual framing and express verbal identification of Lake Charles continued the geographic component of Counter-Defendant's recurring Danielle Elizabeth Allen/DEA identity narrative. Counter-Plaintiff does not allege that the image alone constituted a direct accusation, but alleges it as context, continuity, identification, and false-light support when considered with the prior and subsequent Allen/Lake Charles publications. Counter-Plaintiff further alleges that the publication occurred after repeated denials that she was Danielle Elizabeth Allen and after Counter-Defendant had already used Lake Charles, Allen-related criminal material, voice comparisons, family references, and geographic clues to encourage viewers to associate Counter-Plaintiff with Allen.

558. On February 26, 2026, Counter-Defendant published programming substantively concerning Jeffrey Epstein and national news while using #dfordanielle, #danirobertson, and #truthtellerdani. Counter-Plaintiff alleges the publication as a particularly clear example of Dani-associated identifiers attached to unrelated programming, supporting the pleaded discoverability, audience, promotional-use, and identity-association theory.

559. On February 27, 2026, Counter-Defendant again invoked "LARA," "the medical board," "the practice of medicine," and "licensing," while claiming professional harm. Counter-Plaintiff alleges only those professional-license and claimed-harm portions of the publication as additional LARA causation and damages context.

560. On March 1, 2026, Counter-Defendant stated: "I'm not going to play it on this channel. I don't want to be struck," while explaining that Counter-Plaintiff-associated material had been played or replayed on Stationhead. Counter-Plaintiff alleges this as deliberate cross-platform programming and audience-funnel evidence, not as a new copyright-infringement claim.

561. On March 2, 2026, Counter-Defendant published programming principally concerning Middle East or other current-events subject matter while again using Dani-associated identifiers. Counter-Plaintiff alleges that publication as another representative unrelated-content metadata example and does not seek a long-form merits claim from the unrelated subject matter.

562. On March 5, 2026, Counter-Defendant stated "we listened to it again," stated "I just went over to Stationhead and played it," and again stated: "I'm not going to play it on this channel. I don't want to be struck." The same live included Super Chat activity. Counter-Plaintiff alleges the Stationhead statements as cross-platform programming evidence and the Super Chats only as commercial context; Counter-Plaintiff does not allege that any particular payment was made because of Counter-Plaintiff.

**April 9, 2026 — Renewed DEA / Lake Charles Identity Publication**

563. On April 9, 2026, during UNWINEWITHTEDDY | NightTalk, Counter-Defendant stated: "Yes, she dox DEA," asked "How did she get DEA's Instagram," and asked: "Why do they

have a PO box there in Lake Charles?" Counter-Plaintiff alleges that in the context of years of Allen/DEA/Lake Charles publications, those statements renewed the identity association by treating Counter-Plaintiff's alleged access to DEA-related information and a Lake Charles location as evidence within the continuing criminal-identity theory.

564. Counter-Plaintiff denies being Danielle Elizabeth Allen and denies that lawful access to public social-media information, a post-office-box reference, or other lawful research established that identity or criminal association. Counter-Plaintiff alleges the April 9 publication as a separate timely publication supporting Count I, Count V, fault or actual-malice allegations, and prospective relief.

565. — April 14, 2026 Lake Charles Continuity. On April 14, 2026, Counter-Defendant stated while discussing Counter-Plaintiff and the continuing identity controversy: "She had already interviewed someone from Nosy Ho Live's high school yearbook. She had already contacted Lake Charles, y'all better leave me alone."

566. Counter-Plaintiff alleges the statement as additional timely context showing that Lake Charles remained an express component of Counter-Defendant's Defendant-focused identity narrative only days after the April 9, 2026 DEA/Lake Charles publication. Counter-Plaintiff does not allege that lawful contact with another person or geographical location independently constitutes wrongdoing.

## XXI. MAY 5, MAY 8, AND MAY 20, 2026 — FORMAL RETRACTION NOTICE, THIRD-PARTY SURVEILLANCE NARRATIVE, AND COMPLETE-CATALOG MONITORING

567. On May 5, 2026, before asserting this defamation counterclaim, Counter-Plaintiff sent Counter-Defendant a written Formal Retraction and Correction Demand Under Michigan

Defamation Law expressly invoking MCL 600.2911. See Ex. B. The May 5 demand specifically identified as false, among other matters, accusations or implications that Counter-Plaintiff committed or was associated with a DUI; was an accessory after the fact, obstructed justice, helped cover up a crime, or was connected to an accessory-after-the-fact allegation; was involved in or associated with child homicide or the death of a child; was a sex worker, prostitute, escort, or otherwise engaged in commercial sexual conduct; was involved in criminal activity through the "Dirty 40"; and was truthfully identified with those accusations through #DForDanielle or similar identifiers. See Ex. B. The May 5 demand expressly stated that Counter-Plaintiff had repeatedly denied the accusations, demanded retraction and correction in substantially the same manner and visibility as the challenged publications, demanded preservation of evidence, and reserved claims for exemplary damages. See Ex. B. More than three months elapsed between the May 5 retraction demand and this August 17, 2026 amended counterclaim. Counter-Plaintiff alleges that Counter-Defendant had a reasonable opportunity to retract and correct the publications encompassed by that demand before institution of this counterclaim.

**A. May 8, 2026 — Kimberly Smith Residence Incident, Active Chat Participation, and Surveillance Narrative**

568. On May 8, 2026, Counter-Defendant actively participated in Kimberly Smith's live-chat discussion concerning an unfamiliar man and vehicle at or near Smith's residence. Using the @unwinewithteddy account, Counter-Defendant greeted Smith and asked, "Was this man wearing glasses?" while Smith and others were discussing the unidentified man and the circumstances surrounding his presence at or near Smith's residence.

569. Counter-Defendant thereafter discussed the same incident during her own May 8, 2026 *UNWINEWITHTEDDY | NightTalk* broadcast and expressly confirmed her earlier participation in Smith's chat, stating in substance: "So I asked her when I [was] in the chat … was he wearing glasses and she said no."

570. Counter-Defendant explained that she sought the identifying detail because she was comparing Smith's account with men or vehicles Counter-Defendant claimed she herself had previously observed. Counter-Defendant described Smith's account as "plausible," stated that she had no reason to doubt Smith's story, reviewed or discussed images or video concerning the man and vehicle, and discussed whether Smith could later recognize him.

571. Counter-Defendant then connected Smith's report with a broader surveillance-related narrative by discussing her own claimed experiences involving unfamiliar men or vehicles, persons allegedly observing her, persons at or near residences, "people watching others homes," "following or having people followed," persons being photographed without their knowledge, and persons being followed in vehicles.

572. Counter-Plaintiff alleges the May 8 sequence as active participation in gathering identifying information concerning the Smith residence incident, followed by amplification of that incident before Counter-Defendant's own audience and incorporation of it into the recurring surveillance, following, and residence-related narrative previously used in Defendant-focused publications.

573. Counter-Plaintiff denies hiring, directing, sending, recruiting, encouraging, coordinating, or authorizing any person to watch, follow, surveil, intimidate, photograph, telephone, approach, or appear at the residence of Counter-Defendant, Kimberly Smith, or any other person. Counter-Plaintiff alleges that the May 8 sequence reinforced the recurring

implication that suspicious persons, vehicles, residence-directed activity, or surveillance incidents were meaningfully connected to Counter-Plaintiff or the controversy surrounding her. Counter-Plaintiff does not allege that Counter-Defendant expressly stated that Counter-Plaintiff personally sent the unidentified man unless the source record establishes that exact attribution.

**B. May 20, 2026**

574. On May 20, 2026, during UNWINEWITHTEDDY | NightTalk, Counter-Defendant stated that she possessed "Danielle's videos all of them her complete catalog." Counter-Defendant discussed "clues" contained throughout Counter-Plaintiff's content. Counter-Defendant stated: "it's all there you just have to put it together."

575. Counter-Plaintiff alleges this as direct evidence of sustained archival monitoring of Counter-Plaintiff's complete content catalog. Counter-Plaintiff alleges that this monitoring continued years after Counter-Plaintiff began demanding cessation. Counter-Plaintiff does not allege that possession of publicly available videos, standing alone, constitutes stalking. Counter-Plaintiff alleges the admission as evidence of continuity, fixation, intent, identity investigation, and the cumulative nature of the broader conduct.

**XXII. JULY 2, 2026 — SAME-NAME COURT-RECORD / CRIMINAL IMPLICATION**

576. On July 2, 2026, Counter-Defendant published UNWINEWITHTEDDY | RunTellThatToo "Who Told You That?" By July 2026, Counter-Defendant knew that "Dani Robertson" or "Danielle Robertson" was an online/stage identifier and not Counter-Plaintiff's legal name. Counter-Defendant nevertheless searched for and discussed real persons bearing the same or similar Robertson name.

577. Counter-Defendant discussed an unrelated court or arrest matter. Counter-Defendant attempted to connect Counter-Plaintiff's previously disclosed staged jail prank to the unrelated real-world court matter. Counter-Defendant characterized the prank as sounding like an "alibi" or "confession."

578. Counter-Plaintiff denies that the unrelated arrest or court proceeding concerned her. Counter-Plaintiff alleges that using unrelated Robertson records despite knowing the identifier was not her legal name materially implied that she had concealed a real arrest, criminal matter, or missed court obligation. Counter-Plaintiff alleges that implication was false.

**July 8, 2026 — Associate/Network Monitoring**

579. Counter-Defendant described entering another creator's stream to "just listen in." Counter-Defendant described observing who was present, preserving a screenshot, identifying or counting accounts, and recognizing persons she associated with the Dani-centered controversy. Counter-Plaintiff alleges the incident as evidence of continued scrutiny of persons and online spaces Counter-Defendant associated with Counter-Plaintiff.

580. Counter-Plaintiff does not allege that listening to a public livestream standing alone constitutes stalking. Counter-Plaintiff alleges the July 8 publication as monitoring, associate-network, continuity, and intent evidence occurring less than one month before the Court's August 6, 2026 authorization of third-party identity discovery.

**July 23, 2026 — Downstream Crime-Video Dissemination**

581. On July 23, 2026, Counter-Defendant stated in substance that someone had downloaded "from D for Danielle the interrogation" and placed it on "their crime video." Counter-Defendant further discussed the crime-video upload as having received more than 30,000 views.

582. Counter-Plaintiff alleges that statement as evidence that the Allen interrogation material used in Counter-Defendant's Dani-focused identity programming disseminated beyond Counter-Defendant's own channels and entered downstream true-crime programming reaching an additional audience.

583. Counter-Plaintiff does not attribute the independent third-party crime video or its wording to Counter-Defendant merely because another person downloaded or republished material. Counter-Plaintiff alleges the July 23 publication as evidence of dissemination, audience reach, causation, reputational injury, and the continuing public meaning of the Allen criminal-identification material.

## XXIII. AUGUST 6, 2026 — LAWFUL DISCOVERY DISTINGUISHED

584. On August 6, 2026, the Court authorized third-party identity discovery. Counter-Plaintiff does not base Count II upon lawful subpoenas issued within that authorization. The authorization did not retroactively authorize Counter-Defendant's prior self-directed identity investigations or previously premature third-party subpoenas.

## XXIV. PREMATURE GOOGLE SUBPOENA AND PRE-AUGUST-6 IDENTITY EXTRACTION

585. Counter-Defendant filed this action on December 23, 2024. Shortly thereafter, Counter-Defendant attempted to obtain identifying information concerning Counter-Plaintiff through a subpoena directed to Google and through other third-party process. At that time ordinary third-party identity discovery had not been authorized. Counter-Plaintiff learned of the action through notice associated with the attempted subpoena and appeared to protect her anonymity and challenge the subpoena.

586. Counter-Plaintiff alleges that the Google subpoena contained attorney-identifying information suggesting involvement of counsel even though Counter-Defendant was proceeding pro se. Counter-Plaintiff does not presently characterize the subpoena as "forged" absent adjudication of that issue. Counter-Plaintiff alleges the document materially suggested attorney involvement or issuance authority that Counter-Plaintiff disputed.

587. The Court later held that the early subpoenas were premature under Rule 26 and quashed them. Counter-Plaintiff alleges this chronology as evidence that the litigation immediately continued the identity-extraction objective already pursued outside judicial discovery for years. Counter-Plaintiff does not allege that filing a lawsuit itself constitutes stalking. Counter-Plaintiff does not allege that subpoenas later expressly authorized beginning August 6, 2026 constitute stalking.

588. Counter-Plaintiff alleges the foregoing only as historical pre-August-6-2026 chronology concerning earlier process already addressed by the Court. Counter-Plaintiff does not challenge or characterize as wrongful any identity discovery conducted within the express scope of the Court's August 6, 2026 order and presently reserves any allegation concerning later public or extrajudicial identity activity unless and until conduct outside that authorization occurs.

## XXV. MONETIZATION, ENGAGEMENT, AND ECONOMIC INCENTIVE

589. Counter-Defendant regularly solicited likes, shares, subscriptions, channel memberships, donations, Cash App payments, Super Chats, and audience participation while producing Defendant-focused content. Defendant-focused broadcasts generated views and engagement. Some broadcasts generated direct financial contributions. Counter-Defendant

promoted additional channels and cross-platform programming during Defendant-focused content.

590. Counter-Plaintiff does not allege that monetizing lawful commentary is wrongful. Counter-Plaintiff alleges that Defendant-focused controversy supplied Counter-Defendant with audience engagement and economic incentive to continue producing Defendant-centered accusations, identity theories, and broadcasts rather than allowing the controversy to end. Counter-Plaintiff alleges that the sustained combination of monetization and continued Defendant-focused publication is relevant to motive and persistence.

## XXVI. BRAND AND REPUTATIONAL HARM

591. Counter-Plaintiff developed online identities, channels, names, and branding through which audiences recognized her. Counter-Defendant repeatedly attached those identifiers to criminal identities, hacking accusations, cyber-security insinuations, surveillance allegations, dishonesty allegations, financial accusations, and identity controversies. Counter-Defendant repeatedly used Counter-Plaintiff's visible hashtags and backend metadata identifiers. Counter-Plaintiff alleges that this persistent association impaired the reputation attached to her names, channels, and online brand. Counter-Defendant additionally attached Counter-Plaintiff's recognizable identity to sex-work and commercial-sexual-conduct implications, mental-instability and psychiatric characterizations, and terrorism or dangerous-person portrayals.

592. Counter-Plaintiff has received reports from viewers that Counter-Defendant's Defendant-focused content appeared in their feeds or otherwise reached them through online recommendations or associations. Counter-Plaintiff does not presently allege that a

particular metadata tag technologically caused a particular recommendation. Counter-Plaintiff alleges the reports as evidence of actual dissemination and audience exposure.

593. Counter-Plaintiff alleges reputational injury, humiliation, emotional distress, and diversion of substantial time and resources to rebutting accusations and preserving evidence. Counter-Plaintiff alleges reasonable out-of-pocket evidence-preservation, storage, transcription, records, and mitigation expenses to the extent proved. Counter-Plaintiff alleges diversion of productive or revenue-generating time to the extent proved. Counter-Plaintiff does not plead "brand interference" as a separate tort.

594. — Commercial Amplification of Reputational Harm. Counter-Plaintiff alleges that the commercially valuable content was not neutral discussion of Counter-Plaintiff. Counter-Defendant repeatedly attached Counter-Plaintiff's Dani-related identity and brands to commercial sex-work and sexualized misconduct implications and to publications portraying Counter-Plaintiff as Danielle Elizabeth Allen or as connected with Allen's family and with criminal-interrogation, arrest, homicide, second-degree-murder, accessory-after-the-fact, and infant-death material. Counter-Plaintiff alleges that Counter-Defendant generated audience engagement and commercial benefit from publications that simultaneously degraded the reputation and goodwill attached to Counter-Plaintiff's identity and brands.

595. Counter-Plaintiff further alleges that the reputational injury was not limited to the Allen criminal identity. Counter-Defendant also attached Counter-Plaintiff's recognizable identity to a false sexualized persona involving Nosy Ho Live's "sex work classes" and alleged connection to the sex-work industry, a mental-instability persona involving psychiatric terminology and asserted need for evaluation, and a dangerous or terroristic persona involving "terrorism," "terrorizer," and dangerous-person terminology.

## COUNT I

## DEFAMATION, DEFAMATION PER SE, AND DEFAMATION BY IMPLICATION

596. Counter-Plaintiff incorporates the preceding allegations to the extent applicable to this count.

597. — Allen Criminal-Identification Implication. Counter-Plaintiff alleges that the actionable defamatory sting arose from the recurring combination of Counter-Plaintiff's recognizable Dani identity, names, handles, voice, brands, accounts, and associated persons with Danielle Elizabeth Allen's mugshot, police interrogation, arrest and custody imagery, DUI history, accessory-after-the-fact allegation, second-degree-murder material, homicide-related reporting, and the death of a four-month-old infant.

598. Counter-Defendant repeatedly invited viewers to determine whether Counter-Plaintiff was Allen through "rule in / rule out" polls, voice comparisons, image comparisons, family comparisons, geographic clues, and numbered Mystery Clues and publicly reported audience results favoring the identification.

599. Counter-Plaintiff repeatedly denied being Allen. Counter-Defendant later expressly acknowledged that she did not know the identification "100%," that it was "not scientific as a fact," and that Counter-Plaintiff "may not be" Allen, yet subsequently published materially more definitive language including "VOICE CONFIRMED."

600. Counter-Plaintiff alleges that the later definitive publications cannot be evaluated in isolation from the criminal referent Counter-Defendant had already supplied through months of Allen mugshot, interrogation, arrest, homicide, infant-death, and identity-comparison programming.

601. — Actual Audience Meaning. Counter-Plaintiff alleges that third parties actually understood the publications as identifying Counter-Plaintiff with the Allen child-death criminal matter. HearHerTV expressly promoted Counter-Defendant's Unwind with Teddy channel as the source of the detailed identity analysis, participated in the "rule in" process, treated Counter-Plaintiff as Allen, and independently escalated the identification into express child-murder accusations.

602. Donat Ricketts separately stated that the Dani/Allen identification had been "proven by Unwind with Teddy," directed his own viewers to Counter-Defendant's content to compare the voices, and independently repeated child-killer accusations.

603. Counter-Plaintiff does not attribute HearHerTV's or Ricketts's independent wording to Counter-Defendant as direct speech. Counter-Plaintiff alleges those publications as evidence that the defamatory implication was objectively intelligible, actually understood, disseminated, and reputationally damaging.

604. Additional preserved audience evidence further demonstrates actual understanding of the Allen criminal-identification implication. By April 7, 2023, a commenter displayed as "Jennifer Luv Spewitt" directed statements to "Danielle" concerning "your" DUI, a baby's death, running from police, and a father or "daddy" described as a deputy. On May 16, 2024, a separate commenter displayed as "Zenobia Alkebu" referred to Counter-Plaintiff as "dui dani."

605. Counter-Plaintiff does not attribute either commenter's independent words to Counter-Defendant as direct speech. Counter-Plaintiff alleges the comments as evidence that multiple audience members at different times actually understood and adopted the DUI and related Allen/DEA associations communicated through the broader identity campaign.

606. Counter-Defendant published false and defamatory communications concerning Counter-Plaintiff to third persons, with legally sufficient fault, causing legally cognizable harm.

607. Counter-Plaintiff further alleges defamation by implication. Viewed in context and as a whole, the challenged publications juxtaposed Counter-Plaintiff's identity and identifiers with Danielle Elizabeth Allen's criminal history and criminal-investigation material in a manner capable of conveying a materially false defamatory implication.

608. Counter-Plaintiff invokes MCL 600.2911(1) only to the extent a particular actionable publication imputes commission of a criminal offense.

609. Michigan law additionally provides that words imputing a lack of chastity to any female or male are actionable in themselves. MCL 600.2911(1). Counter-Plaintiff invokes that provision to the extent the sex-work implication pleaded below is found to impute lack of chastity or commercial sexual conduct.

610. Counter-Plaintiff invokes MCL 600.2911(1)'s lack-of-chastity provision only to the extent the particular sex-work or prostitution implication, considered in full context, is legally found to impute a lack of chastity. Counter-Plaintiff otherwise alleges the sex-work implication under ordinary defamation standards and does not contend that every reference to sex work automatically constitutes defamation per se.

611. Counter-Defendant published the challenged statements and presentations to third-party audiences.

612. Counter-Defendant identified Counter-Plaintiff by name, handle, title, hashtag, direct account mention, metadata, voice, DForDanielle identifier, or surrounding context.

613. The publications were therefore "of and concerning" Counter-Plaintiff.

614. Counter-Plaintiff's Allen claim does not arise merely because Counter-Defendant discussed another person with a similar name. Counter-Plaintiff alleges the recurring juxtaposition of her recognizable Dani identity with Danielle Elizabeth Allen's mugshot, interrogation, arrest, DUI, accessory-after-the-fact allegation, homicide-related investigation, and infant-death criminal material. Counter-Plaintiff is not Allen and denies all Allen-associated criminal conduct.

615. Counter-Plaintiff alleges actual audience understanding through the separately pleaded HearHerTV, Donat Ricketts, Jennifer Luv Spewitt, and Zenobia Alkebu evidence. Counter-Plaintiff does not attribute those third parties' independent wording to Counter-Defendant but alleges it as evidence that the Allen/child-death and DUI implications were actually understood and disseminated.

616. Counter-Plaintiff further relies upon Counter-Defendant's own deliberate repetition of the Allen theory, including the August 15, 2023 statement that she needed to repeat the alleged Allen impersonation "often," the March 19, 2024 representation that her own "assessment and the evidence" pointed toward Allen, the June 6, 2024 continuation, and the February 6 and February 9, 2026 renewals.

617. Counter-Plaintiff alleges fault from Counter-Defendant's earlier admissions that she did not know the identification "100%," that it was "not scientific as a fact," and that Counter-Plaintiff "may not be Danielle Elizabeth Allen," together with Counter-Plaintiff's repeated denials and the later continuation of materially equivalent criminal-identification publications.

618. Counter-Plaintiff alleges defamation per se only to the extent a particular publication directly or by materially false factual implication imputed criminal conduct actionable per se under Michigan law.

619. Counter-Plaintiff also alleges defamation by implication because the recurring juxtaposition of Counter-Plaintiff's identity with Allen's criminal history was capable of causing viewers to understand that Counter-Plaintiff was Allen or responsible for Allen's criminal conduct.

620. Counter-Plaintiff separately alleges a false "Dirty 40" conspiracy implication to the extent Counter-Defendant identified Counter-Plaintiff as a member, participant, organizer, or co-conspirator in the group after expressly defining that designation as a coordinated and secretive group involved in malicious, nefarious, illegal, harmful, or wrongful activity, including knowing participation, aiding and abetting, conspiracy, criminal charges, and legal responsibility.

621. Counter-Plaintiff denies participating in a criminal conspiracy or organized criminal enterprise with persons Counter-Defendant placed within the "Dirty 40." Counter-Plaintiff alleges crime-based defamation per se only to the extent a particular publication, considered in full context, imputed criminal conduct to Counter-Plaintiff.

622. Counter-Plaintiff alleges the November 28, 2023 "Dirty 40" publication principally as evidence of defamatory meaning, notice, fault, context, and defensive setoff under MCL 600.5823 to the extent the statute applies.

623. — Sex-Work / Commercial-Sexual-Conduct Implication. Counter-Plaintiff separately alleges that the October 22, 2024 publication materially implied that Counter-Plaintiff purchased or participated in Nosy Ho Live's "sex work classes," might herself be "into that kind of a business," and was "linked to" the sex-work industry.

624. Counter-Plaintiff does not convert Counter-Defendant's qualified terminology into a direct quotation Counter-Defendant never made. Counter-Plaintiff alleges the defamatory meaning from the full sequence in which Counter-Defendant expressly identified "sex work classes," stated that she believed Counter-Plaintiff purchased such a class, discussed persons allegedly connected to a "ring," and then suggested that Counter-Plaintiff might herself be "into that kind of a business" and was "linked to" that industry.

625. Counter-Plaintiff denies being a sex worker or prostitute, engaging in commercial sexual conduct, purchasing or participating in Nosy Ho Live's sex-work classes, or participating in a sex-work ring or industry.

626. Because the October 22, 2024 publication predates the ordinary one-year affirmative Count I period, Counter-Plaintiff alleges it for historical defamatory meaning, false-light context, fault, notice, reputational history, and defensive setoff under MCL 600.5823 to the extent legally available and does not plead it as an unrestricted independently timely affirmative damages publication.

627. — Directed Troll-Farm Implication Context. Counter-Plaintiff further relies upon the separate March 19, 2024 "TROLL FARM" publication as historical implication evidence because Counter-Defendant associated the publication with Dani Robertson, directed repetition of selected assertions, instructed viewers to "read between the lines," characterized the presentation as "eye opening," and affirmatively reinforced the developing troll-farm theory. Counter-Plaintiff does not attribute every independent guest statement to Counter-Defendant and alleges the publication for implication, meaning, false-light, fault, and statutory-setoff purposes to the extent legally available.

628. — July 26, 2024 Assignment-Giving / Dirty-40 Implication Context. Counter-Plaintiff further relies upon the July 26, 2024 ASSIGNMENT UNDERSTOOD publication as historical coordinated-network implication evidence. Counter-Defendant represented that a communication stating "assignment understood" established that persons were operating pursuant to assignments, stated that multiple persons were involved and were not acting "solo dolo," described persons as being assigned to other people and checking back concerning their assignments, connected that conduct to the "Dirty 40," and expressly told "Truth teller" that "the assignment came from you."

629. Counter-Plaintiff denies directing persons to harass, troll, infiltrate, surveil, retaliate against, or otherwise wrongfully target Counter-Defendant or others and denies operating or directing the coordinated wrongful network portrayed in the publication.

630. Counter-Plaintiff alleges the July 26, 2024 publication for historical defamatory meaning, false-light context, fault, notice, audience conditioning, and coordinated-network context and does not plead it as an unrestricted independently timely affirmative defamation-damages publication.

631. Counter-Plaintiff's remaining impersonation-based defamation theory is limited to the materially false implication that Counter-Plaintiff impersonated Sybrena Evans when communicating with the United States Copyright Office.

632. Counter-Plaintiff admits that she communicated with the Copyright Office but denies identifying herself as Sybrena Evans.

633. Counter-Plaintiff does not rely in Count I upon a channel-strike or takedown theory and does not seek defamation recovery merely because she submitted or was accused of submitting copyright complaints.

634. — August 26, 2025 Money Accusation. Counter-Plaintiff further alleges an independently actionable written publication in which Counter-Defendant expressly identified Counter-Plaintiff through @DaniRobertson and @TruthTellerDani and stated that Counter-Plaintiff "refused to refund" Joy Ferguson's money for a livestream.

635. Counter-Plaintiff denies wrongfully receiving, converting, retaining, controlling, or refusing to return Ferguson's funds and alleges that the applicable transaction and refund mechanism were governed through the platform rather than through Counter-Plaintiff's unilateral possession or control of Ferguson's money.

636. Counter-Plaintiff alleges that the publication falsely portrayed her as dishonestly retaining another person's money and reinforced Counter-Defendant's recurring portrayal of Counter-Plaintiff as fraudulent, deceptive, or financially dishonest.

637. Counter-Plaintiff further alleges independently timely publications or implications, to the extent proved, including:

638. Counter-Plaintiff alleges each separately dated video, livestream, Short, post, or other publication identified in this pleading as a distinct publication and does not aggregate separate publications merely because they addressed the same recurring accusation or were published on the same date.

a. the August 26, 2025 publication falsely portraying Counter-Plaintiff as wrongfully retaining or controlling Joy Ferguson's money;

b. the September 28, 2025 Wyoming registered-agent publication, to the extent it materially implied that Counter-Plaintiff personally used shell companies, scam-related entities, fraudulent business arrangements, or comparable clandestine structures merely because she used a registered-agent address;

c. the October 1, 2025 publication materially implying Counter-Plaintiff caused, arranged, or was connected to suspicious calls, a driveway vehicle, stalking, or surveillance;

d. the December 8, 2025 DForDeep6 Part 1 Allen criminal-identification publication;

e. the December 9, 2025 DForDeep6 Part 2 Allen criminal-identification publication;

f. the December 10, 2025 DForDeep6 Part 3 Allen criminal-identification publication;

g. the December 23, 2025 Sybrena Evans impersonation implication;

h. the January 6, 2026 fraud and criminal-behavior implication associated with criminalized anonymity;

i. the January 23, 2026 implication of unlawful "backdoor" access to court or government records;

j. the January 31, 2026 implication that Counter-Plaintiff posed a cyber-security risk or used malware, viruses, tracking, or illicit information-gathering techniques;

k. the February 6, 2026 Allen criminal-interrogation publication;

l. the February 9, 2026 Allen/DEA/Lake Charles criminal-identification publication;

m. the April 9, 2026 renewed DEA/Lake Charles criminal-identification implication;

n. the May 8, 2026 publication and associated live-chat participation continuing and amplifying the third-party residence-surveillance implication; and

o. the July 2, 2026 implication that Counter-Plaintiff was connected to an unrelated Robertson arrest or court matter.

639. Counter-Plaintiff alleges each foregoing statement or implication was materially false in the manner specifically pleaded above.

640. Counter-Plaintiff denies being Danielle Elizabeth Allen or participating in any Allen-associated criminal conduct; denies being a sex worker or prostitute or participating in

commercial sex work; denies hacking, malware distribution, illegal database access, unlawful backdoor access, covert technological intrusion, sending persons to stalk or surveil Counter-Defendant, wrongfully retaining Joy Ferguson's money, or being the unrelated Robertson associated with the July 2026 court-record narrative.

641. Counter-Defendant knew of repeated contrary denials and nevertheless continued renewing substantially similar accusations and implications.

**A. Fault, Constitutional Actual Malice, Common-Law Malice, and Retraction Notice**

642. Counter-Plaintiff alleges at least negligence as to each actionable publication and, to the extent a higher constitutional standard applies, alleges knowledge of falsity or reckless disregard for truth or falsity.

643. Counter-Plaintiff alleges at least the level of fault required by Michigan law. To the extent liability for a publication involving Counter-Plaintiff as a private individual rests solely upon negligence, Counter-Plaintiff seeks only the damages permitted by MCL 600.2911(7). Counter-Plaintiff separately invokes MCL 600.2911(1) where applicable and separately alleges knowledge of falsity or reckless disregard as pleaded below. Counter-Plaintiff seeks noneconomic damages only to the extent legally recoverable.

644. Counter-Plaintiff alleges constitutional actual malice from a cumulative knowledge trail rather than from hostility alone. In 2023, Counter-Defendant herself admitted that she did not know "100%" whether Counter-Plaintiff was Allen, stated that the identification was "not scientific as a fact," and later acknowledged that Counter-Plaintiff "may not be Danielle Elizabeth Allen."

645. Counter-Plaintiff repeatedly denied being Allen and repeatedly disputed the criminal associations. Counter-Defendant nevertheless continued publishing the Allen narrative,

including titles and presentations that increased rather than reduced the degree of asserted certainty.

646. On August 15, 2023, Counter-Defendant did not merely repeat the Allen premise inadvertently; she stated that she "need[ed] to say" the alleged Allen impersonation "often" so that a family member who might be listening would hear it. Counter-Plaintiff alleges this as evidence of deliberate publication and third-party dissemination after dispute and denial.

647. By March 19, 2024, Counter-Defendant expressly told Jaguar Wright that her own "assessment and the evidence" pointed toward Danielle Elizabeth Allen. Counter-Plaintiff alleges that the shift from acknowledged uncertainty to an affirmative evidence-based representation, despite intervening denials, supports an inference of knowing or reckless persistence rather than innocent mistake.

648. Counter-Plaintiff sent at least six written cease-and-desist notices over the course of the dispute, including notices dated September 3, 2022; October 5, 2022; January 31, 2023; April 24, 2024; September 11, 2024; and June 21, 2025.

649. The April 24, 2024 written notice was particularly specific: it expressly informed Counter-Defendant that Counter-Plaintiff was not Danielle Elizabeth Allen, denied the DUI and accessory-to-homicide or child-death associations, objected to continuing DForDanielle publications and direct tagging, and demanded cessation.

650. Counter-Defendant thereafter continued Allen-related identity and criminal imagery, including the June 6, 2024 publication immediately preceding Counter-Plaintiff's LARA complaint and later 2026 Allen publications.

651. On May 5, 2026, Counter-Plaintiff escalated the notice from cease-and-desist demands to a formal, publication-focused retraction and correction demand under MCL 600.2911,

specifically identifying the DUI, accessory-after-the-fact, child-homicide, Dirty 40 criminal-group, criminal-misidentification, and #DForDanielle associations and sex-work, prostitution, escorting, or comparable commercial-sexual-conduct accusations or implications as false. See Ex. B.

652. Counter-Plaintiff alleges that the combination of Counter-Defendant's own admitted uncertainty, repeated direct denials, specific written correction notices, the April 24, 2024 Allen-specific notice, the May 5, 2026 statutory retraction demand, contrary evidence, and continued materially equivalent publication supports an inference of knowing falsity or reckless disregard as to actionable later publications.

653. Counter-Plaintiff does not equate hostility, audience engagement, or financial motive alone with constitutional actual malice. Those matters are alleged only as circumstantial context together with evidence bearing on Counter-Defendant's subjective doubts, knowledge, persistence, and refusal to correct.

654. Separately, Counter-Plaintiff alleges common-law malice in the sense of bad faith or ill will for purposes of exemplary damages. Counter-Plaintiff relies upon the multi-year persistence after repeated notice; the stated desire to expose Counter-Plaintiff's identity; the September 9, 2023 statement that the presentation was "purposeful"; the statement "I want one person, your identity"; audience recruitment; associate expansion; the June 6, 2024 statement "Yes, I want her identity known"; and continuation after formal demands to cease, retract, and correct.

655. Counter-Plaintiff alleges compliance with the pre-suit retraction-notice condition of MCL 600.2911(2)(b) as to libel publications encompassed by the May 5, 2026 demand. The demand was sent before this counterclaim, expressly invoked MCL 600.2911, requested

retraction and correction in substantially the same manner as the challenged publications, and afforded Counter-Defendant more than three months before this counterclaim was filed. See Ex. B.

656. Counter-Plaintiff seeks exemplary damages only to the extent permitted by Michigan law, as compensation for additional injury attributable to common-law malice and not as punitive damages or duplicative recovery.

657. Counter-Plaintiff therefore seeks exemplary damages under MCL 600.2911(2)(b), as legally available, for the incremental injury to feelings attributable to Counter-Defendant's common-law malice, and only as to publications for which the statutory retraction prerequisite and all other elements are established.

**B. Full Context, Audience Meaning, Damages, and Timeliness**

658. Counter-Plaintiff alleges that Counter-Defendant frequently used questions, qualifiers, hypotheticals, audience comments, "maybe," "could," "rule it in, rule it out," and similar formulations while conveying defamatory factual implications.

659. Counter-Plaintiff therefore pleads the defamatory meaning from each publication's full context rather than converting qualified wording into direct quotations never used.

660. Contemporaneous audience reactions are alleged as evidence of actual audience understanding, not as automatic republications attributable to Counter-Defendant.

661. Counter-Plaintiff's online reputation is particularly dependent upon credibility because her public-facing work includes commentary concerning true crime, homicide cases, public controversies, alleged injustice, activism, and accountability.

662. Counter-Plaintiff alleges that falsely associating her recognizable online identity with an unrelated woman's mugshot, DUI history, interrogation, arrest, accessory-after-the-fact

allegation, and child-death-related criminal investigation directly injured the credibility and reputation upon which her public-facing work depends.

663. Counter-Plaintiff further alleges that falsely associating her recognizable online identity with commercial sex work or a sex-work industry was capable of impairing her credibility, reputation, personal dignity, and the goodwill associated with her public-facing identity.

664. Counter-Plaintiff alleges reputational injury, humiliation, emotional harm, damage to the reputation associated with her public names and online branding, mitigation expenses, and other proved economic loss.

665. Counter-Plaintiff seeks affirmative damages only for publications for which recovery is timely and legally available.

666. Older publications are pleaded as context, notice, audience meaning, intent, fault, course-of-conduct evidence, and, where MCL 600.5823 permits, defensive setoff up to the amount of Plaintiff's established claim.

**C. Damages Allocation — Independently Timely Affirmative Recovery Versus MCL 600.5823 Setoff**

667. Counter-Plaintiff expressly segregates affirmative damages from defensive setoff so that older publications are not pleaded as though MCL 600.5823 created an unrestricted affirmative recovery.

668. As to Count I only, Counter-Plaintiff seeks affirmative defamation damages for independently timely publications or republications and preserves relation back where legally permitted. Counter-Plaintiff filed her original Answer and Counterclaims on August 10, 2026 and files this First Amended Answer and Counterclaims on August 17, 2026. Michigan provides a one-year limitations period for libel and slander under MCL 600.5805(11). To the extent an

amended claim arises from conduct, transactions, occurrences, or publications set out or attempted to be set out in the August 10, 2026 original Answer and Counterclaims, Counter-Plaintiff invokes Fed. R. Civ. P. 15(c)(1)(B) and preserves the August 10, 2026 filing date. Independently of relation back, publications timely measured from this amended pleading remain subject to the ordinary limitations period and otherwise applicable accrual, republication, tolling, and preservation rules.

669. The independently timely Count I publications presently identified include the August 26, 2025 publication and the later 2025 and 2026 publications specifically pleaded above. Counter-Plaintiff does not seek a standalone affirmative damages judgment based solely on an older defamation publication that is otherwise time-barred.

670. Earlier defamation publications, including 2022–2024 publications and any publication that is not independently timely and does not properly relate back to the August 10, 2026 original Answer and Counterclaims, are pleaded for context, identification, audience meaning, notice, intent, fault, actual-malice evidence, common-law-malice evidence, causation, and reputational history and, where the statutory conditions are satisfied, solely as defensive setoff under MCL 600.5823.

671. Any amount allowed solely through MCL 600.5823 is requested only as a defensive offset or recoupment against the amount established as Plaintiff's claim and not as an affirmative money judgment exceeding Plaintiff's established claim based solely on otherwise untimely defamation publications.

672. Counts II, III, IV, V, and VI remain governed by the limitations, accrual, causation, and damages rules applicable to those distinct causes of action; this Count I allocation is not intended to impose the one-year defamation cutoff on non-defamation causes of action.

673. Counter-Plaintiff requests that damages be allocated by count and by actionable publication or conduct as necessary to prevent duplication or double recovery.

674. Counter-Plaintiff seeks prospective relief against particular statements or materially equivalent implications only after they are adjudicated false and actionable.

**D. APPLICATION OF MICHIGAN DEFAMATION ELEMENTS**

**False and Defamatory Fact or Implication**

675. Counter-Plaintiff alleges materially false statements or factual implications concerning her, including assertions or implications that she:

a. was Danielle Elizabeth Allen or the person associated with Allen's DUI, arrest, accessory-after-the-fact allegation, interrogation, or child-death investigation;

b. purchased or participated in Nosy Ho Live's "sex work classes," was "into that kind of a business," or was otherwise "linked to" commercial sex work or the sex-work industry;

c. illegally accessed computer or governmental systems or obtained information through restricted, privileged, or "backdoor" access;

d. used malware, viruses, illicit tracking, or clandestine information-gathering techniques;

e. impersonated Sybrena Evans in a Copyright Office communication;

f. wrongfully retained Joy Ferguson's money;

g. used shell companies, scam-related entities, fraudulent business arrangements, or comparable clandestine structures, or committed or participated in other fraud or fraudulent legal-document conduct, where the particular publication is proved;

h. caused or arranged suspicious telephone calls, vehicles, stalking, surveillance, or residence-directed intimidation; or

i. participated in any other criminal conduct specifically pleaded in the existing and amended factual allegations.

**Of and Concerning Counter-Plaintiff**

676. The challenged publications identified Counter-Plaintiff through her names, handles, voice, content, associates, direct account mentions, and recurring identifiers including Dani Robertson, @DaniRobertson, @TruthTellerDani, @DaniMontanaTV, #DaniRobertson, #TruthTellerDani, #DaniMontanaTV, and DForDanielle.

**Publication**

677. Counter-Defendant communicated the challenged material to third persons through YouTube videos and livestreams, members-only programming, Stationhead, social-media posts, panels, and cross-platform publications.

678. Actual downstream publications, including the Allen/"child killer" republications and October 2, 2025 surveillance discussion, are further evidence that third persons received and understood the challenged implications.

**Fault**

679. Counter-Plaintiff alleges at least the fault legally required for each actionable publication.

680. To the extent constitutional actual malice applies, Counter-Plaintiff relies upon Counter-Defendant's own admissions of uncertainty, including:

a. "I don't know 100%";

b. the Allen identification was "not scientific as a fact right now";

c. Counter-Plaintiff "may not be Danielle Elizabeth Allen"; and

d. concerning the restricted/backdoor-access narrative: "I really believe that. But we will find out."

681. Counter-Plaintiff further relies upon repeated written denials, at least six cease-and-desist notices, the April 24, 2024 Allen-specific denial, the May 5, 2026 statutory retraction demand, contrary information supplied in particular broadcasts, and materially equivalent later republications.

682. Counter-Plaintiff alleges these matters not merely as a failure to investigate but as circumstantial evidence bearing upon Counter-Defendant's subjective knowledge or doubts.

**Defamatory Meaning and Defamation Per Se**

683. Counter-Plaintiff alleges that falsely associating her with homicide-related criminal material, fraud, commercial sex work, illegal computer access, malware, impersonation, or orchestrated surveillance is reasonably capable of lowering her reputation in the estimation of the community and deterring others from associating or doing business with her.

684. Counter-Plaintiff invokes MCL 600.2911 to the extent a particular actionable publication imputes commission of a criminal offense.

**Causation and Injury**

685. Counter-Plaintiff alleges reputational injury, humiliation, emotional injury, impairment of the reputation associated with her online identities, diversion of productive and revenue-producing time, mitigation costs, and proved economic losses.

686. The downstream "child killer" publications and October 2025 surveillance commentary are alleged as evidence that audience members actually received and understood the criminal and surveillance implications.

**COUNT II**

**CIVIL ACTION FOR DAMAGES RESULTING FROM STALKING**

**MCL 600.2954; MCL 750.411h**

687. Counter-Plaintiff incorporates the preceding allegations to the extent applicable to this count.

688. This is Counter-Plaintiff's principal course-of-conduct counterclaim.

689. MCL 600.2954 creates a civil cause of action for a victim against an individual who engages in conduct prohibited by MCL 750.411h. Counter-Plaintiff asserts that Michigan civil cause of action in this federal Court pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

690. Counter-Plaintiff alleges that Counter-Defendant's conduct satisfies the stalking requirements incorporated into the civil remedy by MCL 600.2954 through MCL 750.411h.

691. Under MCL 750.411h, stalking requires a willful course of conduct involving repeated or continuing harassment, and a "course of conduct" means a pattern composed of a series of two or more separate noncontinuous acts evidencing continuity of purpose.

692. Harassment includes repeated or continuing unconsented contact directed toward a victim that would cause a reasonable person emotional distress and that actually causes the victim emotional distress.

693. "Unconsented contact" includes contact initiated or continued without consent or in disregard of an expressed desire that the contact be avoided or discontinued.

694. Conduct serving a legitimate purpose and constitutionally protected activity cannot be converted into stalking merely because it is unwelcome.

695. Counter-Plaintiff therefore does not allege that every video, criticism, public-record search, hashtag, lawsuit filing, or discussion of a common public topic constitutes stalking.

696. — Course of Unconsented Contact. Counter-Plaintiff does not allege that criticism, public commentary, ordinary hashtags, lawful public-record review, lawful litigation activity, or lawful discovery standing alone constitutes stalking.

697. Counter-Plaintiff instead relies upon a continuing course that included repeated literal account-directed mentions after notice to stop; repeated demands that Counter-Plaintiff engage or respond; continued presence in Counter-Plaintiff-controlled online spaces after requests to leave; attempted circumvention of known website access restrictions; direct Allen-family outreach; identity and family-location investigation; repeated public solicitation of assistance in identifying Counter-Plaintiff; and later re-engagement of persons whose publicly described methods included offline location verification, family contact, telephone contact, contemplated travel, and "boots on the ground."

698. Counter-Plaintiff alleges that Counter-Defendant possessed actual notice that continued Defendant-directed contact was unwanted through blocks, repeated written cease demands beginning in 2022, direct objections to tagging and contact, and subsequent requests that Counter-Defendant disengage.

699. Counter-Plaintiff alleges the repeated direct electronic contacts, access-boundary conduct, family/location activity, and continuing identity solicitations together as the qualifying course and does not ask the Court to treat public criticism itself as stalking.

700. — February 11, 2026 Stationhead Incident. Counter-Plaintiff further alleges that Counter-Defendant entered or listened to Counter-Plaintiff's Stationhead room after years of blocked or unwanted contact, was expressly told to leave, did not immediately disengage, and later publicly acknowledged entering the room and nearly returning.

701. Counter-Plaintiff does not allege that listening to a single publicly accessible livestream, standing alone, constitutes stalking. Counter-Plaintiff alleges the incident as part of the larger post-notice cross-platform course when considered together with the repeated direct account mentions, cease notices, monitoring, identity investigation, and unwanted contact history.

702. — Known Third-Party Escalation. Counter-Plaintiff alleges that Counter-Defendant continued to engage Marquisio Watson a/k/a KingWurld concerning Counter-Plaintiff's identity after Watson's publicly described methods included "boots on the ground," address verification, family contact, local-source recruitment, telephone calls, contemplated travel, and "pull up" activity.

703. Counter-Plaintiff alleges Counter-Defendant's later tagging and solicitation of Watson concerning Counter-Plaintiff's voice and identity as circumstantial evidence of knowledge and continued escalation, including because the solicitation directed Watson to specific preexisting voice-identification material asking listeners to identify Counter-Plaintiff by her "unedited voice" and "unique laughter." Counter-Plaintiff does not allege agency or attribute every independent Watson act to Counter-Defendant.

704. — May 8, 2026 Smith Residence Discussion and Information Solicitation. Counter-Defendant personally entered Kimberly Smith's live-chat discussion concerning an unfamiliar man at or near Smith's residence and solicited an identifying detail by asking

whether the man was wearing glasses. Counter-Defendant thereafter amplified the same incident in her own May 8 broadcast and compared it with other claimed incidents involving men, vehicles, watching, following, and residence-related activity.

705. Counter-Plaintiff alleges the May 8 conduct as part of the larger pre-August-6-2026 course involving associate-directed monitoring, information solicitation, surveillance-themed publication, and third-party involvement. Counter-Plaintiff does not allege that asking a single question in another person's public chat, standing alone, constitutes stalking.

**A. Actual Notice**

706. Counter-Plaintiff expressly withdrew consent to continuing Defendant-directed contact. Counter-Defendant had actual notice through written cease demands beginning in 2022, platform blocks, direct objections to tagging and contact, requests that Counter-Defendant leave membership spaces, and Counter-Defendant's own broadcasts acknowledging "your request for me to remove myself from membership" and replaying the instruction "Exit all my memberships." Counter-Plaintiff alleges those notices, restrictions, objections, and acknowledgments cumulatively as proof that Counter-Defendant knew substantial portions of the later qualifying contact were unwanted.

**B. Repeated or Continuing Conduct**

707. Counter-Plaintiff alleges that despite actual notice, Counter-Defendant continued conduct that Counter-Plaintiff alleges constitutes qualifying unconsented contact or harassment under MCL 750.411h, including:

a. repeated direct electronic account tagging;

708. The volume of preserved literal @ mentions and account-directed tagging is addressed in Section VIII above. Counter-Plaintiff has preserved the underlying publication catalog and

alleges the representative dates and identifiers pleaded herein as examples of the repeated post-notice account-directed course. See Ex. C.

709. — Literal Account Mentions. Counter-Plaintiff relies upon literal account mentions using @, rather than ordinary hashtags using #, as part of the direct electronic-contact course. Representative post-notice publications included direct account mentions of @DaniRobertson, @TruthTellerDani, and other established Counter-Plaintiff accounts.

710. Those literal account mentions were capable of generating platform notifications directed to Counter-Plaintiff's accounts. Counter-Plaintiff does not allege that every literal mention necessarily produced a notification absent platform records establishing actual delivery.

711. The August 26, 2025 Joy Ferguson publication is additionally alleged as direct account-directed contact because it expressly used @DaniRobertson and @TruthTellerDani after repeated written requests that Counter-Defendant cease Defendant-directed contact.

b. repeated demands that Counter-Plaintiff call, respond, answer, enter broadcasts, or engage;

c. continued membership/access after express requests to leave;

d. alleged circumvention of Defendant-controlled website restrictions;

e. cross-platform entry and monitoring after attempts to exclude Counter-Defendant;

f. remaining in Counter-Plaintiff's Stationhead space after an express direction to leave;

g. repeated associate-directed account tagging after requests to cease;

h. repeated efforts to enlist third persons in identifying or scrutinizing Counter-Plaintiff;

i. audience-assisted identity searches;

j. repeated account-directed electronic communications incorporating false criminal, hacking, surveillance, or dangerous-conduct narratives, to the extent those communications otherwise satisfy MCL 750.411h; and

k. additional qualifying contact established through discovery.

712. Counter-Plaintiff alleges that the qualifying course continued from 2022 through 2026 through separate noncontinuous acts evidencing continuity of purpose.

**C. Monitoring and Identity Campaign as Context**

713. As context for that course, Counter-Defendant repeatedly analyzed Counter-Plaintiff's voice, physical characteristics, account relationships, associates, and identity clues; solicited audience assistance; stated "I want to find your identity"; asked on February 3, 2026, "So, how do we find out who she is?"; and on May 20, 2026 acknowledged possessing Counter-Plaintiff's "complete catalog" and searching it for clues. Counter-Plaintiff does not allege those speech or research acts independently establish stalking but alleges them as evidence of purpose and continuity surrounding the separately pleaded unconsented contacts.

**D. Associates**

714. The alleged course also extended to persons Counter-Defendant associated with Counter-Plaintiff, including moderators, supporters, Down the Rabbit Hole News, Lenora, Jenny Penny, and others. Down the Rabbit Hole News expressly requested that directed tagging stop, yet Counter-Defendant continued account mentions or associate-directed activity. Counter-Plaintiff alleges such conduct only as part of the cumulative course and in support of narrowly tailored prospective relief and does not attribute independent third-party acts to Counter-Defendant absent a legally sufficient basis.

**E. Objective and Actual Emotional Distress**

715. Counter-Plaintiff alleges that the repeated qualifying conduct after years of cessation demands would cause a reasonable person in her circumstances to feel harassed, intimidated, frightened, threatened, or emotionally distressed and actually caused Counter-Plaintiff substantial emotional distress, including fear of involuntary unmasking and offline targeting, humiliation, anxiety, and reputational distress.

716. Counter-Plaintiff further alleges that the duration and persistence compounded that distress and required repeated monitoring, preservation, documentation, and response to conduct she had already requested be stopped.

**F. Legitimate-Purpose / First Amendment Limitation**

717. Count II excludes lawful court-authorized discovery, ordinary litigation discussion, criticism, opinion, truthful reporting, lawful fair use, lawful public-record review, constitutionally protected activity, and conduct serving a legitimate purpose. Public posts, metadata, monetization, and identity commentary are alleged only as context unless the particular conduct independently satisfies Michigan law.

**G. Damages**

718. Counter-Plaintiff alleges damages resulting from the prohibited course.

719. Those damages include emotional distress and reputational consequences.

720. Counter-Plaintiff alleges reasonable out-of-pocket preservation and mitigation costs to the extent legally recoverable.

721. Counter-Plaintiff alleges diversion of time and other economic losses to the extent proved.

722. Counter-Plaintiff seeks actual damages, exemplary damages, costs, and other relief authorized by MCL 600.2954. Counter-Plaintiff is self-represented and does not presently seek attorney fees.

**H. Earlier Conduct / Setoff**

723. Conduct outside the ordinary limitations period is alleged as background, notice, intent, and course-of-conduct evidence.

724. To the extent Count II or any other state-law counterclaim is otherwise subject to a limitations defense under a limitations period prescribed in Chapter 58, Counter-Plaintiff invokes MCL 600.5823 defensively where the counterclaim was not already barred when the relevant Plaintiff claim accrued. Any relief available solely through MCL 600.5823 is limited to offset against the amount established as Plaintiff's claim.

## COUNT III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

725. Counter-Plaintiff incorporates the preceding allegations to the extent applicable to this count.

726. — Cumulative Nature of Conduct. Counter-Plaintiff alleges that the extreme and outrageous character of the conduct arises from the alleged cumulative course rather than from ordinary online criticism or any single isolated statement.

727. The alleged course included continued direct contact after written demands to cease; years of attempts to identify and expose Counter-Plaintiff; repeated association of Counter-Plaintiff with homicide, infant-death, criminal-interrogation, arrest, fraud, and coordinated-criminal-network material after express denials; public audience polls asking viewers to determine Counter-Plaintiff's identity; outreach to Allen-family members; attempted

circumvention of known access restrictions; repeated family and location investigation; continued engagement with persons using offline "boots on the ground" methods; cross-platform monitoring; and commercial exploitation of the controversy for recurring audience engagement and paid programming.

728. Counter-Plaintiff alleges that Counter-Defendant continued substantial portions of that course despite actual knowledge that Counter-Plaintiff wanted the contact, targeting, and false identity association to stop.

729. Counter-Plaintiff further alleges as part of the cumulative course the recurring portrayal of Counter-Plaintiff as connected to commercial sex work; the repeated characterization of Counter-Plaintiff as terroristic, a "terrorizer," dangerous, or someone who terrorizes others; and repeated use of psychiatric or mental-instability terminology portraying Counter-Plaintiff as suffering from a "sickness," requiring evaluation, displaying "paranoia," or possessing "multiple personality."

730. Counter-Plaintiff does not allege that protected opinion, rhetorical hyperbole, or any one isolated characterization standing alone establishes intentional infliction of emotional distress. Counter-Plaintiff alleges the terms as components of the cumulative multi-year course pleaded in this Count.

731. Counter-Defendant's alleged course of conduct was extreme and outrageous; was undertaken intentionally or recklessly; caused Counter-Plaintiff's injuries; and resulted in severe emotional distress.

732. Counter-Plaintiff does not base this claim merely upon insults, criticism, ordinary disagreement, or constitutionally protected speech.

**A. Non-Speech, Access-Boundary, and Direct-Contact Conduct**

733. Count III does not rely on speech standing alone. Counter-Plaintiff specifically relies upon alleged non-speech, access, and contact conduct as part of the cumulative outrageousness analysis.

734. In May 2024, after Counter-Plaintiff attempted to block Counter-Defendant from a Defendant-controlled website or online space, Counter-Defendant allegedly described accessing the site from a different physical location or computer, including a public library. Counter-Plaintiff alleges that conduct as deliberate circumvention of an expressed access boundary.

735. Counter-Plaintiff also expressly directed Counter-Defendant to "Exit all my memberships," and Counter-Defendant later acknowledged "your request for me to remove myself from membership." Counter-Plaintiff alleges continued membership or access after withdrawal of consent as conduct distinct from ordinary criticism.

736. Counter-Plaintiff further relies upon repeated literal account-directed tagging after written cease demands, repeated cross-platform entry or monitoring after blocks or exclusion efforts, and the February 11, 2026 Stationhead incident in which Counter-Defendant did not immediately leave after being directly told to leave.

737. Counter-Plaintiff further relies upon alleged efforts to connect her pseudonymous online identity to real-world identity and location information, together with attempts to obtain identifying account data outside then-existing court authorization. Counter-Plaintiff alleges those acts as part of the cumulative fear of offline targeting while not seeking IIED liability merely for protected discussion of public records or public locations.

738. Counter-Plaintiff specifically limits this theory to preauthorization identity-data efforts and other conduct outside then-existing court authorization. Counter-Plaintiff does not base Count III on discovery later expressly authorized by the Court.

739. The foregoing access-boundary, contact, and identity-location conduct is alleged together with the publication history to show a sustained course, not to transform any isolated public webpage view, tag, or lawful investigation into IIED by itself.

740. Counter-Plaintiff relies upon the cumulative multi-year course specifically pleaded in ¶¶726–730 and 733–739 and the incorporated factual chronology, rather than repeating each component again in this Count.

741. Counter-Defendant had repeated notice that Counter-Plaintiff wanted the conduct to stop.

742. Counter-Defendant had repeated notice of Counter-Plaintiff's denial of the principal identity accusations.

743. Counter-Plaintiff alleges that the persistence after years of notice distinguishes this case from an ordinary online disagreement.

744. Counter-Plaintiff alleges that the duration, repetition, escalation, identity focus, criminal associations, boundary circumvention, and continued post-notice conduct were extreme and outrageous when considered cumulatively.

745. Counter-Plaintiff alleges Counter-Defendant intended the continuing campaign or acted recklessly regarding the likelihood that it would cause severe distress.

746. Counter-Plaintiff alleges the conduct actually caused severe emotional distress.

747. The distress includes continuing fear concerning identity exposure and offline targeting, humiliation, reputational distress, anxiety associated with the continuing campaign, and disruption caused by the need continually to protect, document, and defend herself.

748. Counter-Plaintiff alleges causation between the sustained conduct and that distress.

749. Counter-Plaintiff seeks all damages legally recoverable.

750. Counter-Plaintiff expressly preserves First Amendment limitations and does not seek IIED liability for protected speech standing alone.

**COUNT IV**

**KNOWING MATERIAL COPYRIGHT MISREPRESENTATION**

**17 U.S.C. § 512(f)**

751. Counter-Plaintiff incorporates the preceding allegations only to the extent consistent with this federal claim.

752. Counter-Plaintiff created a composite meme using multiple source components.

753. Those components included an image of Counter-Defendant derived from Michigan court footage.

754. The background or bookshelf portion came from separately sourced stock material.

755. The red hockey-style clothing/body component came from a separately sourced image.

756. Counter-Plaintiff selected and arranged the various components into a composite meme.

757. Counter-Defendant did not record the court footage.

758. Counter-Defendant did not create Counter-Plaintiff's composite arrangement.

759. Counter-Defendant nevertheless asserted copyright rights concerning the image.

760. In the original case materials, Counter-Defendant described the challenged image as her likeness from a PPO proceeding and alleged that Counter-Plaintiff removed the background and used the image.

761. Counter-Defendant thereafter sought registration for a work identified as "Miss Evans."

762. Counter-Defendant's application materials acknowledged that the underlying image came from court-recorded video.

763. Counter-Plaintiff alleges that Counter-Defendant asserted authorship or copyright rights substantially because the image depicted Counter-Defendant's own likeness.

764. The Copyright Office later refused registration.

765. Counter-Plaintiff alleges the refusal explained, in substance, that Counter-Defendant's likeness did not itself constitute authorship in the court-recorded material and that Counter-Defendant had not established authorship/authority sufficient to register the underlying audiovisual work.

766. The copyright claim in this action was later dismissed with prejudice on the merits.

**A. DMCA Notices**

767. On or about December 12, 2024, Google/YouTube notified Counter-Plaintiff concerning copyright complaints submitted by Counter-Defendant.

768. Any earlier reference to "December 12, 2004" was a typographical error; the intended date is December 12, 2024.

769. Counter-Defendant submitted copyright infringement notices affecting four Counter-Plaintiff videos. See Ex. E.

770. In those notices Counter-Defendant represented that Counter-Plaintiff's identified material infringed copyright rights owned or controlled by Counter-Defendant.

771. Counter-Plaintiff alleges that those ownership and infringement representations were materially false.

772. Counter-Plaintiff alleges Counter-Defendant knew she had not authored the court recording.

773. Counter-Plaintiff alleges Counter-Defendant knew she had not authored Counter-Plaintiff's composite arrangement.

774. Counter-Plaintiff alleges Counter-Defendant therefore knew she lacked the exclusive copyright rights she represented as the basis for removal.

775. Section 512(f) imposes liability upon a person who knowingly materially misrepresents under § 512 that material or activity is infringing and causes reliance damages.

**B. Service-Provider Reliance**

776. YouTube acted upon Counter-Defendant's notices.

777. Four Counter-Plaintiff videos were removed or disabled.

778. Counter-Plaintiff received notice of channel consequences and a deadline requiring response to avoid additional adverse action or termination risk.

779. Counter-Plaintiff was required to submit counter-notifications or otherwise invoke the platform's challenge process.

780. Counter-Plaintiff alleges approximately ten days of lost or materially impaired ordinary YouTube activity as a result of the takedown process.

781. Counter-Plaintiff alleges corresponding lost revenue during that period.

782. Counter-Plaintiff also incurred time and reasonable costs responding to the takedowns and preserving evidence.

**C. Relationship to Filing of This Action**

783. Counter-Defendant sought copyright registration during the same December 2024 period.

784. Counter-Defendant filed this action on December 23, 2024.

785. Counter-Plaintiff alleges that the lawsuit was filed while the registration process remained incomplete.

786. Counter-Plaintiff alleges that the filing prevented or delayed ordinary restoration of the affected videos through the platform process.

787. Counter-Plaintiff alleges that the resulting losses were caused by the service provider's reliance upon the challenged copyright representations.

788. Counter-Plaintiff seeks all damages recoverable under 17 U.S.C. § 512(f).

789. Counter-Plaintiff does not assert in this pleading a separate copyright-infringement counterclaim concerning Counter-Defendant's later Stationhead or RipRunningReceipts use of Counter-Plaintiff's content. Those facts are alleged only for the purposes expressly stated elsewhere in this pleading and do not enlarge Count IV beyond the four specifically pleaded copyright takedown notices.

## XXVII. REQUEST FOR NARROWLY TAILORED PROSPECTIVE INJUNCTIVE RELIEF

790. Counter-Plaintiff's principal objective has been cessation. Before seeking prospective relief, Counter-Plaintiff used cease-and-desist notices, blocking and exclusion mechanisms, requests that Counter-Defendant leave membership spaces, a PPO process, and regulatory assistance; Counter-Plaintiff alleges that relevant portions of the challenged course nevertheless continued into 2026.

791. Counter-Plaintiff does not seek an order prohibiting mention of her, criticism, truthful reporting, lawful discussion of public court proceedings, lawful court-authorized discovery, use of public hashtags, or other constitutionally protected expression.

792. Counter-Plaintiff seeks only narrowly tailored prospective relief directed to specific conduct finally adjudicated unlawful.

793. To the extent authorized by applicable law and Fed. R. Civ. P. 65, Counter-Plaintiff requests prospective relief prohibiting Counter-Defendant from:

a. repeatedly directing electronic communications to Counter-Plaintiff, including literal account tagging or direct account mentions intended to create account-directed contact, after notice that such direct contact is unwanted;

b. repeatedly demanding that Counter-Plaintiff call, answer, respond, enter a broadcast, or otherwise directly engage after notice to cease;

c. circumventing Counter-Plaintiff-controlled website, membership, account, or platform access restrictions for the purpose of continuing conduct adjudicated unlawful;

d. remaining in Defendant-controlled interactive spaces after express exclusion where the continued presence constitutes qualifying unconsented contact;

e. directing, soliciting, encouraging, or coordinating third persons to locate, identify, contact, surveil, or obtain nonpublic identifying information concerning Counter-Plaintiff outside lawful court-authorized discovery;

f. using persons associated with Counter-Plaintiff as a means to reach, pressure, locate, or perpetuate conduct adjudicated to constitute stalking of Counter-Plaintiff;

g. repeatedly directing unwanted electronic contact to known associates of Counter-Plaintiff for the purpose of facilitating conduct adjudicated to constitute stalking or unlawful harassment;

h. republishing particular statements or materially equivalent defamatory implications only after those statements or implications have been finally adjudicated false and actionable; and

i. engaging in other specific conduct finally adjudicated to violate MCL 750.411h or other applicable law.

794. Counter-Plaintiff requests that any injunction contain an express carveout preserving:

a. lawful court-authorized discovery;

b. ordinary litigation communications permitted by law;

c. criticism and opinion;

d. truthful reporting;

e. lawful fair use;

f. general public discussion of this litigation; and

g. other constitutionally protected expression.

795. Where stalking-related relief would restrict speech, applicable First Amendment protections must be observed, and an injunction directed to defamatory speech must be confined to speech definitively adjudicated false and actionable.

796. Counter-Plaintiff therefore requests conduct-specific relief rather than a general prohibition on speech.

797. Counter-Plaintiff alleges a likelihood of recurrence based upon the duration and continuation of the challenged course from the March 2023 Mystery Clue/Allen campaign through later family mapping, third-party identity solicitation, direct account mentions, 2025 KingWurld re-engagement, post-notice money accusations, monitoring and surveillance implications, renewed 2026 Allen publications, public identity solicitation, and continued cross-platform activity.

798. Counter-Plaintiff does not seek an order prohibiting lawful criticism, discussion of public proceedings, lawful discovery, or constitutionally protected commentary. Counter-Plaintiff

seeks only narrowly tailored prospective relief directed to conduct adjudicated actionable, including qualifying unwanted direct contact, actionable false criminal-identification publications, and other conduct satisfying the elements of the claims actually established.

**XXVIII. DAMAGES**

799. Counter-Plaintiff alleges actual damages to the extent caused by actionable conduct and proved.

800. Those damages include injury to reputation and to the reputation associated with Counter-Plaintiff's online names, channels, and branding.

801. Counter-Plaintiff alleges humiliation, emotional distress, and, as to Count III, severe emotional distress to the extent established.

802. As to actionable libel encompassed by the May 5, 2026 pre-suit retraction demand, Counter-Plaintiff seeks exemplary damages under MCL 600.2911(2)(b) only upon proof of common-law malice and only to compensate incremental injury to feelings attributable to bad faith or ill will.

803. Counter-Plaintiff alleges fear concerning involuntary identity exposure and offline targeting.

804. Counter-Plaintiff alleges disruption caused by the repeated need to monitor, preserve, rebut, and respond to the continuing accusations and conduct.

805. Counter-Plaintiff has incurred actual out-of-pocket expenses reasonably associated with preserving, documenting, responding to, and mitigating the alleged continuing conduct, including digital or cloud storage, evidence preservation, transcription, records, and amounts actually paid to non-attorney persons or services assisting with evidence collection, preservation, organization, or review.

806. Counter-Plaintiff seeks those out-of-pocket amounts only to the extent they were reasonably incurred as a result of actionable conduct, can be proved, and are legally recoverable.

807. Counter-Plaintiff alleges separately provable lost income, lost revenue, or diversion of revenue-producing time to the extent causally attributable and legally recoverable.

808. Counter-Plaintiff alleges specific lost YouTube revenue attributable to the challenged DMCA takedown period to the extent proved.

809. Counter-Plaintiff does not allege that ordinary litigation expenses automatically constitute tort damages.

810. Counter-Plaintiff does not seek compensation merely for her own pro se time.

811. Counter-Plaintiff is self-represented and does not presently seek attorney fees.

812. Counter-Plaintiff separately seeks allowable taxable or statutory costs to the extent authorized by applicable law, including MCL 600.2954, Fed. R. Civ. P. 54(d), and 28 U.S.C. § 1920.

813. Counter-Plaintiff seeks only damages and costs legally recoverable under each applicable cause of action.

814. Counter-Plaintiff alleges actual reputational dissemination beyond Counter-Defendant's own audience because third-party creators expressly relied upon, promoted, or attributed the Allen identification to Counter-Defendant's programming and then repeated materially more severe criminal conclusions to their own audiences.

815. Counter-Plaintiff alleges that the HearHerTV and Donat Ricketts publications demonstrate that the false Allen/child-death implication was not merely Counter-Plaintiff's subjective interpretation but was actually understood, adopted, and disseminated by third parties.

816. Counter-Plaintiff further alleges actual downstream dissemination reflected in Counter-Defendant's July 23, 2026 acknowledgment that Allen interrogation material obtained from DForDanielle had been placed on a third-party crime video that had received more than 30,000 views.

817. Counter-Plaintiff does not attribute that independent publication to Counter-Defendant merely because another person downloaded or republished material. Counter-Plaintiff alleges it as evidence of dissemination, audience meaning, causation, reputational injury, and damages.

**COUNT V**

**FALSE-LIGHT INVASION OF PRIVACY**

818. Counter-Plaintiff incorporates the preceding allegations to the extent applicable to this Count.

819. — Constructed False Persona. Through repeated titles, thumbnails, tags, direct account mentions, voice comparisons, images, police-interrogation material, mugshots, criminal-history presentations, audience polls, family comparisons, geographic clues, and later assertions of confirmation, Counter-Defendant repeatedly constructed and reinforced a public persona in which "Dani" was Danielle Elizabeth Allen or was a member of Allen's family and was connected to the Lake Charles homicide and infant-death criminal matter.

820. Counter-Defendant simultaneously portrayed Counter-Plaintiff as engaging in fraud, impersonation, hidden coordination, "Dirty 40" or co-conspirator activity, troll-farm operation, dishonest money conduct, and suspicious surveillance or location-related conduct.

821. Counter-Plaintiff denies those portrayals and alleges that the cumulative public persona placed her before the public in a materially false position that would be highly objectionable to a reasonable person.

822. — Privacy Interest Distinct From Defamation. Counter-Plaintiff does not plead Count V merely because public criticism or allegedly defamatory speech injured her reputation. The challenged false light also implicated private-life interests by publicly assigning to Counter-Plaintiff a real-world criminal identity and criminal history that were not hers; purported blood and family relationships; alleged commercial sexual conduct or sex-work status; alleged psychiatric or mental-health conditions; and private or pseudonymous real-world identity, family, and location characteristics that Counter-Plaintiff had not placed before the public as true facts about herself.

823. To the extent a particular publication concerns only public commentary, public business activity, or another matter that does not implicate Counter-Plaintiff's privacy or private life, Counter-Plaintiff does not rely upon that publication standing alone to establish Count V. Counter-Plaintiff alleges false-light liability only for publicity satisfying Michigan's distinct privacy requirements in addition to the remaining elements of the tort.

824. Counter-Plaintiff further alleges knowledge or reckless disregard because Counter-Defendant continued the portrayals after Counter-Plaintiff's repeated denials and after Counter-Defendant herself expressly acknowledged material uncertainty concerning the Allen identification.

825. Counter-Defendant further reinforced the false dishonest-persona portrayal through the August 26, 2025 written publication accusing Counter-Plaintiff of refusing to return Joy Ferguson's money. Counter-Plaintiff alleges that the money accusation combined with the

recurring fraud, fake-name, criminal-network, and deceptive-conduct accusations to place Counter-Plaintiff before the public as financially dishonest and fraudulent.

826. — Troll-Farm / Coordinated-Network False Light. Before suggesting that Counter-Plaintiff might be "running" a troll farm, Counter-Defendant had already instructed her recurring audience that the "Dirty 40" consisted of persons allegedly acting behind the scenes in coordinated, secretive, malicious, nefarious, or conspiratorial activity.

827. Counter-Defendant later described a "troll farm" as involving coordination, multiple "moving parts," persons who "move around," and a possible "head," before stating that Counter-Plaintiff was "not exposing the troll farm" and was "maybe running one of [her] own."

828. Counter-Plaintiff alleges that, in the audience context Counter-Defendant herself created, the later statement portrayed Counter-Plaintiff as operating or directing an organized deceptive network rather than merely having online supporters.

829. — Directed Troll-Farm Framing and Adoption. The March 19, 2024 publication titled HearHerTv "JAGUAR WRIGHT & THE TROLL FARM" AnalyzeThis further reinforced the coordinated-network false light. Counter-Defendant included #danirobertson in the publication, directed selected statements to be repeated, instructed viewers to "read between the lines," characterized material as "eye opening," and affirmatively stated in substance that the developing troll-farm theory "makes sense."

830. Counter-Plaintiff does not seek to hold Counter-Defendant automatically responsible for every independent panelist statement. Counter-Plaintiff alleges false-light responsibility from Counter-Defendant's own framing, selected presentation, prompting, adoption, confirmation, and

incorporation of third-party assertions into the recurring Dani-centered coordinated-network persona.

831. Counter-Plaintiff's coordinated-network theory does not rest upon the mere fact that she collaborated with Black Rabbit or other creators. The challenged false light arises where Counter-Defendant transformed ordinary online association into allegations or implications of covert, fraudulent, criminal, stalking, investigative, or organized deceptive activity.

832. — Assignment-Giving / Directed-Network False Light. Counter-Defendant further reinforced the coordinated-network false light in the July 26, 2024 ASSIGNMENT UNDERSTOOD publication by representing that persons associated with Counter-Plaintiff operated pursuant to assignments, that multiple persons were involved rather than acting "solo dolo," that persons were assigned to other people and checked back concerning their assignments, and that the "Dirty 40" participated in that system.

833. Counter-Defendant expressly directed the accusation toward Counter-Plaintiff's TruthTellerDani identity by stating: "You've given out assignment because the assignment came from you, truth teller." Counter-Plaintiff alleges that this transformed a communication containing the words "assignment understood" into a broader public portrayal of Counter-Plaintiff as directing or managing persons assigned to target other people.

834. Counter-Plaintiff denies operating, directing, or managing such a network and alleges the publication as an additional component of the false coordinated, deceptive, and organized-network persona. Counter-Plaintiff does not rely upon independent audience references to "RICO" or organized crime as though Counter-Defendant herself made those particular statements.

835. — Sex-Work / Sexualized False Persona. Counter-Defendant further placed Counter-Plaintiff before the public in a false and highly objectionable sexualized position by associating her with Nosy Ho Live's "sex work classes," stating that she believed Counter-Plaintiff had purchased such a class, suggesting that Counter-Plaintiff might herself be "into that kind of a business," and stating that Counter-Plaintiff was "linked to" that industry.

836. Counter-Plaintiff denies engaging in commercial sex work, being a prostitute or sex worker, participating in a sex-work ring or industry, or purchasing or participating in Nosy Ho Live's sex-work instruction.

837. — Mental-Instability / Psychiatric False Persona. Before later directing psychiatric or mental-instability terminology toward Counter-Plaintiff, Counter-Defendant had publicly presented mental-health programming in a medically authoritative manner, including stating during the August 16, 2023 bipolar-disorder program, "I'm qualified." Counter-Plaintiff alleges that at least one audience member perceived Counter-Defendant through that professional lens by referring to her as a "GREAT DOCTOR," a comment Counter-Defendant's account hearted.

838. Counter-Defendant thereafter publicly used psychiatric and psychological terminology concerning Counter-Plaintiff, including stating that she believed the conduct was "a sickness," raising "multiple personality disorder," stating that Counter-Plaintiff "definitely needs to be evaluated," referring to "paranoia," and later stating, "I definitely think she's got multiple personality."

839. Counter-Plaintiff further alleges that Counter-Defendant's later mental-health characterizations did not arise in isolation. In September 2024, Counter-Defendant repeatedly described Counter-Plaintiff through psychological terminology including "malignant narcissist," "multiple personality," "cognitive dissonance," and "mental conflict." Counter-Plaintiff does not

allege that each term independently constitutes a formal diagnosis or actionable statement. Counter-Plaintiff alleges the sequence as part of the cumulative false public persona portraying her as psychologically disordered, unstable, manipulative, and in need of professional evaluation.

840. — Terrorism / Dangerous-Person False Persona. Counter-Defendant repeatedly portrayed Counter-Plaintiff as terroristic or dangerous, including characterizing conduct attributed to her as "homegrown terrorism," stating, "She is a homegrown terrorist. I really believe that," subsequently using "terrorizer" "to be more precise," describing Counter-Plaintiff as a "dangerous person," and stating that Counter-Plaintiff "can hurt somebody."

841. Counter-Defendant continued the same theme through later statements that Counter-Plaintiff had been "terrorizing a number of YouTubers," that attributed conduct constituted "terrorism," and that Counter-Plaintiff "just terrorizes people."

842. Counter-Plaintiff denies engaging in terrorism, terroristic activity, unlawful violence, or conduct creating a factual basis to portray her as physically dangerous. Counter-Plaintiff alleges the recurring terminology as part of the cumulative false public persona and does not contend that every rhetorical use of "terrorize" independently establishes defamation.

843. Counter-Plaintiff alleges that Counter-Defendant publicized the challenged material to the public generally or to a large audience; that the resulting false light would be highly objectionable to a reasonable person; and that Counter-Defendant knew of or recklessly disregarded the falsity of the publicized matter and the false light created.

844. Counter-Defendant publicized the challenged matters through publicly available Internet broadcasts, social-media publications, cross-platform programming, and other communications reaching substantial audiences.

845. Counter-Defendant repeatedly placed Counter-Plaintiff before the public as though she were or probably were Danielle Elizabeth Allen while publishing or discussing Allen's mugshot, interrogation, DUI, arrest, accessory-after-the-fact allegation, and infant-death-related criminal material.

846. Counter-Plaintiff is not Danielle Elizabeth Allen and did not participate in those criminal events.

847. Counter-Defendant additionally placed Counter-Plaintiff before the public as a person who engaged in or was associated with hacking or restricted computer access, malware or viruses, illicit tracking, fraud or document falsification, impersonation, and the arrangement or orchestration of stalking or surveillance.

848. Counter-Plaintiff denies those materially false characteristics and acts as specifically alleged in the existing and amended factual allegations.

849. Falsely portraying an individual as connected with homicide-related criminal conduct, fraud, clandestine cyber misconduct, impersonation, or orchestrated stalking and surveillance would be highly objectionable to a reasonable person.

850. Counter-Plaintiff alleges that Counter-Defendant knew of or recklessly disregarded the falsity and false position because Counter-Plaintiff repeatedly denied the Allen identification and other accusations.

851. Counter-Defendant additionally acknowledged her own uncertainty concerning the Allen identification, including that she did not know it "100%," that it was "not scientific as a fact right now," and that Counter-Plaintiff "may not be Danielle Elizabeth Allen."

852. Counter-Defendant nevertheless continued or renewed the materially equivalent criminal-identification narrative.

853. Counter-Defendant similarly acknowledged unresolved uncertainty concerning alleged illicit access by stating in substance: "I really believe that. But we will find out."

854. Counter-Plaintiff alleges that those admissions, combined with repeated direct denials, cease-and-desist notices, correction demands, and continued publication, support an inference of knowledge or reckless disregard rather than innocent mistake.

855. Counter-Plaintiff suffered humiliation, emotional distress, reputational injury, impairment of her public-facing online identity, and proved economic or mitigation losses.

856. Count V is pleaded consistently with and, where necessary, in the alternative to Count I.

857. Counter-Plaintiff seeks compensatory damages and prospective relief legally available for false-light invasion of privacy while requesting allocation sufficient to prevent double recovery for the same indivisible injury.

858. Counter-Plaintiff relies upon the separately pleaded October 13–20, 2023, December 8–10, 2025, February 6 and February 9, 2026, and April 9, 2026 Allen/DEA publications, together with the separately pleaded sex-work, mental-health, family-identity, real-world-identity, and location-related publications, to the extent those matters implicate the privacy or private-life interests described in ¶822. Other coordinated-network, criminalized-anonymity, cyber-misconduct, and dangerous-person publications are incorporated into Count V only where the particular publication independently satisfies Michigan's false-light privacy requirements and otherwise remain relevant to the other counts for which they are pleaded.

**COUNT VI**

**APPROPRIATION OF NAME AND IDENTITY FOR COUNTER-DEFENDANT'S ADVANTAGE**

859. Counter-Plaintiff incorporates the preceding allegations to the extent applicable to this Count.

860. Michigan recognizes appropriation where a defendant uses another's name or likeness for the defendant's own purposes or benefit, subject to First Amendment protection for use concerning matters of legitimate public concern. This claim is not based merely on Counter-Defendant's discussion of Counter-Plaintiff, commentary concerning matters of public interest, or incidental monetization of such commentary. Counter-Plaintiff alleges instead that Counter-Defendant adopted and used Counter-Plaintiff's preexisting MessyDani identity as Counter-Defendant's own payment, promotional, social-media, or source-identifying designation for Counter-Defendant's benefit and without authorization.

861. Before Counter-Defendant's challenged use, Counter-Plaintiff had established MessyDani through her prior use of MessyDani.com and associated online activity.

862. MessyDani.com was registered on or about September 2, 2021.

863. Counter-Plaintiff alleges that MessyDani identified Counter-Plaintiff and her online identity before Counter-Defendant's later adoption of the same designation.

864. Counter-Defendant knew of Counter-Plaintiff's use through her familiarity with and investigation of Counter-Plaintiff's website and online identity.

865. Counter-Defendant thereafter used the identical MessyDani designation in connection with Counter-Defendant-associated social-media and payment activity.

866. The DForDanielle account profile directly linked Cash App $MessyDani, Instagram messydani, and Stationhead dfordanielle, together with Counter-Defendant-associated contact information.

867. Counter-Plaintiff alleges that Counter-Defendant used $MessyDani in connection with solicitation, receipt, or facilitation of payments.

868. Counter-Plaintiff alleges that Counter-Defendant used messydani on Instagram and MessyDani in additional social-media activity.

869. Counter-Plaintiff did not authorize Counter-Defendant to adopt MessyDani as Counter-Defendant's own payment, social-media, promotional, or identity designation.

870. Counter-Plaintiff alleges that Counter-Defendant obtained or sought financial, promotional, audience, engagement, and identity-association benefits from the challenged use.

871. Counter-Plaintiff alleges resulting loss of control over her identity, reputational injury, impairment of the value or goodwill associated with MessyDani, and proved economic injury.

872. Counter-Plaintiff does not base Count VI merely upon Counter-Defendant's use of DForDanielle. Counter-Plaintiff acknowledges that DForDanielle was Counter-Defendant's own designation for Counter-Plaintiff-focused programming.

873. DForDanielle is relevant because Counter-Defendant used it to identify Counter-Plaintiff and then connected that Dani-focused network with the previously existing MessyDani identifier, including $MessyDani and messydani.

874. Counter-Plaintiff further alleges the earlier January 2022 twin/Avengers/Natasha communications as circumstantial evidence of Counter-Defendant's preexisting familiarity

with, attention to, and expressed desire to mirror aspects of Counter-Plaintiff's online persona, but not as a claim to ownership of Marvel or Avengers intellectual property.

875. Counter-Plaintiff seeks actual damages and other monetary or equitable relief legally available and established by proof, including narrowly tailored prospective relief against uses finally adjudicated to constitute unlawful appropriation.

876. Counter-Plaintiff relies upon the representative commercial-use and cross-platform facts separately pleaded above, including members-only programming, use of Dani-associated identifiers on unrelated or generic programming, YouTube-to-Stationhead audience redirects, Super Chats and other monetized activity, recurring solicitation of subscriptions and engagement, and Counter-Defendant's statement that approximately 10,000 views could be made back "on one video when we do find you," as evidence of benefit, commercial context, association, and damages. Counter-Plaintiff does not allege that every payment, view, or subscription was caused by Counter-Plaintiff and does not use those facts to assert an additional copyright claim.

877. Counter-Plaintiff does not allege that monetization alone converts criticism or commentary into appropriation. Counter-Plaintiff alleges appropriation principally from Counter-Defendant's alleged unauthorized beneficial adoption and use of Counter-Plaintiff's preexisting MessyDani name or identifier as Counter-Defendant's own payment, social-media, promotional, or source-identifying designation, rather than from protected use of Dani-related identifiers in commentary concerning matters of legitimate public interest.

878. — Scope of Count VI. Counter-Plaintiff does not seek appropriation liability merely because Counter-Defendant mentioned, criticized, reported upon, or commented concerning Counter-Plaintiff or matters of legitimate public interest. Count VI is limited principally to

the alleged unauthorized beneficial adoption and use of Counter-Plaintiff's preexisting MessyDani identity as Counter-Defendant's own payment, social-media, promotional, or source-identifying designation. The broader Dani-related programming, audience engagement, and monetization allegations are pleaded as context supporting knowledge, benefit, association, and damages and do not independently convert protected commentary into appropriation.

## XXIX. PRAYER FOR RELIEF

WHEREFORE, Defendant/Counter-Plaintiff respectfully requests that the Court:

A. enter judgment in Defendant's favor on Plaintiff's remaining LARA-based defamation claim;

B. hold that qualifying good-faith LARA reporting and cooperation are protected by MCL 333.16244 to the extent established;

C. determine Plaintiff's alleged Williams and Robertson regulatory publications separately according to their respective speakers, contents, dates, defenses, causation, and damages, and decline to impute Williams's independent acts to Defendant absent legally sufficient proof of agency or concerted liability;

D. enter judgment for Counter-Plaintiff on Count I as to statements and implications proved false, defamatory, published, actionable, and made with the legally required fault;

E. award actual damages on Count I, including proved reputational, emotional, business, and economic damages legally recoverable under Michigan law;

F. award exemplary damages on Count I to the extent permitted by MCL 600.2911(2)(b), upon proof of the applicable pre-suit retraction requirement, common-law malice, and incremental injury to feelings attributable to bad faith or ill will;

G. enter judgment for Counter-Plaintiff on Count II for conduct proved prohibited by MCL 750.411h and actionable under MCL 600.2954;

H. award the actual damages, exemplary damages, allowable costs, and other relief authorized by MCL 600.2954, while recognizing that Counter-Plaintiff does not presently seek attorney fees;

I. enter judgment for Counter-Plaintiff on Count III for intentional infliction of emotional distress;

J. enter judgment for Counter-Plaintiff on Count IV under 17 U.S.C. § 512(f);

K. award damages caused by the four challenged copyright takedowns, including proved lost revenue and other damages incurred as a result of service-provider reliance and legally recoverable under § 512(f);

L. enter judgment for Counter-Plaintiff on Count V for false-light invasion of privacy as to publications proved to have widely publicized Counter-Plaintiff in a highly objectionable false position with the legally required knowledge or reckless disregard;

M. award actual damages legally recoverable on Count V while preventing duplicative recovery for injury also compensated under Count I;

N. enter judgment for Counter-Plaintiff on Count VI for appropriation of Counter-Plaintiff's name or identity for Counter-Defendant's advantage;

O. award actual damages and other monetary relief legally available and proved to have resulted from Counter-Defendant's unauthorized beneficial use of Counter-Plaintiff's MessyDani identity;

P. enter narrowly tailored prospective relief against specific MessyDani uses finally adjudicated unlawful, without restraining protected commentary concerning Counter-Plaintiff;

Q. apply MCL 600.5823 to qualifying older counterclaims on a publication-by-publication basis and only to the extent permitted by its terms;

R. enter narrowly tailored prospective injunctive relief substantially as requested above;

S. limit any speech-related injunction to specific conduct or particular statements or materially equivalent implications finally adjudicated unlawful, false, and actionable, with appropriate protection for lawful court-authorized discovery, truthful reporting, criticism, opinion, and other constitutionally protected expression;

T. award allowable taxable or statutory costs;

U. grant such declaratory or equitable relief as is lawful and necessary to prevent recurrence of conduct adjudicated unlawful; and

V. grant such other and further relief as the Court deems just and proper.

## XXX. NO JURY DEMAND

879. Defendant/Counter-Plaintiff does not presently demand a jury trial.

Respectfully submitted,

**Defendant/Counter-Plaintiff, Pro Se**

sued under the disputed designation "Danielle Robertson"

4539 N. 22nd Street

Phoenix, Arizona 85016-4639

DaniRobertson@proton.me

Dated: August 17, 2026

Signature: Danielle Robertson

Defendant/Counter-Plaintiff, Pro Se

## CERTIFICATE OF SERVICE

I certify that on August 17, 2026, I served a true and correct copy of the foregoing Defendant's First Amended Answer to Remaining Claim, Affirmative Defenses, Counterclaims, and Request for Prospective Injunctive Relief upon Plaintiff in the manner permitted by the Federal Rules of Civil Procedure, the Local Rules of this Court, and applicable orders.

Dated: August 17, 2026

Signature: Danielle Robertson

Defendant/Counter-Plaintiff, Pro Se

## CITATION-CHECK CERTIFICATION

Pursuant to ECF No. 74, PageID.783–784, as reiterated in ECF No. 173, I certify that I have personally checked each legal citation appearing in this filing and that each citation is accurate and stands for its asserted proposition.

Dated: August 17, 2026

Signature: Danielle Robertson

Defendant/Counter-Plaintiff, Pro Se

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SYBRENA EVANS, Plaintiff/Counter-Defendant

v.

DANIELLE ROBERTSON, et al., Defendants

Case No. 5:24-cv-13435-JEL-EAS
Hon. Judith E. Levy
Mag. Judge Elizabeth A. Stafford

# EXHIBIT A

## February 24-25, 2025 LARA Investigative Correspondence and Supporting Evidence Submission

LARA Allegation No. 56-24-003982

Gmail DANI R <danimontana2022@gmail.com>

# LARA Allegation #56-24-003982

4 messages

**Lehman, Meghan (LARA)** <LehmanM4@michigan.gov> Fri, Feb 21, 2025 at 9:53 AM
To: "Danimontana2022@gmail.com" <Danimontana2022@gmail.com>

Dani Robertson:

I am an investigator with the Michigan Department of Licensing and Regulatory Affairs (LARA).

I am contacting you regarding Sybrena Evans, PA.

Please call me at the phone number listed below at your earliest convenience.

Thank you.

Meghan Lehman, Regulation Agent

Public Health Code Investigations Section

Investigations & Inspections Division

Bureau of Professional Licensing

Direct Line: 248.404.0201

www.michigan.gov/bpl

LARA LICENSING AND REGULATORY AFFAIRS | PROTECT PEOPLE & PROMOTE BUSINESS

**DANIELLE ROBERTSON** <danimontana2022@gmail.com> Mon, Feb 24, 2025 at 5:25 PM
To: "Lehman, Meghan (LARA)" <LehmanM4@michigan.gov>

# Sybrena Evans: Stalking, Harassment, and Associations

(AKA **UnwineWithTeddy**, **AinatashaTheMachine**, **RunTellThatToo** on YouTube)

## 1. Admitted Malicious Doxxing and Unauthorized Access (Timestamp: 0:00 – 0:23)

- **Evans openly admits** to doxxing people, meaning she **maliciously posts private information online to harm them**.
- She **confessed to traveling to different locations** to **bypass a website block** and regain access after being restricted.
- **Continues stalking** by refusing to leave my **private YouTube memberships** on **three different channels** (which I cannot block due to YouTube limitations).

---

## 2. Coordinated Harassment with Violent Individuals

### A. Donat Ricketts Connection (3:27 – 17:52)

- **Evans collaborates with Donat Ricketts**, a person with a **history of violent threats**, **domestic violence**, and **elder abuse charges**.
- Encouraged him to harass **Evangelist Valerie and her sister**, falsely claiming I might be related to them.
- Donat later distanced himself from Evans, stating he was gifting off of me for content, and he was done with her identification games, etc.
- **Donat Ricketts' direct threats (17:52):**
  - **Publicly threatened in a YouTube video** to **"beat up" and "off"** me.
  - Stated:
    - **"Bitch, I will knock on your door and beat your mother fawking ass."**
    - **"If you live close by or somewhere where I know, bitch, I will off you."**
  - Engaged in **sexual harassment** via a **public YouTube community post**, stating:
    - **"Let me Angry fuck you."**
    - **"Might show up at your house"** after **obtaining my address from YouTube**.

---

### B. Marquisio Watson Connection (26:31 – 56:12)

- In **July 2024, Evans linked up with Marquisio Watson**, another individual with a **violent history**
- Watson **echoed Evans' defamatory claims**, falsely accusing me of being **Danielle Allen** (a woman accused in a homicide but later cleared).
- **Evans and Watson falsely accused me of striking her channel**, using an email from **Tasha K's fan club**, when it was later proven that **Nicole Johnson (Tasha K's Fan Club President) was responsible**.
- **Watson later distanced himself from Evans**, stating that she was playing victim and likes to play the victim.
- **Threats from Watson after linking with Evans (56:12):**
  - Evans **praised** his "boots-on-the-ground" approach **while he directly threatened me**.

---

## 3. False Accusations of Hacking (1:08:00)

- Evans **falsely accused me of hacking her YouTube channel** and **manipulating source codes**, despite having no technical knowledge.
- **YouTube confirmed her claims were baseless** and advised me to **report her videos for harassment**.
- Evans made **multiple videos spreading these false claims** and later **hid them**, but she continues pushing the narrative.

---

## 4. "Dirty 40" Stalking and Harassment List (1:40:00)

- **Evans admitted to having a "Dirty 40" list**, a **targeted hit list** of people she stalks and harasses based on their **association with me** (e.g., friends, moderators, subscribers).
- **Purpose:** To **dox and harass** individuals by making false claims and framing them in an alleged **RICO conspiracy**.
- **Despite repeated requests to stop**, Evans **continued harassing and targeting innocent individuals**.
- **Created a fake YouTube channel (AINATASHATHEMACHINE)** to **copy my Avengers theme** and impersonate me.
- **Also created social media pages and a CashApp using my website name** to mislead take on likeness, etc..

---

## 5. Multi-Channel Harassment & Video Hiding Pattern

- **Evans operates multiple YouTube channels** where she **obsessively discusses and harasses me**:
  - **UnwineWithTeddy**: Primary channel for harassment.
  - **AinatashaTheMachine**: Created to **copy my branding (Avengers theme) and impersonate me**.
  - **RunTellThatToo**: **Another harassment-based channel**, where she continues making **false claims** and **creepy doxxing videos**.
- **Evans has made hundreds of videos about me** across all these channels.
- **She hides videos to avoid accountability** but **many are still up**, showing her continued obsession and harassment.
- Some videos were hidden due to her being looked into and trying to play victim.

---

## 6. False Identity Conspiracy & Ongoing Defamation (2:15:00)

- **Evans falsely accused me of being Danielle Allen**, a woman charged with **accessory affter the fact to homicide** (later cleared).
- At **2:15:00**, Evans continues **pushing this conspiracy theory**, despite being repeatedly told to stop.
- **She made voice comparisons**, posted **mugshot images**, and manipulated **false evidence** to **spread this lie**.
- **Harassment extends to Danielle Allen and her family**, **dragging innocent people into her conspiracy theories**.
- **She has made hundreds of videos about this false claim, many of which are now hidden**.

---

## 7. Evans is Still Obsessed (As of 2/22/2025)

- Despite me **not mentioning her or making videos about her**, Evans continues **creating new content**, spreading **new lies**, and discussing **Danielle Allen in a disturbing manner**.
- **Proof of our past interactions & how it all started:**
  - **Direct Messages & First Video Breakdown**

---

## Conclusion

- **Sybrena Evans (UnwineWithTeddy, AinatashaTheMachine, RunTellThatToo) is a stalker** with a documented **three-year history of harassment**.
- **She links up with violent individuals** (**Donat Ricketts & Marquisio Watson**) **to harass, defame, and threaten me**.
- **She runs multiple channels dedicated to stalking and harassing me** and hides videos **to avoid accountability**.
- **She has fabricated and spread a false identity conspiracy, falsely accusing me of being Danielle Allen** (timestamp **2:15:00**).
- **Engages in doxxing, false accusations, impersonation, and conspiracy-fueled harassment**.
- **Has ignored multiple cease-and-desist notices**.
- **Her obsessive behavior is ongoing**.

### Investigator Reference

- **Evans' YouTube Channels:**
  - UnwineWithTeddy
  - AinatashaTheMachine
  - RunTellThatToo
- **Evidence Video:** See attached

TED.mp4

4o

[Quoted text hidden]

---

**Lehman, Meghan (LARA)** <LehmanM4@michigan.gov> Tue, Feb 25, 2025 at 3:56 PM
To: DANIELLE ROBERTSON <danimontana2022@gmail.com>

Received. Thanks very much.

**From:** DANIELLE ROBERTSON <danimontana2022@gmail.com>
**Sent:** Monday, February 24, 2025 5:26 PM
**To:** Lehman, Meghan (LARA) <LehmanM4@michigan.gov>
**Subject:** Re: LARA Allegation #56-24-003982

**CAUTION: This is an External email. Please send suspicious emails to** abuse@michigan.gov

[Quoted text hidden]

---

**DANIELLE ROBERTSON** <danimontana2022@gmail.com> Tue, Feb 25, 2025 at 7:30 PM
To: "Lehman, Meghan (LARA)" <LehmanM4@michigan.gov>

This is another channel that she created. Although she hid all the videos, the bio and community posts are still up. It's called DforDanielle
https://www.youtube.com/@DForDanielle/community

## About

*DForDanielle* @*DForDanielle*

Welcome to ***DForDanielle***, where we dive deep into unsolved mysteries and investigative stories. Here, we explore the intriguing narrative of a real ***Danielle***, a woman once charged as an Accessory After the Fact in the tragic case of a 4-month-old infant's death—a charge later dismissed by Lake Charles Police. While no definitive link between her and the anonymous ***DForDanielle*** has been proven, compelling questions remain.

Join us as we follow clues, analyze evidence, and seek answers to illuminate the mystery surrounding these stories. Together, let's explore the truth behind the shadows and see where the trail leads.

#***DForDanielle*** #TruthTeller #IdentifyTheVoice #Unmasking

## Links

CashApp
cash.app/$MessyDani

## About

cash.app/$MessyDani

Instagram
instagram.com/messydani

Stationhead
stationhead.com/dfordanielle

## Channel details

unwinewithteddy@gmail.com

www.youtube.com/@DForDanielle

186 subscribers

Joined Sep 19, 2023

Share channel Report user

[Quoted text hidden]

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SYBRENA EVANS, Plaintiff/Counter-Defendant

v.

DANIELLE ROBERTSON, et al., Defendants

Case No. 5:24-cv-13435-JEL-EAS
Hon. Judith E. Levy
Mag. Judge Elizabeth A. Stafford

# EXHIBIT B

## May 5, 2026 Formal Retraction and Correction Demand Under Michigan Defamation Law

Sent to UNWINEWITHTEDDY@gmail.com; MCL 600.2911

# Formal Retraction and Correction Demand Under Michigan Defamation Law

From D.R.

To UNWINEWITHTEDDY@GMAIL.COM

Date Tuesday, May 5th, 2026 at 9:19 AM

This email serves as a formal demand for retraction and correction under Michigan defamation law, including MCL 600.2911.

I have previously sent cease-and-desist communications demanding that you stop making false statements about me, my identity, my online presence, my associates, and/or my brand. However, Michigan law specifically addresses retraction and correction in defamation matters, so this notice is intended to serve as a formal retraction and correction demand.

You have published and republished false and defamatory statements about me, my identity, my online presence, my associates, and/or my brand. These statements have been made through videos, verbal statements, captions, hashtags, tags, comments, posts, livestreams, and other online publications.

I demand that you retract and correct the following false statements, labels, accusations, and implications concerning me, my identity, my online presence, and/or my brand:

1. That I hacked you.
2. That I hacked other people.
3. That I use my website to hack people.
4. That I can get people's exact addresses through my website.
5. That I use my website or online presence to dox people.
6. That I have access to government databases.
7. That I use government databases to dox people.
8. That I obtain or use government database information to locate, identify, expose, threaten, harass, or dox people.
9. That I sent people to stalk you.
10. That I directed, encouraged, paid, coordinated, or caused unknown men or any other persons to follow you, monitor you, approach you, intimidate you, or interfere with you in real life.
11. That I called your phone.
12. That I repeatedly called your phone.
13. That I harassed you by phone.
14. That I caused others to call your phone.
15. That I spoofed calls to your phone.
16. That I committed DUI, was involved in a DUI, was connected to a DUI, or am the person you have associated with DUI allegations.
17. That I was an accessory after the fact, obstructed justice, helped cover up a crime, or was connected to any accessory-after-the-fact allegation.
18. That I was involved in, responsible for, or associated with child homicide, the death of a child, or any related allegation.
19. That I use drugs.

20. That I am involved in financial scams.
21. That I am involved in money laundering.
22. That I am part of, affiliated with, acting with, acting for, or involved in "the Dirty 40."
23. That "the Dirty 40" is a criminal organization, racketeering group, RICO-type enterprise, or coordinated criminal group involving me.
24. That I am part of a "troll farm," operate a troll farm, work with a troll farm, or participate in coordinated online harassment.
25. That I am a "goon," hired goon, internet goon, or part of any group of people used to threaten, harass, intimidate, stalk, or attack you or anyone else.
26. That I engage in sex work.
27. That I engage in prostitution.
28. That I engage in escorting.
29. That I engage in illegal sexual activity.
30. That I engage in sexual misconduct.
31. That my brand, business identity, online identity, alias, username, platform presence, associates, followers, customers, or business contacts are involved in hacking, website hacking, doxing, use of government databases to dox people, phone harassment, sending people to follow you, DUI allegations, accessory-after-the-fact allegations, child-homicide-related allegations, drug-use allegations, financial scams, money laundering, "the Dirty 40," a troll farm, goons, sex work, prostitution, escorting, illegal sexual activity, or sexual misconduct.
32. That I am the person you have misidentified in connection with the allegations listed above.
33. That "#DForDanielle," or any similar hashtag, tag, caption, identifier, phrase, video description, comment, or label, truthfully identifies me, my brand, or my online presence as connected to the allegations listed above.
34. That any continued hashtag, tag, caption, video, comment, repost, livestream, message, or verbal statement truthfully associates me or my brand with hacking, website hacking, doxing, government database access, phone harassment, sending people to follow you, DUI allegations, accessory-after-the-fact allegations, child-homicide-related allegations, drug-use allegations, financial scams, money laundering, "the Dirty 40," troll farms, goons, sex work, prostitution, escorting, illegal sexual activity, or sexual misconduct.

These statements and implications are false. Your use of videos, verbal statements, captions, hashtags, tags, comments, repeated references, and association-based statements has misidentified me and associated me and/or my brand with false criminal, sexual, reputational, and business-damaging accusations.

These statements are especially serious because several of them accuse or imply criminal conduct. Under Michigan defamation law, statements imputing the commission of a crime are defamatory per se. Your accusations that I hacked people, use my website to hack people, use my website to get people's exact addresses, use government databases to dox people, sent people to stalk or follow you, harassed you by phone, participated in DUI-related conduct, acted as an accessory after the fact, was involved in child-homicide-related allegations, used drugs, participated in financial scams, participated in money laundering, or was involved in a criminal organization or RICO-type activity through "the Dirty 40" are false and defamatory.

I have repeatedly denied these accusations and have informed you that these statements and implications are false. Despite that notice, you have continued to publish, repeat, imply, and associate me and/or my brand with these accusations.

Your conduct has not been limited to isolated statements. Over the last four years, you have engaged in a continuing pattern of unwanted contact, unwanted tagging, unwanted attachments, misidentification, and defamatory publication concerning me, my identity, my online presence, my associates, and/or my brand.

This conduct includes, but is not limited to:

1. tagging me in posts, videos, captions, comments, hashtags, and other online publications;
2. tagging or referencing my associates, followers, business contacts, customers, collaborators, and/or accounts connected to me;
3. attaching me, my brand, or my associates to defamatory videos, hashtags, captions, comments, and the accusations listed above;
4. using "#DForDanielle" or similar hashtags, labels, captions, tags, or identifiers to misidentify me and associate me or my brand with the accusations listed above;
5. accusing or implying that I have access to government databases and use government databases to dox people;
6. accusing or implying that I use my website to hack people, obtain people's exact addresses, or dox people;
7. accusing or implying that I sent unknown men or other persons to follow, monitor, intimidate, or interfere with you in real life;
8. accusing or implying that I called, repeatedly called, spoofed, or harassed you by phone when I did not do so;
9. accusing or implying that I use drugs;
10. accusing or implying that I am involved in financial scams or money laundering;
11. accusing or implying that "the Dirty 40" is a criminal organization, racketeering group, RICO-type enterprise, or coordinated criminal group involving me;
12. attempting to join, access, monitor, bypass, or invade spaces, platforms, groups, memberships, websites, or accounts after access was denied, restricted, blocked, banned, or made unwelcome;
13. continuing to reference, tag, attach, identify, misidentify, or publish about me and my brand after being told to cease;
14. publishing or republishing defamatory videos, verbal statements, captions, tags, hashtags, comments, and posts repeating the accusations listed above.

This repeated unwanted conduct, including tagging, unwanted attachments, attempted membership joins, attempts to bypass or invade website bans, website-hacking accusations, government-database accusations, doxing accusations, phone-call accusations, real-life following accusations, drug-use accusations, financial-scam accusations, money-laundering accusations, "Dirty 40" criminal-organization accusations, and repeated defamatory videos and posts, constitutes a continuing course of harassment. It has caused reputational harm, business harm, emotional distress, and interference with my brand, online presence, associates, and relationships.

I demand that you immediately:

1. retract and correct each of the false statements and implications listed above;
2. remove or disable access to all videos, posts, captions, tags, hashtags, comments, livestreams, and other publications making, repeating, implying, or republishing those statements;
3. stop using "#DForDanielle" or any similar hashtag, tag, caption, identifier, label, phrase, or wording to identify, misidentify, reference, or associate me or my brand with those accusations;
4. stop tagging me, my brand, my associates, my followers, customers, business contacts, collaborators, or accounts connected to me in posts, videos, captions, comments, hashtags, or statements concerning those accusations;
5. stop contacting me directly or indirectly, including through tags, hashtags, comments, attachments, messages, associates, followers, customers, platforms, memberships, websites, or third parties;
6. stop attempting to access, join, monitor, bypass, or invade websites, groups, memberships, accounts, platforms, or online spaces connected to me or my brand after access has been denied, restricted, blocked, banned, or made unwelcome;

7. publish the retraction and correction in substantially the same manner, format, platform, visibility, and audience as the original publications, including videos, posts, captions, hashtags, tags, livestreams, and any platforms where the accusations were made;
8. preserve all evidence, including videos, posts, captions, hashtags, tags, comments, drafts, deleted content, messages, emails, metadata, analytics, communications with third parties, membership join attempts, website access attempts, ban-related records, platform records, phone-call accusations, alleged call logs, alleged reports, alleged witness communications, alleged government-database accusations, alleged website-hacking accusations, alleged address-obtaining accusations, alleged doxing accusations, alleged drug-use accusations, alleged financial-scam accusations, alleged money-laundering accusations, alleged "Dirty 40" accusations, and all records concerning me, my brand, "#DForDanielle," "troll farm," "goon," "Dirty 40," sex work allegations, hacking allegations, website-hacking allegations, doxing allegations, government-database allegations, phone-harassment allegations, DUI allegations, accessory-after-the-fact allegations, child-homicide-related allegations, drug-use allegations, financial-scam allegations, and money-laundering allegations.

This demand applies to your prior publications as well as your newer and continuing videos, posts, captions, hashtags, tags, verbal statements, unwanted contacts, unwanted attachments, attempted membership joins, access attempts, phone-call accusations, website-hacking accusations, doxing accusations, government-database accusations, real-life following accusations, drug-use accusations, financial-scam accusations, money-laundering accusations, "Dirty 40" criminal-organization accusations, and republications. Any continued publication, republication, tagging, hashtag use, contact, attachment, access attempt, or repetition of these false accusations after this notice may be used as evidence of willfulness, malice, bad faith, reckless disregard, harassment, and intentional or reckless infliction of emotional distress.

No further direct discussion is requested or invited. You do not need to contact me to debate, explain, justify, argue, or repeat the accusations. The only actions demanded are retraction, correction, removal, preservation of evidence, cessation of further defamatory publication or republication, and cessation of further unwanted contact or attempted access.

Nothing in this notice waives any rights, claims, defenses, counterclaims, damages, requests for injunctive relief, or remedies, all of which are expressly reserved.

Dated: May 5, 2026

Sent pursuant to Michigan law, including MCL 600.2911, as a formal demand for retraction and correction before the filing of any defamation claim, counterclaim, or related request for damages.

**EXHIBIT C**

# CHRONOLOGY OF WRITTEN CEASE-AND-DESIST NOTICES AND CONTINUED ACCOUNT-MENTION / CHANNEL-IDENTIFIER PUBLICATIONS

*DaniRobertson / TruthTellerDani / DaniMontana-DaniMontanaTV*

Purpose. This demonstrative exhibit places the six written cease-and-desist notices in chronological sequence with representative YouTube videos/livestreams and preserved cross-platform records that continued to use or promote the identifiers DaniRobertson, TruthTellerDani, DaniMontana/DaniMontanaTV, and DForDanielle. Qualifying YouTube identifier use includes literal @ mentions, documented hashtags, and captured search-association records. X/Twitter and Facebook records are included as cross-platform dissemination evidence but are not added to the YouTube period counts.

For clarity, a literal @ account mention is separately significant as account-directed identifier use; a hashtag is included only to demonstrate continued publication association and is not characterized as direct account contact.

Counting note. The period figures are conservative counts of exact-date entries in Counter-Plaintiff's preserved publication ledger compiled from preserved platform screenshots and records. Year-only and relative-date entries are excluded. Separately verified exact-date publications not yet incorporated into the ledger are identified separately and, where stated, added only as a minimum. These figures summarize the preserved catalog and do not allege that every listed publication independently constitutes actionable conduct. The exhibit also includes a scoped volume summary that separately reports unique publications and identifier occurrences and maintains exact #DForDanielle use as a separate overlapping designation category.

**Six written cease-and-desist notices:** September 3, 2022; October 5, 2022; January 31, 2023; April 24, 2024; September 11, 2024; June 21, 2025.

**Additional formal notice:** May 5, 2026 publication-focused retraction/correction demand.

## SUMMARY BY NOTICE PERIOD

| Period | Date span | Minimum catalogued video records | Basis / limitation |
|---|---|---|---|
| Before Cease #1 | Before Sept. 3, 2022 | 1 | Preserved publication ledger |
| **After Cease #1** | Sept. 4-Oct. 4, 2022 | 4 | Preserved publication ledger |
| **After Cease #2** | Oct. 6, 2022-Jan. 30, 2023 | 49 | Preserved publication ledger |
| **After Cease #3** | Feb. 1, 2023-Apr. 23, 2024 | 75 | Preserved publication ledger |
| **After Cease #4** | Apr. 25-Sept. 10, 2024 | 4 | Preserved publication ledger; excluded out-of-scope publication removed |
| **After Cease #5** | Sept. 12, 2024-June 20, 2025 | 97 + 2 separately verified = at least 99 | May 7 and May 15, 2025 are separately verified preserved YouTube records; out-of-scope publications removed |
| **After Cease #6** | June 22, 2025-Aug. 7, 2026 | 45 | Preserved publication ledger after removal of out-of-scope entries |
| After May 5, 2026 retraction demand | May 6-Aug. 7, 2026 | 11 | Subset of post-Cease #6 period; preserved publication ledger |

## VOLUME SUMMARY - UNIQUE PUBLICATIONS AND IDENTIFIER OCCURRENCES

Volume methodology. The broader preserved working catalog contains 295 video/livestream rows. Four records intentionally excluded from this filing exhibit under the current pleading scope are removed from the tally below, leaving 291 scoped video/livestream records. A publication may contain both a literal @ account mention and a hashtag/search-metadata identifier; those categories therefore overlap and are not additive.

| Measure | Count | Treatment / limitation |
|---|---|---|
| Unique Exhibit C-scoped video/livestream records | 291 | One publication counted once; four intentionally excluded out-of-scope ledger rows removed. |
| Publications with at least one literal @ account mention | 145 | Includes 12 publications that also contain hashtag/search-metadata identifiers. |
| Publications with at least one Dani-associated hashtag/search-metadata identifier | 158 | Includes the same 12 overlap publications; do not add 145 + 158. |
| Direct-@ plus hashtag overlap | 12 | Already included in both preceding category counts. |
| Distinct Dani-associated identifier occurrences | 402 | Each distinct target identifier is counted once per publication; this is not 402 separate publications. |
| Videos separately verified with the exact #DForDanielle hashtag | 50 | Separate overlapping audit; not added to 291. Does not include title-only DForDanielle use or DFor___ derivative titles. |

## IDENTIFIER OCCURRENCE BREAKDOWN WITHIN THE 291 SCOPED VIDEO/LIVESTREAM RECORDS

| Identifier | Publications containing identifier |
|---|---|
| @DaniRobertson | 99 |
| @TruthTellerDani | 73 |
| @DaniMontanaTV | 25 |
| #DaniRobertson / #DanielleRobertson | 144 |
| #TruthTellerDani | 29 |
| #DaniMontanaTV | 21 |
| #DaniMontana | 11 |
| **TOTAL DISTINCT IDENTIFIER OCCURRENCES** | **402** |

Exact #DForDanielle audit note. The 50 exact-#DForDanielle videos are maintained as a separate, narrow category because that designation was used by Counter-Defendant for Counter-Plaintiff-focused programming. The 50-video figure is not a complete tally of DForDanielle title/name use, community-post use, or DFor___ derivative series titles, and it is not added to the 291 scoped video/livestream total. Categories overlap and therefore should not be added together unless expressly identified as non-overlapping.

**EXHIBIT C**

# DETAILED REPRESENTATIVE CHRONOLOGY

*Notice rows are shaded. Video rows are representative examples; the volume of the full period is reflected in the summary table. Identifier evidence is stated only at the level supported by the preserved screenshot/ledger record.*

**Literal @ marker:** [@] identifies a representative publication for which the preserved record shows a literal @ mention of @DaniRobertson, @TruthTellerDani, @DaniMontana, or @DaniMontanaTV. Unmarked video rows reflect hashtag/association evidence or notice events. The marker does not change any period total.

| Date | Type | Notice / representative publication | Channel-identifier evidence | Source |
|---|---|---|---|---|
| May 26, 2022 | VIDEO | ANOTHER ONE BITES THE DUST! | #DaniRobertson | PL |
| **Sept. 3, 2022** | **CEASE #1** | **First written cease-and-desist notice** | **Written notice** | **WN** |
| Sept. 25, 2022 | VIDEO | Morning Mocha - DANI ROBERTSON / NOSEY HEAUX LIVE | #DaniRobertson | PL |
| Sept. 30, 2022 | **VIDEO [@]** | IT'S DUCKERY FRIDAY! "Quack Quack!" | @DaniRobertson | PL |
| Oct. 2, 2022 | **VIDEO [@]** | "CRACKING THE CODE" Part 2 | @DaniRobertson | PL |
| **Oct. 5, 2022** | **CEASE #2** | **Second written cease-and-desist notice** | **Written notice** | **WN** |
| Oct. 6, 2022 | VIDEO | NO THANKS! "I'll Wait" | #DaniRobertson | PL |
| Oct. 9, 2022 | **VIDEO [@]** | "Hello Mrs. Officer" The Tapes | @DaniRobertson | PL |
| Oct. 11, 2022 | **VIDEO [@]** | "THE POLICE CALL and BOGUS WELFARE CHECK" | @DaniRobertson | PL |
| Nov. 2, 2022 | **VIDEO [@]** | Oh SNAP! II "YouTube Community Guidelines Violation" | @DaniRobertson | PL |
| Dec. 4, 2022 | **VIDEO [@]** | TRUTHTELLERDANI MASKED IMPERSONATOR? | @TruthTellerDani | PL |
| Dec. 7, 2022 | **VIDEO [@]** | She Won't Be Found! DIRTY DELETE | @TruthTellerDani; @DaniRobertson | PL |
| Dec. 23, 2022 | VIDEO | MS. DAVIS "Go Fund Me gofundme?" | #TruthTellerDani | PL |
| **Jan. 31, 2023** | **CEASE #3** | **Third written cease-and-desist notice** | **Written notice** | **WN** |
| Apr. 6, 2023 | **VIDEO [@]** | YOUTUBE AIN'T YOUR DADDY "Or Your Momma Too" | @DaniRobertson in title/description | PL / Fig. A |
| Apr. 22, 2023 | **VIDEO [@]** | ALL IN THE FAMILY - Mystery Clue #14 | @DaniRobertson in title/description | PL / Fig. A |
| Jun. 25, 2023 | **VIDEO [@]** | @TruthTellerDani THIS NEEDS TO STOP! YouTube Community Guidelines | @TruthTellerDani | PL |
| Jul. 1, 2023 | **VIDEO [@]** | @DaniRobertson and Danielle E. Allen BOTH HAVE TIES TO INDIANA | @DaniRobertson | PL |
| Sept. 8, 2023 | **VIDEO [@]** | @DaniRobertson "CAUSE UNWINEWITHTEDDY GONNA FIND OUT" Pt. 1 | @DaniRobertson | PL |
| Oct. 13, 2023 | **VIDEO [@]** | @DaniRobertson VOICE CONFIRMED By Courtney Morris's Family Members | @DaniRobertson; #DaniRobertson; #TruthTellerDani | PL |
| Dec. 15, 2023 | **VIDEO [@]** | "I'M ABSOLUTELY POSITIVE @DaniRobertson Knows Who I Am" | @DaniRobertson in title/description | Fig. B |
| Dec. 17, 2023 | **VIDEO [@]** | How @DaniRobertson HIJACKED JaguarWright & DalladelphiaTVNetwork | @DaniRobertson in title/description | Fig. B |
| Dec. 19, 2023 | **VIDEO [@]** | COMPARE VOICE BOXES ... vs. @DaniRobertson | @DaniRobertson in title/description | Fig. B |
| Feb. 7, 2024 | **VIDEO [@]** | "DANI WE KNEW THE MUGSHOT WAS NOT HHTV" #Shorts | @DaniRobertson in description | Fig. A |
| **Apr. 24, 2024** | **CEASE #4** | **Fourth written notice; specifically objected to continued DForDanielle publications and direct tagging and demanded cessation** | **Written notice** | WN; see ECF No. 84, PageID.1256 |
| Apr. 30, 2024 | VIDEO | Mystery Clue #7 "THERE'S SOMETHING ABOUT THAT VOICE" | #DaniRobertson | PL |
| Jul. 8, 2024 | VIDEO | Jaguar Wright Sharrell's World "BLACK TEA SERVED HOT" AnalyzeThis | #DaniRobertson | PL |
| Aug. 25, 2024 | VIDEO | MessyMocha: Don't Blink "IT HAPPENED SO QUICKLY" AnalyzeThis | #DaniRobertson | PL |
| Sept. 4, 2024 | VIDEO | NightTalk: "I HEAR THE U.S. MARSHALS ARE COMING" AnalyzeThis | #DaniRobertson | PL |
| **Sept. 11, 2024** | **CEASE #5** | **Fifth written cease-and-desist notice** | **Written notice** | **WN** |
| Sept. 12, 2024 | VIDEO | Hey MOB! GET IN HERE | #DaniRobertson; #DaniMontanaTV | PL |
| Sept. 20, 2024 | **VIDEO [@]** | DEFLECTION PROJECTION WON'T STOP U.S. MARSHAL SERVICE | @DaniRobertson | PL / RTT |
| Sept. 20, 2024 | **VIDEO [@]** | SAY MY NAME THAT'S NOT MY NAME | @TruthTellerDani; #DaniMontana | RTT |
| Sept. 22, 2024 | **VIDEO [@]** | Diddy Drama: KIM'S LOST WORDS | @DaniRobertson; @TruthTellerDani | PL |
| Sept. 23, 2024 | **VIDEO [@]** | IT IS MESSY MONDAY RIGHT? | @DaniRobertson; @TruthTellerDani; @DaniMontanaTV | PL |
| Sept. 24, 2024 | **VIDEO [@]** | LOOK WHO'S COMPLAINING? | @DaniRobertson; @TruthTellerDani | PL / RTT |
| Sept. 27, 2024 | **VIDEO [@]** | YOU'VE BEEN CHECKED | @DaniRobertson in title; @TruthTellerDani | RTT |
| Sept. 30, 2024 | **VIDEO [@]** | Hey MOB! GET IN HERE | @TruthTellerDani; #DaniRobertson; #DaniMontana | RTT |